IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

_____

RUDOLPH McQUILKIN,

                Plaintiff,

                                    Civil Action No.
                                    9:08-CV-00975 (TJM/DEP)

        v.

CENTRAL NEW YORK PSYCHIATRIC
CENTER, J. TAYLOR, J. BERGGREN,
V. KOMARETH, K. SANGANI, DR.
HERNANDEZ, D. SAWYER, S. HANNA,
and G. BODROG,

                Defendants.

_____

APPEARANCES:                  OF COUNSEL:

FOR PLAINTIFF:

RUDOLPH MCQUILKIN, *Pro Se*
114-46 173rd Street
St. Albans Queens
New York, NY 11434

FOR DEFENDANTS CNYPC, J. TAYLOR,
J. BERGGREN, V. KOMARETH, DR.
HERNANDEZ, D. SAWYER, S. HANNA,
and G. BODROG:

HON. ANDREW M. CUOMO        KRISTA A. ROCK, ESQ.
Attorney General of               Assistant Attorney General
the State of New York
The Capitol

Albany, NY 12224
<u>FOR DEFENDANT K. SANGANI</u>:

O'CONNOR, O'CONNOR LAW FIRM     PETER JOSLIN, JR., ESQ.
LAW FIRM - Albany Office
20 Corporate Woods Blvd.
Albany, NY 12211

DAVID E. PEEBLES
U.S. MAGISTRATE JUDGE

<u>REPORT AND RECOMMENDATION</u>

Plaintiff Rudolph McQuilkin, a former New York State prison

inmate who is proceeding *pro se* and *in forma pauperis*, has

commenced this action pursuant to 42 U.S.C. § 1983 against the

Central New York Psychiatric Center ("CNYPC" or "Center") and

several Center employees as well as the superintendent of one of the

correctional facilities in which he was previously housed, claiming that

his civil rights were violated during the course of his confinement.  In

his complaint, as amended, plaintiff alleges that he was civilly

committed to CNYPC against his will and forcibly medicated with

various psychiatric drugs in retaliation for having served a "notice of

summons" on the superintendent of the Gouverneur Correctional

Facility ("Gouverneur"), without his consent and in violation of his

religious beliefs.  Plaintiff further complains of the seizure and

destruction of certain of his personal property.  Plaintiff's complaint

seeks injunctive relief, elimination of any reference of being a mental

health patient from his institutional record, and an award of both

compensatory and punitive damages.

In response to plaintiff's complaint one of the defendants, Dr.

Kishor R. Sangani, a psychiatrist, has moved for dismissal alleging

that plaintiff's complaint fails to assert an actionable claim against him.

Those remaining defendants who have been served and appeared in

the action have moved for summary judgment on a variety of grounds,

both procedural and substantive including, *inter alia*, on the basis of

qualified immunity.

Having carefully considered defendants' motions, which

McQuilkin has not opposed, I recommend that they be granted and

that the second amended complaint be dismissed in its entirety.

I.    BACKGROUND[1]

At the times relevant to the claims set forth in his second

amended complaint, plaintiff was a prison inmate entrusted to the care

---

[1]      In light of the procedural posture of the case the following recitation
is derived from the record now before the court with all inferences drawn and
ambiguities resolved in favor of the plaintiff.  *Terry v. Ashcroft*, 336 F.3d 128, 137
(2d Cir. 2003).

and custody of the New York State Department of Correctional Services ("DOCS"), and designated to various DOCS prisons as well as the CNYPC, a facility located in Marcy, New York and operated under the authority of the New York State Office of Mental Health ("OMH").  *See generally* Second Amended Complaint.  Plaintiff was released from DOCS custody on October 27, 2009.  Waldron Aff. (Dkt. No. 66) ¶ 35 and Exh. A.[2]

Plaintiff was admitted into the CNYPC from the nearby Mid-State Correctional Facility ("Mid-State"), on September 17, 2007, and was diagnosed with schizophrenia, paranoid type.[3]  *Id.* at ¶ 6, Exh. B. at P2;  Defendants' Rule 7.1(a)(3) Statement ¶ 2.  Paranoid schizophrenia can cause a variety of symptoms, the most prevalent of which are delusions, auditory hallucinations and disorganized thinking. Waldron Aff. (Dkt. No. 66) ¶ 7.

_____

[2]    Because defendants' summary judgment moving papers were filed traditionally, they do not appear on the docket but collectively have been assigned docket number 66.

[3]    The 2007 admission to the Center was plaintiff's second, the first having occurred in 1998.  Waldron Aff. (Dkt. No. 66) ¶¶ 8-9.  During the first admission,  which lasted twenty-seven days, plaintiff was diagnosed with schizophrenia paranoid type.  *Id.*  The notes of that admission reflect that while at Mid-State plaintiff refused to take psychotropic medications.  *Id.* at ¶¶ 8-9 and Exh. B at P289.

Individuals who suffer from this type of schizophrenia frequently suffer from feelings of being persecuted or plotted against and may have grandiose delusions that are associated with protecting themselves from the perceived plot.  Waldron Aff. (Dkt. No. 66) ¶ 7.  According to his referral from Mid-State, on or about September 17, 2007, plaintiff "started to become irritable and paranoid.  He displayed a thought disorder and believed that there was a plan by the mental health staff to murder him.  He was refusing medication and mental health treatment."   Waldron Aff. (Dkt. No. 66) Exh. B at P289.

 Upon his arrival at the CNYPC, plaintiff consistently refused his medications.  *Id.* at P291.  Plaintiff explained the basis for that refusal by stating to CNYPC personnel "these are heterogeneous medications, work as isotopes, you know, like small nuclear bombs[,]", adding "I am a different organism, therefore under no circumstances I would take them." *Id.*

On or about October 1, 2007, Donald Sawyer, Ph. D., the Executive Director of the Center, petitioned the New York State Supreme Court, Oneida County, for an order committing plaintiff to the CNYPC for a period not to exceed six months.  *Id.* at P271-272.

Following a hearing regarding the petition held on October 11, 2007,

Supreme Court Justice Anthony F. Shaheen issued a ruling, over

plaintiff's objection, in which he determined that McQuilkin was

mentally ill and a proper subject for custody and continued treatment in

the CNYPC within the meaning of New York Mental Hygiene Law

("MHL") § 9.27, and therefore approved the requested retention

period.[4]  Waldron Aff. (Dkt. No. 66) Exh. B. at P263.

Based on plaintiff's refusal to consent to the administration of

medication while at the Center, and following an evaluation of his

condition by CNYPC staff, on or about November 1, 2007, Sawyer

once again petitioned the state courts, this time for an order

authorizing OMH employees to forcibly administer psychiatric

medication to McQuilkin.  Waldron Aff. (Dkt. No. 66) ¶ 17 and Exh. B

at P276-96.  That involuntary treatment petition was granted on

November 21, 2007, following a hearing and despite McQuilkin's

objection, based upon a finding that plaintiff lacked the capacity to

---

[4]      Pursuant to the MHL, the director of a hospital may receive and
retain therein as a patient any person alleged to be mentally ill and in need of
involuntary care and treatment upon the certificates of two examining physicians,
accompanied by an application for the admission of such a person.  N.Y. MENTAL
HYG. § 9.27(a).  The examination may be conducted jointly but each examining
physician must execute a separate certificate.  *Id.*

make a reasoned decision regarding his own treatment and that the

administration of medication to the plaintiff was in his best interest.  *Id.*

at ¶¶ 19-20 and Exh. B at P318-19.  The order granting the petition

authorized the administration of psychiatric drugs "during the

concurrent retention of Rudolph McQuilkin, and any extension thereof

at [CNYPC] as well as for a period not to exceed twelve (12) months

after the patient is discharged from the [CNYPC] to a psychiatric

satellite unit operated by [OMH] at a New York State Correctional

facility..."  *Id*. at Exh. B and P319.

Plaintiff was discharged from the CNYPC and transferred into

the Clinton Correctional Facility ("Clinton") on January 4, 2008,

commencing the twelve-month period of court-authorized forced

medication.  Waldron Aff. (Dkt. No. 66) ¶ 21.  During that time, plaintiff

was injected with fifty milligrams of Haldol, an antipsychotic

medication, once a month.  *Id.* at ¶¶ 21-22 and Exh. B. at P320-23.

From the expiration of the court-ordered psychiatric treatment

period on January 4, 2009 until April of 2009, plaintiff refused to be

medicated, which caused him to become symptomatic.  Waldron Aff.

(Dkt. No. 66) ¶ 23 and Exh. B. at P327-30.  On April 8, 2009, Dr.

Sohail Gillani, a psychiatrist, requested that McQuilkin be taken to the

Clinton Mental Health Satellite Unit ("Satellite Unit") for evaluation as

to whether an involuntary psychiatric hospitalization in the CNYPC,

based upon the recommendation of two physicians, should be sought

and with the intent of seeking another court order permitting

involuntary psychiatric medication.  Waldron Aff. (Dkt. No. 66)  ¶ 24

and Exh. B at P331-32.  This request was based on plaintiff's ongoing

refusal to take psychiatric medication and his repeated history of

subsequent psychiatric decompensation, as well as his refusal to

attend therapy sessions during which his mental status could be

clinically monitored.  *Id.*

As a result of Dr. Gillani's request, plaintiff was escorted from his

cell to the Mental Health Satellite unit at Clinton, where he was

assigned to a residential crisis treatment program cell.  *Id.* at ¶ 26.

Once there, McQuilkin showed poor insight and judgment, continued

to display symptoms of paranoia, and persisted in his denial of any

mental health issues.  *Id.* at ¶ 27.  Plaintiff remained in the satellite unit

for less than twenty-four hours, however, based upon his agreement to

take his prescribed psychiatric medication (Haldol 50 mg).  *Id.* at ¶ 28.

During the period that Haldol was administered, plaintiff complained of side effects including a rash.[5]  Waldron Aff. (Dkt. No. 66) ¶ 32.  The use of Haldol to address plaintiff's condition was ultimately discontinued, and Risperal was added to his prescription drug regimen on or about July 17, 2009.  *Id.* at ¶ 33 and Exh. B at P336.  Since then, plaintiff has not registered any further medical complaints, and reports that he "like[s] the Risperdal better."  *Id.* at ¶ 34.

II.    PROCEDURAL HISTORY

Plaintiff commenced this action on September 22, 2008, and has since twice amended his complaint.  Dkt. Nos. 1, 8, and 35.  As defendants, plaintiff's second amended complaint names the CNYPC; J. Taylor, the Superintendent of the Gouverneur Correctional Facility; CNYPC psychiatrists J. Berggren, V. Komareth, K. Sangani, S. Hanna, and Dr. Hernandez; D. Sawyer, the Director of the CNYPC; and G. Bodrog, whose position is not disclosed in plaintiff's complaint but who appears to be a physician involved in the October, 2007 petition to

---

[5]    According to defendants' submissions, this is not a side effect ordinarily associated with Haldol.  Waldron Aff. (Dkt. No. 66) ¶ 32.

9

have him involuntarily committed.  Dkt. No. 35; *see* Waldron Aff. (Dkt. No. 66) Exh. B at P287-88.  Plaintiff's second amended complaint contains three designated causes of action requesting various forms of relief, including 1) an order prohibiting defendants from forcing McQuilkin to take psychiatric medications against his free will; 2) total expungement of any reference of being a mental health patient from plaintiff's institutional record; and 3) damages for wanton disregard of his Eighth Amendment rights as well as directing that defendants not retaliate against him for filing this proceeding.  Dkt. No. 35.

In response all of the defendants, with the exception of Dr. Sangani, have answered generally denying the allegations of plaintiff's complaint and asserting eighteen separate affirmative defenses.  Dkt. No. 38.  For his part, Dr. Sangani has moved pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure seeking the dismissal of plaintiff's claims against him for failure to state a claim upon which relief may be granted.  Dkt. No. 56.

On January 28, 2010, following the completion of discovery, the defendants other than Dr. Sangani moved for summary judgment dismissing plaintiff's complaint upon a variety of grounds.  Dkt. No. 66.

In their motion, those defendants argue that 1) all claims against the CNYPC and against the other defendants in their official capacities should be dismissed as barred by the Eleventh Amendment; 2) plaintiff's first cause of action, seeking injunctive relief, should be dismissed as moot in light of his release from DOCS custody; 3) plaintiff's claims are procedurally barred based upon his failure to exhaust administrative remedies with respect the majority of his claims; 4) plaintiff's claims surrounding his interfacility transfer lack merit since inmates do not have a constitutional right to be incarcerated at a correctional facility of their choice; 5) plaintiff's due process claim concerning the alleged seizure and destruction of his personal property is not constitutionally cognizable; 6) plaintiff is not entitled to expungement of his psychiatric records; 7)  plaintiff's allegations of wrongdoing are unduly conclusory and therefore subject to dismissal; 8) plaintiff's challenges to his OMH confinement are barred by *Heck v. Humphrey* and the *Rooker-Feldman* doctrine[6]; 9) defendants are entitled to qualified immunity; and 10)  plaintiff's claims

---

[6]        *Heck v. Humphrey*, 512 U.S. 477, 114 S. Ct. 2364 (1994); *District of Columbia v. Feldman*, 460 U.S. 462, 103 S. Ct. 1303 (1983); *Rooker v. Fidelity Trust Co.,* 263 U.S. 413, 44 S. Ct. 149 (1923).

surrounding disagreement with his medical care are not actionable under the Eighth Amendment.

Despite expiration of the time for responding, plaintiff has failed to offer any submissions in opposition to either of the pending motions, which are now ripe for determination and have been referred to me for the issuance of a report and recommendation, pursuant to 28 U.S.C. § 636(b)(1)(B) and Northern District of New York Local Rule 72.3(c). *See also* Fed. R. Civ. P. 72(b).

III.   DISCUSSION

    A.   Standards of Review

        1.   Motion to Dismiss

A motion to dismiss a complaint, brought pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, calls upon a court to gauge the facial sufficiency of that pleading, utilizing as a backdrop a pleading standard which, though unexacting in its requirements, "demands more than an unadorned, the-defendant-unlawfully-harmed me accusation" in order to withstand scrutiny. *Ashcroft v. Iqbal*, ___ U.S. ___, ___, 129 S. Ct. 1937, 1949 (2009) (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 554, 555, 127 S. Ct. 1955, (2007)).  Rule 8(a)(2)

of the Federal Rules of Civil Procedure requires that a complaint contain "a short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  *Id.*  While modest in its requirement, that rule commands that a complaint contain more than mere legal conclusions; "[w]hile legal conclusions can provide the framework of a complaint, they must be supported by factual allegations."  *Ashcroft,* 129 S.Ct. at 1950.

To withstand a motion to dismiss, a complaint must plead sufficient facts which, when accepted as true, state a claim which is plausible on its face.  *Ruotolo v. City of New York*, 514 F.3d 184, 188 (2d Cir. 2008) (citing *Twombly*, 550 U.S. at 570, 127 S. Ct. at 1974).  As the Second Circuit has observed, "[w]hile *Twombly* does not require heightened fact pleading of specifics, it does require enough facts to 'nudge [plaintiffs'] claims across the line from conceivable to plausible.'" *In re Elevator Antitrust Litig.*, 502 F.3d 47, 50 (2d Cir. 2007) (quoting *Twombly*, 550 U.S. at 570, 127 S. Ct. at 1974).

In deciding a Rule 12(b)(6) dismissal motion, the court must accept the material facts alleged in the complaint as true and draw all inferences in favor of the non-moving party.  *Cooper v. Pate*, 378 U.S.

546, 546, 84 S. Ct. 1723, 1734 (1964); *Miller v. Wolpoff & Abramson, LLP*, 321 F.3d 292, 300 (2d Cir. 2003), *cert. denied*, 540 U.S. 823, 124 S. Ct. 153 (2003); *Burke v. Gregory*, 356 F. Supp.2d 179, 182 (N.D.N.Y. 2005) (Kahn, J.).  The burden undertaken by a party requesting dismissal of a complaint under Rule 12(b)(6) is substantial; the question presented by such a motion is not whether the plaintiff is likely ultimately to prevail, "'but whether the claimant is entitled to offer evidence to support the claims.'" *Log On America, Inc. v. Promethean Asset Mgmt. L.L.C.*, 223 F. Supp.2d 435, 441 (S.D.N.Y. 2001) (quoting *Gant v. Wallingford Bd. of Educ.*, 69 F.3d 669, 673 (2d Cir. 1995)) (citations and quotations omitted).

## 2.   Summary Judgment Motions

Summary judgment motions are governed by Rule 56 of the Federal Rules of Civil Procedure.  Under that provision, summary judgment is warranted when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 2552 (1986); *Anderson*

*v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 106 S. Ct. 2505, 2509-10

(1986); *Security Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.*,

391 F.3d 77, 82-83 (2d Cir. 2004).  A fact is "material", for purposes of

this inquiry, if it "might affect the outcome of the suit under the

governing law."  *Anderson*, 477 U.S. at 248, 106 S. Ct. at 2510; *see*

*also Jeffreys v. City of New York*, 426 F.3d 549, 553 (2d Cir. 2005)

(citing Anderson).  A material fact is genuinely in dispute "if the

evidence is such that a reasonable jury could return a verdict for the

nonmoving party."  *Anderson*, 477 U.S. at 248, 106 S. Ct. at 2510.

A party moving for summary judgment bears an initial burden of

demonstrating that there is no genuine dispute of material fact to be

decided with respect to any essential element of the claim in issue; the

failure to meet this burden warrants denial of the motion.  *Anderson*,

477 U.S. at 250 n.4, 106 S. Ct. at 2511 n.4; *Security Ins.*, 391 F.3d at

83.  In the event this initial burden is met, the opposing party must

show, through affidavits or otherwise, that there is a material issue of

fact for trial.  Fed. R. Civ. P. 56(e); *Celotex*, 477 U.S. at 324, 106 S.

Ct. at 2553; *Anderson*, 477 U.S. at 250, 106 S. Ct. at 2511.  Though

pro se plaintiffs are entitled to special latitude when defending against

15

summary judgment motions, they must establish more than mere

"metaphysical doubt as to the material facts."  *Matsushita Elec. Indus.*

*Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S. Ct. 1348, 1356

(1986); *but see Vital v. Interfaith Med. Ctr.*, 168 F.3d 615, 620-21 (2d

Cir. 1999) (noting obligation of court to consider whether pro se

plaintiff understood nature of summary judgment process).

When deciding a summary judgment motion, a court must

resolve any ambiguities, and draw all inferences from the facts, in a

light most favorable to the nonmoving party.  *Jeffreys*, 426 F.3d at 553;

*Wright v. Coughlin*, 132 F.3d 133, 137-38 (2d Cir. 1998).  The entry of

summary judgment is warranted only in the event of a finding that no

reasonable trier of fact could rule in favor of the non-moving party.

*See Building Trades Employers' Educ. Assn v. McGowan*, 311 F.3d

501, 507-08 (2d Cir. 2002) (citation omitted); see also Anderson, 477

U.S. at 250, 106 S. Ct. at 2511 (summary judgment is appropriate only

when "there can be but one reasonable conclusion as to the verdict").

B.    Plaintiff's Failure to Oppose Defendants' Summary
      Judgment Motion

Before turning to the merits of plaintiff's claims, a threshold issue

to be addressed is the legal significance, if any, of his failure to oppose

defendants' motions, and specifically whether that failure automatically

entitles defendants to the relief sought.

This court's rules provide that

[w]here a properly filed motion is unopposed and the Court
determines that the moving party has met its burden to
demonstrate entitlement to the relief requested therein, the
non-moving party's failure to file or serve any papers as
this Rule requires shall be deemed as consent to the
granting or denial of the motion, as the case may be,
unless good cause is shown.

N.D.N.Y.L.R. 7.1(b)(3).  Undeniably, *pro se* plaintiffs are entitled to

some measure of forbearance when defending against dismissal or

summary judgment motions.  *See Jemzura v. Public Serv. Comm'n*,

961 F. Supp. 406, 415 (N.D.N.Y. 1997) (McAvoy, C.J.).  The deference

owed to *pro se* litigants, however, does not extend to relieving them of

the consequences of Local Rule 7.1(b)(3).  *Robinson v. Delgado*, No.

96-CV-169, 1998 WL 278264, at *2 (N.D.N.Y. May 22, 1998) (Pooler,

J. & Hurd, M.J.)[7]; *Cotto v. Senkowski*, No. 95-CV-1733, 1997 WL

665551, at *1 (N.D.N.Y. Oct. 23, 1997) (Pooler, J. & Hurd, M.J.);

*Wilmer v. Torian*, 980 F. Supp.106, 106-07 (N.D.N.Y. 1997) (Pooler, J.

& Hurd, M.J.).  Accordingly, absent a showing of good cause

---

[7]     Copies of all unreported decisions cited in this document have been
appended for the convenience of the *pro se* plaintiff.

defendants' unopposed motions should be granted, if determined to be facially meritorious.  *See Allen v. Comprehensive Analytical Group, Inc.*, 140 F. Supp.2d 229, 231-32 (N.D.N.Y. 2000) (Scullin, C.J.); *Leach v. Dufrain*, 103 F. Supp.2d 542, 545-46 (N.D.N.Y. 2000) (Kahn, J.).

It should also be noted that the plaintiff's failure to properly oppose the pending summary judgment motion is not without further consequences.  By failing to submit papers in opposition to their motion, plaintiff has left the facts set forth in defendants' Local Rule 7.1(a)(3) Statement unchallenged, thus permitting the court to deem facts set forth in the defendants' statement of material facts not in dispute to have been admitted based upon his failure to properly respond to that statement.   *See Elgamil v. Syracuse Univ.*, No. 99-CV-611, 2000 WL 1264122, at *1 (N.D.N.Y. Aug. 22, 2000) (McCurn, S.J.) (listing cases); *see also Monahan v. New York City Dept of Corrs.*, 214 F.3d 275, 292 (2d Cir. 2000) (discussing district courts' discretion to adopt local rules like 7.1(a)(3)).

Based upon plaintiff's failure to oppose defendants' summary judgment motion, I recommend that the court review the motion for

18

facial sufficiency, accepting defendants' assertions of facts as set forth in their Local Rule 7.1(a)(3) Statement as uncontroverted, and that the motion be granted if determined to be facially meritorious.[8]

### C.    Eleventh Amendment Immunity

At the outset, defendants' summary judgment motion seeks dismissal of plaintiff's claims against the CNYPC as well as the individual defendants, to the extent that they are sued in their official capacities, asserting their entitlement to Eleventh Amendment immunity.

As defendants correctly argue, "it is beyond dispute that the State of New York and its agencies have never consented to be sued in federal court." *Dube v. State Univ. of N.Y.*, 900 F.2d 587, 594-95 (2d Cir. 1990), *cert. denied*, 501 U.S. 1211 (1991) .[9]  "The law is clear

---

[8]    I note that defendants' notice of motion contains the required notice to plaintiff of the consequences of his failure to respond to the summary judgment motion.  Dkt. No. 66; *see* N.D.N.Y.L.R. 56.2.

[9]    "On the other hand, a state official acting in his [or her] official capacity may be sued in a federal forum to enjoin conduct that violates the federal Constitution, notwithstanding the Eleventh Amendment bar.  *Id.* at 595 (citing *Papasan v. Allain*, 478 U.S. 265, 276-77, 105 S. Ct. 2932, 2939-40 (1986)).  Insofar as plaintiff seeks injunctive relief, his claims against the CNYPC and the individual defendants in their official capacities are not barred by the Eleventh Amendment.  As will be seen, however, plaintiff's request for injunctive relief is nonetheless moot in light of his release from prison.  *See* pp. 21 - 23, *post.*

19

that the state, and state agencies..., are immune from prisoner § 1983

suits because of their Eleventh Amendment sovereign immunity."

*Jackson v. Johnson*, 985 F. Supp. 422, 426 (S.D.N.Y. 1997).

The Eleventh Amendment protects a state against suits brought

in federal court by citizens of that state, regardless of the nature of the

relief sought.  *Alabama v. Pugh*, 438 U.S. 781, 782, 98 S. Ct. 3057,

3057-58 (1978).  This absolute immunity which states enjoy under the

Eleventh Amendment extends to both state agencies and state

officials sued in their official capacities, when the essence of the claim

involved is one against a state as the real party in interest.[10]  *Richards*

*v. State of New York Appellate Division, Second Dep't*, 597 F. Supp.

689, 691 (E.D.N.Y. 1984), (citing *Pugh* and *Cory v. White*, 457 U.S.

85, 89-91 102 S. Ct. 2325, 2328-2329 (1982)).  To the extent that a

state official is sued for damages in his or her official capacity the

official is entitled to invoke the Eleventh Amendment immunity

---

[10]     In a broader sense, this portion of defendants' motion implicates the sovereign immunity enjoyed by the State.  As the Supreme Court has reaffirmed relatively recently, the sovereign immunity enjoyed by the states is deeply rooted, having been recognized in this country even prior to ratification of the Constitution, and is neither dependent upon nor defined by the Eleventh Amendment.  *Northern Ins. Co. of New York v. Chatham County*, 547 U.S. 189, 193, 126 S. Ct. 1689, 1693 (2006).

belonging to the state.[11]  *Kentucky v. Graham*, 473 U.S. 159, 166-67,

105 S. Ct. 3099, 3105 (1985); *Hafer*, 502 U.S. at 25, 112 S. Ct. at 361.

Because plaintiff's section 1983 claims against the CNYPC are in

reality claims against the State of New York, they typify those against

which the Eleventh Amendment protects, and are therefore subject to

dismissal.  *Daisernia v. State of New York*, 582 F. Supp. 792, 798-99

(N.D.N.Y. 1984) (McCurn, J.).  Additionally, to the extent that plaintiff

asserts claims for damages against the defendants in their official

capacities, those claims are properly regarded as claims against the

state, and are likewise barred by the Eleventh Amendment.  *Kentucky

v. Graham*, 473 U.S. 159, 169, 105 S. Ct. 3099, 3107 (1985); *Ying

Jing Gan v. City of N.Y.*, 996 F.2d 522, 529 (2d Cir. 1993).

Accordingly, I recommend the entry of summary judgment dismissing

plaintiff's claims for damages against the CNYPC and the individual

defendants in their official capacities.

D.    Mootness

In their motion, defendants next seek summary judgment with

---

[11]    By contrast, the Eleventh Amendment does not establish a barrier
against suits seeking to impose individual or personal liability on state officials
under section 1983.  *See  Hafer v. Melo*, 502 U.S. 21, 25, 112 S. Ct. 358, 361
(1991).

respect to plaintiff's first cause of action, in which he seeks "[a]n order prohibiting defendants from forcing plaintiff to take psychiatric medications against his free will."  Second Amended Complaint (Dkt. No. 35) p. 9. In support of their request, defendant argues that because the plaintiff is no longer in state custody, that claim is moot.

"The mootness doctrine is derived from Article III of the Constitution, which provides that federal courts may decide only live cases or controversies.  'This case-or-controversy requirement subsists through all stages of federal judicial proceedings, trial and appellate.'"  *Van Wie v. Pataki*, 267 F.3d 109, 113 (2d Cir. 2001) (citations omitted).  A federal court has no authority to decide an issue when the relief sought can no longer be given, or is no longer needed. *Martin-Trigona v. Shiff*, 702 F.2d 380, 386 (2d Cir. 1983).  The courts have recognized a narrow exception to this rule for repetitive conduct, although only in exceptional circumstances.  *City of Los Angeles v. Lyons*, 461 U.S. 95, 109, 103 S. Ct. 1660, 1669 (1983).  The capable of repetition doctrine applies when the conduct at issue is of insufficient duration to permit it to be fully litigated and is reasonably likely to reoccur.  *Spencer v. Kemna*, 523 U.S. 1, 17, 118 S. Ct. 978,

988 (1998) (citing and quoting *Lyons*).  This limited exception does not appear to be potentially applicable in this instance.

The record now before the court reflects that plaintiff is no longer in state custody.  *See* Dkt. No. 57;  Waldron Aff. (Dkt. No. 66) Exh. A. To the extent McQuilkin seeks injunctive relief preventing the defendants from forcing him to be medicated against his will, they are no longer involved with him, and the claim is now moot. I therefore recommend dismissal of plaintiff's first cause of action on this basis.

E.    Exhaustion

In their motion defendants seek dismissal of certain of plaintiff's claims on the basis of his failure to exhaust available administrative remedies before commencing suit.

The Prison Litigation Reform Act of 1996 ("PLRA"), Pub. L. No. 104-134, 110 Stat. 1321 (1996), which imposes several restrictions on the ability of prisoners to maintain federal civil rights actions, expressly requires that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted."  42

U.S.C. § 1997e(a); *see Woodford v. Ngo,* 548 U.S. 81, 84, 126 S. Ct. 2378, 2382 (2006); *Hargrove v. Riley,* No. CV-04-4587, 2007 WL 389003, at *5-6 (E.D.N.Y. Jan. 31, 2007).  "[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong."  *Porter v. Nussle*, 534 U.S. 516, 532, 122 S. Ct. 983, 992 (2002) (citation omitted).

The failure of a prisoner to satisfy the PLRA's exhaustion requirement, though not jurisdictional, gives rise to a defense which may affirmatively be raised by a defendant in response to an inmate suit.  *Jones v. Block*, 549 U.S. 199*, 212,* 127 S. Ct. 910, 919 (2007). In the event a defendant named in such an action establishes that the inmate plaintiff failed properly to exhaust available remedies prior to commencing the action, his or her complaint is subject to dismissal. *See Pettus v. McCoy*, No. 04-CV-0471, 2006 WL 2639369, at *1 (N.D.N.Y. Sept. 13, 2006) (McAvoy, J.); *see also Woodford*, 548 U.S. at 94-95, 126 S. Ct. at 2387-88 (holding that the PLRA requires "proper exhaustion" of available remedies).  "Proper exhaustion" requires a plaintiff to procedurally exhaust his or her claims by

"compl[ying] with the system's critical procedural rules."  *Woodford*,

548 U.S. at 95, 126 S. Ct. at 2388; *see also Macias v. Zenk*, 495 F.3d

37, 43 (2d Cir. 2007) (citing *Woodford*).[12]

New York prison inmates are subject to an Inmate Grievance

Program ("IGP") established by the DOCS and recognized as an

"available" remedy for purposes of the PLRA.  *See Mingues v. Nelson*,

No. 96 CV 5396, 2004 WL 324898, at *4 (S.D.N.Y. Feb. 20, 2004)

(citing *Mojias v. Johnson*, 351 F.3d 606 (2d Cir. 2003) and *Snider v.*

*Melindez*, 199 F.3d 108, 112-13 (2d Cir.1999)).  The IGP consists of a

three-step review process.  First, a written grievance is submitted to

the IGRC within twenty-one days of the incident.   7 N.Y.C.R.R. §

701.5(a).  The IGRC, which is comprised of inmates and facility

employees, then issues a determination regarding the grievance.  *Id.*

§§ 701.4(b), 701.5(b).  If an appeal is filed, the superintendent of the

facility next reviews the IGRC's determination and issues a decision.

*Id*. § 701.5(c).  The third level of the process affords the inmate the

---

[12]     While placing prison officials on notice of a grievance through less
formal channels may constitute claim exhaustion "in a substantive sense", an
inmate plaintiff nonetheless must meet the procedural requirement of exhausting
his or her available administrative remedies within the appropriate grievance
construct in order to satisfy the PLRA.  *Macias*, 495 F.3d at 43 (quoting *Johnson v.*
*Testman*, 380 F.3d 691, 697-98 (2d Cir. 2004) (emphasis omitted).

right to appeal the superintendent's ruling to the CORC which makes the final administrative decision.  *Id.* § 701.5(d).  Ordinarily, absent the finding of a basis to excuse non-compliance with this prescribed process, only upon exhaustion of these three levels of review may a prisoner seek relief pursuant to section 1983 in a federal court.  *Reyes v. Punzal*, 206 F. Supp.2d 431, 432 (W.D.N.Y. 2002) (citing, *inter alia*, *Sulton v. Greiner*, No. 00 Civ. 0727, 2000 WL 1809284, at *3 (S.D.N.Y. Dec. 11, 2000)).

In support of their exhaustion argument, defendants submit a declaration given by Karen Bellamy, the Director of the IGP, reflecting that from a review of records maintained by the CORC it appears that only one grievance filed by the plaintiff, grievance number CL 57139-08, relating to missing personal property, was processed through to completion under the IGP.  *See* Bellamy Aff. (Dkt. No. 66) ¶ 10.  This, they assert, requires dismissal of all of plaintiff's remaining claim as unexhausted.

While McQuilkin does not appear to have filed grievances related to the other matters at issue in this case, including principally his treatment while at the CNYPC, and to have processed those

26

grievances through to completion under the IGP, he did take certain measures to complain of the treatment received while there.  At the suggestion of personnel employed at the Mental Hygiene Legal Services, with whom plaintiff communicated in writing concerning his plight on multiple occasions including in February of 2008, plaintiff McQuilkin sent letters on March 28, 2008, and again on June 27, 2008, to Dr. Jonathan Kaplan, the Clinical Director of the Mental Hygiene Psychiatric Center at Marcy, New York, to whom he had been referred.[13]  *See* Second Amendment Complaint (Dkt. No. 35) pp. 12-23, 26.  In those letters, plaintiff requested that Dr. Kaplan review his treatment plan in light of adverse effects from which he claimed to suffer as a result of the medication being administered.  *Id.* at pp. 12-13, 26.  In addition, McQuilkin forwarded a letter dated February 21, 2008, to "the psychiatrist" at Clinton, again complaining of being compelled to take the drugs and of their side effects, and also that he was not being properly monitored "due to insincere motives on the original action for the court order."  *See* Attachments to Second

---

[13]     The attachments to plaintiff's Second Amended Complaint (Dkt. No. 35) are not separately marked as exhibits, nor are the pages numbered.  The page numbers referred to herein as are reflected in the court's docket.

Amended Complaint (Dkt. No. 35) p. 31.

While confined at Clinton, plaintiff also filed an inmate grievance, dated April 1, 2008 and assigned grievance number CL-56924-08, complaining that he was being ordered to take psychiatric medication against his will, that he was experiencing adverse side effects from the medication, and requesting that the medication be discontinued. Attachments to Second Amended Complaint (Dkt. No. 15) p. 10.  In response to plaintiff's grievance, the IGRC advised McQuilkin that pursuant to DOCS Directive No. 4040,[14] the OMH, together with its employees, policies and procedures, are not within the jurisdiction of the DOCS inmate grievance program, and he was therefore directed to address the issue of psychiatric medication with Joanne Waldron, Satellite Unit Chief. *Id.* at p. 11.  Thus, in accordance with the DOCS Directive No. 4040, the matter was deemed closed, and there is no record of plaintiff having appealed this determination. *Id*.

On June 27, 2008, plaintiff wrote letters to Drs. Gillani and

---

[14]    DOCS Directive No. 4040 provides, in relevant part, that "[t]he IGRC may dismiss and close a grievance after a hearing if it determines, by majority vote (3 of 4), that . . . the grievant is seeking action with respect to any policy, regulation, rule or action of any agency not under the supervision of the Commissioner of Correctional Services (see section 701.3[f] of this Part)."  7 N.Y.C.R.R. § 701.5(b)(4)(i)(d).

Berggren complaining of the administration of psychiatric drugs,

claiming that he was being discriminated against and harassed by

certain corrections officers and nurses who administered his oral

medication, and requesting a meeting to discuss the possibility of

receiving all of his medication once a month by injection.  *See* Second

Amended Complaint (Dkt. No. 15) at pp. 24-25.  Plaintiff wrote a

second letter to Dr. Gillani on July 16, 2008,  voicing the same

complaint and again requesting that he be given all his court-ordered

drugs at the same time each month.  *Id.* at pp. 27-28.

Although the plaintiff was at all relevant times an inmate in the

primary care and custody of the DOCS, the conduct giving rise to his

claims occurred at the CNYPC, a facility operated by the OMH.  Based

upon that circumstance, it is arguable that plaintiff's claims are not

subject to the PLRA because they do not involve "prison life."  While

the court's research has not identified a case in this circuit squarely

addressing the issue, it appears that even though confined to the

CNYPC at the time in question, plaintiff would still qualify as a prisoner

subject to the requirements of the PLRA.  *See, e.g., Page v. Torrey*,

201 F.3d 1136, 1140 (9th Cir. 2000) ("[W]e hold that only individuals

who, at the time they seek to file their civil actions, are detained as a result of being accused of, convicted of, or sentenced for criminal offense are 'prisoners' within the definition of 42 U.S.C. § 1997e . . . ."); *Kalinowski v. Bond*, 358 F.3d 978, 979 (7th Cir.) ("As used in this section, the term 'prisoner' means any person incarcerated or detained at any facility who is accused of, convicted of, sentenced for, or adjudicated delinquent for, violations of criminal law or the terms and conditions of parole, [or] probation . . . .") (quoting 28 U.S.C. § 1915(h)), *cert. denied*, 542 U.S. 907, 124 S. Ct. 2843 (2004).  It would therefore appear that plaintiff's complaint includes a combination of claims relating to lost property, which were properly exhausted, and claims for which he failed to exhaust his administrative remedies, including those relating to his confinement to CNYPC and the forced administration of psychiatric drugs, as well as that relating to retaliation.[15]

    In a series of decisions rendered since enactment of the PLRA, the Second Circuit has crafted a three-part test for determining

---

[15]    Because defendants have not raised failure to exhaust administrative remedies with regard to plaintiff's claims that he was denied access to the courts and the right to practice his religion, I have not addressed exhaustion of these claims.

whether dismissal of an inmate's complaint is warranted for failure to satisfy the PLRA's exhaustion requirement. *Macias*, 495 F.3d 37 at 41; *see Hemphill v. New York*, 380 F.3d 680, 686 (2d Cir. 2004). The test for determining whether a claim has not been properly exhausted should nonetheless be considered under the Second Circuit's prescribed exhaustion rubric focuses upon whether special circumstances have been plausibly alleged which, if demonstrated, would justify excusing a plaintiff's failure to exhaust administrative remedies. *Hemphill*, 380 F.3d at 689; *see also Giano v. Goord*, 380 F.3d at 676-77; *Hargrove*, 2007 WL 389003, at *10. The circumstances potentially qualifying as "special" under this prong of the test can include where a plaintiff's reasonable interpretation of applicable regulations regarding the grievance process differs from that of prison officials and leads him or her to conclude that the dispute is not grievable. *Giano*, 380 F.3d at 676-77; *see also Hargrove*, 2007 WL 389003, at *10 (quoting and citing *Giano*).

Undeniably, plaintiff appears not to have pursued to completion a grievance regarding his treatment at the CNYPC. It should be noted, however, that "DOCS Directive 4040 states, *inter alia*, that '[t]he

individual decisions or dispositions of any current or subsequent program or procedure having a written appeal mechanism which extends review to outside the facility shall be considered non-grievable.'" *Giano*, 380 F.3d at 678.  Indeed, as was previously noted, the IGRC response to plaintiff's grievance number CL 56924-08 requesting discontinuation of his medication specifically stated, "OMH, it's [sic] employees and policies and procedures are not with in [sic] the jurisdiction of the DOCS Inmate grievance program."  *See* Attachments to Second Amended Compl. (Dkt. No. 35) p. 11.  Given this response, it seems somewhat disingenuous for defendants to now contend that plaintiff failed to fully exhaust his administrative remedies as to the claims relating to his psychiatric treatment.  It is true that, strictly construed, plaintiff's grievance number CL 56924-08 does not specifically complain of his CNYPC confinement; nonetheless, after having received the foregoing response from the IGRC, and being specifically advised that the his grievance complaining of being forced to take the drugs was being "closed and dismissed", it certainly would have been reasonable for plaintiff to conclude that he could not grieve either claim, and likewise that an appeal of the denial of the medication

grievance would be rejected.

It is also worth noting that the IGRC directed the plaintiff to the OMH, and that both before and after he was notified that his grievance was closed and dismissed, he sent numerous letters to the Clinical Director of CNYPC, both the Director and Deputy Director of Mental Hygiene Legal Services, and Drs. Gillani and Berggren complaining of his psychiatric treatment.   In each instance, Mental Hygiene Legal Services referred plaintiff to the physicians and ultimately advised that they could provide no further assistance; McQuilkin's letters to the doctors received no responses at all.

In view of the foregoing, it appears that, at a minimum, issues of fact exist as to whether sufficient special circumstances are present to excuse plaintiff's failure to exhaust claims relating to his psychiatric treatment.  For the going reasons, I conclude that the defendants' motion for summary judgment dismissing the plaintiff's unexhausted claims regarding his confinement in the CNYPC and involuntarily administration of psychiatric drugs against the plaintiff's wishes will be denied.

F.    <u>Confinement At Clinton</u>

Although not identified as a discrete cause of action, plaintiff's complaint alleges that he was "transported to the Clinton Correctional Facility against his free will and adamant refusal."  Second Amended Compl. (Dkt. No. 35) ¶  3.  To the extent that plaintiff attempts to premise his section 1983 claim in part upon this prison transfer, defendants seek dismissal of that claim as failing to allege a constitutional violation.

It is well-established that convicted prisoners have no right to choose the prison they are housed in.  *Montanye v. Haymes*, 427 U.S. 236, 243, 96 S. Ct. 2543, 2547 (1976).  Prison authorities are entrusted with unfettered discretion to transfer prisoners from one institution to another.  *Pugliese v. Nelson*, 617 F.2d 916, 922-23 (2d Cir. 1980).

In view of the foregoing, summary judgment in favor of the defendants on plaintiff's apparent claim of violation of his constitutional rights based upon his alleged involuntarily transfer to Clinton is appropriate.

G.     Due Process Claim Based on Destruction of Personal Property

Although not alleged as a distinct cause of action, in his second

34

amended complaint plaintiff appears to claim that all of his legal work and documentation – five draft bags altogether – were seized and allegedly destroyed by employees at the Gouverneur Correctional Facility ("Gouverneur").  Second Amended Compl. (Dkt. No. 35) ¶ 2. Defendants contend that this claim also should be dismissed as failing to state a constitutionally cognizable cause of action.

Addressing inmate claims relating to stolen or lost property, the Supreme Court has held that even intentional destruction of prisoner's property may not be the basis for constitutional claims if sufficient post deprivation remedies are available to address the claim.  *Hudson v. Palmer,* 468 U.S. 517, 531, 104 S. Ct. 3194, 3202 (1984) (citing *Parratt v. Taylor*, 451 U.S. 527, 541, 101 S. Ct. 1908, 1916 (1981)). As long as a meaningful post deprivation remedy is provided, the due process requirement is met and the Fourteenth Amendment is satisfied*.  Howard v. Leonardo*, 845 F. Supp. 943, 947 (N.D.N.Y. 1994) (citing *Paratt*, 451 U.S. at 540, 101 S. Ct. at 1916).  With regard to claims of lost or stolen property, the Second Circuit has recognized that New York provides, "an adequate post deprivation remedy in the form of, *inter alia*, a Court of Claims action.  *Jackson v. Burke*, 256

F.3d 93, 96 (2d Cir. 2001) (citing *Love v. Coughlin*, 714 F.2d 207, 208-09 (2d Cir. 1983)).

In this instance plaintiff had available to him, and indeed apparently pursued, an internal DOCS process for making a claim for his lost property. Additionally, under the New York Court of Claims Act, the State provides inmates like the plaintiff with a post deprivation remedy by way of an action asserted in the New York Court of Claims for appropriation of personal property. *See* N.Y. CT. OF CLAIMS ACT §§ 8, 9 (2). Thus, as a matter of law, McQuilkin was afforded adequate procedural protections and any procedural due process claim premised upon the alleged destruction of his property at Gouverneur is subject to dismissal.[16]

H.    Expungement of Psychiatric Records

Plaintiff's second cause of action seeks "total expungement from [sic] any reference of mental health patient from Plaintiff's institutional record." Second Amended Compl. (Dkt. No. 35) Second Cause of

---

[16]    The availability of a post-deprivation remedy does not foreclose plaintiff's claim that he was effectively denied meaningful access to the courts as a result of the loss of his legal documents. *See Lewis v. Casey*, 518 U.S. 343, 350, 116 S.Ct. 2174, 2179 (1996). As will be seen, however, that claim also lacks merit. *See* pp. 41-43, *post*.

Action.   In their motion, defendants request dismissal of this cause of

action as not presenting a constitutional claim, and additionally

because the relief sought is not available under New York law.

To state a valid claim under section 1983, a plaintiff must allege

that he or she was deprived of a right guaranteed under the

Constitution of the United States." *Snider v. Dylag*, 188 F.3d 51, 53

(2d Cir. 1999) (citing *Dwares v. City of New York*, 985 F.2d 94, 98 (2d

Cir. 1993)).  Plaintiff has identified no cognizable constitutional right at

stake with regard to his mental health records.  While plaintiff

complains of his involuntary commitment at the Center, it appears from

the record now before the court that the commitment occurred, at least

in part, based upon state court proceedings conducted pursuant to

New York Correction Law § 402.[17] *See generally* Waldron Aff. (Dkt.

––––––––––––––––––––

[17]      Under that provision, upon receiving a report from a physician that an
inmate is, in his or her opinion, mentally ill the superintendent of a correctional
facility must apply to the court for designation of two examining physicians who,
conducting a personal examination, may certify that the inmate is mentally ill and
in need of care and treatment, if deemed appropriate.  N.Y. Correction Law § 402.
In the event that certification is made by the two examining physicians, the
superintendent must then apply to an appropriate state court judge for an order of
commitment, with notice to the affected inmate as well as any known relative.  *Id.* §
402 (3). The inmate thereafter may request a hearing, and the court additionally
may request one of its own initiative.  *Id.* § 402(5).  In the event the court
determines that the person is mentally ill and in need of care and treatment, the
court may order him or her committed for a period not to exceed six months in
order that the inmate may be transferred into an OMH facility.  *Id.*

No. 66).  As such, plaintiff cannot plausibly allege the denial of

procedural due process associated with that commitment.

Nor has McQuilkin stated a claim under New York law, even

assuming such a claim would be actionable under section 1983.

Generally, expungement of psychiatric records is not an available form

of relief in New York.  *Wade v. Dep't of Mental Hygiene of New York*,

49 N.Y.2d 947 (1980).  MHL section 33.14 does allow for the sealing

of psychiatric records when

> the petitioner has demonstrated by competent medical
> evidence that he is not currently suffering from a mental
> illness, has not for a period of three years received
> inpatient services for the treatment of a mental illness, and
> the interests of the petitioner and society would best be
> served by sealing the petitioner's records.

N.Y. MENTAL HYG. LAW  § 33.14(a)(1)(b).  Plaintiff cannot avail himself

of the sealing provision in this instance, however.  At the outset,

plaintiff cannot establish that he has not "received inpatient services

for a period of three years."  *Id.*  Plaintiff was discharged from services

on October 27, 2009 and has therefore received inpatient services

within the last three years.  Waldron. Aff. (Dkt. No. 66) Exh A.

Additionally, plaintiff has not established, by competent medical

evidence, that he is not currently suffering from a mental illness, nor

38

has he demonstrated that both his interests and those of society would be best served by sealing his records of mental health treatment.

For these reasons, the defendants' motion should be granted with respect to plaintiff's second cause of action.

I.       Religious Discrimination and Access to Court

Plaintiff's complaint makes passing reference to abridgement of his right to "access the court of law" and his "religious rights."  Second Amended Complaint  (Dkt. No. 35) ¶¶  2, 8.  As defendants assert in support of their motion, plaintiff's complaint is devoid of any factual allegations to support these claims, and there is nothing in the record that would suggest that these rights are implicated.

1.       Religious Discrimination

While inmates confined within prison facilities are by no means entitled to the full panoply of rights guaranteed under the United States Constitution, including its First Amendment, the free exercise clause of that amendment does afford them at least some measure of constitutional protection, including their right to participate in congregate religious services.  *See Pell v. Procunier,* 417 U.S. 817, 822, 94 S. Ct. 2800, 2804 (1974) ("In the First Amendment context . . .

a prison inmate retains those First Amendment rights that are not

inconsistent with his [or her] status as a prisoner or with the legitimate

penological objectives of the corrections system."); *see also*

*Salahuddin v. Coughlin,* 993 F.2d 306, 308 (2d Cir. 1993) ("It is well

established that prisoners have a constitutional right to participate in

congregate religious services.") (citing cases).  The task of defining the

contours of that right in a prison setting requires careful balance of the

rights of prison inmates against the legitimate interests of prison

officials tasked with maintaining prison security.  *O'Lone v. Estate of

Shabazz,* 482 U.S. 342, 348, 107 S. Ct. 2400, 2404 (1987); *Ford* v.

*McGinnis*, 352 F.3d 582, 588 (2d Cir. 2003); *Salahuddin,* 993 F.2d at

308.  When determining whether an action taken by prison officials

impinges upon that individual's First Amendment free exercise right,

the inquiry is "one of reasonableness, taking into account whether the

particular [act] affecting [the] right. . . is 'reasonably related to

legitimate penological interests.'" *Benjamin v. Coughlin,* 905 F.2d 571,

574 (2d Cir.), *cert. denied,* 498 U.S. 951, 111 S. Ct. 372 (1990)

(quoting *Turner v. Safley*, 482 U.S. 78, 89, 107 S. Ct. 2254, 2261

(1987)); *Ford,* 352 F.3d at 588; *see also Farid v. Smith,* 850 F.2d 917,

925 (2d Cir. 1988) (citing, *inter alia, O'Lone,* 482 U.S. at 348, 107 S.

Ct. at 2404).

In this instance, neither plaintiff's complaint nor the record before

the court discloses any facts demonstrating religious discrimination or

establishing that plaintiff's religious beliefs were somehow burdened by

his confinement to CNYPC or the administration of psychiatric drugs

against his will.  Plaintiff's complaint does not identify his religion, nor

does it explain how the forced administration of psychiatric

medications infringes upon his sincerely held religious beliefs.  Since

plaintiff's religious deprivation claim is stated in wholly conclusory

terms without the articulation of facts demonstrating the existence of a

plausible claim, and in light of his failure to come forward with the

evidence to support that claim in the face of defendants' summary

judgment motion, I recommend that any cause of action deemed to

assert a First Amendment freedom of religion violation be dismissed.

### 2.   Access to Courts

Turning to plaintiff's reference to his deprivation of access to the

courts, I note that undeniably "[p]risoners have a constitutional right of

access to the courts, which is infringed when prison officials interfere

with a prisoner's preparation of legal documents." *Thomas v. Egan*, 1 Fed. App'x 52, 54 (2d Cir. 2001) (citing *Lewis*, 518 U.S. at 350, 116 S. Ct. at 2179) (cited in accordance with Fed. R. App. Proc. 32.1).  "To state a claim of denial of access to the courts, an inmate must allege an actual injury." *Id.* (citing *Lewis*, 518 U.S. at 349, 116 S. Ct. at 2179).  Conclusory allegations are insufficient.  *Id.*  (citing *Lewis*, 518 U.S. at 349, 116 S. Ct. at 2179).

In this instance, plaintiff's complaint alleges that among his property confiscated and destroyed by unnamed prison workers at Gouverneur were legal documents.  Second Amended Complaint (Dkt. No. 35) ¶ 2.  Neither his complaint nor anything within the record now before court suggests, however, that plaintiff suffered any harm as a result of the alleged destruction of his legal documents.  Plaintiff's complaint therefore fails to allege the existence of prejudice, an essential element of such a claim.  *See Davidson v. Murray*, 371 F. Supp.2d 361, 366 (W.D.N.Y. 2005) (citing cases) (requiring proof on access to courts claim that "a nonfrivolous legal claim had been frustrated or was being impeded due to the action or inaction" of defendants).  Based upon this lack of supporting facts, I recommend

that plaintiff's court access claim be dismissed.

      J.      <u>Retaliation</u>

      The claims set forth in plaintiff's complaint appear to be centered upon his involuntary commitment into the CNYPC and the forced administering of anti-psychotic medication, allegedly in retaliation for his filing a "notice of summons" against the DOCS.  In their motion, defendants assert that plaintiff has failed to state a cognizable claim of retaliation.

      When adverse action is taken by prison officials against an inmate, motivated by the inmate's exercise of a right protected under the Constitution, including the free speech provisions of the First Amendment, a cognizable retaliation claim under 42 U.S.C. § 1983 lies.  *See Franco v. Kelly*, 854 F.2d 584, 588-90 (2d Cir. 1988).  As the Second Circuit has repeatedly cautioned, however, such claims are easily incanted and inmates often attribute adverse action, including the issuance of misbehavior reports, to retaliatory animus; courts must therefore approach such claims "with skepticism and particular care." *Dawes v. Walker*, 239 F.3d 489, 491 (2d Cir. 2001) (citing *Flaherty v. Coughlin*, 713 F.2d 10, 13 (2d Cir. 1983)), *overruled on other grounds*

sub nom., *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506 (2002); *Davis v. Goord*, 320 F.3d 346, 352 (2d Cir. 2003) (same).

In order to state a prima facie claim under § 1983 for retaliatory conduct, a plaintiff must advance non-conclusory allegations establishing that 1) the conduct at issue was protected; 2) the defendants took adverse action against the plaintiff; and 3) there was a causal connection between the protected activity and the adverse action - in other words, that the protected conduct was a "substantial or motivating factor" in the prison officials' decision to take action against the plaintiff.  *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287, 97 S. Ct. 568, 576 (1977); *Dillon v. Morano*, 497 F.3d 247, 251 (2d Cir. 2007); *Dawes*, 239 F.3d at 492 (2d Cir. 2001).  If the plaintiff carries this burden, then to avoid liability the defendants must show by a preponderance of the evidence that they would have taken action against the plaintiff "even in the absence of the protected conduct."  *Mount Healthy*, 429 U.S. at 287, 97 S. Ct. at 576.  If taken for both proper and improper reasons, state action may be upheld if the action would have been taken based on the proper reasons alone.  *Graham v. Henderson*, 89 F.3d 75, 79 (2d Cir. 1996)

(citations omitted).

Analysis of retaliation claims thus requires careful consideration of the protected activity in which the inmate plaintiff has engaged, the adverse action taken against him or her, and the evidence tending to link the two.  When such claims, which are exceedingly case specific, are alleged in only conclusory fashion, and are not supported by evidence establishing the requisite nexus between any protected activity and the adverse action complained of, a defendant is entitled to summary judgment dismissing plaintiff's retaliation claims.  *Flaherty*, 713 F.2d at 13.

Plaintiff alleges that he was administered antipsychotic medication "in a continuing retaliation against him for filing a claim in the International Trade Court several years ago which was against the State of New York and the Quango New York State Brokerage Mortmain Collection Department of Correctional Services."  Second Amended Compl. (Dkt. No. 35) ¶ 2.  Plaintiff also alleges that in retaliation for his service of a "notice of summons upon [Defendant Taylor] on July 2, 2007 and July 3, 2007 . . .".  defendants seized and destroyed five bags containing his property on July 18, 2007, and "wrongfully referred" him to the psychiatric department

at Clinton. *Id.*

Plaintiff's complaint clearly satisfies the first element of the retaliation claim.  Both the filing of a claim with the International Trade Court and service of a notice of summons appear to qualify as constituting protected activity.  *See Joseph's House and Shelter, Inc. v. City of Troy*, 641 F. Supp.2d 154, 159 n. 5 (N.D.N.Y. 2009) (Scullin, S.D.J.) (citing *Dougherty v. Town of N. Hempstead*, 282 F.3d 83, 91 (2d Cir. 2002) (finding lawsuit constitutionally protected activity under the First Amendment)).  In addition I have assumed, solely for purposes of the instant motion, that the forced administering of drugs and the destruction of plaintiff's property could qualify as sufficiently adverse to trigger the protections of the First Amendment.  *See Jones v. Harris*, 665 F. Supp.2d 384, 399 (S.D.N.Y. 2009).  The evidence of a connection between the two, however, is lacking in this case.

The portion of plaintiff's retaliation claim stemming from his filing of the claim in the International Trade Court is easily dispensed with.  By plaintiff's own admission that claim was filed "several years ago" and does not appear to have involved any of the named defendants in this action. The bare allegation that the filing of that claim is somehow linked to the

46

Fill

defendants' actions in forcing him to take medications, without further support, is woefully insufficient to establish the required connection between that protected activity and the adverse consequences claimed in his retaliation cause of action. *Flaherty*, 344 F.3d at 13.

Plaintiff's retaliation claim against defendant Taylor based upon service of a summons, followed by in short order by the seizure of his property, presents a closer question given the close proximity in time between the two events.  In the face of a summary judgment motion, however, calling for plaintiff to lay bare his claims and the proof which supports them, however, this alone is insufficient to establish a basis upon which a reasonable factfinder could conclude that unlawful retaliation has occurred.  *Vega v. Lareau*, No. 9:04-CV-0750, 2010 WL 2682307, at *10 (N.D.N.Y. 2010) (Baxter, M.J.).  I note, in that regard, that the record fails to support plaintiff's claim that defendant Taylor, against whom this portion of the retaliation claim is asserted, was involved in any way in the decision to admit the plaintiff into the CNYPC.  Instead, the record reflects the decision was made by OMH care providers following an evaluation of plaintiff's mental status, and was authorized by a state court order.

Because the record fails to support plaintiff's retaliation cause of

action, I recommend that it be dismissed.

K.    OMH Confinement and Involuntary Treatment

Also embedded in plaintiff's complaint is a claim for violation of his Eighth and Fourteenth Amendment rights arising from his commitment to the CNYPC as well as the drugs he was forcibly administered while there. In support of their motion, defendants argue that these claims should be dismissed as impermissibly conclusory, and further that because they are precluded under *Heck v. Humphrey* and the *Rooker-Feldman* doctrine.

1.    Eighth Amendment

The claims alleged in plaintiff's complaint relating to his involuntary commitment to the CNYPC and the forced administration of drugs are predicated upon alleged violation of the Eighth and Fourteenth Amendments and, in essence, are directed to the medical treatment that he received for his schizophrenia.

The Eighth Amendment's prohibition of cruel and unusual punishment encompasses punishments that involve the "unnecessary and wanton infliction of pain" and are incompatible with "the evolving standards of decency that mark the progress of a maturing society." *Estelle v. Gamble*, 429 U.S. 97, 102, 104, 97 S. Ct. 285, 290, 291 (1976); *see also*

*Whitley v. Albers*, 475 U.S. 312, 319, 106 S. Ct. 1078, 1084 (1986) (citing,

*inter alia*, *Estelle*).  While the Eighth Amendment does not mandate

comfortable prisons, neither does it tolerate inhumane treatment of those

in confinement; thus the conditions of an inmate's confinement are subject

to Eighth Amendment scrutiny.  *Farmer v. Brennan*, 511 U.S. 825, 832,

114 S. Ct. 1970, 1976 (1994) (citing *Rhodes v. Chapman*, 452 U.S. 337,

349, 101 S. Ct. 2392, 2400 (1981)).  A claim alleging that prison

conditions violate the Eighth Amendment must satisfy both an objective

and subjective requirement – the conditions must be "sufficiently serious"

from an objective point of view, and the plaintiff must demonstrate that

prison officials acted subjectively with "deliberate indifference".

*See Leach,* 103 F. Supp.2d at 546 (citing *Wilson v. Seiter*, 501 U.S. 294,

111 S. Ct. 2321 (1991)); *Waldo v. Goord,* No. 97-CV-1385, 1998 WL

713809, at *2 (N.D.N.Y. Oct. 1, 1998) (Kahn, J. and Homer, M.J.); *see*

*also, generally, Wilson*, 501 U.S. 294, 111 S. Ct. 2321.  Deliberate

indifference exists if an official "knows of and disregards an excessive risk

to inmate health or safety; the official must both be aware of facts from

which the inference could be drawn that a substantial risk of serious harm

exists, and he must also draw the inference."  *Farmer*, 511 U.S. at 837,

114 S. Ct. at 1978; *Leach*, 103 F. Supp.2d at 546 (citing *Farmer*); *Waldo*, 1998 WL 713809, at *2 (same).

To satisfy the objective prong of an Eighth Amendment conditions of confinement claim, a plaintiff must demonstrate a deprivation of "'the minimal civilized measure of life's necessities,' such as adequate food, clothing shelter, sanitation, medical care, and personal safety." *May v. DeJesus*, No.3:06CV1888, 2010 WL 1286800, at *4 (D.Conn. Mar. 30, 2010) (quoting *Alvarez v. County of Cumberland*, Civil No. 07-346(RBK), 2009 WL 750200, at *2 (D.N.J. Mar. 18, 2009) (citation omitted)). Conditions that are merely restrictive or harsh, however, do not implicate the Eighth Amendment; "they are merely part of the penalty that criminal offenders pay for their offense against society." *May*, 2010 WL 1286800, at *4 (quoting *Alvarez*,1009 WL 750200, at *2).

Plaintiff does not claim that he was deprived of any of basic need or that his personal safety was put at risk during his confinement in the CNYPC or at Clinton.  Instead, his complaint is directed to the facts that he was confined to a mental health facility and forced to undergo mental health treatment.  Broadly construed, at best, plaintiff's Eighth Amendment claim can be interpreted as a challenge to his medical treatment.

Claims that prison officials have intentionally disregarded an

inmate's medical needs are encompassed within the Eighth Amendment's

prohibition of cruel and unusual punishment.  *Estelle*, 429 U.S. at 104, 97

S. Ct. at 291.   Here, however, even liberally construing plaintiff's

allegations there is no claim, and indeed no evidence in the record to

suggest that plaintiff's medical needs were disregarded.  In fact, at the

heart of plaintiff's claim is his contention that he did not need mental

health treatment at all.  It is well established, however, that "[c]harges that

amount only to allegations of malpractice, and mere disagreements with

respect to quality of medical care do not state an Eighth Amendment

claim." *Arroyo v. City of New York*, 2003 WL 22211500, at * 2 (S.D.N.Y.

Sept. 25, 2003) (citing *Estelle*, 429 U.S. at 105-06, 97 S. Ct. at 292).  As a

result, defendants are correct in their assertion that plaintiff's Eighth

Amendment challenge to his CNYPC confinement and mental health

treatment must fail as a matter of law.

     2.   *Heck v. Humphrey*

Defendants also assert that any claim by plaintiff that he should not

have been placed in the CNYPC or in an OMH Satellite Unit is barred by

the rule enunciated in *Heck v. Humphrey*.  In *Heck*, the United States

Supreme Court addressed the types of claims for which state prisoners

may seek redress in section1983 actions.  *Heck*, 512 U.S. at 480-82, 114

S. Ct. at 2369-70.  The Supreme Court specifically held that a state

prisoner's claim for damages is not cognizable under 42 U.S.C. § 1983 if a

judgment in his or her favor "would necessarily imply the invalidity of his

conviction or sentence."  *Heck*, 512 U.S. at 487, 114 S. Ct. at 2372.  For a

plaintiff to recover damages for actions

> whose unlawfulness would render a conviction or
> sentence invalid, a § 1983 plaintiff must prove that
> the conviction or sentence has been reversed on
> direct appeal, expunged by executive order,
> declared invalid by a state tribunal authorized to
> make such determination, or called into question
> by a federal court's issuance of a writ of habeas
> corpus.

*Id.* at 486-87, 2372.  "But if the district court determines that the plaintiff's

action, even if successful, will not demonstrate the invalidity of any

outstanding criminal judgment against the plaintiff, the action should be

allowed to proceed, in the absence of some other bar to the suit."  *Id.*  The

Second Circuit has observed, however, that a section 1983 suit by a

prisoner, "challenging the validity of a disciplinary or administrative

sanction that does not affect the overall length of the prisoner's

confinement is not barred by [*Heck*]."  *Jenkins v. Haubert*, 179 F.3d 19, 27 (2d Cir. 1999).

In this case, plaintiff is not disputing either his conviction or his confinement to prison; rather, McQuilkin is challenging his confinement to a mental health facility, which occurred in accordance with a state court order.  Plaintiff additionally challenges the forced administration of psychotropic drugs, which also was court-authorized.  It does not appear that these state court determinations had any effect on the length of the plaintiff's prison term.  Waldron Aff. (Dkt. No. 66) Exh. B P263, P318-319.  Additionally, these state court proceedings clearly were not criminal in nature, but rather were civil state mental health proceedings.  As a result, it cannot be said that the instant action would affect the invalidity of a criminal judgment against the plaintiff.[18]

For these reasons, it therefore does not appear that plaintiff's claims are precluded by the doctrine enunciated in *Heck v. Humphrey*.

3.    *Rooker-Feldman*

---

[18]    The fact that plaintiff has been released from custody does not alter this conclusion because "[t]his favorable termination requirement applies to plaintiffs who are incarcerated at the time that they file their section 1983 actions, regardless of whether they are later released."  *Hamm v. Hatcher*, No. 05-CV-503, 2009 WL 1322357, at *8 n. 6 (S.D.N.Y. May 5, 2009).

Defendants further assert that plaintiff's OMH retention and involuntary treatment claims are subject to dismissal under the *Rooker-Feldman* doctrine because the plaintiff was accorded due process in the state court mental health proceedings, and the claim presents a pure question of state law that is not properly raised in a section 1983 action.

"Where a federal suit follows a state suit, the former may be prohibited by the so-called *Rooker-Feldman* doctrine in certain circumstances." *Hoblock v. Albany County Board of Elections*, 422 F.3d 77, 83 (2d Cir. 2005).  A federal district court "has no authority to review final judgments of state court judicial proceedings." *District of Columbia v. Feldman*, 460 U.S. 462, 482, 103 S. Ct. 1303, 1315 (1983).  "To do so would be an exercise of appellate jurisdiction which only the Supreme Court possesses over state court judgments." *Rooker v. Fidelity Trust Co.*, 263 U.S. 413, 416, 44 S. Ct. 149, 150 (1923).

The Supreme Court of the United States reviewed and redefined the limits of the *Rooker-Feldman* doctrine in *Exxon Mobile Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280, 125 S. Ct. 1517 (2005).  The Court limited application of the doctrine to "cases brought by state court losers

54

complaining of injuries caused by state court judgments rendered before

the district court proceedings commenced and inviting district court review

and rejection of those judgments." *Exxon Mobile Corp.*, 544 U.S. at 284,

125 S. Ct. at 1521-22.  In *Hoblock*, the Second Circuit established four

elements that must be met before the *Rooker-Feldman* doctrine applies:

> First, the federal court plaintiff must have lost in
> state court.  Second the plaintiff must 'complain[ ]
> of injuries caused by [a] state court judgment[.]'
> Third, the plaintiff must 'invite district court review
> and rejection of [that] judgment[ ].'  Fourth, the
> state court judgment must have been 'rendered
> before the district court proceedings commenced.'

*Hoblock*, 422 F.3d at 85.

Here, the first and fourth elements of this test are clearly satisfied.

First, the plaintiff lost in the New York Supreme Court proceedings which

resulted in the retention and involuntary treatment described in plaintiff's

complaint.  *See* Waldron Aff. (Dkt. No. 66) Exh. B at P263, P318-319.

Additionally, the state court decisions at issue, dated October 11, 2007

and November 21, 2007, respectively, *see id.*, were rendered prior to the

commencement of this action on September 15, 2008.  *See* Dkt. No. 1.

The second and third elements of the prevailing *Rooker-Feldman*

test also appear to have been established in this instance.  Plaintiff's

complaint is directly addressed to the injuries suffered as a result of those

court determinations.  Moreover, plaintiff's complaint, as amended,

appears to challenge the correctness of those rulings, seeking both an

order prohibiting his forced medication, despite the fact that it was

accomplished pursuant to a state court order, as well as expungement of

records of his treatment at the Center, also accomplished by court order.

This, then, appears to present a classic case of a claim precluded under

the *Rooker-Feldman* doctrine.  I therefore recommend dismissal of

plaintiff's confinement and administration of psychiatric drug claims on this

basis.

     L.    <u>Due Process Claims</u>

In their motion defendants further attack plaintiff's procedural due

process claim asserted under the Fourteenth Amendment.

To successfully state a claim under 42 U.S.C. § 1983 for denial of

procedural due process, a plaintiff must show that he or she 1) possessed

an actual liberty interest, and 2) was deprived of that interest without being

afforded sufficient procedural safeguards.  *See Tellier v. Fields*, 280 F.3d

69, 79-80 (2d Cir. 2000) (citations omitted); *Hynes v. Squillace*, 143 F.3d

653, 658 (2d Cir. 1998); *Bedoya v. Coughlin*, 91 F.3d 349, 351-52 (2d Cir.

1996).  It is undeniable that [i]nvoluntary confinement, including civil

commitment, constitutes a significant deprivation of liberty, requiring due

process."  *Abdul-Matiyn v. Pataki*, 9:06-CV-1503, 2008 WL 974409, at *10

(N.D.N.Y. April. 8, 2008) (Hurd, J. and Homer, M.J.) (quoting *Fisk v.

Letterman*, 401 F. Supp.2d 362, 374 (S.D.N.Y. 2005) (citations omitted).

"When a person's liberty interests are implicated, due process requires at

a minimum notice and an opportunity to be heard."  *Mental Hygiene Legal

Service v. Spitzer*, 2007 WL 4115936, at * 5 (S.D.N.Y. Nov. 16, 2006)

(citing *Hamdi v. Rumsfeld*, 542 U.S. 507, 533, 124 S. Ct. 2633, 2648

(2004) (plurality opinion)).  The Supreme Court has approved the use of

involuntary confinement where there has been a determination that the

person in question currently suffers from a "mental abnormality" and is

likely to pose a future danger to the public.  *Abdul*, 2008 WL 974409, at

*10 (citing *Kansas v. Hendricks*, 521 U.S. 346, 371, 117 S. Ct. 2072, 2086

(1997)).

    The primary focus of plaintiff's due process claim and defendants'

motion seeking its dismissal, then, is upon the sufficiency of the

procedural safeguards associated with that deprivation.[19]  In this instance,

---

[19]    The record does not address, and I am therefore unable to
determine, whether as a result of his involuntary commitment to the CNYPC and

plaintiff was committed to the CNYPC by way of the procedures set out in the New York Corrections Law § 402.

It is clear from the record before the court that plaintiff was retained at the CNYPC under the authority of that statute, and his retention and involuntary treatment with the antipsychotic medication were court-ordered.  Section 402 provides procedures and safeguards similar to the provisions of MHL section 33.03, the general provision governing involuntary commitment, and one which "has withstood challenges that it was facially unconstitutional."  *United States v. Waters*, 23 F.3d 29, 32 (2d Cir. 1994) (citing *Project Release v. Prevost*, 722 F.2d 960, 971-981 (2d Cir. 1983)).

Plaintiff's claims regarding involuntary medication are similarly destined to fail.  The Second Circuit has held that "due process requires an opportunity for hearing and review of a decision to administer antipsychotic medication-but such a hearing need not be judicial in nature."  *Project Release*, 722 F.2d at 981.  Moreover, due process does

_____

forced medication, plaintiff suffered deprivation of a cognizable liberty interest beyond that already associated with this criminal conviction and sentence.  I have nonetheless assumed, for purposes of the pending motion, that the plaintiff can demonstrate the deprivation of a cognizable liberty interest associated with those acts.

not require a guarantee that a physician's assessments in their commitment evaluation be correct. *Rodriguez City of New York*, 72 F.3d 1051, 1062 (2d Cir. 1995).

Plaintiff was transferred from Mid-State to the CNYPC on September 17, 2007, after he refused medication and mental health treatment, and once admitted continued to refuse medication without any rational basis for doing so. As a result, the Executive Director of the CNYPC petitioned the court, based upon the certifications of two examining physicians, for an order committing McQuilkin for six months. McQuilkin objected to the retention petition, and a hearing was held in Oneida County Supreme Court to determine whether the plaintiff was mentally ill and a proper subject for involuntary commitment. Following the hearing, on October 11, 2007, the court ordered plaintiff's commitment to CNYPC for six months.

After the commitment order was issued, McQuilkin persisted in his refusal to consent to the administration of medication. As a result, following a similar procedure as he did for commitment, based upon the certification of two examining physicians, defendant Sawyer petitioned the court for an order authorizing the administration of the medication against McQuilkin's will. McQuilkin opposed the petition, and, after a hearing, the

court determined that he lacked capacity to make a reasoned decision regarding his own treatment and granted the petition.  *United States v. Waters*, 23 F.3d at 32.

Because the evidence in the record establishes that defendants followed the procedures outlined in New York Corrections Law § 402 in obtaining authorization for plaintiff's involuntary commitment, and plaintiff was afforded the constitutionally required process to which he was entitled in connection with both that determination and the court ordered forced mediation, his procedural process claim lacks merit.[20]

For the foregoing reasons, I recommend summary judgment granting dismissal of plaintiff's due process claim arising out of his mental health confinement and treatment with psychiatric medication.

M.    Defendant Sangani's Motion to Dismiss

In his motion Dr. K. Sangani, who has yet to answer plaintiff's

---

[20]    To the extent that plaintiff may be suggesting that defendants failed to follow the procedures outlined in the MHL, his claim would still fail.  Section 1983 imposes liability for violations of rights protected by the Constitution and laws of the United States, and not for violations arising solely out of state or common law principles.  *Fluent v. Salamanca Indian Lease Auth.*, 847 F. Supp. 1046, 1056 (W.D.N.Y. 1994).  "A violation of a state law or regulation, in and of itself, does not give rise to liability under 42 U.S.C. § 1983."  *Cusamano v. Sobek*, 604 F. Supp.2d 416, 482 (N.D.N.Y. 2009) (Suddaby, J.) (collecting cases).  For this reason, even if defendants had failed to follow the letter of the New York MHL provisions with regard to his confinement and treatment, that failure would not provide the basis a cognizable section 1983 claim.

complaint, seeks its dismissal for failure to state a claim against him upon which relief may be granted. The focus of defendant Sangani's motion is upon plaintiff's failure to allege in his complaint facts showing Sangani's involvement in the constitutional deprivations alleged.

"It is well settled in this Circuit that personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *Farid v. Ellen*, 593 F.3d 233, 249 (2d Cir. 2010) (quoting *Farrell v. Burke*, 449 F.3d 470, 484 (2d Cir. 2006)). It should also be noted that personal involvement of a named defendant in any alleged constitutional deprivation is a prerequisite to an award of damages against that individual under section 1983. *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994) (citing *Moffitt v. Town of Brookfield*, 950 F.2d 880, 885 (2d Cri. 1991) and *McKinnon v. Patterson*, 568 F.2d 930, 934 (2d Cir.1977), *cert. denied*, 434 U.S. 1087, 98 S. Ct. 1282 (1978)). In order to prevail on a section 1983 cause of action against an individual, a plaintiff must show some tangible connection between the constitutional violation alleged and that particular defendant. *See Bass v. Jackson*, 790 F.2d 260, 263 (2d Cir. 1986).

The only mention of Dr. Sangani in plaintiff's second amended

complaint is in that portion wherein it is alleged, "[t]he next day plaintiff was transferred to Marcy Psychiatric Center and petition before the court upon the application of K. Perlman and the certificates of Doctors K. Sangani and V. Komareth on 10/11/07. . ."  Amended Complaint. (Dkt. No. 35) ¶  5.  It is doubtful that the mere provision of a certificate in support of an involuntary commitment petition would suffice to establish a physician's personal involvement in a claim that the involuntary commitment was either retaliatory or accomplished through lack of procedural due process. As such, it seems doubtful that plaintiff's claim against Dr. Sangani is legally plausible, given his failure to sufficiently allege that defendant's personal involvement in a constitutional deprivation. Ordinarily, a court should not dismiss a complaint filed by a *pro se* litigant without granting leave to amend *at least* once if there is any indication that a valid claim might be stated.  *Branum v. Clark*, 927 F.2d 698, 704-05 (2d Cir.1991) (emphasis added); *see also* Fed. R. Civ. Proc. 15(a) (leave to amend "shall be freely given when justice so requires"); *see also Mathon v. Marine Midland Bank, N.A.,* 875 F. Supp. 986, 1003 (E.D.N.Y.1995) (leave to replead granted where court could not say that under no circumstances would proposed claims provide a basis for relief).  I note, however, that I

have already recommended dismissal of plaintiff's claims growing out of that commitment as legally insufficient.  I therefore similarly recommend that an order be entered dismissing plaintiff's claims against Dr. Sangani on this basis, without leave to replead.

### N.   Defendants Komareth and Bodrog

Although defendants' motion does not explicitly request this relief, I have of my own initiative determined to raise the question of whether plaintiff's claims should proceed against the defendants Komareth and Bodrog, two defendants who were never served with the summons and complaint, and who, if this report and recommendation is adopted, would be the sole remaining defendants in the case.

Rule 4(m) of the Federal Rules of Civil Procedure requires that service of a summons and complaint be made within 120 days of issuance of the summons.[21]   "[W]here good cause is shown, the court has no

---

[21]   That rule provides that

[i]f a defendant is not served within 120 days after the complaint is filed, the court–on motion or on its own after notice to the plaintiff–must dismiss the action without prejudice against that defendant or order that service be made within a specified time.  But if the plaintiff shows good cause for the failure, the court must extend the time for service for an appropriate period.

choice but to extend the time for service, and the inquiry is ended."

*Panaras v. Liquid Carbonic Indus. Corp.*, 94 F.3d 338, 340 (7th Cir. 1996).

"If, however, good cause does not exist, the court may, in its discretion,

either dismiss the action without prejudice or direct that service be

effected within a specified time." *Id.* (citing Fed. R. Civ. P. 4(m)); *Zapata*

*v. City of New York*, 502 F.3d 192, 196 (2d Cir. 2007) ("[D]istrict courts

have discretion to grant extensions even in the absence of good cause.");

*Romandette v. Weetabix Co., Inc.*, 807 F.2d 309, 311 (2d Cir. 1986).

When examining whether to extend the specified 120 day period for

service, a district court is afforded ample discretion to weigh the

"overlapping equitable considerations" involved in determining whether

good cause exists and whether an extension may be granted in the

absence of good cause.  *See Zapata*, 502 F.3d at 197.

 A plaintiff's *pro se* status entitles him or her to a certain degree of

leniency insofar as service of process is concerned; courts generally favor

resolution of such a case on its merits, rather than on the basis of a

procedural technicality. *Poulakis v. Amtrak*, 139 F.R.D. 107, 109 (N.D. Ill.

1991).  When a plaintiff proceeds *in forma pauperis*, such as is the case

---

Fed. R. Civ. P. 4(m). This court's local rules shorten the time for service from the
120 day period under Rule 4(m) to sixty days.  *See* N.D.N.Y.L.R. 4.1(b).

here, the court is obligated to issue the plaintiff's process to the United

States Marshal, who must in turn effect service upon the defendants,

"thereby relieving [the] plaintiff of the burden to serve process once

reasonable steps have been taken to identify for the court the defendants

named in the complaint." *Byrd v. Stone*, 94 F.3d 217, 219 (6th Cir. 1996).

I am mindful of the Second Circuit's recent decision in *Murray v.*

*Pataki*, in which the court cautioned that

> [a] *pro se* prisoner proceeding *in forma pauperis* is only
> required to provide the information necessary to identify the
> defendant, *see, e.g. Sellers*, 902 F.2d at 602, and it is
> "unreasonable to expect incarcerated and unrepresented
> prisoner-litigants to provide the current business addresses of
> prison-guard defendants who no longer work at the prison,"
> *Richardson v. Johnson*, 598 F.3d 734, 739-40 (11th Cir. 2010).

*Murray v. Pataki*, No. 09-1657, 2010 WL 2025613, at *2 (2d Cir. May 24,

2010) (summary order) (cited in accordance with Fed. R. App. Proc. 32.1).

In this instance, however, plaintiff has failed to demonstrate the requisite

vigilance in insuring service upon these defendants and, to the extent

necessary, eliciting the court's assistance.  Plaintiff's original complaint in

this action was filed on September 15, 2008.  Summonses issued for

defendants Komareth and Bodrog were initially returned unexecuted on

January 16, 2009.  *See* Dkt. Nos. 18, 19.  The summonses were

thereafter reissued and again forwarded to the Marshals for service on

April 29, 2009, Dkt. No. 30, and yet again on May 14, 2009, Dkt. No. 36,

but were, once again, returned as unexecuted on July 23, 2007

(defendant Komareth), Dkt. No. 44, and August 3, 2009 (defendant

Bodrog) Dkt. No. 46.  Despite the passage of more than one year, and at

least one court intervention at plaintiff's request seeking an order

compelling discovery, *see* Dkt. Minute Entry Dated 8/5/09, plaintiff has

failed to request assistance from the court in locating and serving these

defendants.  On that basis I recommend dismissal of plaintiff's claims

against defendants Komareth and Bodrog, without prejudice.[22]

IV.   <u>SUMMARY AND RECOMMENDATION</u>

Although defendants have asserted that certain of plaintiff's claims

should be dismissed for failure to exhaust his administrative remedies, the

record shows that special circumstances potentially exist that could justify

excusing the plaintiff from the exhaustion requirement in this instance.  I

------

[22]      In his complaint plaintiff alleges that defendants Komareth and
Bodrog are physicians who submitted certifications in support of the applications to
confine McQuilkin to the CNYPC and to require that he submit to the
administration of psychiatric medication.  Since I have already determined that as
to the defendants Hanna and Hernandez, who also submitted certifications in
support of these applications, plaintiff has failed to establish that his constitutional
rights have been violated, for the same reasons I could recommend dismissal of
plaintiff's against these two defendants on the merits as well.

therefore recommend against dismissal of plaintiff's claims on this procedural basis.

Turning to the merits of plaintiff's claims, I note first that his claim for injunctive relief must be dismissed as moot, based upon his release from custody.  I also recommend dismissal of all claims against the CNYPC, and plaintiff's damages claims against the defendants in their official capacities, on the basis of the immunity afforded under the Eleventh Amendment.  I further find that the balance of plaintiff's claims are not supported by the record now before the court, and no reasonable factfinder could conclude that those claims are meritorious.  Finally, I recommend dismissal of plaintiff's involuntary commitment and forced medication claims on the basis of the *Rooker-Feldman* doctrine, and find it unnecessary, in light of these determinations, to address the additional, alternative basis for dismissal of qualified immunity.

Based upon the foregoing it is hereby respectfully,

RECOMMENDED that defendants' motion for summary judgment (Dkt. No. 66) be GRANTED, and that plaintiff's claims against the Central New York Psychiatric Center, Berggren, Hernandez, Sawyer, Hanna and Taylor be DISMISSED in all respects, with prejudice; and it is further

RECOMMENDED that defendant Sangani's motion to dismiss the complaint (Dkt. No. 56) be GRANTED and that all claims against that defendant be DISMISSED for failure to state a plausible civil rights claim; it is further

RECOMMENDED that plaintiff's claims against defendants Komareth and Bodrog be DISMISSED, *sua sponte*, without prejudice.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report.  Such objections must be filed with the Clerk of the Court within FOURTEEN days of service of this report.  FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW.  28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72; *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993).

It is hereby ORDERED that the clerk of the court amend the court's records to reflect the correct spelling of defendant Berggen's name; and it is further

ORDERED THAT the clerk serve a copy of this report and recommendation upon the parties in accordance with this court's local rules.

David E. Peebles
U.S. Magistrate Judge

Dated:      August 27, 2010
            Syracuse, NY



Not Reported in F.Supp., 1998 WL 278264 (N.D.N.Y.)
(Cite as: 1998 WL 278264 (N.D.N.Y.))

**H**
Only the Westlaw citation is currently available.


United States District Court, N.D. New York.
Anthony ROBINSON, Plaintiff,
v.
Jane DELGADO, Hearing Officer and Lieutenant; and
Donald Selsky, Director of Inmate Special Housing
Program, Defendants.
**No. 96-CV-169 (RSP/DNH).**


May 22, 1998.


Anthony Robinson, Veterans Shelter, Brooklyn, for
Plaintiff, Pro Se.

Hon. Dennis C. Vacco, Attorney General of the State of
New York, Attorney for Defendants, Albany, Ellen Lacy
Messina, Esq., Assistant Attorney General, of Counsel.


ORDER


POOLER, D.J.


**\*1** Anthony Robinson, a former inmate incarcerated by the
New York State Department of Corrections ("DOCS"),
sued two DOCS employees, alleging that they violated his
right to due process in the course of a disciplinary
proceeding and subsequent appeal. On September 9, 1997,
defendants moved for summary judgment. Defendants
argued that plaintiff failed to demonstrate that the fifty
days of keeplock confinement that he received as a result
of the hearing deprived him of a liberty interest within the
meaning of the Due Process Clause. Plaintiff did not
oppose the summary judgment motion, and Magistrate
Judge David N. Hurd recommended that I grant it in a
report-recommendation filed April 16, 1998. Plaintiff did
not file objections.

Because plaintiff did not file objections, I "need only
satisfy [myself] that there is no clear error on the face of
the record in order to accept the recommendation."
Fed.R.Civ.P. 72(b) advisory committee's note. After
reviewing the record, I conclude that there is no clear error
on the face of the record. After being warned by
defendants' motion that he must offer proof in admissible
form that his disciplinary confinement imposed an
"atypical and significant hardship on the inmate in relation
to the ordinary incidents of prison life," Robinson failed
to offer any such proof. *Sandin v. Conner,* 515 U.S. 472,
115 S.Ct. 2293, 2300, 132 L.Ed.2d 418 (1995).
Consequently, he cannot maintain a due process challenge.
*Id.* Therefore, it is

ORDERED that the report-recommendation is approved;
and it is further

ORDERED that defendants' motion for summary
judgment is granted and the complaint dismissed; and it is
further

ORDERED that the Clerk of the Court serve a copy of this
order on the parties by ordinary mail.
HURD, Magistrate J.


REPORT-RECOMMENDATION


The above civil rights action has been referred to the
undersigned for Report and Recommendation by the
Honorable Rosemary S. Pooler, pursuant to the local rules
of the Northern District of New York. The plaintiff
commenced the above action pursuant to 42 U.S.C. § 1983
claiming that the defendants violated his Fifth, Eighth, and
Fourteenth Amendment rights under the United States
Constitution. The plaintiff seeks compensatory and
punitive damages.

Presently before the court is defendants' motion for
summary judgment pursuant to Fed R. Civ. P. 56.
However:

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1998 WL 278264 (N.D.N.Y.)
(Cite as: 1998 WL 278264 (N.D.N.Y.))

When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party.

Fed. R. Civ. P 56(e).

In addition, "[f]ailure to file any papers as required by this rule shall, unless for good cause shown, be deemed by the court as consent to the granting or denial of the motion, as the case may be." L.R. 7.1(b)(3).

*2 The defendants filed their motion on September 9, 1997. The response to the motion was due on October 23, 1997. It is now five months beyond the date when the plaintiff's response was due, and he has failed to file any papers in opposition to defendants' motion.

Therefore, after careful consideration of the notice of motion, affirmation of Ellen Lacy Messina, Esq., with exhibits attached, and the memorandum of law; and there being no opposition to the motion; it is

RECOMMENDED that the motion for summary judgment be GRANTED and the complaint be dismissed in its entirety.

Pursuant to 28 U.S.C. § 636(b)(l), the parties have ten days within which to file written objections to the foregoing report. *Frank v. Johnson,* 968 F.2d 298, 300 (2d Cir.), *cert. denied,* 506 U.S. 1038, 113 S.Ct. 825, 121 L.Ed.2d 696(1992). Such objections shall be filed with the Clerk of the Court with a copy to be mailed to the chambers of the undersigned at 10 Broad Street, Utica, New York 13501. FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. § 636(b)(l); Fed.R.Civ.P. 72, 6(a), 6(e); *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993); *Small v. Secretary of HHS,* 892 F.2d

15, 16 (2d Cir.1989); and it is

ORDERED, that the Clerk of the Court serve a copy of this Order and Report-Recommendation, by regular mail, upon the parties to this action.

N.D.N.Y.,1998.
Robinson v. Delgado
Not Reported in F.Supp., 1998 WL 278264 (N.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



Page 1

Not Reported in F.Supp., 1997 WL 665551 (N.D.N.Y.)
(Cite as: 1997 WL 665551 (N.D.N.Y.))

**C**
Only the Westlaw citation is currently available.

United States District Court, N.D. New York.
Marcus COTTO, Plaintiff,
v.
Daniel SENKOWSKI, Superintendent of Clinton
Annex; T.J. Howard, Hearing Officer; J. Maggy,
Sergeant; Byron Wind, Officer; Barry Rock, Officer;
and Philip Coombe, Jr., Acting Commissioner,
Defendants.
No. 95-CV-1733 (RSP/DNH).

Oct. 23, 1997.

Marcus Cotto, Plaintiff, pro se, Auburn Correctional
Facility, Auburn, New York.

Hon. Dennis C. Vacco, Attorney General of the State of
New York, Attorney for Defendants, Albany, New York,
Darren O'Connor, Esq., Asst. Attorney General, of
Counsel.

MEMORANDUM DECISION AND ORDER

POOLER, D.J.

*1 This matter comes to me following a
report-recommendation by Magistrate Judge David N.
Hurd, duly filed on the 29th of August, 1997. Following
ten days from the service thereof, the Clerk has sent me
the entire file, including any and all objections filed by the
parties herein.

In his *pro se* complaint, Cotto alleges that in August 1995,
he and some other inmates were attacked while
incarcerated at Clinton Correctional Facility. Compl., Dkt.
No. 1, ¶ 2. Cotto alleges that as a result of this incident he

was charged with engaging in violent conduct and conduct
which disturbed the order of the facility. *Id.* Although
Cotto was found guilty of these charges and sentenced to
a term of one year in the Special Housing Unit and loss of
six months good time, his sentence was reversed on
administrative appeal. *Id.* Cotto brought this action
pursuant to 42 U.S.C. § 1983, alleging various violations
of his rights under the Eighth and Fourteenth
Amendments. *Id.*

By motion filed March 3, 1997, defendants sought
summary judgment. Dkt. No. 17. Plaintiff filed no papers
in opposition to the motion. In his report-recommendation,
the magistrate judge recommended that I grant defendants'
motion pursuant to Local Rule 7.1(b)(3), which provides
that, absent a showing of good cause, failure to respond to
a motion shall be deemed consent to the relief requested.
Dkt. No. 19, at 2. Cotto has filed no objections to the
report-recommendation.

After careful review of all of the papers herein, including
the magistrate judge's report-recommendation, it is

ORDERED that the report-recommendation is hereby
approved, and it is further

ORDERED that defendants' motion for summary
judgement is GRANTED and the complaint against them
dismissed in its entirety, and it is further

ORDERED that the Clerk of the Clerk serve a copy of this
order on the parties by regular mail.

IT IS SO ORDERED.
DAVID N. HURD, United States Magistrate Judge.

*REPORT-RECOMMENDATION*

This matter was referred to the undersigned by the
Honorable   Rosemary   S.   Pooler,   for

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1997 WL 665551 (N.D.N.Y.)
(Cite as: 1997 WL 665551 (N.D.N.Y.))

Report-Recommendation pursuant to the Local Rules of the Northern District of New York.

Plaintiff commenced the above § 1983 action making various allegations regarding violations of his civil rights under the United States Constitution. Pursuant to Fed.R.Civ.P. 56, the defendants have moved for summary judgment alleging that there is no genuine issue as to any material fact and that as a matter of law they are entitled to judgment.

The defendants have filed a motion pursuant to Fed.R.Civ.P. 56 granting summary judgment in favor of the defendants on grounds including that there is no genuine issue as to any material fact, and that the defendant is entitled to judgment as a matter of law.

It is now more than ninety days beyond the date when the response papers were due, and the plaintiff has not filed any papers in opposition to the motion. "Failure to file any papers as required by this rule shall, unless for good cause shown, be deemed by the court as consent to the granting or denial of the motion, as the case may be." Rules of U.S. Dist. Ct. for Northern Dist. of N.Y., L .R. 7.1(b)(3).

**\*2** NOW, upon careful consideration of the notice of motion, statement pursuant to Local Rule 7.1(F), with exhibits attached, and the memorandum of law submitted in support of the defendants' motion; and there being no opposition to the motion, it is

RECOMMENDED that the motion be granted and the complaint be dismissed in its entirety.

Pursuant to 28 U.S.C. § 636(b)(I), the parties have ten days within which to file written objections to the foregoing report. Frank v. Johnson, 968 F.2d 298, 300 (2d Cir.), cert denied, 506 U.S. 1038, 113 S.Ct. 825, 121 L.Ed.2d 696 (1992). Such objections shall be filed with the Clerk of the Court with a copy to be mailed to the chambers of the undersigned at 10 Broad Street, Utica, New York 13501. FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. § 636(b)(I);

Fed.R.Civ.P. 72, 6(a), 6(e); Roldan v. Racette, 984 F.2d 85, 89 (2d Cir.1993); Small v. Secretary of HHS, 892 F.2d 15, 16 (2d Cir.1989); and it is

ORDERED, that the Clerk of the Court serve a copy of this Report-Recommendation, by regular mail, upon the parties to this action.

N.D.N.Y.,1997.
Cotto v. Senkowski
Not Reported in F.Supp., 1997 WL 665551 (N.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 2000 WL 1264122 (N.D.N.Y.)
(Cite as: 2000 WL 1264122 (N.D.N.Y.))

**C**  Only the Westlaw citation is currently available.

United States District Court, N.D. New York.
Lisa ELGAMIL, Plaintiff,
v.
SYRACUSE UNIVERSITY, Defendant.
**No. 99-CV-611 NPMGLS.**

Aug. 22, 2000.

Joch & Kirby, Ithaca, New York, for Plaintiff, Joseph Joch, of counsel.

Bond, Schoeneck & King, LLP, Syracuse, New York, for Defendant, John Gaal, Paul Limmiatis, of counsel.

MEMORANDUM-DECISION AND ORDER

MCCURN, Senior J.

INTRODUCTION

**\*1** Plaintiff brings suit against defendant Syracuse University ("University") pursuant to 20 U.S.C. § 1681 *etseq.* ("Title IX") claiming hostile educational environment, and retaliation for complaints of same. Presently before the court is the University's motion for summary judgment. Plaintiff opposes the motion.

LOCAL RULES PRACTICE

The facts of this case, which the court recites below, are affected by plaintiff's failure to file a Statement of Material Facts which complies with the clear mandate of Local

Rule 7.1(a)(3) of the Northern District of New York. This Rule requires a motion for summary judgment to contain a Statement of Material Facts with specific citations to the record where those facts are established. A similar obligation is imposed upon the non-movant who

shall file a response to the [movant's] Statement of Material Facts. The non-movant's response shall mirror the movant's Statement of Material Facts by admitting and/or denying each of the movant's assertions in matching numbered paragraphs. Each denial shall set forth a specific citation to the record where the factual issue arises.... *Any facts set forth in the [movant's] Statement of material Facts shall be deemed admitted unless specifically controverted by the opposing party.*

L.R. 7.1(a)(3) (emphasis in original).

In moving for summary judgment, the University filed an eleven page, twenty-nine paragraph Statement of Material Facts, replete with citations to the record in every paragraph. Plaintiff, in opposition, filed a two page, nine paragraph statement appended to her memorandum of law which failed to admit or deny the specific assertions set forth by defendant, and which failed to contain a single citation to the record. Plaintiff has thus failed to comply with Rule 7.1(a)(3).

As recently noted in another decision, "[t]he Local Rules are not suggestions, but impose procedural requirements upon parties litigating in this District." *Osier v. Broome County,* 47 F.Supp.2d 311, 317 (N.D.N.Y.1999). As a consequence, courts in this district have not hesitated to enforce Rule 7.1(a)(3) and its predecessor, Rule 7.1(f) [FN1] by deeming the facts asserted in a movant's proper Statement of Material Facts as admitted, when, as here, the opposing party has failed to comply with the Rule. *See,e.g., Phipps v. New York State Dep't of Labor,* 53 F.Supp.2d 551, 556-57 (N.D.N.Y.1999); *DeMar v. Car-Freshner Corp.,* 49 F.Supp.2d 84, 86 (N.D.N.Y.1999); *Osier,* 47 F. Supp .2d at 317; *Nicholson v. Doe,* 185 F.R.D. 134, 135 (N.D.N.Y.1999); *TSI Energy,*

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2000 WL 1264122 (N.D.N.Y.)
(Cite as: 2000 WL 1264122 (N.D.N.Y.))

*Inc. v. Stewart and Stevenson Operations, Inc.,* 1998 WL
903629, at *1 n. 1 (N.D. N.Y.1998); *Costello v.. Norton,*
1998 WL 743710, at *1 n. 2 (N.D.N.Y.1998); *Squair v.
O'Brien & Gere Engineers, Inc.,* 1998 WL 566773, at *1
n. 2 (N.D.N.Y.1998). As in the cases just cited, this court
deems as admitted all of the facts asserted in defendant's
Statement of Material Facts. The court next recites these
undisputed facts.

FN1. Amended January 1, 1999.

BACKGROUND

*2 Plaintiff became a doctoral student in the University's
Child and Family Studies ("CFS") department in the
Spring of 1995. Successful completion of the doctoral
program required a student to (1) complete 60 credit hours
of course work; (2) pass written comprehensive
examinations ("comp.exams") in the areas of research
methods, child development, family theory and a specialty
area; (3) after passing all four comp. exams, orally defend
the written answers to those exams; (4) then select a
dissertation topic and have the proposal for the topic
approved; and (5) finally write and orally defend the
dissertation. Plaintiff failed to progress beyond the first
step.

Each student is assigned an advisor, though it is not
uncommon for students to change advisors during the
course of their studies, for a myriad of reasons. The
advisor's role is to guide the student in regard to course
selection and academic progress. A tenured member of the
CFS department, Dr. Jaipaul Roopnarine, was assigned as
plaintiff's advisor.

As a student's comp. exams near, he or she selects an
examination committee, usually consisting of three faculty
members, including the student's advisor. This committee
writes the questions which comprise the student's comp.
exams, and provides the student with guidance and
assistance in preparing for the exams. Each member of the
committee writes one exam; one member writes two. Two
evaluators grade each exam; ordinarily the faculty member
who wrote the question, and one other faculty member

selected by the coordinator of exams.

Roopnarine, in addition to his teaching and advising
duties, was the coordinator of exams for the entire CFS
department. In this capacity, he was generally responsible
for selecting the evaluators who would grade each
student's comp. exam, distributing the student's answer to
the evaluators for grading, collecting the evaluations, and
compiling the evaluation results.

The evaluators graded an exam in one of three ways:
"pass," "marginal" or "fail." A student who received a
pass from each of the two graders passed that exam. A
student who received two fails from the graders failed the
exam. A pass and a marginal grade allowed the student to
pass. A marginal and a fail grade resulted in a failure. Two
marginal evaluations may result in a committee having to
decide whether the student would be given a passing
grade. In cases where a student was given both a pass and
a fail, a third evaluator served as the tie breaker.

These evaluators read and graded the exam questions
independently of each other, and no indication of the
student's identity was provided on the answer. FN2 The
coordinator, Roopnarine, had no discretion in compiling
these grades-he simply applied the pass or fail formula
described above in announcing whether a student passed
or failed the comp. exams. Only after a student passed all
four written exam questions would he or she be permitted
to move to the oral defense of those answers.

FN2. Of course, as mentioned, because one of
the evaluators may have written the question, and
the question may have been specific to just that
one student, one of the two or three evaluators
may have known the student's identity regardless
of the anonymity of the examination answer.

*3 Plaintiff completed her required course work and took
the comp. exams in October of 1996. Plaintiff passed two
of the exams, family theory and specialty, but failed two,
child development and research methods. On each of the
exams she failed, she had one marginal grade, and one
failing grade. Roopnarine, as a member of her committee,

© 2010 Thomson Reuters. No Claim to Orig. US Gov.
Works.

Not Reported in F.Supp.2d, 2000 WL 1264122 (N.D.N.Y.)
(Cite as: 2000 WL 1264122 (N.D.N.Y.))

authored and graded two of her exams. She passed one of them, specialty, and failed the other, research methods. Roopnarine, incidently, gave her a pass on specialty, and a marginal on research methods. Thus it was another professor who gave her a failing grade on research methods, resulting in her failure of the exam. As to the other failed exam, child development, it is undisputed that Roopnarine neither wrote the question, nor graded the answer.

Pursuant to the University's procedures, she retook the two exams she failed in January of 1997. Despite being given the same questions, she only passed one, child development. She again failed research methods by getting marginal and fail grades from her evaluators. This time, Roopnarine was not one of the evaluators for either of her exam questions.

After this second unsuccessful attempt at passing research methods, plaintiff complained to the chair of the CFS department, Dr. Norma Burgess. She did not think that she had been properly prepared for her exam, and complained that she could no longer work with Roopnarine because he yelled at her, was rude to her, and was otherwise not responsive or helpful. She wanted a new advisor. Plaintiff gave no indication, however, that she was being sexually harassed by Roopnarine.

Though plaintiff never offered any additional explanation for her demands of a new advisor, Burgess eventually agreed to change her advisor, due to plaintiff's insistence. In March of 1997, Burgess and Roopnarine spoke, and Roopnarine understood that he would no longer be advising plaintiff. After that time period, plaintiff and Roopnarine had no further contact. By June of that year, she had been assigned a new advisor, Dr. Mellisa Clawson.

Plaintiff then met with Clawson to prepare to take her research methods exam for the third time. Despite Clawson's repeated efforts to work with plaintiff, she sought only minimal assistance; this was disturbing to Clawson, given plaintiff's past failures of the research methods exam. Eventually, Clawson was assigned to write plaintiff's third research methods exam.

The first time plaintiff made any mention of sexual harassment was in August of 1997, soon before plaintiff made her third attempt at passing research methods. She complained to Susan Crockett, Dean of the University's College of Human Development, the parent organization of the CFS department. Even then, however, plaintiff merely repeated the claims that Roopnarine yelled at her, was rude to her, and was not responsive or helpful. By this time Roopnarine had no contact with plaintiff in any event. The purpose of plaintiff's complaint was to make sure that Roopnarine would not be involved in her upcoming examination as exam coordinator. Due to plaintiff's complaints, Roopnarine was removed from all involvement with plaintiff's third research methods examination. As chair of the department, Burgess took over the responsibility for serving as plaintiff's exam coordinator. Thus, Burgess, not Roopnarine, was responsible for receiving plaintiff's answer, selecting the evaluators, and compiling the grades of these evaluators; [FN3] as mentioned, Clawson, not Roopnarine, authored the exam question.

    FN3. Plaintiff appears to allege in her deposition and memorandum of law that Roopnarine remained the exam coordinator for her third and final exam. *See* Pl.'s Dep. at 278; Pl.'s Mem. of Law at 9. The overwhelming and undisputed evidence in the record establishes that Roopnarine was not, in fact, the coordinator of this exam. Indeed, as discussed above, the University submitted a Statement of Material Facts which specifically asserted in paragraph 18 that Roopnarine was removed from all involvement in plaintiff's exam, including the role of exam coordinator. *See* Def.'s Statement of Material Facts at ¶ 18 (and citations to the record therein). Aside from the fact that this assertion is deemed admitted for plaintiff's failure to controvert it, plaintiff cannot maintain, without any evidence, that Roopnarine was indeed her exam coordinator. Without more than broad, conclusory allegations of same, no genuine issue of material fact exists on this question.

**\*4** Plaintiff took the third research methods examination

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2000 WL 1264122 (N.D.N.Y.)
(Cite as: 2000 WL 1264122 (N.D.N.Y.))

in September of 1997. Clawson and another professor, Dr. Kawamoto, were her evaluators. Clawson gave her a failing grade; Kawamoto indicated that there were "some key areas of concern," but not enough for him to deny her passage. As a result of receiving one passing and one failing grade, plaintiff's research methods exam was submitted to a third evaluator to act as a tie breaker. Dr. Dean Busby, whose expertise was research, was chosen for this task. Busby gave plaintiff a failing grade, and began his written evaluation by stating that

[t]his is one of the most poorly organized and written exams I have ever read. I cannot in good conscience vote any other way than a fail. I tried to get it to a marginal but could not find even one section that I would pass.

Busby Aff. Ex. B.

The undisputed evidence shows that Clawson, Kawamoto and Busby each evaluated plaintiff's exam answer independently, without input from either Roopnarine or anyone else. Kawamoto and Busby did not know whose exam they were evaluating. [FN4] Importantly, it is also undisputed that none of the three evaluators knew of plaintiff's claims of sexual harassment.

> FN4. Clawson knew it was plaintiff's examination because she was plaintiff's advisor, and wrote the examination question.

After receiving the one passing and two failing evaluations, Burgess notified plaintiff in December of 1997 that she had, yet again, failed the research methods exam, and offered her two options. Although the University's policies permitted a student to only take a comp. exam three times (the original exam, plus two retakes), the CFS department would allow plaintiff to retake the exam for a fourth time, provided that she took a remedial research methods class to strengthen her abilities. Alternatively, Burgess indicated that the CFS department would be willing to recommend plaintiff for a master's degree based on her graduate work. Plaintiff rejected both offers.

The second time plaintiff used the term sexual harassment in connection with Roopnarine was six months after she was notified that she had failed for the third time, in May of 1998. Through an attorney, she filed a sexual harassment complaint against Roopnarine with the University. This written complaint repeated her allegations that Roopnarine had yelled at her, been rude to her, and otherwise had not been responsive to her needs. She also, for the first time, complained of two other acts:

1. that Roopnarine had talked to her about his sex life, including once telling her that women are attracted to him, and when he attends conferences, they want to have sex with him over lunch; and

2. that Roopnarine told her that he had a dream in which he, plaintiff and plaintiff's husband had all been present.

Prior to the commencement of this action, this was the only specific information regarding sexual harassment brought to the attention of University officials.

The University concluded that the alleged conduct, if true, was inappropriate and unprofessional, but it did not constitute sexual harassment. Plaintiff then brought this suit. In her complaint, she essentially alleges two things; first, that Roopnarine's conduct subjected her to a sexually hostile educational environment; and second, that as a result of complaining about Roopnarine's conduct, the University retaliated against her by preventing her from finishing her doctorate, mainly, by her failing her on the third research methods exam.

**\*5** The University now moves for summary judgment. Primarily, it argues that the alleged conduct, if true, was not sufficiently severe and pervasive to state a claim. Alternatively, it argues that it cannot be held liable for the conduct in any event, because it had no actual knowledge of plaintiff's alleged harassment, and was not deliberately indifferent to same. Finally, it argues that plaintiff is unable to establish a retaliation claim. These contentions are addressed below.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2000 WL 1264122 (N.D.N.Y.)
(Cite as: 2000 WL 1264122 (N.D.N.Y.))

DISCUSSION

The principles that govern summary judgment are well established. Summary judgment is properly granted only when "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). When considering a motion for summary judgment, the court must draw all factual inferences and resolve all ambiguities in favor of the nonmoving party. See Torres v. Pisano, 116 F.3d 625, 630 (2d Cir.1997). As the Circuit has recently emphasized in the discrimination context, "summary judgment may not be granted simply because the court believes that the plaintiff will be unable to meet his or her burden of persuasion at trial." Danzer v. Norden Sys., Inc., 151 F.3d 50, 54 (2d Cir.1998). Rather, there must be either an absence of evidence that supports plaintiff's position, see Norton v. Sam's Club, 145 F.3d 114, 117-20 (2d Cir.), cert. denied, 525 U.S. 1001 (1998), "or the evidence must be so overwhelmingly tilted in one direction that any contrary finding would constitute clear error." Danzer, 151 F.3d at 54. Yet, as the Circuit has also admonished, "purely conclusory allegations of discrimination, absent any concrete particulars," are insufficient to defeat a motion for summary judgment. Meiri v. Dacon, 759 F.2d 989, 998 (2d Cir.1985). With these principles in mind, the court turns to defendant's motion.

*I. Hostile Environment*

Title IX provides, with certain exceptions not relevant here, that

[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance.

20 U.S.C. § 1681(a).

Recently, the Supreme Court reiterated that Title IX is enforceable through an implied private right of action, and that monetary damages are available in such an action.

See Gebser v. Lago Vista Indep. Sch. Dist., 524 U.S. 274, , 118 S.Ct. 1989, 1994 (1998) (citing Cannon v. University of Chicago, 441 U .S. 677 (1979) and Franklin v. Gwinnett County Pub. Sch., 503 U.S. 60 (1992)).

A. Severe or Pervasive

Provided that a plaintiff student can meet the requirements to hold the school itself liable for the sexual harassment,[FN5] claims of hostile educational environment are generally examined using the case law developed for hostile work environment under Title VII. See Davis, 119 S.Ct. at 1675 (citing Meritor Sav. Bank, FSB v. Vinson, 477 U.S. 57, 67 (1986), a Title VII case). Accord Kracunas v. Iona College, 119 F.3d 80, 87 (2d Cir.1997); Murray v. New York Univ. College of Dentistry, 57 F.3d 243, 249 (2d Cir.1995), both abrogated on other grounds by Gebser, 118 S.Ct. at 1999.

> FN5. In Gebser, 118 S.Ct. at 1999, and Davis v. Monroe County Bd. of Educ., 526 U.S. 629, , 119 S.Ct. 1661, 1671 (1999), the Supreme Court explicitly departed from the *respondeat superior* principles which ordinarily govern Title VII actions for purposes of Title IX; in a Title IX case it is now clear that a school will not be liable for the conduct of its teachers unless it knew of the conduct and was deliberately indifferent to the discrimination. Defendant properly argues that even if plaintiff was subjected to a hostile environment, she cannot show the University's knowledge and deliberate indifference. This argument will be discussed below.

> It bears noting that courts examining sexual harassment claims sometimes decide first whether the alleged conduct rises to a level of actionable harassment, before deciding whether this harassment can be attributed to the defendant employer or school, as this court does here. See,e.g., Distasio v. Perkin Elmer Corp., 157 F.3d 55 (2d Cir.1998). Sometimes, however, courts first examine whether the defendant can be held liable for the conduct,

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2000 WL 1264122 (N.D.N.Y.)
(Cite as: 2000 WL 1264122 (N.D.N.Y.))

and only then consider whether this conduct is actionable. *See,e.g.,Quinn v. Green Tree Credit Corp.,* 159 F.3d 759, 767 n. 8 (2d Cir.1998). As noted in *Quinn,* the Circuit has not instructed that the sequence occur in either particular order. *Seeid.*

**\*6** In *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 21-22 (1993), the Supreme Court stated that in order to succeed, a hostile environment claim must allege conduct which is so "severe or pervasive" as to create an " 'objectively' hostile or abusive work environment," which the victim also "subjectively perceive[s] ... to be abusive." *Richardson v. New York State Dep't of Corr. Servs.,* 180 F.3d 426, 436 (alteration in original) (quoting *Harris,* 510 U.S. at 21-22). From this court's review of the record, there is no dispute that plaintiff viewed her environment to be hostile and abusive; hence, the question before the court is whether the environment was "objectively" hostile. *Seeid.* Plaintiff's allegations must be evaluated to determine whether a reasonable person who is the target of discrimination would find the educational environment "so severe, pervasive, and objectively offensive, and that so undermines and detracts from the victim['s] educational experience, that [this person is] effectively denied equal access to an institution's resources and opportunities." *Davis,* 119 S.Ct. at 1675.

Conduct that is "merely offensive" but "not severe or pervasive enough to create an objectively hostile or abusive work environment-an environment that a reasonable person would find hostile or abusive" is beyond the purview of the law. *Harris,* 510 U.S. at 21. Thus, it is now clear that neither "the sporadic use of abusive language, gender-related jokes, and occasional teasing," nor "intersexual flirtation," accompanied by conduct "merely tinged with offensive connotations" will create an actionable environment. *Faragher v. City of Boca Raton,* 524 U.S. 775, 787 (1998). Moreover, a plaintiff alleging sexual harassment must show the hostility was based on membership in a protected class. *SeeOncale v. Sundowner Offshore Servs., Inc.,* 523 U.S. 75, 77 (1998). Thus, to succeed on a claim of sexual harassment, a plaintiff "must always prove that the conduct at issue was not merely tinged with offensive sexual connotations, but actually constituted discrimina[tion] ... because of ... sex." *Id.* at 81 (alteration

and ellipses in original).

The Supreme Court has established a non-exclusive list of factors relevant to determining whether a given workplace is permeated with discrimination so severe or pervasive as to support a Title VII claim. *SeeHarris,* 510 U.S. at 23. These include the frequency of the discriminatory conduct, its severity, whether the conduct was physically threatening or humiliating, whether the conduct unreasonably interfered with plaintiff's work, and what psychological harm, if any, resulted from the conduct. *Seeid.;Richardson,* 180 F.3d at 437.

Although conduct can meet this standard by being either "frequent" or "severe," *Osier,* 47 F.Supp.2d at 323, "isolated remarks or occasional episodes of harassment will not merit relief [ ]; in order to be actionable, the incidents of harassment must occur in concert or with a regularity that can reasonably be termed pervasive." ' *Quinn,* 159 F.3d at 767 (quoting *Tomka v. Seiler Corp.,* 66 F.3d 1295, 1305 n. 5 (2d Cir.1995)). Single or episodic events will only meet the standard if they are sufficiently threatening or repulsive, such as a sexual assault, in that these extreme single incidents "may alter the plaintiff's conditions of employment without repetition." *Id.AccordKotcher v. Rosa and Sullivan Appliance Ctr., Inc.,* 957 F.2d 59, 62 (2d Cir.1992) ("[t]he incidents must be repeated and continuous; isolated acts or occasional episodes will not merit relief.").

**\*7** The University quite properly argues that the conduct plaintiff alleges is not severe and pervasive. As discussed above, she claims that she was subjected to behavior by Roopnarine that consisted primarily of his yelling at her, being rude to her, and not responding to her requests as she felt he should. This behavior is insufficient to state a hostile environment claim, despite the fact that it may have been unpleasant. *See,e.g.,Gutierrez v. Henoch,* 998 F.Supp. 329, 335 (S.D.N.Y.1998) (disputes relating to job-related disagreements or personality conflicts, without more, do not create sexual harassment liability); *Christoforou v. Ryder Truck Rental, Inc.,* 668 F.Supp. 294, 303 (S.D.N.Y.1987) ("there is a crucial difference between personality conflict ... which is unpleasant but legal ... [and sexual harassment] ... which is despicable and illegal."). Moreover, the court notes that plaintiff has

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2000 WL 1264122 (N.D.N.Y.)
(Cite as: 2000 WL 1264122 (N.D.N.Y.))

failed to show that this alleged behavior towards her was sexually related-an especially important failing considering plaintiff's own testimony that Roopnarine treated some males in much of the same manner. *See,e.g.,* Pl.'s Dep. at 298 ("He said that Dr. Roopnarine screamed at him in a meeting"). As conduct that is "equally harsh" to both sexes does not create a hostile environment, *Brennan v. Metropolitan Opera Ass'n, Inc.,* 192 F.3d 310, 318 (2d Cir.1999), this conduct, while demeaning and inappropriate, is not sufficiently gender-based to support liability. *See Osier,* 47 F.Supp.2d at 324.

The more detailed allegations brought forth for the first time in May of 1998 are equally unavailing. These allegations are merely of two specific, isolated comments. As described above, Roopnarine told plaintiff of his sexual interaction(s) with other women, and made a single, non-sexual comment about a dream in which plaintiff, plaintiff's husband, and Roopnarine were all present. Accepting as true these allegations, the court concludes that plaintiff has not come forward with evidence sufficient to support a finding that she was subject to abuse of sufficient severity or pervasiveness that she was "effectively denied equal access to an institution's resources and opportunities." *Davis,* 119 S.Ct. at 1675.

*Quinn,* a recent Second Circuit hostile work environment case, illustrates the court's conclusion well. There, plaintiff complained of conduct directed towards her including sexual touching and comments. She was told by her supervisor that she had been voted the "sleekest ass" in the office and the supervisor deliberately touched her breasts with some papers he was holding. 159 F.3d at 768. In the Circuit's view, these acts were neither severe nor pervasive enough to state a claim for hostile environment. *See id.* In the case at bar, plaintiff's allegations are no more severe than the conduct alleged in *Quinn,* nor, for that matter, did they occur more often. Thus, without more, plaintiff's claims fail as well.

**\*8** Yet, plaintiff is unable to specify any other acts which might constitute sexual harassment. When pressed to do so, plaintiff maintained only that she "knew" what Roopnarine wanted "every time [she] spoke to him" and that she could not "explain it other than that's the feeling [she] had." Pl.'s Dep. at 283-85, 287, 292. As defendant

properly points out, these very types of suspicions and allegations of repeated, but unarticulated conduct have been shown to be insufficient to defeat summary judgment. *See Meiri,* 759 F.2d at 998 (plaintiff's allegations that employer " 'conspired to get of [her];' that he 'misconceived [her] work habits because of his subjective prejudice against [her] Jewishness;' and that she 'heard disparaging remarks about Jews, but, of course, don't ask me to pinpoint people, times or places.... It's all around us,' ' are conclusory and insufficient to satisfy the demands of Rule 56) (alterations and ellipses in original); *Dayes v. Pace Univ.,* 2000 WL 307382, at *5 (S.D.N.Y.2000) (plaintiff's attempts to create an appearance of pervasiveness by asserting "[t]he conduct to which I was subjected ... occurred regularly and over many months," without more "is conclusory, and is not otherwise supported in the record [and] therefore afforded no weight"); *Quiros v. Ciba-Geigy Corp.,* 7 F.Supp.2d 380, 385 (S.D.N.Y.1998) (plaintiff's allegations of hostile work environment without more than conclusory statements of alleged discrimination insufficient to defeat summary judgment); *Eng v. Beth Israel Med. Ctr.,* 1995 U.S. Dist. Lexis 11155, at *6 n. 1 (S.D.N.Y.1995) (plaintiff's "gut feeling" that he was victim of discrimination was no more than conclusory, and unable to defeat summary judgment). As plaintiff comes forward with no proper showing of either severe or pervasive conduct, her hostile environment claim necessarily fails.

B. Actual Knowledge / Deliberate Indifference

Even if plaintiff's allegations were sufficiently severe or pervasive, her hostile environment claim would still fail. As previously discussed, *see supra* note 5, the Supreme Court recently departed from the framework used to hold defendants liable for actionable conduct under Title VII. *See Davis,* 119 S.Ct. at 1671; *Gebser,* 118 S.Ct. at 1999. Pursuant to these new decisions, it is now clear that in order to hold an educational institution liable for a hostile educational environment under Title IX, it must be shown that "an official who at minimum has authority to address the alleged discrimination and to institute corrective measures on the [plaintiff's] behalf *has actual knowledge of [the] discrimination* [.]" *Gebser,* 118 S.Ct. at 1999 (emphasis supplied). What's more, the bar is even higher: after learning of the harassment, in order for the school to be liable, its response must then "amount to deliberate

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2000 WL 1264122 (N.D.N.Y.)
(Cite as: 2000 WL 1264122 (N.D.N.Y.))

indifference to discrimination[,]" or, "in other words, [ ] *an official decision by the [school] not to remedy the violation."Id.* (Emphasis supplied). Accord*Davis,* 119 S.Ct. at 1671 ("we concluded that the [school] could be liable for damages only where the [school] itself intentionally acted in clear violation of Title IX by remaining deliberately indifferent to acts of teacher-student harassment of which it had actual knowledge."). This requires plaintiff to show that the school's "own deliberate indifference effectively 'cause[d]' the discrimination." *Id.* (alteration in original) (quoting *Gebser,* 118 S.Ct. at 1999). The circuits that have taken the question up have interpreted this to mean that there must be evidence that actionable harassment continued to occur *after* the appropriate school official gained actual knowledge of the harassment. *SeeReese v. Jefferson Sch. Dist.,* 208 F.3d 736, 740 (9th Cir.2000); *Soper v. Hoben,* 195 F.3d 845, 855 (6th Cir.1999); *Murrell v. School Dist. No. 1, Denver Colo.,* 186 F.3d 1238, 1246 (10th Cir.1999); *Wills v. Brown Univ.,* 184 F.3d 20, 26-27 (1st Cir.1999). There is no serious contention that plaintiff can satisfy this requirement.

**\*9** By the time plaintiff complained to Dean Crockett of sexual harassment in August of 1997, it is uncontested that her alleged harasser had no contact with her. Nor, for that matter, did he ultimately have any involvement in the third retake of her exam. She had a new advisor, exam committee and exam coordinator. Quite simply, by that point, Roopnarine had no involvement with her educational experience at all.[FN6] This undisputed fact is fatal to plaintiff's claim. As discussed above, the Supreme Court now requires some harm to have befallen plaintiff *after* the school learned of the harassment. As there have been no credible allegations of subsequent harassment, no liability can be attributed to the University.[FN7]*SeeReese,* 208 F.3d at 740 ("There is no evidence that any harassment occurred after the school district learned of the plaintiffs' allegations. Thus, under *Davis,* the school district cannot be deemed to have 'subjected' the plaintiffs to the harassment.").

FN6. Of course, plaintiff contends that the University had notice of the harassment prior to this time, through her complaints to Burgess that she no longer could work with Roopnarine, because he yelled at her, was rude to her, and refused to assist her with various requests. But it is undisputed that she never mentioned sexual harassment, and provided no details as might suggest sexual harassment. Indeed, as pointed out by defendant, plaintiff *herself* admits that she did not consider the conduct sexual harassment until another person later told her that it might be, in June of 1997. *See* Pl.'s Dep. at 258-59, 340. As a result, plaintiff can not seriously contend that the University was on notice of the alleged harassment before August of 1997.

FN7. As mentioned previously, *seesupra* note 3, plaintiff maintains without any evidentiary support that Roopnarine played a role in her third exam. This allegation is purely conclusory, especially in light of the record evidence the University puts forward which demonstrates that he was not, in fact, involved in the examination.

As plaintiff's allegations of harassment are not severe or pervasive enough to state a claim, and in any event, this conduct can not be attributed to the University, her hostile environment claim is dismissed.

*II. Retaliation*

Plaintiff's retaliation claim must be dismissed as well. She cannot establish an actionable retaliation claim because there is no evidence that she was given failing grades due to complaints about Roopnarine. *SeeMurray,* 57 F.3d at 251 (retaliation claim requires evidence of causation between the adverse action, and plaintiff's complaints of discrimination). The retaliation claim appears to be based exclusively on plaintiff's speculative and conclusory allegation that Roopnarine was involved in or influenced the grading of her third research methods exam.[FN8] In any event, the adverse action which plaintiff claims to be retaliation must be limited to her failing grade on the third research methods exam, since plaintiff made no complaints of sexual harassment until August of 1997, long after plaintiff failed her second examination. *SeeMurray,* 57 F.3d at 251 (retaliation claim requires proof that defendant had knowledge of plaintiff's protected activity at the time of the adverse reaction); *Weaver v.*

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2000 WL 1264122 (N.D.N.Y.)
(Cite as: 2000 WL 1264122 (N.D.N.Y.))

*Ohio State Univ.*, 71 F.Supp.2d 789, 793-94 (S.D.Ohio) ("[c]omplaints concerning unfair treatment in general which do not specifically address discrimination are insufficient to constitute protected activity"), *aff'd,* 194 F.3d 1315 (6th Cir.1999).

> **FN8.** As properly noted by defendant, *see* Def. Mem. of Law at 28 n. 14, plaintiff's complaint alleges that a number of individuals retaliated against her, but in her deposition she essentially conceded that she has no basis for making a claim against anyone other than Roopnarine and those who graded her third exam. *See* Pl.'s Dep. at 347-53.

The undisputed evidence establishes that Roopnarine had no role in the selection of who would grade plaintiff's exam. Nor, for that matter, did he grade the exam; this was done by three other professors. Each of these professors has averred that they graded the exam without any input or influence from Roopnarine. More importantly, it is undisputed that none of the three had any knowledge that a sexual harassment complaint had been asserted by plaintiff against Roopnarine, not surprising since two of the three did not even know whose exam they were grading. Plaintiff's inability to show that her failure was causally related in any way to her complaint of harassment is fatal to her retaliation claim.[FN9]

> **FN9.** Plaintiff's claim also fails to the extent that the school's refusal to let her take the research methods exam for a fourth time was the retaliatory act she relies upon. It is undisputed that the University's policies for CFS department students only allow a comp. exam to be given three times. *See* Gaal Aff. Ex. 53. Plaintiff cannot claim that the University's refusal to depart from its own policies was retaliation without some concrete showing that its refusal to do so was out of the ordinary, i.e., that it had allowed other students to take the exam a fourth time without a remedial course, when these other students had not engaged in some protected activity. *See* *Murray,* 57 F.3d at 251 (there is "no allegation either that NYU selectively enforced its academic standards, or that the decision in

[plaintiff's] case was inconsistent with these standards.").

CONCLUSION

**\*10** For the aforementioned reasons, Syracuse University's motion for summary judgment is GRANTED; plaintiff's claims of hostile environment and retaliation are DISMISSED.

IT IS SO ORDERED.

N.D.N.Y.,2000.
Elgamil v. Syracuse University
Not Reported in F.Supp.2d, 2000 WL 1264122 (N.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))

C   Only the Westlaw citation is currently available.

United States District Court,
E.D. New York.
Wayne HARGROVE, Plaintiff,
v.
Sheriff Edward RILEY; Nassau County Correctional
Facility, et al; Nassau County University Medical Staff
and Nassau County Correctional Facility, Defendants.
**Civil Action No. CV-04-4587 (DGT).**

Jan. 31, 2007.

Wayne Hargrove, Ossining, NY, pro se.

Alexander V. Sansone, Troy & Troy, Lake Ronkonkoma,
NY, Joseph Carney, Mineola, NY, for Defendants.

*MEMORANDUM AND ORDER*

TRAGER, J.

*1 Inmate Wayne Hargrove ("Hargrove" or "plaintiff")
brings this *pro se* action pursuant to 42 U.S.C. § 1983
against the Nassau County Sheriff, Nassau County
Correctional Facility ("NCCF") and NCCF's medical staff,
(collectively, "defendants"), seeking damages for injuries
allegedly caused by defendants while he was incarcerated
at NCCF. Defendants now move for summary judgment
pursuant to Fed.R.Civ.P. 56 arguing, *inter alia,* that
Hargrove's claims should be dismissed because he failed
to exhaust administrative remedies, as required by the
Prison Litigation Reform Act of 1995 ("PLRA"), 42
U.S.C. § 1997e. For the following reasons, defendants'
motions for summary judgment are granted.

**Background**

On August 27, 2004,[FN1] Hargrove filed a complaint,
alleging that defendants violated his civil rights when they
forcibly administered purified protein derivative skin tests
("PPD test") to test for latent tuberculosis ("TB") in April
2002, 2003 and 2004 while he was incarcerated at NCCF.
Complaint, Ex. C; Aff. in Opp. at 1-4, Ex. A. Hargrove
named Nassau County Sheriff Edward Reilly ("Reilly"),
NCCF and Nassau County University Medical Staff [FN2] as
defendants.[FN3] On November 22, 2004, after discovery,
County Defendants and NHCC Defendants filed separate
motions for summary judgment pursuant to Fed.R.Civ.P.
56. Both defendants properly filed a Local Rule 56.1
Statement and served Hargrove a Notice to *Pro Se* Litigant
Opposing Motion for Summary Judgment, pursuant to
Local Civil Rule 56.2.

FN1. Hargrove signed the complaint August 27,
2004. The *pro se* clerk's office received and filed
the complaint on September 20, 2004. Under the
prison mail-box rule, a *pro se* prisoner's
complaint is deemed filed when it is delivered to
prison authorities. *See, e.g., Walker v.
Jastremski,* 430 F.3d 560, 562 (2d
Cir.2005)(deeming *pro* se prisoner's § 1983
action filed on date complaint was handed to
prison officials). There is no evidence in the
record as to when Hargrove handed the
complaint to prison officials. However, it is clear
the operative date is between August 27, 2004
and September 20, 2004. As discussed, *infra,*
both of these dates occur before Hargrove
properly exhausted the administrative remedies
available to him at NCCF.

FN2. The Nassau County University Medical
Staff are employed by the Nassau Health Care
Corporation ("NHCC"). Pursuant to the
Correctional Center Health Services Agreement
between the County of Nassau and NHCC, dated
September 24, 1999, NHCC provides medical
services for inmates at NCCF. County Defs.'s

© 2010 Thomson Reuters. No Claim to Orig. US Gov.
Works.

Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))

Not. of Motion, Decl., at 1.

FN3. Reilly and NCCF are represented separately from NHCC. Accordingly, when a distinction is necessary, Reilly and NCCF will be referred to as "County Defendants" and Nassau County University Medical Staff and NHCC will be referred to as "NHCC Defendants."

**(1)**

**Tuberculosis Testing at NCCF**

Upon entering NCCF, new prisoners must first go through medical intake. Aff. of Kim Edwards, ("Edwards Aff.") ¶ 3. This standard process usually takes seventy-two hours. Edwards Aff. ¶ 4. During medical intake, NCCF tests inmates for TB. Aff. of Getachew Feleke ("Feleke Aff.") ¶ 3. NCCF generally uses a PPD test to detect latent TB. Feleke Aff. ¶ 3. However, if an inmate has previously tested positive for TB, it is NCCF's policy to test for TB using an x-ray instead.[FN4] Feleke Aff. ¶ 3. As part of its Infectious Disease Program, NCCF re-tests inmates for TB each year, beginning after they have been housed in that facility for one year. Edwards Aff. ¶ 5.

FN4. According to WebMD, "[a] tuberculin skin test should not be done for people who have a(1) Known TB infection [or a] (2) Positive tuberculin skin test in the past. A second test may cause a more severe reaction to the TB antigens." Jan Nissl, RN, BS, *Tuberculin Skin Tests,* W E B M D , h t t p : / / www.webmd.com/hw/lab_tests/hw203560.asp (last visited Jan. 31, 2007).

**(2)**

**Hargrove's Tuberculosis Testing at NCCF**

On March 15, 2002, Hargrove was incarcerated at NCCF.

NHCC Defs.' 56.1 Statement ¶ 1. Before entering the general population, Hargrove was processed through medical intake. NHCC Defs.' 56.1 Statement ¶ 2. The NCCF Medical Intake Chart for Hargrove, dated March 15, 2002 ("3/15/02 Chart"), shows that Hargrove informed medical staff that he had previously been exposed to tuberculosis. NHCC Defs.' Notice of Mot., Ex. C, at 1; NHCC Defs.' 56.1 Statement ¶ 2. The 3/15/02 Chart also shows that Hargrove reported testing positive to a prior PPD test and that he had been treated for TB in 2000. NHCC Defs.' Notice of Mot., Ex. C, at 1. Hargrove alleges that he was exposed to and treated for TB in 1997. Hargrove's Aff. in Opp. to Mot. for Summary Judgment, ("Aff. in Opp."), Ex. A at 1-2. Defendants contend that Hargrove was given an x-ray during the medical intake process because of his reported positive PPD test, and that the x-ray was negative, showing no active TB infection. NHCC Defs.' 56.1 Statement ¶ 2; Edwards Aff. ¶ 3. Without specifying a date, Hargrove generally states that his "request to be x-rayed was denied." Aff. in Opp. at 3.

**\*2** Pursuant to NCCF's Infectious Disease Program, after being incarcerated in NCCF for a year, Hargrove was scheduled to be re-tested for TB. Edwards Aff. ¶ 5; NHCC Defs.' 56.1 Statement ¶ 4. On May 24, 2003, Hargrove was given a PPD skin test. Edwards Aff. ¶ 5; NHCC Defs.' 56.1 Statement ¶ 4. This test was negative. Edwards Aff. ¶ 5; NHCC Defs.' 56.1 Statement ¶ 4. According to Hargrove, he requested an x-ray instead of a PPD test because of his previous exposure to TB, but was forced to submit to the PPD test. He also alleges that defendants threatened to put him in "keep lock" or "lock up" unless he submitted to the PPD test.[FN5] Complaint, Ex. C; Aff. in Opp. at 1-4, Ex. A.

FN5. Hargrove has made contradictory statements about being placed in "keep lock" or "lock up". It is unclear whether he is alleging that defendants threatened to place him in "lock up" unless he submitted to the PPD test or whether he was actually placed in "lock up" until such time that he agreed to submit to the PPD tests. For example, in his complaint, Hargrove states that when he "refused to submit to another [PPD] test, the Correctional Authorities were brought in and placed [him] in lock up." Complaint ¶ 4. In a hearing before Magistrate Judge Bloom on

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))

January 31, 2005, Hargrove stated that he took the PPD tests because he was told that he would be placed in "lock up" until he submitted to the test. Hr'g Tr. 6:1-18; 9:5-10:10. In Exhibit B to his complaint, Hargrove alleges both that he was given an unwarranted TB shot and that when he refused the same shot he was placed in "keep lock." Complaint, Ex. B. There is no evidence in the record that Hargrove was ever segregated from the general population while housed at NCCF, outside of the seventy-two hour initial medical intake period. Aff. of Sgt. Neumann ("Neumann Aff.") at 1-2 (referring to prison records showing Hargrove's holding locations which demonstrate that he was never placed in "lock up"); NCCF 56.1 Statement ¶ E. Whether or not Hargrove was actually placed in "lock up" is not a material fact for purposes of this motion; as explained in detail, *infra,* Hargrove's failure to exhaust administrative remedies under the PLRA precludes a consideration of the merits of his Section 1983 claim.

The following year, in June of 2004, Hargrove was scheduled to be retested. Edwards Aff. ¶ 6; NHCC Defs.' 56.1 Statement ¶ 5. Because of the contradiction between the negative May 2003 PPD test and his reported positive history, NCCF contacted the Infectious Disease Department of the Nassau County Medical Center. Edwards Aff. ¶ 6. It was suggested that Hargrove be given a two-step PPD test, administered fifteen days apart. Feleke Aff. ¶ 4; Edwards Aff. ¶ 6. Hargrove was given these two PPD skin tests in June 2004. Edwards Aff. ¶ 6; NHCC Defs.' 56.1 Statement ¶ 5. Again, Hargrove alleges that these tests were administered against his will and under threat of being placed in quarantine. Complaint, Exs. A, B; Aff. in Opp., Ex. A.

On December 3, 2004, Hargrove was seen by a physician's assistant. NHCC Defs.' 56.1 Statement ¶ 6. During this meeting, Hargrove complained of a dry cough and that the site on his forearm where the June 2004 PPD tests had been administered was red and swollen. NHCC Defs.' 56.1 Statement ¶ 6; 11/28/04 Sick Call Request.

Hargrove's December 18, 2004 chart notes a positive PPD

test and an order was placed in the chart that Hargrove not be submitted for future PPD tests. Edwards Aff. ¶ 7; NHCC Defs.' 56.1 Statement ¶ 8. *See also* 11/19/2004 Grievance.

Hargrove alleges that the following physical ailments were caused by the PPD tests: chronic coughing, high blood pressure, chronic back pain, lung infection, dizzy spells, blurred vision and a permanent scar on both his forearms. Complaint, Ex. C; Aff. in Opp. at 3-4.

(3)

**NCCF's Inmate Grievance Procedure**

NCCF has had an inmate grievance program ("IGP") in place since 2001. Aff. of Kenneth Williams, ("Williams Aff."), at 2. NCCF's IGP is carried out in conformance with the New York State Commission of Corrections Minimum Standards and Regulations for Management of County Jails and Penitentiaries ("Minimum Standards"). *Id.*

The IGP is designed to resolve complaints and grievances that an inmate may have regarding the inmate's care and treatment while incarcerated at NCCF. Williams Aff. at 2. Upon entering NCCF, all inmates receive a copy of the NCCF inmate handbook, which outlines the IGP. *Id.*

**\*3** The record does not include an actual copy of NCCF's IGP, but the NCCF's IGP is detailed in the affidavit of NCCF Investigator Kenneth Williams. [FN6] The IGP encourages inmates to resolve their grievances informally with the staff member assigned to the inmate housing unit first. *Id.* If an acceptable resolution cannot be reached, inmates must then proceed through the formal three-step process set out in the IGP. *Id.* at 3.

FN6. Hargrove does dispute any statements made by Investigator Williams regarding the inmate grievance procedure, time limits or its availability to him. Furthermore, Hargrove does

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))

not dispute that he received a handbook outlining the IGP.

The first step requires an inmate to submit his grievance form [FN7] to the Inmate Grievance Unit by placing it in a locked box located in each housing area, "within five days of the date of the act or occurrence giving rise to the grievance." [FN8] *Id.* at 2-3. NCCF indexes all grievance forms filed by inmates in a log book and in a computer system. *Id.* at 1, 3. Once a grievance form is received by the Inmate Grievance Unit, the grievance is investigated and the inmate will receive a written determination of the outcome from the Inmate Grievance Coordinator in Section II of the grievance form. [FN9] *Id.* at 3. The inmate is then given a choice to accept or appeal the decision by checking the desired selection and signing his name in Section III of the grievance form. *See, e.g.,* 11/19/2004 Grievance form. If the inmate is not satisfied with the decision of the Inmate Grievance Coordinator, the inmate may appeal the determination to the Chief Administrative Officer. Williams Aff. at 3. Finally, if the inmate is not satisfied with the Chief Administrative Officer's determination, the inmate may appeal to the New York State Commission of Correction Citizen's Policy and Complaint Review Council ("Council"). *Id.* at 3. The Council will then render a final determination. *Id.* at 3.

> FN7. The grievance forms contain four sections to be utilized throughout all three steps of the IGP. Section I provides space for the inmate to explain his complaint and the actions he requests as relief. Section II is for the decision of the Inmate Grievance Coordinator. Section III is titled "Acceptance/Appeal of Grievance Coordinator's decision" and contains two mutually exclusive options in which the inmate must choose one or the other: "I have read and accept the Grievance Coordinator's decision," or "I have read and appeal the Grievance Coordinator's decision." Section IV provides space for the decision of the Chief Administrative Officer.

> FN8. Hargrove has not argued that he was unaware of this five-day deadline.

> FN9. There is no evidence in the record specifying the how long an inmate has to appeal inaction by the Inmate Grievance Unit.

(4)

**Authenticity of the Grievance Forms and Other Documents Submitted by Hargrove**

In support of his allegations that he continuously informed defendants that he had been exposed to TB and, therefore, should not have been given PPD tests, Hargrove submitted three letters with his complaint, two of which were addressed to the Inmate Grievance Committee and one of which was addressed to "To whom it may concern." Complaint, Exs. A-C. He also submitted five complaint letters written to Sheriff Reilly, seventeen sick call requests and nine grievance forms during discovery and with his Affidavit in Opposition to Defendants' Motion for Summary Judgment, explaining that some of the medical records and notarized letters were "missing." Aff. in Opp, Ex. A at 2. Defendants call the authenticity of most of these documents into question, contending that Hargrove never submitted any grievance form or complaint letter before he filed his complaint. County Defs.' Mem. of Law at 16-21; County Defs.' 56.1 Statement at ¶¶ B2, C3, D3.

Kenneth Williams, an investigator at NCCF in the Inmate Grievance Unit, testified that he reviewed all of the grievance forms, complaint letters and sick call requests annexed to Hargrove's Complaint and to Hargrove's Affidavit in Opposition to Defendants' Motion for Summary Judgment. Williams Aff. at 2. Williams testified that he examined the grievance records at NCCF and searched "for any grievances by plaintiff/inmate Hargrove" and found "only two." [FN10] Williams Aff. at 1. The first grievance, dated November 19, 2004, complained that the medical staff continued "forcing [Hargrove] to take a T.B. shot while [he] keep[s] telling them that [he] has been exposed to T.B." 11/19/2004 Grievance; Williams Aff. at 1. In response to this grievance, Hargrove's "positive" TB status was noted in his medical records and an order was placed in Hargrove's medical chart, stating that Hargrove not be subjected to future PPD tests. 11/19/2004 Grievance, Section II;

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))

Williams Aff. at 1; NHCC Defs.' 56.1 Statement ¶ 8; Edwards Aff. ¶ 7. In Section III of the 11/19/2004 Grievance, Hargrove acknowledged that he had read the Grievance Coordinator's decision, and that he chose to accept the decision instead of appealing it. 11/19/2004 Grievance. The other grievance received by the Grievance Unit, dated May 11, 2005, complained of an unrelated matter. 5/11/2005 Grievance (complaining of back problems and requesting the return of his medical shoes); Williams Aff. at 1. Thus, Williams concluded that, beside the 11/19/2004 and 5/11/2005 Grievance Forms, none of the other documents were "received by the grievance unit, and, given the locked box system, the grievance-forms were never submitted by plaintiff/inmate." Williams Aff. at 2.

> FN10. It is NCCF's procedure to forward to the attention of the Grievance Unit all official grievance forms and complaint letters-even ones not specifically addressed to the Grievance Unit. Williams Aff. at 3.

**\*4** A visual examination of the grievance forms Hargrove submitted in support of his claims suggests forgery. Five of the nine grievance forms were requests to stop PPD testing. *See* April 19, 2002 grievance; April 28, 2002 grievance; April 20, 2003 grievance; April 28, 2003 grievance; November 19, 2004 grievance. The remaining grievance forms concerned Hargrove's requests for medical shoes. *See* March 18, 2002 grievance; July 6, 2002 grievance; February 20, 2003 grievance; May 11, 2005 grievance. Of the grievance forms complaining of unwanted PPD tests, the April 28, 2002 grievance form is a patent photocopy of the April 19, 2002 grievance form, and the April 28, 2003 grievance form is a patent photocopy of the April 20, 2003 grievance form, with only the handwritten dates changed. The only potentially authentic grievance forms relating to Hargrove's complaint about the PPD testing are dated April 19, 2002, April 20, 2003, and November 19, 2004. Of these grievance forms, only the November 19, 2004 has been authenticated by NCCF personnel. *See generally* Williams Aff. at 1-4.

Turning to the complaint letters addressed to Reilly, many contain notary stamps cut from the bottom of unrelated

documents and photocopied onto the bottom of the complaint letters. *See* County Defs.' Mem. of Law at 18-21. C.O. Thomas McDevitt and C.O. Paul Klein, both of whom perform notary services for prisoners at NCCF, have submitted sworn affidavits, stating that they kept individual Notary Log Books covering all dates relevant to this litigation. Aff. of C.O. Klein, ("Klein Aff."), at 1; Aff. of C.O. McDevitt, ("McDevitt Aff."), at 1. McDevitt's Notary Log Book shows that he notarized only one document for Hargrove. This document, dated May 13, 2002, was a motion related to Hargrove's criminal trial. McDevitt Aff. at 1-2. Hargrove signed the Notary Log Book acknowledging receipt of that notarized motion. McDevitt Aff. at 2. McDevitt states that he never notarized any other documents for Hargrove. McDevitt Aff. at 2. However, McDevitt's stamp and signature dated May 13, 2002 (the date of the legitimate notarization) appear on Hargrove's letter to Sheriff Reilly dated May 10, 2002. County Defs.' Not. of Motion, Ex. A.

These facts repeat themselves in regard to the documents bearing the notary stamp and signature of Klein. Klein had performed several legitimate notarizations for Hargrove in connection to Hargrove's criminal trial. Klein Aff. at 1-2. Hargrove signed Klein's Notary Log Book acknowledging receipt of those notarized documents. Klein Aff. at 2. However, Klein states that he never notarized any of Hargrove's letters addressed to Sheriff Reilly that bear Klein's stamp and signature. Klein Aff. at 2. On all of the documents that Hargrove submitted bearing Klein's stamp and signature, the dates and signatures of Klein match identically to the dates on which he had performed legitimate notarizations for Hargrove in connection with his criminal trial. Defendants argue it is clear that the documents bearing the stamps and signatures of McDevitt and Klein were not actually notarized by these notaries. County Defs.' Mem. of Law at 17-22.

**\*5** Hargrove does not deny these allegations. Instead, he resubmits the documents that McDevitt and Klein testify they did not notarize with his Affidavit in Opposition and insists that the documents "refute[ ] the assertions put forth by the defendants." Aff. in Opp. at 2.

**Discussion**

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))

**(1)**

**Summary Judgment Standard**

A motion for summary judgment is granted when "there is no genuine issue as to any material fact and ... the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). A court ruling on a summary judgment motion must construe the facts in the light most favorable to the non-moving party and draw all reasonable inferences in his favor. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255 (1986); *Williams v. Metropolitan Detention Center,* 418 F.Supp.2d 96, 100 (E.D.N.Y.2005). Defendants, the moving party in this action, bear the burden of demonstrating the absence of a genuine issue of material fact. *Baisch v. Gallina,* 346 F.3d 366, 371 (2d Cir.2003).

As Hargrove is proceeding *pro se,* his complaint must be reviewed carefully and liberally, and be interpreted to "raise the strongest arguments it suggests," *Green v. United States,* 260 F.3d 78, 83 (2d Cir.2001), particularly when civil rights violations are alleged, *see, e.g., McEachin v. McGuinnis,* 357 F.3d 197, 200 (2d Cir.2004). Plaintiff's complaint does not specify the legal theories upon which it relies, but, in construing his complaint to raise its strongest arguments, it will be interpreted to raise claims under 42 U.S.C. § 1983. *See, e.g., Dufort v. Burgos,* No. 04-CV-4940, 2005 WL 2660384, at *2 (E.D.N.Y. Oct. 18, 2005) (liberally construing plaintiff's complaint, which failed to specify the legal theory or theories upon which it rested, as, *inter alia,* a claim under 42 U.S.C. § 1983); *Williams,* 418 F.Supp.2d at 100 (same).

**(2)**

**Prison Litigation Reform Act**

**a. Purpose of the Prison Litigation Reform Act**

The PLRA was intended to "reduce the quantity and improve the quality of prisoner suits." *Woodford v. Ngo,*

--- U.S. ----, 126 S.Ct. 2378, 2387 (2006) (quoting *Porter v. Nussle,* 534 U.S. 516, 524 (2002)). It seeks to eliminate unwarranted interference with the administration of prisons by federal courts, and thus " 'affor[d] corrections officials time and opportunity to address complaints internally before allowing the initiation of a federal case.' " *Woodford,* 126 S.Ct. at 2387 (quoting *Porter,* 534 U.S. at 525).*See also Booth v. Churner,* 532 U.S. 731, 739 (2001). Formal grievance procedures allow prison officials to reconsider their policies, implement the necessary corrections and discipline prison officials who fail to follow existing policy. *See Ruggiero v. County of Orange,* 467 F.3d 170, 177-78 (2d Cir.2006).

**b. The Exhaustion Requirement**

The PLRA's "invigorated" exhaustion provision, 42 U.S.C. § 1997e(a), provides the mechanism to reduce the quantity and improve the quality of prisoners' suits by requiring that prison officials have the opportunity to address prisoner complaints through internal processes before allowing a case to proceed in federal court. *Woodford,* 126 S.Ct. at 2382 (citing *Porter,* 534 U.S. at 524).Section 1997e(a) provides that:

**\*6** [n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other federal law, by a prisoner confined in any jail, or other correctional facility until such administrative remedies as are available are exhausted.

42 U.S.C. § 1997e(a).

The exhaustion requirement is a mandatory condition precedent to any suit challenging prison conditions, including suits brought under Section 1983. *Woodford,* 126 S.Ct. at 2383;*Ruggiero,* 467 F.3d at 174;*Williams,* 418 F.Supp.2d at 100-01. The exhaustion provision is applicable to suits seeking relief, such as money damages, that may not be available in prison administrative proceedings, as long as other forms of relief are obtainable through administrative channels. *Giano v. Goord,* 380 F.3d 670, 675 (2d Cir.2004); *see also Woodford,* 126 S.Ct. at 2382-83 ("[A] prisoner must now exhaust

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))

administrative remedies even where the relief sought-monetary damages-cannot be granted by the administrative process.") (citing *Booth,* 532 U.S. at 734).

In June 2006, the Supreme Court held that the PLRA requires "proper exhaustion" before a case may proceed in federal court. *Woodford,* 126 S.Ct. at 2387. "Proper exhaustion" requires a prisoner to use " 'all steps that the agency holds out, and doing so *properly* (so that the agency addresses the issues on the merits).' " *Ruggiero,* 467 F.3d at 176 (citing *Woodford,* 126 S.Ct. at 2385 (emphasis in original). Although the level of detail necessary to properly exhaust a prison's grievance process will vary from system to system, *Jones v. Bock,* 127 S.Ct. 910, 2007 WL 135890, at *12 (Jan. 22, 2007), "proper exhaustion" under the PLRA " 'demands compliance with [that] agency's deadlines and other critical procedural rules.' " *Ruggiero,* 467 F.3d at 176 (quoting *Woodford,* 126 S.Ct. at 2386). Thus, the PLRA's exhaustion requirement is not satisfied by "untimely or otherwise procedurally defective attempts to secure administrative remedies." *Ruggiero,* 467 F.3d at 176 (citing *Woodford,* 126 S.Ct. at 2382).

(3)

**Exhaustion Analysis: Hargrove did not Exhaust the Administrative Remedies Made Available by NCCF prior to Bringing Suit**

Section 1997e(a) of the PLRA applies to Hargrove's complaint; Hargrove was and continues to be confined in a correctional facility, *see Berry v. Kerik,* 366 F.3d 85, 87 (2d Cir.2004), and Hargrove's claim is about a "prison condition" within the meaning of the PLRA, *see Williams,* 418 F.Supp.2d at 101. *See also Sloane v. W. Mazzuca,* No. 04-CV-8266, 2006 WL 3096031, at *4 (S.D.N.Y. Oct. 31, 2006) (recognizing PLRA's application to complaint alleging retaliation by prison officials for plaintiff's refusal to consent to a PPD test). Accordingly, the merits of Hargrove's Section 1983 claims can only be addressed if it is first determined that Hargrove properly exhausted each claim under Section 1997e(a) of the PLRA before filing his complaint in federal court.

*7 Hargrove has submitted both forged [FN11] and authentic grievance forms in opposing defendants' motions for summary judgment. Excluding, for the moment, the forged documents, NCCF's records reflect that Hargrove did not submit his first grievance until after he filed the instant complaint. Williams Aff. at 1. Hargrove's first grievance complaining of unwanted PPD testing is dated November 19, 2004, Williams Aff. at 1, two to three months after Hargrove filed his complaint. Additionally, this first grievance, dated November 19, 2004, was submitted five months after the last PPD test was administered to him in June 2004. NHCC Defs.' 56.1 Statement ¶¶ 5,6. This five-month period far exceeds the five-day window provided by NCCF's IGP. Since Hargrove failed to comply with the IGP's deadlines, he did not properly exhaust the available administrative remedies. *Ruggiero,* 467 F.3d at 176 (" 'untimely or otherwise procedurally defective attempts to secure administrative remedies do not satisfy the PLRA's exhaustion requirement.' ") (quoting *Woodford,* 126 S.Ct. at 2382).

> FN11. Based on an examination of the documents themselves, as well as the uncontradicted testimony of the notaries performing services for prisoners at NCCF, *see generally* Klein Aff.; McDevitt Aff., and of the investigator in the Inmate Grievance Unit, *see generally* Williams Aff., it appears that many of the documents submitted by Hargrove are forgeries. However, in order to view the facts in the light most favorable to Hargrove, and so as to avoid making findings of fact in a summary judgment motion, for the purposes of the exhaustion analysis, all of the documents will be considered to be authentic. However, for purposes of the sanctions analysis, the documents will be explored and the consequences of Hargrove's misrepresentations will be addressed.

Furthermore, even if the falsified grievance forms Hargrove submitted in support of his claim are considered authentic, they are still untimely. The diagnostic TB tests (whether x-ray or PPD tests) were given to Hargrove on March 15, 2002, May 24, 2003 and in June of 2004, but the grievance forms Hargrove submitted complaining of unwanted PPD tests are dated April 19, 2002, April 28, 2002, April 20, 2003, April 28, 2003 and November 19,

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))

2004. None of these grievances were filed "within five days of the of the date of the act or occurrence giving rise to the grievance." Williams Aff. at 3. There is no evidence in the record suggesting that NCCF's IGP allows for a tolling of the five-day time limit in which to file a grievance.[FN12]

> FN12. Even if the submitted grievances had been filed within the proscribed time period, they only show that Hargrove's grievances reached an Inmate Grievance Coordinator, the first formal step of NCCF's three-step administrative grievance process; Hargrove never appealed to the Chief Administrative Officer. By failing to take the next available step in NCCF's IGP, Hargrove failed to satisfy the mandatory exhaustion requirement. *See, e.g., Williams, 418 F.Supp.2d at 101, 102* (dismissing *pro se* complaint where plaintiff could only show he exhausted two of the four-step process mandated by prison's administrative process).

While the letters to Reilly and sick call requests show that Hargrove attempted to bring his complaints about the PPD testing to the attention of the prison staff, *see, e.g.,* Aff. in Opp., Exs. A-D, NCCF's IGP requires use of formal grievance forms. Thus, writing complaint letters and submitting sick call requests did not properly exhaust NCCF's available administrative remedies. *See, e .g., Hernandez v. Coffey,* No. 99-CV-11615, 2006 WL 2109465, at *4 (S.D.N.Y. July 26, 2006) (holding letters did not satisfy plaintiff's exhaustion obligation); *Williams, 418 F.Supp.2d at 101* (holding that because plaintiff's efforts to convey his medical condition through letters and conversations with the warden and medical staff did "not include the required steps of the PLRA's administrative remedy process," plaintiff failed to exhaust); *Mills v. Garvin,* No. 99-CV-6032, 2001 U.S. Dist. LEXIS 3333, at *8 (S.D.N.Y. Mar. 2, 2001) ("letter writing is not the equivalent of an exhaustion of administrative remedies under the PLRA").

As Hargrove failed to properly exhaust his administrative remedies, this action is precluded by 42 U.S.C. § 1997e(a) unless Hargrove can establish excuse for his failure to exhaust.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

(4)

**No Grounds to Excuse Plaintiff's Failure to Exhaust**

*8 Exhaustion is an affirmative defense that defendants have the duty to raise. *Jones,* 2007 WL 135890, at * 8-11;*Sloane,* 2006 WL 3096031, at *4;*Williams, 418 F.Supp.2d at 101*. Once argued by the defendants, a plaintiff has an opportunity to show why the exhaustion requirement should be excused or why his failure to exhaust is justified. *See Ruggiero,* 467 F.3d at 175;*Collins v. Goord,* 438 F.Supp.2d 399, 411 (S.D.N.Y.2006) ("[T]he Second Circuit has cautioned that 'while the PLRA's exhaustion requirement is 'mandatory,' certain caveats apply.' ")(internal citations omitted). Thus, before concluding that a prisoner failed to exhaust available administrative remedies as required by Section 1997e(a) of the PLRA, the following three factors must be considered: (1) whether administrative remedies were actually available to the prisoner; (2) whether defendants have either waived the defense of failure to exhaust or acted in such a way as to estop them from raising the defense; and (3) whether special circumstances, such as a reasonable misunderstanding of the grievance procedures, exist justifying the prisoner's failure to comply with the exhaustion requirement. *Ruggiero,* 467 F.3d at 175 (citing *Hemphill v. New York,* 380 F.3d 680, 686 (2d Cir.2004)).[FN13]

> FN13. Courts in the Second Circuit have questioned what effect, if any, the Supreme Court's recent decision in *Woodford* requiring "proper exhaustion" may have on the three-step *Hemphill* inquiry. The Second Circuit has yet to address this issue. *See Ruggiero,* 467 F.3d at 175-76 (declining to "determine what effect *Woodford* has on our case law in this area ... because [plaintiff] could not have prevailed even under our pre-*Woodford* case law). To date, district courts have acknowledged the tension, but resolved to apply *Hemphill* to exhaustion claims until instructed otherwise by the Second Circuit. *See, e.g., Larkins v. Selsky,* 04-CV-5900, 2006 WL 3548959, at *9, n. 4 (S.D.N.Y. Dec. 6,

Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))

2006) (applying the current law of the Second Circuit to exhaustion claims); *Sloane,* 2006 WL 3096031, at *5 ("Until such time as the Court of Appeals considers the impact of *Woodford,* if any, on its prior rulings, this Court must follow the law of the Second Circuit. The Court will therefore apply the current law of this circuit to the exhaustion claims."); *Collins v. Goord,* 438 F.Supp.2d at 411 n. 13 (acknowledging that *Woodford* and *Hemphill* may be in tension, but deciding exhaustion claims under *Hemphill* inquiry); *Hernandez v. Coffey,* No. 99-CV11615, 2006 WL 2109465, at *3 (S.D.N.Y. July 26, 2006) (same). Here, Hargrove does not prevail under *Hemphill;* therefore, there is no occasion to address the potential effect *Woodford* may have had in his case.

**a. Whether administrative remedies were "available" to Hargrove**

The first step in the *Hemphill* inquiry requires a court to determine whether administrative remedies were available to the prisoner. *Hemphill,* 380 F.3d at 686. The test for assessing availability is an "objective one: that is, would a similarly situated individual of ordinary firmness have deemed them available." *Id.* at 688 (internal quotation marks omitted). In making this determination, "courts should be careful to look at the applicable set of grievance procedures." *Abney v. McGinnis,* 380 F.3d 663, 668 (2d Cir.2004). Exhaustion may be considered unavailable in situations where plaintiff is unaware of the grievance procedures or did not understand it, *Ruggiero,* 467 F.3d at 179, or where defendants' behavior prevents plaintiff from seeking administrative remedies,[FN14] *Hemphill v. State of New York,* 380 F.3d 680, 686 (2d Cir.2004).

FN14. Case law does not clearly distinguish between situations in which defendants' behavior renders administrative remedies "unavailable" to the plaintiff and cases in which defendants are estopped from asserting non-exhaustion as an affirmative defense because of their behavior. As such, there will be some overlap in the analyses.

Here, Hargrove has not claimed that NCCF's administrative grievance procedure was unavailable to him. In fact, Hargrove demonstrated his access to and knowledge of NCCF's IGP by filing proper grievances on November 19, 2004 and on May 10, 2005. Hargrove did not dispute any part of Investigator Williams's affidavit detailing the IGP and its availability to inmates since 2001. Specifically, Hargrove did not dispute, upon entering the facility, that he received a copy of the inmate handbook outlining the IGP. He has not claimed that he is unfamiliar with or unaware of NCCF's IGP. Hargrove has not alleged that prison officials failed to advance his grievances [FN15] or that they threatened him or took any other action which effectively rendered the administrative process unavailable.

FN15. Although not specifically alleged, interpreting the evidence to "raise the strongest argument," Hargrove may be arguing that NCCF's IGP was not available to him because the Grievance Coordinator failed to respond to his grievances. In the single grievance regarding PPD tests that defendants concede is authentic, Hargrove writes, "[n]ow for the third time your office refused to answer my grievances so please look into this matter because the T.B. shot is [sic] effecting my health." 11/19/04 Grievance. This language implies that Hargrove filed grievances in the past and received no response from the Inmate Grievance Coordinator. Furthermore, Hargrove wrote on one of the submitted copies of the November 19, 2004 grievance that "[t]his is the only accepte[sic] that Plaintiff got back from all grievances and letters that the Plaintiff sent to Sheriff Riley and his medical staffs about his staff making [sic] take T.B. test for 3 year[s]." County Defs'. Not. of Motion, Ex. A, 11/19/2004 grievance.

First, it must be reiterated that filing of the initial grievances was untimely. However, even assuming *arguendo* that the original grievances had been timely filed, district courts in the Second Circuit have held that the "lack of a response from the [Inmate Grievance Review Committee] does not excuse an inmate's obligation to exhaust his

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))

remedies through available appeals." *Hernandez v. Coffey,* 2006 WL 2109465, at *3-5. *See also Hemphill,* 380 F.3d at 686 ("Threats or other intimidation by prison officials may well deter a prisoner of 'ordinary firmness' from filing an internal grievance, but not from appealing directly to individuals in positions of greater authority within the prison system"); *Acosta v. Corr. Officer Dawkins,* No. 04-CV-6678, 2005 WL 1668627, at *3 (S.D.N.Y. July 14, 2005) (inmate required to appeal lack of response to exhaust administrative remedies); *Mendoza v. Goord,* No. 00-CV-0146, 2002 U.S. Dist. LEXIS 22573, at *6 (S.D.N.Y. Nov. 21, 2002) ("If, as a result of a negligent error by prison officials-or even their deliberate attempt to sabotage a prisoner's grievance-the prisoner [does not receive a response] on his complaint, he is not thereby forestalled from appealing"). Hargrove did not assert or offer evidence suggesting that he appealed the unresponsiveness or that those appeals were not advanced.

**\*9** Additionally, Hargrove's transfer from NCCF to Sing Sing Correctional Facility ("Sing Sing") in July 2005 did not excuse his previous failure to properly exhaust. *See, e.g., Sims v. Blot,* No. 00-CV-2524, 2003 WL 21738766, at *4 (S.D.N.Y. July 25, 2003) (determining that failure to exhaust administrative remedies is not excused by transfer to another facility); *Santiago v. Meinsen,* 89 F.Supp.2d 435, 440-41 (S.D.N.Y.2000) (determining that plaintiff should not be "rewarded" for failing to participate in grievance procedure before being transferred). Hargrove had ample opportunity to properly file his grievances and to appeal their results as required by NCCF's procedures while he was imprisoned at NCCF. The last PPD test Hargrove complains of was given in 2004; therefore, Hargrove had until June or July of 2004 to timely file his grievance in accordance with NCCF's IGP. Hargrove was not transferred to Sing Sing until July 2005. County Defs.' Mem. of Law at 2. Thus, Hargrove's transfer cannot excuse his previous failure to properly exhaust.

**b. Estoppel**

The second step of the inquiry asks whether defendants are estopped from raising exhaustion as a defense. Specifically, "whether the defendants may have forfeited the affirmative defense of non-exhaustion by failing to raise or preserve it, or whether the defendants' own actions inhibiting the inmate's exhaustion of remedies may estop one or more of the defendants from raising the plaintiff's failure to exhaust as a defense." *Hemphill,* 380 F.3d at 686 (internal citations omitted).

Here, Hargrove has not made any statements that would permit a finding that defendants should be estopped from raising the affirmative defense of exhaustion or that defendants waived the right to raise the defense. Defendants first raised the PLRA's exhaustion requirement as an affirmative defense in their respective answers. *See* County Defs.' Am. Answer at 3; NHCC Defs.' Answer at 1. County Defendants raised it again in their motion for summary judgment. *See* County Defs.' Mem of Law at 15-23. Thus, defendants are not estopped from raising the affirmative defense now. *See, e.g., Sloane,* 2006 WL 3096031, at *8 (exhaustion defense not waived where defendants first raised it in their motion to dismiss).

Additionally, defendants have not threatened Hargrove or engaged in other conduct preventing him from exhausting the available administrative remedies. *Cf. Ziemba v. Wezner,* 366 F.3d 161, 162 (2d Cir.2004) (holding defendants were estopped from asserting non-exhaustion because of prison officials' beatings, threats and other conduct inhibiting the inmate from filing proper grievances); *Feliciano v. Goord,* No. 97-CV-263, 1998 WL 436358, at *2 (S.D.N.Y. July 27, 1998) (holding defendants were estopped from asserting non-exhaustion where prison officials refused to provide inmate with grievance forms, assured him that the incidents would be investigated by staff as a prerequisite to filing a grievance, and provided prisoner with no information about results of investigation). Hargrove has not argued otherwise. *See Ruggiero,* 467 F.3d at 178 (holding defendants were not estopped from asserting a failure to exhaust defense where plaintiff pointed to no affirmative act by prison officials that would have prevented him from pursing administrative remedies); *Sloane,* 2006 WL 3096031, at *8 (finding no estoppel where plaintiff did not argue that defendants prevented him from pursuing the available administrative remedies); *Hernandez,* 2006 WL 2109465,

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))

at *4 (finding no estoppel where plaintiff did not argue that any threats or intimidation prevented him from pursuing his appeals). Thus, for the same reasons that administrative remedies were not deemed unavailable to Hargrove, defendants are not estopped from raising a failure to exhaust defense.

**c. Special circumstances**

**\*10** Even where administrative remedies are available and the defendants are not estopped from arguing exhaustion, the court must "consider whether 'special circumstances' have been plausibly alleged that justify 'the prisoner's failure to comply with administrative procedural requirements.' " Hemphill, 380 F.3d at 688 (quoting Giano, 380 F.3d at 676). For example, plaintiff's reasonable interpretation of regulations differing from prison official's interpretation has been held to constitute a "special circumstance." Giano, 380 F.3d at 676-77. No special circumstances have been alleged that would excuse Hargrove from availing himself of administrative remedies. See Sloane, 2006 WL 3096031, at *8; Freeman v. Goord, No. 02-CV-9033, 2004 U .S. Dist. LEXIS 23873, at * 9-10 (S.D.N.Y.2004) (granting motion to dismiss where "there is no evidence in the record ••• of any 'special circumstances' in this action.")

**(5)**

**Hargrove's Failure to Exhaust, in Addition to his Fraud on the Court, Warrants Dismissal with Prejudice**

Hargrove has not sufficiently rebutted the defendants' assertion of failure to exhaust, and a liberal reading of his submissions does not reveal any grounds to excuse that failure.

Because Hargrove filed a complaint in federal court before filing a grievance, permitting his unexhausted and unexcused claim to proceed would undercut one of the goals of the exhaustion doctrine by allowing NCCF to be haled into federal court without the "opportunity to correct

its own mistakes with respect to the programs it administers." Woodford, 126 S.Ct. at 2385. See also Ruggiero, 467 F.3d at 178 (citing Porter, 534 U.S. at 525). Thus, his complaint must be dismissed.

In general, dismissal without prejudice is appropriate where plaintiff has failed to exhaust but the time permitted for pursuing administrative remedies has not expired. Berry v. Kerik, 366 F.3d 85, 87 (2d Cir.2004). Dismissal with prejudice is appropriate where "administrative remedies have become unavailable after the prisoner had ample opportunity to use them and no special circumstances justified failure to exhaust." Berry, 366 F.3d at 88. Here, Hargrove's administrative remedies were available to him during his entire period of confinement at NCCF. He remained incarcerated in NCCF throughout the time period in which he alleges the PPD tests are given. He could have exhausted remedies for his grievances at any time. Therefore, Hargrove had ample opportunity to seek administrative remedies but failed to do so. Because there is no evidence in the record that administrative remedies are still available to Hargrove, as the five-day time period had run, and because Hargrove has alleged no special circumstances justifying his failure to exhaust, his complaint is accordingly dismissed with prejudice. Berry, 366 F.3d at 88 (upholding dismissal with prejudice where plaintiff had no justification for his failure to pursue administrative remedies while they were available.)

**\*11** Additionally, defendants' have moved for sanctions based on Hargrove's alleged submission of falsified evidence. If a party commits a fraud on the court, the court has the inherent power to do whatever is reasonably necessary to deter abuse of the judicial process. Shangold v. The Walt Disney Co., No. 03-CV-9522, 2006 WL 71672, at *4 (S.D.N.Y. January 12, 2006) (citing Chambers v. NASCO, Inc., 501 U.S. 32, 44 (1991)). Fraud upon the court has been defined as "fraud which seriously affects the integrity of the normal process of adjudication." Gleason v. Jandrucko, 860 F.2d 556, 559 (2d Cir.1988); McMunn v. Mem'l Sloan-Kettering Cancer Center, 191 F.Supp.2d 440, 445 (S.D.N.Y.2002). In order for a court to grant sanctions based upon fraud, it must be established by clear and convincing evidence that a party has "sentiently set in motion some unconscionable scheme calculated to interfere with the judicial system's ability impartially to adjudicate a matter by ... unfairly hampering

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))

the presentation of the opposing party's claim or defense." *McMunn*, 191 F.Supp.2d at 455 (quoting *Aoude v. Mobil Oil Corp.*, 892 F.2d 1115, 1119 (1st Cir.1989).

After carefully reviewing the allegedly fraudulent documents, it must be concluded that Hargrove consciously falsified these documents. *See, e.g., Shangold*, 2006 WL 71672, at *1, *3 (finding clear and convincing evidence of fraud where plaintiffs fabricated a timeline and plot outlines to advance their claims); *McMunn*, 191 F.Supp.2d at 446 (finding clear and convincing evidence of fraud where plaintiff edited audio tapes and represented that they were unedited during discovery). The notaries performing services for prisoners at NCCF testify that they never notarized many of the documents supplied by Hargrove. *See* Klein Aff.; McDevitt Aff. Furthermore, a visual examination of the documents themselves makes it clear that many of the documents submitted by Hargrove are forgeries.

In considering what sanction to impose, courts consider the following five factors: (i) whether the misconduct was the product of intentional bad faith; (ii) whether and to what extent the misconduct prejudiced the plaintiffs; (iii) whether there was a pattern of misbehavior rather than an isolated instance; (iv) whether and when the misconduct was corrected; and (v) whether further misconduct is likely to occur in the future. *Scholastic, Inc. v. Stouffer*, 221 F.Supp.2d 425, 444 (S.D.N.Y.2002) (citing *McMunn*, 191 F.Supp.2d at 461).

Here, Hargrove's deception was not an isolated instance; he fabricated the dates on many grievance forms, in addition to improperly duplicating notary stamps on complaint letters to make them look authentic. Klein Aff. at 2; McDevitt Aff. at 2; County Defs.' 56.1 Statement ¶¶ C3, D3. He submitted these forgeries to defendants during discovery and again as exhibits to his Affidavit in Opposition to Defendant's Motion for Summary Judgment. A severe sanction is warranted as Hargrove's forgeries were intentional, he never corrected them once their authenticity was challenged and he continues to insist on their veracity. Aff. in Opp. at 1-4. Given that there is clear and convincing evidence that Hargrove has continuously and consciously perpetrated a fraud on the court through his submission of fraudulent documents and sworn

affirmations of those documents' authenticity, dismissal with prejudice is especially appropriate. *See, e.g., Shangold*, 2006 WL 71672, at *5 (dismissing with prejudice where plaintiffs fabricated evidence to advance their claims); *Scholastic*, 221 F.Supp.2d at 439-444 (dismissing with prejudice where plaintiff produced seven pieces of falsified evidence); *McMunn*, 191 F.Supp.2d at 445 (dismissing with prejudice where plaintiff "lie[d] to the court and his adversary intentionally, repeatedly, and about issues that are central to the truth-finding process").

**Conclusion**

**\*12** Because Hargrove did not satisfy the exhaustion requirement under the PLRA, defendants' motions for summary judgment are granted. Further, considering the fraud Hargrove perpetrated on the court, the claims are dismissed against all defendants with prejudice. The Clerk of the Court is directed to close the case.

SO ORDERED:

E.D.N.Y.,2007.
Hargrove v. Riley
Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 2006 WL 2639369 (N.D.N.Y.)
(Cite as: 2006 WL 2639369 (N.D.N.Y.))

C
Only the Westlaw citation is currently available.

United States District Court,
N.D. New York.
James PETTUS, Plaintiff,
v.
Jospeh McCOY, Superintendent, Deputy Ryan,
Defendants.
No. 9:04-CV-0471.

Sept. 13, 2006.

James Pettus, Comstock, NY, pro se.

Charles J. Quackenbush, New York State Attorney
General, The Capitol Albany, NY, for Defendants.

**DECISION and ORDER**

THOMAS J. McAVOY, Senior District Judge.

*1 Plaintiff commenced the instant action asserting
various violations of his constitutional rights arising out of
his placement at the Southport Correctional Facility. In his
Complaint, Plaintiff alleges that he was improperly sent to
the Special Housing Unit ("SHU") at a maximum security
facility and that being in SHU has put his life in jeopardy.
Currently before the Court is Defendants' motion for
summary judgment pursuant to Fed.R.Civ.P. 56 seeking
dismissal of the Complaint in its entirety for failure to
exhaust administrative remedies.

**I. FACTS**[FN1]

    FN1. The following facts are taken from
    Defendants' statement of material facts submitted

pursuant to N.D.N.Y.L.R. 7.1(a)(3). These facts
are deemed admitted because they are supported
by the record evidence and Plaintiff failed to
submit an opposing statement of material facts as
required by Rule 7.1(a)(3). Plaintiff was
specifically advised by Defendants of his
obligation to file an opposing statement of
material facts and to otherwise properly respond
to the motion for summary judgment.

Plaintiff is an inmate in the custody of the New York State
Department of Correctional Services. Plaintiff signed the
instant Complaint on April 7, 2004. On his Complaint
form, Plaintiff indicated that there is a grievance
procedure available to him and that he availed himself of
the grievance procedure by filing a complaint with the
IGRC [FN2], followed by an appeal to the superintendent of
the facility, and then to the Central Office Review
Committee in Albany. The Complaint indicates that
Plaintiff is "waiting for response from Albany." The
Complaint was filed on April 27, 2004.

    FN2. Inmate Grievance Review Committee.

On April 12, 2004, prior to the filing of the instant
Complaint, Plaintiff filed a grievance relating to the issues
presented in this case. On April 19, 2004, the IGRC
recommended that Plaintiff's grievance be denied. Plaintiff
then appealed that decision to the facility Superintendent.
In the meantime, on April 27, Plaintiff commenced the
instant litigation. On May 3, 2004, after Plaintiff filed the
Complaint in this case, the Superintendent denied
Plaintiff's grievance. On May 5, 2004, Plaintiff appealed
the decision to the Central Office Review Committee in
Albany. On June 23, 2004, the Central Office Review
Committee denied Plaintiff's appeal. Plaintiff did not file
any other grievances in connection with the matters raised
in this lawsuit.

Defendants now move to dismiss on the ground that
Plaintiff commenced the instant action before fully
exhausting his available administrative remedies.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 2639369 (N.D.N.Y.)
(Cite as: 2006 WL 2639369 (N.D.N.Y.))

## II. DISCUSSION

The sole issue presented is whether Plaintiff was required to complete the administrative process before commencing this litigation. This issue has already been addressed by the Second Circuit in *Neal v. Goord,* 267 F.3d 116 (2d Cir.2001). The issue in that case was "whether plaintiff's complaint should have been dismissed despite his having exhausted at least some claims during the pendency of his lawsuit." *Id.* at 121. The Second Circuit held that "exhausting administrative remedies after a complaint is filed will not save a case from dismissal." *Id.*

In this case, Defendants have established from a legally sufficient source that an administrative remedy is available and applicable. *Mojias v. Johnson,* 351 F.3d 606, 610 (2d Cir.2003); *see also* 7. N.Y.C.R.R. § 701.1, *et seq.* Plaintiff's Complaint concerns his placement in SHU at a maximum security facility. These are matters that fall within the grievance procedure available to NYSDOCS inmates and are required to be exhausted under the Prison Litigation Reform Act, 42 U.S.C. § 1997e. Plaintiff has failed to demonstrate any applicable exception to the exhaustion requirement. Because Plaintiff commenced the instant litigation prior to fully completing the administrative review process, the instant Complaint must be dismissed without prejudice. *Neal,* 267 F.3d 116.

## III. CONCLUSION

*2 For the foregoing reasons, Defendants' motion for summary judgment is GRANTED and the Complaint is DISMISSED WITHOUT PREJUDICE. The Clerk of the Court shall close the file in this matter.

IT IS SO ORDERED.

N.D.N.Y.,2006.
Pettus v. McCoy
Not Reported in F.Supp.2d, 2006 WL 2639369 (N.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 2004 WL 324898 (S.D.N.Y.)
(Cite as: 2004 WL 324898 (S.D.N.Y.))

**H**
Only the Westlaw citation is currently available.

United States District Court,
S.D. New York.
William MINGUES, Plaintiff,
v.
C.O NELSON and C.O. Berlingame, Defendants.
**No. 96 CV 5396(GBD).**

Feb. 20, 2004.

**Background:** Inmate brought a § 1983 action asserting, inter alia, claims of excessive force during his wife's visit with him at the correctional facility.

**Holding:** On a defense motion to dismiss, the District Court, Daniels, J., held that the record established that the action was filed after the effective date of the Prison Litigation Reform Act (PLRA).
Motion granted.

West Headnotes

Civil Rights 78 🗝    1395(7)

78 Civil Rights
    78III Federal Remedies in General
        78k1392 Pleading
            78k1395 Particular Causes of Action
                78k1395(7) k. Prisons and Jails; Probation and Parole. Most Cited Cases
Record established that inmate's § 1983 action was filed after the effective date of the Prison Litigation Reform Act of 1996 (PLRA), such that the inmate's failure to exhaust his administrative remedies precluded relief; examination of the initial complaint itself, on its face, unequivocally demonstrated that the inmate's subsequent allegation in his amended complaint that he filed the complaint in April of 1996 was patently false; there was no explanation offered that could reasonably support and account for the existence of May dates on the complaint. 42 U.S.C.A. § 1983; Civil Rights of Institutionalized Persons Act, § 7(a), 42 U.S.C.A. § 1997e(a).

*MEMORANDUM DECISION AND ORDER*

DANIELS, J.

**\*1** This § 1983 action was originally commenced by the plaintiff,[FN1] a prisoner in New York State custody, and his wife claiming their civil rights were violated during the wife's visit with plaintiff at the correctional facility. Discovery in this matter has concluded. Previously, all claims asserted by plaintiff's wife were dismissed for failure to prosecute. Additionally, defendants' summary judgment motion was denied with respect to plaintiff's claims of excessive force,[FN2] and summary judgment was granted dismissing all of plaintiff's other claims. Defendants now seek to dismiss the remaining excessive force claims on the grounds they are barred by the Prisoner Litigation Reform Act of 1996 ("PLRA"), 42 U.S.C. § 1997e(a), as plaintiff failed to exhaust his administrative remedies.

> FN1. Plaintiff and his wife were proceeding *pro se* when they filed the complaint and amended complaint. Thereafter, plaintiff obtained legal representation.

> FN2. In the amended complaint, plaintiff alleges he was beaten, kicked and punched. (Am.Compl. § 6). In his original complaint, he had also claimed that he was whipped." (Compl. at 7, 8). Plaintiff testified at his deposition that he was slapped once in the face, punched about four or five times in the lower back, and a correctional officer then laid on top of him. (Mingues Dep. at 78-81). The incident, which took approximately thirty to forty seconds, caused plaintiff to suffer from back pain for an unspecified period of time. (*Id.* at 81, 86).

Not Reported in F.Supp.2d, 2004 WL 324898 (S.D.N.Y.)
(Cite as: 2004 WL 324898 (S.D.N.Y.))

Subdivision (a) of § 1997e provides, "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." This provision became effective on April 26, 1996. *Blisset v. Casey,* 147 F.3d 218, 219 (2d Cir.1998). The PLRA's exhaustion requirement does not apply retroactively to actions pending when the Act was signed into law. *Scott v. Coughlin,* 344 F.3d 282, 291 (2d Cir.2003).

There is no dispute that plaintiff did not avail himself of the existing and available prison grievance procedure. Plaintiff, however, argues he was not required to exhaust his administrative remedies because, as alleged in his amended complaint, "petitioners (sic) had already filed in April 10-12 of 1996," prior to the PLRA's April 26, 1996 enactment date.[FN3] (Am.Compl. § 2). In order to determine the date that the instant action was commenced, the date of the filing of the amended complaint relates back to the filing date of the original complaint. Fed.R.Civ.P. 15(c). The original complaint was signed and dated by plaintiff's wife on May 8, 1996; it was stamped received by the Pro Se Office on May 10, 1996; and plaintiff's signature is dated May 13, 1996.[FN4]

   FN3. The amended complaint reads as follows:

      That the original complaint filed under and pursuant to Title 42 section 1983 and 1985 was made and submitted before this court in April of 1996, before the application of the Prisoner Litigation Reform Act of 1996 was signed into law. The Act was signed into law April 26, 1996 and petitioners had already filed in April 10-12 of 1996. (Am.Compl. § 2).

   FN4. Plaintiff's wife application for *in forma pauperis* relief was signed and dated May 8, 1996, and it is stamped as received by the Pro Se Office on May 10, 1996. Plaintiff's signature, on his initial application for appointment of counsel, is dated May 13, 1996, and it is stamped as

received by the Pro Se Office on May 10, 1996. Attached to plaintiff's application, is his signed Affirmation of Service, dated May 13, 1996, wherein plaintiff declared under penalty of perjury that he served his application upon the Pro Se Office. Plaintiff alleges that "between April 17, 1996 until October 7, 1996," all visitation was suspended between him and his wife and that their "only form of communications was correspondence ." (Am.Compl. § 7).

The matter was referred to Magistrate Judge Pitman for a Report and Recommendation ("Report"). Although the magistrate judge found that the three earliest possible dates that the evidence demonstrates the complaint could have been filed, *i.e.,* May 8th, 10th, and 13th of 1996, were all beyond the PLRA enactment date, he nevertheless recommended that the motion to dismiss be denied based on plaintiff's allegation in the amended complaint that he filed the original complaint April 10-12 of 1996, prior to the April 26, 1996 enactment date. The magistrate judge found that, "[i]n light of the express allegation in the Amended Complaint that plaintiff commenced the action before April 26, 1996 and the absence of a clear record to the contrary, the requirement that disputed factual issues be resolved in plaintiff's favor for purposes of this motion requires that the motion be denied." (Report at 12-13).

**\*2** Defendants object to the Report's conclusion that there is a material issue of fact regarding the date the action was filed. Plaintiff's attorney did not file any objections.[FN5] The Court must make a *de novo* determination as to those portions of the Report to which there are objections. Fed.R.Civ.P. 72(b); 28 U.S.C. § 636(b)(1)(C). It is not required that the Court conduct a *de novo* hearing on the matter. *United States v. Raddatz,* 447 U.S. 667, 676, 100 S.Ct. 2406, 65 L.Ed.2d 424 (1980). Rather, it is sufficient that the Court "arrive at its own, independent conclusion" regarding those portions to which the objections were made. *Nelson v. Smith,* 618 F.Supp. 1186, 1189-90 (S.D.N.Y.1985) (quoting *Hernandez v. Estelle,* 711 F.2d 619, 620 (5th Cir.1983)). Accordingly, the Court, in the exercise of sound judicial discretion, must determine the extent, if any, it should rely upon the magistrate judge's proposed findings and recommendations. *Raddatz,* 447 U.S. at 676. The Court may accept, reject or modify, in whole or in part, the findings and recommendations set forth within the Report. Fed.R.Civ.P. 72(b); 28 U.S.C. §

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 3

Not Reported in F.Supp.2d, 2004 WL 324898 (S.D.N.Y.)
(Cite as: 2004 WL 324898 (S.D.N.Y.))

636(b)(1)(C). Where there are no objections, the Court may accept the Report provided there is no clear error on the face of the record. *Nelson v. Smith,* 618 F.Supp. at 1189; *see also Heisler v. Kralik,* 981 F.Supp. 830, 840 (S.D.N.Y.1997), *aff'd sub nom. Heisler v. Rockland County,* 164 F.3d 618 (2d Cir.1998).

> FN5. Plaintiff himself filed objections which was not adopted by his counsel. Plaintiff objects to the magistrate judge's finding that an issue exists as to when plaintiff filed the complaint because plaintiff asserts he gave it to prison officials to be mailed in April. Additionally, plaintiff objects to the magistrate judge's suggestion that the defendants convert their motion to one for summary judgment asserting the same theory as set forth in the present motion. Since this Court finds that the instant motion is meritorious, the propriety of plaintiff personally submitting his own objections need not be address as those objections are moot.

Upon a *de novo* review, the Report's recommendation that the motion be denied is rejected by the Court. Section 1997e (a) requires that inmates exhaust all available administrative remedies prior to the commencement of a § 1983 action concerning prison conditions, and failure to do so warrants dismissal of the action. *Porter v. Nussel,* 534 U.S. 516, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002); *Scott,* 344 F.3d at 290. The exhaustion of one's administrative remedies, however, is not a jurisdictional requirement under the PLRA. *Richardson v. Goord,* 347 F.3d 431 (2d Cir.2003). A defendant may assert a non-exhaustion claim as an affirmative defense. *Jenkins v. Haubert,* 179 F.3d 19, 28-29 (2d Cir.1999). Since it is an affirmative defense, defendants bear the burden of proof in this regard. *See, McCoy v. Goord,* 255 F.Supp.2d 233, 248 (S.D.N.Y.2003); *Arnold v. Goetz,* 245 F.Supp.2d 527, 534-35 (S.D.N.Y.2003); *Reyes v. Punzal,* 206 F.Supp.2d 431, 433 (W.D.N.Y.2002). A motion to dismiss, pursuant to Fed.R.Civ.P. 12(b)(6), is an appropriate vehicle to be used by a defendant where the failure to exhaust is clear from the face of the complaint as well as any written instrument attached as an exhibit and any statements or documents incorporated by reference into the complaint. *See, Scott v. Gardner,* 287 F.Supp.2d 477, 485 (S.D.N.Y.2003) (citation omitted); *McCoy,* 255 F.Supp.2d at 249.

In the amended complaint, plaintiff alleges, in a conclusory manner, that he filed the original complaint before the effective date of the PLRA, sometime between April 10th and April 12th of 1996.[FN6] On a motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(6), the court must accept all well-pleaded factual allegations in the complaint as true, and draw all reasonable inference in plaintiff's favor. *Resnick v. Swartz,* 303 F.3d 147, 150-51 (2d Cir.2002) (citation omitted); *Bolt Elec., Inc. v. City of New York,* 53 F.3d 465, 469 (2d Cir.1995). Dismissal is only warranted where it appears without doubt that plaintiff can prove no set of facts supporting his claims that would entitle him to relief. *Harris v. City of New York,* 186 F.3d 243, 247 (2d Cir.1999). The court's consideration is not limiting solely to the factual allegations set forth in the amended complaint. Rather, the court may also consider documents attached to the complaint as exhibits or incorporated in it by reference, matters of which judicial notice may be taken, or to documents either in plaintiff's possession or of which he has knowledge of and relied on in bringing the action. *Brass v. American Film Technologies, Inc.,* 987 F.2d 142, 150 (2d Cir.1993) (citation omitted). The court is not bound to accept as true a conclusory allegation where the pleadings are devoid of any specific facts or circumstances supporting such an assertion. *DeJesus v. Sears, Roebuck & Co., Inc.,* 87 F.3d 65, 70 (2d Cir.1996). Nor must the court "ignore any facts alleged in the complaint that undermine the plaintiff's claim." *Roots Partnership v. Lands' End, Inc.,* 965 F.2d 1411, 1416 (7th Cir.1992) (citation omitted).

> FN6. In response to then Chief Judge Thomas P. Griesa's 1996 order dismissing this action, plaintiff filed an Application for Reconsideration, dated October 28, 1996, wherein he claims that "on April 12, 1996 this petitioner filed a 1983 civil suit ..." (Pl.'s Mot. for Recons. at 1).

*3 Plaintiff fails to allege any factual basis in support of his claim that he filed the initial complaint between April 10-12, 1996. The Court is not required to accept this statement as a well-pleaded factual allegation in light of the existing record which clearly demonstrates that such an allegation is not only factually unsupported by the clear evidence, but is factually impossible. Generally, an

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2004 WL 324898 (S.D.N.Y.)
(Cite as: 2004 WL 324898 (S.D.N.Y.))

amended complaint supersedes the original complaint, and renders it of no legal effect. *In re. Crysen/Montenay Energy Co.,* 226 F.3d 160, 162 (2d Cir.2000). In plaintiff's amended complaint, he states that he is submitting the amended complaint in support of his original complaint. Hence, the original complaint is incorporated by reference in the amended complaint, and may be considered by the Court. Even if the initial complaint was not so incorporated, given the circumstances of this case, the Court would nevertheless consider it as it relates to the original date of filing. An examination of the initial complaint itself, on its face, unequivocally demonstrates that plaintiff's subsequent allegation in his amended complaint that he filed the complaint between April 10th and 12th of 1996 is patently false.

The original complaint refers to plaintiff's prison disciplinary hearing arising out of the same incident forming the basis of the present lawsuit. Generally, the disciplinary charges against plaintiff were in connection with an alleged conspiracy by him and his wife to commit grand larceny against inmate Robert Cornell. That hearing began on April 16, 1996, and concluded on April 19, 1996. (Defs.' Notice of Mot. for Summ. J. Ex. N, Transcript of Disciplinary Hr'g, conducted on April 16, 18-19, 1996). Specifically, in the original complaint, plaintiff refers to the testimony given by this fellow inmate.[FN7] (Compl. at 8). That inmate testified on April 19th. (Hr'g. Tr. at 53-54, 57). Thus, plaintiff's claim that he filed the complaint between April 10-12, 1996, is absolutely impossible as the initial complaint refers to events occurring after that time period. Merely because plaintiff boldly alleges in his amended complaint that he filed the original complaint between April 10th and 12th does not require this Court to turn a blind eye to plaintiff's prior pleadings demonstrating the absurdity of his claim.[FN8] *See, Silva Run Worlwide Ltd. v. Gaming Lottery Corp.,* 2001 WL 396521, *1 (S.D.N.Y. April 19, 2001) (citations omitted) (A court should not "accept allegations that are contradicted or undermined by other more specific allegations in the complaint or by written materials properly before the court.").

FN7. In the complaint, plaintiff alleges "that at his S.H.U. hearing petitioner called as a witness Robert Cornell who stated that this petitioner Mingues nor his wife (co-petitioner) Narvaez ever took any money from him. (Compl. at 8).

FN8. At his deposition, plaintiff testified that he filed the initial complaint "[a]pproximately around June of 1996." (Mingues Dep. at 37-38).

Lawsuits by inmates represented by counsel are commenced when the complaint is filed with the court. *See,* Fed.R.Civ.P. 3, 5(e). For *pro se* litigants, who are not imprisoned and have been granted *in forum pauperis* relief, their complaints are deemed filed when received by the Pro Se Office. *See, Toliver v. County of Sullivan,* 841 F.2d 41 (2d Cir.1998). The complaint of a *pro se* prisoner, however, is deemed filed when he or she gives the complaint to prison officials to be mailed. *Houston v. Lack,* 487 U.S. 266, 270, 108 S.Ct. 2379, 101 L.Ed.2d 245 (1988); *Dory v. Ryan,* 999 F.2d 679, 682 (2d Cir.1993), *modified on other grounds,* 25 F.3d 81 (2d Cir.1994). The "prison mailbox" rule is designed to combat inmate litigants' dependence on the prison facility's mail system and their lack of counsel so as to assure the timely filing of their legal papers with the court. *Noble v. Kelly,* 246 F.3d 93, 97 (2d Cir.2001) (citations omitted). Given the difficulty in determining when a prisoner relinquishes control of the complaint to prison personnel, the date the plaintiff signed the original complaint is presumed to be the date plaintiff gave the complaint to prison officials to be mailed. *See e.g., Forster v. Bigger,* 2003 WL 22299326, *2 (S.D.N.Y. Oct.7, 2003); *Hosendove v. Myers,* 2003 WL 22216809, *2 (D.Conn. Sept.19, 2003); *Hayes v. N .Y.S. D.O.C. Officers,* 1998 WL 901730, *3 (S.D.N.Y. Dec.28, 1998); *Torres v. Irvin,* 33 F.Supp.2d 257, 270 (S.D.N.Y.1998) (cases cited therein).

*4 In response to the Report and Recommendation, plaintiff asserts that, in April, the original complaint "was placed in the facility mail box." (Pl.'s Objection to Report at 1). However, it is uncontested that plaintiff's wife signed the complaint on May 8th; it was received by the Pro Se Office on May 10 th; and plaintiff's signature is dated May 13th. There is no explanation offered that could reasonably support and account for the existence of these May dates on a complaint which plaintiff falsely claims to have deposited to be mailed during the period of April 10th and April 12th. Had plaintiff mailed the complaint directly to the court prior to April 26th, it would have been impossible for the plaintiff's wife to have signed the document two

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2004 WL 324898 (S.D.N.Y.)
(Cite as: 2004 WL 324898 (S.D.N.Y.))

days prior to the date that the Pro Se Office stamped it received on May 10th.[FN9] Moreover, absent evidence to the contrary, applying the mailbox rule would presume that plaintiff gave his complaint to prison officials on May 13, 1996, the date he signed it. *See, Johnson v. Coombe,* 156 F.Supp.2d 273, 277 (S.D.N.Y.2001) (quoting *Torres,* 33 F.Supp.2d at 270). Even if the Court gave plaintiff the benefit of the date reflected on the filed complaint, it was still after the effective date of the PLRA. Hence, plaintiff is legally obligated to have pursued his prison grievance procedures prior to filing the instant action. The plaintiff has offered no explanation for the initial complaint's reference to events that occurred after the date he claims he filed it, the two May dates on which he and his former co-plaintiff wife signed the complaint, or the May date stamped received by the Pro Se Office. As the magistrate Judge observed:

> FN9. The benefit of the mailbox rule does not apply where the plaintiff delivers the complaint to someone outside the prison system to forward to the court. *Knickerbocker v. Artuz,* 271 F.3d 35, 37 (2d Cir.2001).

Apart from the allegation that certain events giving rise to the claims occurred on April 9, 1996, the Original Complaint contains no mention of dates in April, 1996. Mingues no where explains the contradiction between the signature dates on the Original Complaint and the allegations contained in Amended Complaint. (Report at 12).

New York state law provides a three tier grievance procedure applicable to plaintiff's claims of excessive force. *See,* N.Y. Correct. Law § 139 (McKinnney's 2003); N.Y. Comp.Codes R. & Regs. tit. 7, § 701.7 (2003); *Mendoz v. Goord,* 2002 WL 31654855 (S.D.N.Y. Nov.21, 2002); *Rodriguez v. Hahn,* 209 F.Supp.2d 344 (S.D.N.Y.2002). Plaintiff has not denied knowledge of the grievance procedure at his institution, nor claimed that anything or anyone caused him not to file a grievance and completely pursue it through the administrative process.[FN10] The magistrate judge's determination that the defendants' Rule 12(b) motion should be denied because of an "absence of a clear record" contrary to plaintiff's express allegation in the amended complaint that he

commenced the action before April 26, 1996 is erroneous. The Court could have *sua sponte* dismiss this action as the record is unmistakably clear that an appropriate administrative procedure was available to him, that he was required to exhaust his administrative remedies, and that he failed to do so as required by the PLRA. *See, Mojias v. Johnson,* 351 F.3d 606 (2003); *Snider v. Melindez,* 199 F.3d 108, 112-13 (2d Cir.1999). In this case, plaintiff has been afforded notice and given an opportunity to respond to the exhaustion issue and his failure remains clear.

> FN10. In the original complaint, plaintiff stated he did not file a grievance, pursuant to the state's prisoner grievance procedure, "because this matter can not be dealt with by interdepartmental grievances." (Compl. at 2-3). In plaintiff's attorney's memorandum in opposition to the motion to dismiss, counsel contends that plaintiff is not required to file a grievance because the state's prison system provides extremely limited administrative remedies and money damages, which plaintiff seeks, are not available.

**\*5** Accordingly, it is hereby

ORDERED that the Report and Recommendation is not adopted; and it is further

ORDERED that the defendants' motion to dismiss the complaint is granted.

S.D.N.Y.,2004.
Mingues v. Nelson
Not Reported in F.Supp.2d, 2004 WL 324898 (S.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



Page 1

Not Reported in F.Supp.2d, 2000 WL 1809284 (S.D.N.Y.)
(Cite as: 2000 WL 1809284 (S.D.N.Y.))

**c**

Only the Westlaw citation is currently available.

United States District Court, S.D. New York.
Roger SULTON, Plaintiff,
v.
Charles GREINER, Superintendent of Sing Sing Corr.
Fac., Doctor Halko & P.A. Williams of Sing Sing Corr.
Fac. Medical Department, Doctor Lofton, Defendants.
**No. 00 Civ. 0727(RWS).**

Dec. 11, 2000.

Roger Sulton, Wende Correctional Facility, Alden, NY,
Plaintiff, pro se.

Honorable Eliot Spitzer, Attorney General of the State of
New York, New York, NY, By: S. Kenneth Jones,
Assistant Attorney General, for Defendants, of counsel.

OPINION

SWEET, J.

*1 Defendants Charles Greiner ("Greiner"), past
Superintendent of Sing Sing Correctional Facility ("Sing
Sing") and Dr. Nikulas Halko, ("Halko"), P.A. Williams
("Williams"), and Dr. Lofton ("Lofton"), all of the Sing
Sing Medical Department, (collectively, the
"Defendants"), have moved to dismiss the amended
complaint of *pro se* inmate Roger Sulton ("Sulton"),
pursuant to Fed.R.Civ.P. 12(b)(6) and 12(h)(2) for failure
to exhaust administrative remedies. For the reasons set
forth below, the motion will be granted.

*Prior Proceedings*

Sulton filed the complaint in this action on February 2,
2000, asserting a claim against the Defendants under
Section 1983 for alleged violation of his constitutional
rights under the Eighth Amendment for acting with
deliberate indifference to his serious medical needs.
Sulton filed an amended complaint on May 3, 2000, to
identify additional defendants to his suit. Additionally,
Sulton alleges negligent malpractice by the Sing Sing
medical staff. Sulton seeks monetary damages. The instant
motion was filed on August 9, 2000, and was marked fully
submitted on September 6, 2000.

*Facts*

The Defendants' motion comes in the posture of a motion
to dismiss for failure to state a claim, pursuant to Federal
Rule of Civil Procedure 12(b)(6). However, both the
Defendants and Sulton have submitted materials outside
the pleadings. Where a District Court is provided with
materials outside the pleadings in the context of a 12(b)(6)
motion to dismiss, it has two options: the court may
exclude the additional materials and decide the motion on
the complaint alone or convert the motion to one for
summary judgment. *See* Fed.R.Civ.P. 12(b); *Kopec v.
Coughlin, 922 F.2d 152, 154 (2d Cir.1991)*; *Fonte v.
Board of Managers of Continental Towers Condominium,
848 F.2d 24, 25 (2d Cir.1988)*. The Court has determined
to treat the instant motion as a motion for summary
judgment. Therefore, the following facts are gleaned from
the parties' submissions, with all inferences drawn in favor
of the non-movant as required on a motion for summary
judgment. They are not findings of fact by the Court.

Sulton is a prison inmate who was incarcerated in Sing
Sing at the time of the incidents in question. Greiner was
Superintendent of Sing Sing at that time. Halko was and is
a doctor on medical staff at Sing Sing. Williams and
Lofton are alleged to be affiliated with the Sing Sing
Medical Department.

According to Sulton, on October 8, 1998, he slipped on a
flight of wet stairs, where there was no "wet floor" sign
posted, and injured his left knee. The next day his knee
was swollen and the pain "was real bad." That same day

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2000 WL 1809284 (S.D.N.Y.)
(Cite as: 2000 WL 1809284 (S.D.N.Y.))

Sulton went to sick call and saw P.A. Williams. Williams ordered x-rays and also ordered "no-work, feed-in cell, pain killers and a cane" for Sulton. The swelling went down, but the pain got stronger.

For four months Sulton complained to the Sing Sing medical staff about his pain. During this time his left knee would give out "at any time." Yet, "nothing was done." However, the Sing Sing Medical Department did send Sulton to the Green Haven Correctional Facility for an M.R.I. and, subsequently, knee surgery was recommended by an attending physician on April 23, 1999. A hinged knee brace was recommended for post-surgery recovery.

*2 At some point thereafter, Sulton wrote to Greiner concerning his medical problem and he was placed on "a call-out" to see Halko. Halko then informed Sulton that he would not be going for surgery because Correctional Physician Services [FN1] ("CPS") would not allow it. CPS wanted the inmate to undergo physical therapy before they would approve surgery. Sulton continued to be in pain and requested outside medical care from Williams. However, Williams could not do anything about Sulton's surgery until it was approved by CPS.

> FN1. CPS is the health maintenance organization which must pre-approve any outside medical service to be provided to inmates outside of the correctional facility.

In September 1999, Sulton was transferred to Wende Correctional Facility ("Wende"). The medical department there provided him with physical therapy for his left knee, which was "still in constant pain" and was prone to giving out beneath his body weight.

Sulton filed grievance # 14106-99 on November 3, 1999, and on November 24, 1999, he received a response from the Inmate Grievance Resolution Committee (the "IGRC"). Sulton contends that on that same date he indicated his desire to appeal their decision to the Superintendent. Sulton did not appeal his grievance to the highest level of administrative review, the Central Office Review Committee (the "CORC"). In a letter to Wende Superintendent Donnelly ("Donnelly") dated December

17, 2000, Sulton complained that he never received a response to his appeal of the IGRC decision. However, the Defendants have submitted a response from Donnelly dated December 6, 2000, in which Donnelly stated that he concurred with the IGRC's decision.

In January 2000, "plaintiff['s] legs gave out and the right leg took the weight of the body ... causing the plaintiff to suffer ... torn joints in the ankle area." Surgery was performed on the ankle and he was placed on "medical confinement status."

*Discussion*

I. *This Action Will Be Dismissed For Plaintiff's Failure To Comply With The Prison Litigation Reform Act Of 1996*

In his amended complaint, Sulton alleges that he filed a grievance and, although initially the Defendants were unable to identify the grievance, by his opposition to the instant motion Sulton has identified the process he undertook to pursue his grievance.

Section 1997e(a) of the Prison Litigation Reform Act (the "PLRA") provides that:

No action shall be brought with respect to prison conditions under ... 42 U.S.C. § 1983 ... or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.

42 U.S.C. § 1997e(a).

In enacting Section 1997e(a), Congress made exhaustion mandatory. *Salahuddin v. Mead,* 174 F.3d 271, 274-75 (2d Cir.1999). As a result, where an inmate fails to satisfy the PLRA's exhaustion requirement, the complaint must be dismissed. *See, e.g., Santiago v. Meinsen,* 89 F.Supp.2d 435, 439-40 (S.D.N.Y.2000) (citations omitted).

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2000 WL 1809284 (S.D.N.Y.)
(Cite as: 2000 WL 1809284 (S.D.N.Y.))

In New York, the relevant administrative vehicle is the Inmate Grievance Program ("IGP"). *See* N.Y. Correct. Law § 139 (directing Commissioner of the Department of Correctional Services to establish a grievance mechanism in each correctional facility under the jurisdiction of the Department); N.Y. Comp.Codes R. & Regs., tit. 7, § 701.1 (instituting IGP). New York inmates can file internal grievances with the inmate grievance committee on practically any issue affecting their confinement. *See* In re Patterson, 53 N.Y.2d 98, 440 N.Y.S.2d 600 (N.Y.1981) (interpreting N.Y. Correct. Law § 139 broadly); N.Y. Comp.Codes R. & Regs., tit. 7, §§ 701.2(a) (inmates may file grievances about the "substance or application of any written or unwritten policy, regulation, procedure or rule of the Department of Correctional Services ...") and 701.7 (procedures for filing, time limits, hearings and appeals).

*3 The New York State Department of Correctional Services ("DOCS") has established a grievance program with specific procedures which must be followed in order for a prisoner to exhaust his administrative remedies. *See* Petit v. Bender, No. 99 Civ. 0969. 2000 WL 303280, at *2- *3 (S.D.N.Y. March 22, 2000) (holding that prisoner failed to exhaust his administrative remedies where prisoner only partially complied with the grievance procedures established by Section 701 *et seq.*). These procedures include a requirement that an inmate appeal a Superintendent's decision to the CORC by filing an appeal with the Grievance Clerk. *See* N.Y. Comp.Codes R. & Regs., tit. 7, § 701.7(c)(1).

There is, however, an additional issue to be addressed in this case, which is that the administrative remedies available to Sulton do not afford monetary relief. The Second Circuit has not yet ruled on whether the PLRA's exhaustion requirement applies where the available administrative remedies available do not provide the type of relief the prisoner seeks. Snider v. Dylag, 188 F.3d 51, 55 (2d Cir.1999) ("We note that it is far from certain that the exhaustion requirement of 42 U.S.C. § 1997e(a) applies to deliberate indifference claims ... under Section 1983, where the relief requested is monetary and where the administrative appeal, even if decided for the complainant, could not result in a monetary award.").

There is disagreement among the district courts within this circuit as to this issue, although there is "clear trend ... to find exhaustion applicable even where the requested relief, money damages, cannot be awarded by the administrative body hearing the complaint." Santiago v. Meinsen, 89 F.Supp.2d at 440; *see* Snider v. Melindez, 199 F.3d 108, 114 n. 2 (2d Cir.1999) (noting disagreement among courts as to applicability of exhaustion requirement where administrative remedies are unable to provide the relief that a prisoner seeks in his federal action); *but cf.* Nussle v. Willette, 224 F.3d 95, (2d Cir.2000) (holding that exhaustion not required for excessive force claim because such claim is not "prison conditions" suit and overruling district court decisions applying exhaustion requirement to excessive force claims seeking monetary relief).

Moreover, this Court has previously held that a prisoner must exhaust his administrative remedies before seeking relief in federal court in connection with a prison conditions claim even where a prisoner seeks damages not recoverable under an established grievance procedure. Coronado v. Goord, No. 99 Civ. 1674, 2000 WL 52488, at *2 (S.D.N.Y. Jan. 24, 2000); Edney v. Karrigan, No. 99 Civ. 1675, 1999 WL 958921, at *4 (S.D.N.Y. Oct. 14, 1999). This is the rule that will be applied here.

In his response to the motion to dismiss, Sulton indicates that he filed grievance # 14106-99 on November 3, 1999 and on November 24, 1999 he received a response IGRC and that on the same date Sulton indicated his desire to appeal their decision to the Superintendent. Sulton does not contend that he appealed his grievance to the highest level of administrative review, namely, the CORC. Instead, Sulton has asserted that Superintendent Donnelly never replied to the appeal of the IGRC decision and submits a letter dated December 17, 2000 in which Sulton complains that he never received a response from Donnelly. However, the Defendants have submitted a response from Donnelly dated December 6, 2000, in which Donnelly concurred with the decision of the IGRC denying Sulton relief. There is no evidence in the record that Sulton appealed the grievance to CORC.

*4 Accordingly, because Sulton failed to exhaust his administrative remedies by appealing the grievance to the CORC, his claims of medical indifference will be dismissed pursuant to 42 U.S.C. § 1997e. *See* Petit, 2000 WL 303280, at *3.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2000 WL 1809284 (S.D.N.Y.)
(Cite as: 2000 WL 1809284 (S.D.N.Y.))

*Conclusion*

Therefore, for the reasons set forth above, the Defendants'
motion will be granted and the amended complaint will be
dismissed without prejudice to the action being renewed
once Sulton has exhausted all administrative remedies.

It is so ordered.

S.D.N.Y.,2000.
Sulton v. Greiner
Not Reported in F.Supp.2d, 2000 WL 1809284
(S.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



Slip Copy, 2010 WL 2682307 (N.D.N.Y.)
(Cite as: 2010 WL 2682307 (N.D.N.Y.))

Only the Westlaw citation is currently available.

United States District Court,
N.D. New York.
Alex VEGA, Plaintiff,
v.
Mr. LAREAU, Corrections Sergeant; G. Labonte,
Corrections Officer; and Mr. Garbera, Corrections
Counselor, Defendants.
**No. 9:04-CV-0750 (GTS/ATB).**

March 16, 2010.

Alex Vega, pro se.

Charles J. Quakenbush, AAG, for Defendant.

### REPORT-RECOMMENDATION

ANDREW T. BAXTER, United States Magistrate Judge.

**\*1** This matter was referred to Magistrate Judge Gustave J. Di Bianco for Report and Recommendation by the Honorable Glenn T. Suddaby, United States District Judge pursuant to 28 U.S.C. § 636(b) and Local Rules N.D.N.Y. 72.3(c). Due to Judge Di Bianco's retirement on January 4, 2010, the case was reassigned to me. (Dkt. No. 70).

In his amended civil rights complaint, plaintiff alleges that he was harassed and discriminated against by defendants because of what defendants perceived to be plaintiff's sexual orientation. (Amended Complaint (AC)) (Dkt. No. 30). Plaintiff also alleges that, after he filed grievances regarding the harassment and discrimination, defendants retaliated against him by filing false misbehavior reports, not allowing him to attend his assigned program, and threatening to transfer plaintiff out of protective custody

and into general population at another correctional facility. (*Id.*) Plaintiff seeks substantial monetary relief.

Presently before the court is a motion for **summary judgment** pursuant to FED. R. CIV. P. 56 submitted by defendants Lareau, LaBonte, and Garbera. [FN1] (Dkt. No. 66). Defendants assert that plaintiff cannot substantiate his claims of retaliation or equal protection and, even if he could substantiate his claims, that qualified immunity precludes liability for damages. (*Id.*) Plaintiff has responded in opposition to the motion. (Dkt. No. 68). Defendants have filed a reply. (Dkt. No. 69). For the following reasons, this Court will recommend that defendants' motion for **summary judgment** be granted.

> FN1. The defendants' names are spelled as set forth in defendants' Declarations. (*See* Dkt. Nos. 66-4, 66-6, and 66-8). The Clerk of the Court has corrected the docket report accordingly. As discussed below, plaintiff has withdrawn his claims against defendants Garbera and Lareau.

### DISCUSSION

#### I. *Facts*

Plaintiff Alex Vega commenced this action under 42 U.S.C. § 1983, alleging deprivation of his civil rights. The facts and procedural history of this case are set forth more fully in the Decision and Order of United States District Judge Suddaby filed on March 26, 2009, familiarity with which is assumed. (*See* Dkt. No. 65). In that Decision and Order, all defendants were dismissed except defendants Lareau, LaBonte, and Garbera, and all claims were dismissed except those alleging (1) retaliation by defendants LaBonte, Garbera, and Lareau and (2) violation of plaintiff's right to equal protection by defendant LaBonte. (*Id.* at 31-32). The facts pertinent to defendants' present motion for **summary judgment** are related herein in the light most favorable to plaintiff as the non-moving party.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 2682307 (N.D.N.Y.)
(Cite as: 2010 WL 2682307 (N.D.N.Y.))

**A. Uncontested Facts**[FN2]

> FN2. These facts were set forth in defendants' Statement of Material Facts provided in accordance with Local Rule 7.1(a)(3) of the Northern District of New York. The facts set forth as uncontested were included in defendants' Rule 7.1 Statement, supported by record citations, and admitted by plaintiff in his response to defendants' Rule 7.1 Statement. (*See* Dkt. No. 66-3 ("Defendants' Rule 7.1 Statement"); Dkt. No. 68 at 1-2 ("Plaintiff's Response to Defendants' Rule 7.1 Statement")).

During the times relevant to this action, plaintiff was housed in the Assessment and Program Preparation Unit ("APPU") at Clinton Correctional Facility ("Clinton"). (*See generally* AC; Defs.' Rule 7.1 Statement ¶ 2; Dkt. No. 66-4 ("Garbera Declaration") ¶ 10). The Clinton APPU is a transitional unit at which **inmates** receive counseling and services in order to prepare them for longer-term residence at other prison facilities.[FN3] (Defs.' Rule 7.1 Statement ¶ 3; Gabrera Decl. ¶ 10). While housed at Clinton APPU, plaintiff was assigned to the church cleaning work detail which was usually supervised by defendant LaBonte. (Defs.' Rule 7.1 Statement ¶¶ 4, 9; Dkt. No. 66-6 ("LaBonte Decl.") ¶¶ 4-6, 21; AC ¶ 3(f), 8-9).

> FN3. APPU is also "a unit for those **inmates** who are considered 'victim prone' for various reasons." *Lewis v. Brooks,* 9:00-CV-1433, 2005 WL 928617, at *3 (N.D.N.Y. Mar. 10, 2005).

**\*2 Inmate** Brooks was also incarcerated at Clinton during the time period relevant to plaintiff's claims. (Defs.' Rule 7.1 Statement ¶ 6; AC ¶¶ 8, 12, 21-22; LaBonte Decl. ¶¶ 9-11). As discussed below, defendant LaBonte and others suspected that plaintiff and Brooks were homosexual partners, which plaintiff disputes. Under Department of Correctional Services ("DOCS") Standards of **Inmate** Behavior, **inmates** are forbidden to engage in, encourage, solicit or attempt to force others to engage in sexual acts. (Defs.' Rule 7.1 Statement ¶ 7; 7 N.Y.C.R.R. § 270.2 (Disciplinary Rule 101.10)).

In January 2004, plaintiff was a low-ranking **inmate** on the Clinton church cleaning crew, in terms of seniority. (Defs.' Rule 7 .1 Statement ¶ 10; LaBonte Decl. ¶¶ 6, 16). On January 28, 2004, plaintiff appeared before the APPU program committee and was advised that he and **inmate** Brooks would not be allowed to work together in a work assignment. (AC ¶¶ 14-25). On January 29, 2004,[FN4] plaintiff filed a grievance describing a conversation that he had with defendant LaBonte on or about January 15, 2004 and complaining of statements made by members of the APPU committee members during the January 28, 2004 meeting. (Defs.' Rule 7.1 Statement ¶ 15; AC ¶¶ 20-23). The January 29, 2004 grievance did not mention defendant Lareau. (Defs.' Rule 7.1 Statement ¶ 17; Dkt. No. 66-9 ("Quakenbush Decl."), Ex. A).

> FN4. While it appears that the grievance dated January 29, 2004 was not actually "filed" until February 2, 2004, in keeping with plaintiff's allegations as set forth in his amended complaint, the Court will refer to this grievance as the January 29, 2004 grievance. (*See, e.g.,* AC ¶¶ 23, 53).

During the winter and spring of 2004, there were occasions when plaintiff was not brought to his job with the Clinton church cleaning crew. (Defs.' Rule 7.1 Statement ¶ 19; AC ¶ 85; LaBonte Decl. ¶¶ 14, 16-22). Even on the days when he was not allowed to attend his church work program, plaintiff received full pay for those days. (Defs.' Rule 7.1 Statement ¶ 22; LaBonte Decl. ¶ 23). On April 16, 2004, defendant Lareau issued a misbehavior report, charging plaintiff with giving items of personal property to **inmate** Brooks without first obtaining the required authorization. (Defs.' Rule 7.1 Statement ¶ 26; Dkt. No. 66-8 ("Lareau Decl.") ¶ 6; Quakenbush Decl., Ex. B).

On April 16, 2004, correctional officer Charland searched plaintiff's cell and found a pair of scissors, which Charland believed to be contraband, and therefore he issued plaintiff a misbehavior report. (Defs.' Rule 7.1 Statement ¶ 27; Quakenbush Decl., Ex. B). On April 22, 2004, at a Tier II hearing conducted by Lt. Lacy, the charges against plaintiff regarding the scissors were dismissed, and plaintiff entered a plea of guilty to the unauthorized exchange of property charge filed by defendant Lareau.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 2682307 (N.D.N.Y.)
(Cite as: 2010 WL 2682307 (N.D.N.Y.))

(Defs.' Rule 7.1 Statement ¶ 28; Quakenbush Decl., Ex. B). Plaintiff was sentenced to 15 days keeplock and 15 days loss of privileges. (*Id.*)

In the spring of 2005, plaintiff was transferred from Clinton to the Upstate Correctional Facility CADRE program. (Defs.' Rule 7.1 Statement ¶ 23; Garbera Decl. ¶¶ 10-14). The transfer came about via DOCS administrative processes over which none of three remaining defendants had any control. (Defs.' Rule 7.1 Statement ¶ 24; Garbera Decl. ¶¶ 13-16). At Upstate, plaintiff was placed in a selective and advantageous work program, for which plaintiff had to voluntarily sign a participation agreement. (Defs.' Rule 7.1 Statement ¶ 25l Garbera Decl. ¶¶ 14-15).[FN5]

> [FN5.] In addition to the facts outlined herein, Defs.' Rule 7.1 Statement includes the following recitation: "There is no competent, relevant, admissible evidence in the record that C.O. LaBonte, Counselor Garbera, or Lt. Lareau were motivated by a grievance to inflict any adverse retaliatory action against the plaintiff." Rule 7.1 Statement ¶ 18. While plaintiff admits the information set forth, (*see* Dkt. No. 68, ¶ 3), the Court will not consider this statement to be an uncontested fact, especially since retaliation is at the center of plaintiff's claims.

**B. Plaintiff's Additional Facts**[FN6]

> [FN6.] This version does not include the uncontested facts set forth above.

**\*3** On January 15, 2004, defendant LaBonte told **inmate** Peter Grieco, plaintiff's co-worker, that (1) LaBonte believed plaintiff was a homosexual because plaintiff associated with **inmate** Mark Brooks, and (2) plaintiff and Brooks would not be allowed to work in the same program at the same time. (AC ¶ 8). After **inmate** Grieco told plaintiff about Grieco's conversation with defendant LaBonte, plaintiff confronted LaBonte about the conversation, whereupon LaBonte repeated the statements to plaintiff, adding that "as long as plaintiff is assigned at the Church, **inmate** Brooks will 'NEVER' be assigned, for

fear of 'homosexual acts' being committed between plaintiff and **inmate** Brooks." (*Id.* ¶¶ 9-11). In response, plaintiff told LaBonte that he was not homosexual; he had no record of homosexual acts in his file; and was only friends with Brooks. (*Id.* ¶ 12).

When plaintiff appeared before the APPU program committee on January 28, 2004, defendant Garbera told plaintiff that they all knew about plaintiff and **inmate** Brooks "being an[ ] item," and that plaintiff could not change his work program to be closer to Brooks. (AC ¶¶ 15, 16). Plaintiff told the committee that **inmate** Brooks was on the waiting list for the church and plaintiff was trying to leave his church job. (*Id.* ¶ 18). Moreover, while plaintiff made it clear to the committee members that he was not and never had been a homosexual, defendants Facteau, Ward and Garbera told plaintiff that he was *"guilty by association* of being a homosexual, because plaintiff associates and is friends with a 'known' homosexual ( **inmate** Brooks), so get use[d] to being treated like a homosexual is treated in prison." (*Id.* ¶¶ 21, 22). On January 29, 2004, plaintiff filed a grievance against defendants LaBonte, Facteau, Ward, and Garbera concerning LaBonte's statements of January 15, 2004 and the statements and actions of Facteau, Ward, and Garbera on January 28, 2004. (*Id.* ¶ 23). Plaintiff alleges that after these incidents and the filing of the January 29, 2004 grievance, he was subjected to several retaliatory acts, including the loss of his work assignment and four false misbehavior reports, before he was transferred to Upstate in March 2005.

On February 9, 2004, plaintiff wrote to Berg, Assistant Superintendent of Clinton, complaining that plaintiff was not being taken to his church job as a form of retaliation by defendant LaBonte. (AC ¶ 36). On the morning of February 18, 2004, plaintiff was not taken to his job at the church because he "was on call out, as an 'ADD ON' for the A.P.P.U. Law Library." (*Id.* ¶ 38). While at the library, plaintiff and **inmate** Brooks submitted a request for Brooks to assist plaintiff with his legal work. (*Id.* ¶ 38). While they were still in the library, they were informed by law library officer McLain that their request was denied pursuant to instructions from defendant Garbera that plaintiff and Brooks could not be on library call-out at the same time. (*Id.* ¶ 39). After the conversation between McLain, plaintiff, and Brooks was complete, Garbera stood at the law library window taunting plaintiff and

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 2682307 (N.D.N.Y.)
(Cite as: 2010 WL 2682307 (N.D.N.Y.))

Brooks. (*Id.*) Later that morning, while plaintiff was in line leaving the law library, defendant Garbera approached him and said "GOT YA." (*Id.* ¶ 42).

**\*4** On the afternoon of February 18, 2004, defendant LaBonte did not take plaintiff to his assigned church job. (*Id.* ¶ 43). Plaintiff found out later that day that he had been placed on keeplock as a result of his being "out of place" in the law library. (*Id.* ¶¶ 44-45). Plaintiff claims that proper procedures for placing him in keeplock were not followed. (*Id.* ¶ 45). On February 18, 2004, plaintiff wrote a letter of complaint to Artus, the Superintendent of Clinton, and Berg outlining "the facts of incidents that occurred earlier in the day," claiming that the actions taken were harassment and retaliation for his January 29, 2004 grievance. (*Id.* ¶ 46). In response to that letter, Berg told plaintiff, among other things, that Berg could not control defendant Garbera's actions, and that law library officer McLain had given plaintiff false information about what Garbera had said about plaintiff and **inmate** Brooks. (*Id.* ¶ 49).

On February 19, 2004, plaintiff was served with a misbehavior report written by correctional officer Mayo charging plaintiff with, among other things, being out of place and violating rules related to **inmate** movement. (AC ¶ 47). At the subsequent Tier II hearing, defendant LaBonte testified that he did not take plaintiff to his assigned program that day because plaintiff was listed as an "ADD ON" for the law library for the day in question and was called out of the law library for a meeting with his counselor. (*Id.* ¶ 51). As a result of LaBonte's testimony, plaintiff was found not guilty of the charges contained in the misbehavior report. (*Id.*) Plaintiff wrote to Berg on March 1, 2004 requesting the status of his January 29, 2004 unlawful discrimination grievance against LaBonte, Facteau, Ward, and Garbera which had been pending for 31 days. (*Id.* ¶ 53).

On March 27, 2004, plaintiff was not taken to his church job, although three other members of the church crew were. (AC ¶ 63). On March 29, 2007, when plaintiff asked defendant LaBonte why plaintiff was sometimes not taken to his church job, LaBonte said "because you are not allowed to work inside the Church and will only be used for outdoor work. Faggots, Queers, Homosexuals and Transsexuals are not allowed inside a house of God, and

you surly [*sic* ] are one of those, since you are a friend with **inmate** Brooks." (*Id.* ¶ 64). On April 7, 2004, while plaintiff was working at the church, defendant LaBonte told plaintiff that he didn't want plaintiff working at the church and stated " 'I won't fire you, I won't refer you to the program Committee. You will resign before I do any of that.' " (*Id.* ¶ 68).

On April 16, 2004, plaintiff was placed on keeplock status for two misbehavior reports. (AC ¶ 71). Plaintiff was then called to defendant Lareau's office, and accused of purchasing items for **inmate** Brooks. (*Id.* ¶¶ 72, 73). Plaintiff claims that defendant Lareau intimidated plaintiff into admitting that he made purchases for **inmate** Brooks. (*Id.* ¶ 74). When plaintiff returned to his cell, it was being searched. (*Id.* ¶ 75). Defendant Lareau informed plaintiff that **inmate** Brooks was told that plaintiff "snitched" on him, and Lareau threatened plaintiff with a transfer to Southport Correctional Facility Special Housing Unit. (*Id.* ¶ 76). Both plaintiff and **inmate** Brooks were keeplocked pending an investigation of the matter. (*Id.* ¶ 77). On April 17, 2004, plaintiff received two misbehavior reports. (*Id.* ¶ 78). On April 22, 2004, plaintiff was found guilty of purchasing items for **inmate** Brooks. (*Id.* ¶ 79). The hearing officer told plaintiff that he would not lose his church job as a result of the disciplinary hearing. (*Id.*)

**\*5** On April 23, 2004, defendant LaBonte came to plaintiff's cell to retrieve the inclement weather clothing that plaintiff was issued for his church job; LaBonte demanded that plaintiff give him the winter gloves; plaintiff told defendant LaBonte that the gloves were at the church. (AC ¶ 81). LaBonte told plaintiff that he would have to pay for the gloves. (*Id.* ¶ 82). When plaintiff asked LaBonte if he was fired from his church job, LaBonte said "yes." (*Id.* ¶ 83). Plaintiff asked LaBonte if he was being terminated from his job because of his recent disciplinary proceeding or because LaBonte didn't want him working there. (*Id.*) LaBonte replied "I don't want you there, no faggots, queers or transsexuals work at [his] church area or in a house of God, and the ticket just gives me a reason to get rid of you." (*Id.*) LaBonte also threatened that he could have plaintiff transferred at any time. (*Id.* ¶ 84).

Beginning on January 29, 2004, defendant LaBonte did not allow plaintiff to attend his church job for 23 out of 36 working days. (AC ¶ 85). On May 4, 2004, plaintiff

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 2682307 (N.D.N.Y.)
(Cite as: 2010 WL 2682307 (N.D.N.Y.))

appeared before the APPU program committee and was told that he would not be assigned to any program except tailor shop, and therefore he should not ask to be re-assigned to the church. (*Id.* ¶ 89). Plaintiff claims that the church was understaffed, but there was a waiting list of six months to a year for the tailor shop. (*Id.* ¶¶ 90-91).

On October 28, 2004, plaintiff again appeared before the APPU program committee and was told that he would begin a new work program in the tailor shop on November 1, 2004. (AC ¶ 125). Plaintiff was warned that they would not tolerate any trouble from him at the tailor shop "like Plaintiff caused trouble at the Church Job," and plaintiff would be removed from the tailor shop if he caused trouble "and [would be] sent to SHU/Box for longer than he thought possible." (*Id.*) Prior to being assigned to work in the tailor shop, plaintiff was without programming for eight months. (*Id.* ¶ 126). On January 5, 2005, plaintiff appeared before the Clinton APPU Assessment Committee and was asked if he wished to be transferred out of Clinton APPU. (*Id.* ¶ 128). Because he had a list of more than twenty enemies, plaintiff stated that he did not want to be transferred out of APPU. (*Id.*) On January 5, 2005, defendant Garbera told plaintiff " 'You don't file law suits in my jail and expect not to have your ass thrown out of here by us Counselors.' " (*Id.* ¶ 133). On January 12, 2005,[FN7] Garbera told plaintiff " '[y]ou can't stop my method of getting you out of here, I Win.' " (*Id.* ¶ 135). Plaintiff was transferred to Upstate on March 16, 2005. (*See* Dkt. No. 37).

FN7. While plaintiff's amended complaint states that Garbera's statement was made on January 12, 200**4**, given the sequence of events set forth in plaintiff's amended complaint, it appears that this statement was made on January 12, 200**5**.

## II. *Summary Judgment*

**Summary judgment** may be granted when the moving party carries its burden of showing the absence of a genuine issue of material fact. FED. R. CIV. P. 56; *Thompson v. Gjivoje,* 896 F.2d 716, 720 (2d Cir.1990) (citations omitted). "Ambiguities or inferences to be drawn from the facts must be viewed in the light most favorable to the party opposing the **summary judgment**

motion." *Id.* However, when the moving party has met its burden, the nonmoving party must do more than "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 585-86 (1986); *see also Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247-48 (1986).

**\*6** In meeting its burden, the party moving for **summary judgment** bears the initial responsibility of informing the court of the basis for the motion and identifying the portions of " 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). Where the non-movant bears the burden of proof at trial, the moving party may show that he is entitled to **summary judgment** by either (1) pointing to evidence that negates the non-movant's claims or (2) identifying those portions of the non-movant's evidence that demonstrate the absence of a genuine issue of material fact. *Salahuddin v. Goord,* 467 F.3d 263, 272-73 (2d Cir.2006) (citing *Celotex Corp.,* 477 U.S. at 23). The second method requires identifying evidentiary insufficiency, not merely denying the opponent's pleadings. *Id.*

If the moving party satisfies its burden, the nonmoving party must move forward with specific facts showing that there is a genuine issue for trial. *Id.* A dispute about a genuine issue of material fact exists if the evidence is such that "a reasonable [factfinder] could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248. In determining whether there is a genuine issue of material fact, a court must resolve all ambiguities, and draw all inferences, against the movant. *See United States v. Diebold, Inc.,* 369 U.S. 654, 655 (1962). Additionally, while a court " 'is not required to consider what the parties fail to point out,' " the court may in its discretion opt to conduct "an assiduous review of the record" even where a party fails to respond to the moving party's statement of material facts. *Holtz v. Rockefeller & Co.,* 258 F.3d 62, 73 (2d Cir.2001) (citations omitted).

## III. *Retaliation*

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 2682307 (N.D.N.Y.)
(Cite as: 2010 WL 2682307 (N.D.N.Y.))

Any action taken by a defendant in retaliation for the exercise of a constitutional right, even if not unconstitutional in and of itself, states a viable constitutional claim. *Franco v. Kelly,* 854 F.2d 584, 590 (2d Cir.1988). In order for plaintiff's retaliation claim to survive **summary judgment**, plaintiff must establish that

> (1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected speech [or conduct] and the adverse action.

> *Dawes v. Walker,* 239 F.3d 489, 492 (2d Cir.2001), *overruled on other grounds, Swierkiewicz v. Sorema, N.A.,* 534 U.S. 506 (2002).

The Second Circuit has defined "adverse action" in the prison context, as "retaliatory conduct 'that would deter a similarly situated individual of ordinary firmness from exercising ... constitutional rights.' " *Gill v. Pidlypchak,* 389 F.3d 379, 381 (2d Cir.2004) (quoting *Davis v. Goord,* 320 F.3d 346, 353 (2d Cir.2003), *superseded by* 2003 U.S.App. LEXIS 13030, 2003 WL 360053 (2d Cir. Feb. 10, 2003)) (omission in original). This objective test applies even if the plaintiff was not himself subjectively deterred from exercising his rights. *Id.*

**\*7** The court must keep in mind, however, that claims of retaliation are " 'easily fabricated' " and " 'pose a substantial risk of unwarranted judicial intrusion into matters of general prison administration' " and thus, plaintiff must set forth non-conclusory allegations. *Bennett v. Goord,* 343 F.3d 133, 137 (2d Cir.2003) (quoting *Dawes,* 239 F.3d at 491). Finally, even if plaintiff makes the appropriate showing, defendants may avoid liability if they demonstrate that they would have taken the adverse action even in the absence of the protected conduct. *Bennett,* 343 F.3d at 137.

**A. Defendants Lareau and Garbera**

In his opposition to Defendants' motion for **summary judgment**, plaintiff states that he is withdrawing all claims

against Lareau and Garbera. (Dkt. No. 68 ¶ 2). Therefore, with respect to all of the claims against Garbera and Lareau, defendants' motion for **summary judgment** should be granted. *See e.g. Rosen v. City of New York,* No. 07 Civ. 6018, 2009 WL 3489986, at *2 (S.D.N.Y. Oct. 28, 2009) (granting **summary judgment** with respect to claims withdrawn by plaintiff).

**B. Defendant LaBonte**

Plaintiff states that he filed a grievance on January 29, 2004 against defendant LaBonte complaining of comments made by defendant LaBonte on January 15, 2004 regarding plaintiff's sexual orientation, comments which plaintiff believed to be discriminatory. (AC ¶¶ 8-12, 22; *see also* Dkt. No. 66-10 at 12-14) ("January 29, 2004 grievance")).[FN8] Defendants have submitted a copy of the January 29, 2004 grievance. (Dkt. No. 66-10 at 12-14). Plaintiff captioned the grievance *"UNLAWFUL DISCRIMINATION GRIEVANCE AGAINST: SGT. FACTO, COUNSELOR GARBERRA & MR. WARD." (Id.* at 12). At first glance, the grievance does not appear to be filed against defendant LaBonte. (*Id.*) However, the body of the grievance does recount statements by defendant LaBonte as well as a conversation that plaintiff had with defendant LaBonte, clearly suggesting that plaintiff believed that defendant LaBonte was discriminating against plaintiff on the basis of what LaBonte perceived to be plaintiff's sexual orientation. (*Id.*) Moreover, Defendants' Rule 7.1 Statement concedes that plaintiff filed the January 29, 2004 grievance against LaBonte. (*See* Defs .' Rule 7.1 Statement ¶ 15). Therefore, despite its caption, the Court will consider the January 29, 2004 grievance to have been filed against defendant LaBonte. On February 9, 2004, plaintiff also submitted a letter to Berg complaining that defendant LaBonte was not taking plaintiff to his church job in "retaliation." (AC ¶ 36).

> FN8. The grievance is actually dated January 28, 2004, however, for sake of consistency the Court will still refer to it as the January 29, 2004 grievance. (*See* Dkt. No. 66-10 at 12).

There is no dispute that plaintiff's complaint and grievance constitute protected activity. *See Davis,* 320 F.3d at 352-53 (filing a prison grievance is a constitutionally

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 2682307 (N.D.N.Y.)
(Cite as: 2010 WL 2682307 (N.D.N.Y.))

protected activity). *See also Chavis v. Struebel,* 317 F.Supp.2d 232, 237-38 (N.D.N.Y.2004) (finding that letter of complaint could be basis for retaliatory conduct). Therefore, plaintiff meets the first prong of the test for retaliation. Plaintiff must further show that he suffered adverse action, and that there was a causal connection between that adverse action and the protected activity. If plaintiff can make these two showings, the court must determine whether defendants have established that they would have taken the same action even in the absence of the protected conduct.

**\*8** Plaintiff claims that, in retaliation for plaintiff's grievance and complaint against defendant LaBonte, LaBonte reduced the number of hours plaintiff was allowed to work at his church job.[FN9] (AC ¶ 85). Construing plaintiff's amended complaint with great liberality, plaintiff may also allege that defendant LaBonte had plaintiff terminated from his church job in retaliation for plaintiff's grievance against LaBonte. (AC ¶ 83). Neither party has addressed this claim in their papers in support of or in opposition to the present motion. Plaintiff has, however, provided the Court with a copy of DOCS Directive # 4803, **Inmate** Program Placement. (Dkt. No. 68 at 11-13). That directive provides that the Program Chairperson of the **Inmate** Program Assignment Committee "shall be responsible for all program assignments and removals." (*Id.* at 12). Since defendant LaBonte is not alleged to be the Program Chairperson of the **Inmate** Program Assignment Committee, no reasonable factfinder could conclude that defendant LaBonte had the authority to remove plaintiff from his church job.

> FN9. In his amended complaint, plaintiff also alleged that defendant LaBonte retaliated against plaintiff by issuing plaintiff a false misbehavior report on April 24, 2004. (AC ¶ 86). LaBonte's misbehavior report claimed that plaintiff lost state issued gloves. (*Id.*) Plaintiff admitted that he lost the gloves and entered a plea of guilty to the charge. (*Id.* ¶ 95). In his March 26, 2009 Decision and Order, District Judge Suddaby noted that "[w]hen it is undisputed that an **inmate** has in fact committed prohibited conduct, no retaliatory discipline claim can be sustained." (Dkt. No. 65 at 25) (citing *Lowrance v. Achtyl,* 20 F.3d 529, 535 (2d Cir.1994)). Since Plaintiff

admitted that he lost the state issued gloves, Defendant LaBonte would have taken the adverse action even in the absence of the protected conduct, and that portion of plaintiff's retaliation claim against LaBonte was dismissed by Judge Suddaby. (Dkt. No. 65 at 25).

Plaintiff alleges that, beginning on January 29, 2004, defendant LaBonte refused to let plaintiff attend his church job for a total of 23 out of 36 working days. (AC ¶ 85). As discussed below, on some of those occasions, plaintiff did not attend due to reasons beyond defendant LaBonte's control. Further, defendant LaBonte points out that plaintiff received full pay even on the days that he was held back from his job. (LaBonte Decl. ¶ 22).

A job reassignment or termination can under certain circumstances constitute adverse action necessary to support a claim of retaliation. *Gill v. Mooney,* 824 F.2d 192, 194 (2d Cir.1987) ("[A] claim for relief may be stated under section 1983 if otherwise routine administrative decisions are made in retaliation for the exercise of constitutionally protected rights."); *Baker v. Zlochowon,* 741 F.Supp. 436, 439 (S.D.N.Y.1990) ("a claim for relief can be stated under section 1983 for job for reassignments or terminations which were in retaliation for an **inmate's** efforts to seek vindication of his [or her] legal rights ..."); *Gill v. Calescibetta,* No. 9:00-CV-1553, Report and Recommendation, 2009 WL 890661, at \*11-12 (N.D.N.Y. Mar. 11, 2009) (Peebles, M.J.), *adopted* 2009 WL 890661, at \*1-4 (N.D.N.Y. Mar. 31, 2009) (Suddaby, J.) (the termination of a job assignment can constitute adverse action for purposes of a retaliation analysis). As noted, defendant LaBonte was not in a position to terminate or change plaintiff's job assignment. This court doubts that plaintiff could establish that periodically keeping him from attending a job, with no monetary or other apparent penalty, constitutes the type of "adverse action" that would deter a similarly situated individual of ordinary firmness from exercising constitutional rights. We need not resolve whether plaintiff has demonstrated the existence of a genuine issue of material fact as to whether defendant LaBonte took adverse action against plaintiff because, as discussed below, **summary judgment** can be predicated more securely on other grounds.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 2682307 (N.D.N.Y.)
(Cite as: 2010 WL 2682307 (N.D.N.Y.))

**\*9** To show **retaliation** in violation of the First Amendment, a plaintiff must demonstrate that constitutionally protected **conduct** was a substantial or motivating factor for a prison official's adverse action. *Bennett*, 343 F.3d at 137. Plaintiff claims that because LaBonte's adverse actions began *after* plaintiff filed a grievance against him, the actions were in **retaliation** for the grievance.

However, more than conclusory allegations [of a causal connection] are required to survive a **summary judgment** motion. *Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir.1995); *Bartley v.. Collins*, No. 95 Civ. 10161, 2006 WL 1289256 (S.D.N.Y. May 10, 2006). Types of circumstantial evidence that can show a causal connection between the protected **conduct** and the alleged **retaliation** include **temporal** proximity, prior good discipline, finding of not guilty at the disciplinary hearing, and statements by defendants as to their motives. *Colon*, 58 F.3d at 872-73; *Bartley*, 2006 WL 1289256, at \*8.

*Barclay v. New York*, 477 F.Supp.2d 546, 558 (N.D.N.Y.2007) (Hurd, J.). Plaintiff asserts that because defendant LaBonte began excluding him from his assigned church job *immediately* after plaintiff filed a grievance against him, "it is clear that the only reason why plaintiff was excluded from the work crew was because of the grievance that he filed against Officer LaBonte." (Dkt. No. 68 at 7).

In this case, plaintiff filed a grievance against defendant LaBonte on January 29, 2004. (AC ¶ 23). Beginning on that date, plaintiff claims that defendant LaBonte did not take plaintiff to his church job for 23 out of the next 36 working days. (*Id.* ¶ 85). The close proximity in time between the filing of grievance and LaBonte's action in not taking plaintiff to his assigned job is evidence which could lead a reasonable factfinder to conclude that LaBonte's actions were causally related to plaintiff's grievance against him. *See Espinal v. Goord*, 558 F.3d 119, 129 (2d Cir.2009) ("A plaintiff can establish a causal connection that suggests retaliation by showing that protected activity was close in time to the adverse action."). *See also Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir.1995) (temporal proximity between an **inmate's** lawsuit and disciplinary action may serve as circumstantial evidence of retaliation).

Plaintiff argues further that defendant LaBonte's conduct was retaliatory because "just prior to the grievance being filed" plaintiff had received "positive evaluations" from defendant LaBonte with respect to plaintiff's work at the church. (Dkt. No. 68 at 7). While evidence of plaintiff's *"prior* good discipline" might suggest that LaBonte's actions subsequent to the grievance were be retaliatory, in this case, one of the evaluations submitted by plaintiff was actually dated February 12, 2004-after plaintiff filed a grievance against LaBonte. (*Id.* at 9). Defendant LaBonte's February 12, 2004 evaluation actually praises plaintiff's work performance and in fact recommends that plaintiff receive a pay increase. (*Id.*) This evidence suggests that defendant LaBonte was *not* taking retaliatory action against plaintiff. If defendant LaBonte was truly intent on retaliating against plaintiff and keeping him from his church job for improper motives, LaBonte could have issued plaintiff an unsatisfactory evaluation and would not have recommended a pay increase.

**\*10** Plaintiff's own statements provide further evidence to undercut his argument that LaBonte was retaliating against plaintiff on account of his January 29, 2004 grievance. When appealing another grievance, plaintiff stated that his misbehavior report for being "out of place" in the law library "was dismissed ONLY after Corrections Officer G. LaBonte, appeared at [plaintiff's] hearing and stated that [plaintiff] DID IN FACT" have library call out on the day in question. (Dkt. No. 66-10 at 10). LaBonte's conduct in this instance-in February 2004-is totally opposite to an act of retaliation.

This court doubts that, despite the evidence of temporal proximity, plaintiff could persuade a reasonable factfinder that his grievance against LaBonte was a substantial or motivating factor in LaBonte's decision to exclude plaintiff from the church work program. Again, however, we need not resolve this issue and will recommend **summary judgment** on other grounds.

Even though plaintiff has arguably presented some evidence to establish a link between the protected activity and the alleged retaliation,

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 2682307 (N.D.N.Y.)
(Cite as: 2010 WL 2682307 (N.D.N.Y.))

[a] defendant is entitled to **summary judgment** on a retaliation claim "if the undisputed facts demonstrate that the challenged action clearly would have been taken on a valid basis alone." *Davidson v. Chestnut,* 193 F.3d 144, 149 (2d Cir.1999). "A finding of sufficient permissible reasons to justify state action is readily drawn in the context of prison administration," for two reasons. *Graham [v. Henderson],* 89 F.3d [75,] 79 [2d Cir.1996]. First, "[r]etalitation claims by **prisoners** are prone to abuse since **prisoners** can claim retaliation for every decision they dislike." *Id.* Second, "we have been cautioned to recognize that prison officials have broad administrative authority." *Id.*

*Miller v. Loughren,* 258 F.Supp.2d 61, 62 (N.D.N.Y.2003) (Munson, S.J.). *See also Bennett,* 343 F.3d at 139 (Once plaintiff produces evidence sufficient to raise a material question of fact as to retaliation, the burden shifts to the defendant to demonstrate through admissible evidence that the challenged actions would have occurred in any event.).

The record contains the affidavit of defendant LaBonte wherein he asserts that plaintiff was not taken to his assigned job on numerous occasions for legitimate administrative reasons. *See generally* LaBonte Decl. Defendant LaBonte was the officer primarily charged with supervising the church work crew. (LaBonte Decl. ¶ 4; Defs.' Rule 7.1 Statement ¶ 4). Defendant LaBonte states, and plaintiff concedes, that plaintiff was a low-ranking **inmate** on the church cleaning crew. (Defs.' Rule 7.1 Statement ¶ 10; Pl.'s Response to Defs.' Rule 7.1 Statement ¶ 3). In fact, LaBonte states that plaintiff was "one of the least senior members of the church crew, if not the lowest ranking." (LaBonte Decl. ¶ 6). As the supervising officer for the church work crew, it was LaBonte's responsibility to determine on a day to day basis how many **inmates** were needed to complete jobs at the church on any given day. (LaBonte Decl. ¶ 17). This determination was made based upon the amount of work to be done on a particular day. (*Id.*) If there were insufficient jobs to be completed on any given day, plaintiff, "[a]s the junior member of the church detail ... would be the first to be cut." (*Id.*)

*11 Defendant LaBonte further states that during the period in question, plaintiff did not attend his work

program at the church for various reasons beyond LaBonte's control. (LaBonte Decl. ¶¶ 21-22). For example, plaintiff missed some days because he had signed up to attend library call out. (*Id.* ¶ 21). In February 2004, plaintiff was keeplocked as a result of a disciplinary report issued by correctional officer Mayo. (*Id.*) On April 2, 2004, plaintiff had a medical call out; on April 8-9, 2004, the church crew did not work because the church was used for religious observances; and on April 16, 2004 plaintiff was keeplocked. (*Id.*) On other days, when defendant LaBonte was not scheduled to work, LaBonte's relief officer decided whether or not plaintiff attended his church job. (*Id.* ¶ 22). Defendant LaBonte points out that plaintiff received full pay for the days he was not included in the church work crew. (*Id.* ¶ 23).

LaBonte further states that "[t]ensions had developed between [plaintiff] and other church crew **inmates** because of the situation with **inmate** Brooks." (LaBonte Decl. ¶ 18; *see also* Dkt. No. 68 at 9 ( **Inmate** Progress Report dated February 12, 2004 wherein LaBonte noted that "**Inmate** Vega has had minor disagreements with coworkers, but has been able to work through them.")). LaBonte states that members of the church crew reside in the same cell block, and other members of the crew were aware of Brooks' attempt to join the crew, and "resented that an **inmate** 'couple' might become part of their work crew." (LaBonte Decl. ¶ 12). Because plaintiff was attempting to get his friend Brooks assigned to the church crew, LaBonte believed that the other members of the church work crew felt that plaintiff "was pushing to get a benefit which other **prisoners** knew better than to seek." (*Id.* ¶ 13). Tensions among **inmates** present security concerns because they can give "rise to an increased potential for violence during work at the church" and present "a danger to **inmates** as well as to the single security officer attending the work detail." (*Id.* ¶ 18). Because of this tension, LaBonte states that "if the church job could be done with one less **inmate** [he] would choose to leave [plaintiff] behind." (*Id.*)

LaBonte states that, based upon his observations of the behavior of plaintiff and Brooks, as well as upon reports from security staff and other **inmates**, he believed that plaintiff and Brooks might be involved in a homosexual relationship.[FN10] (LaBonte Decl. ¶ 7). The existence of such a relationship is not relevant; rather, LaBonte's and Garbera's statements are evidence of LaBonte's state of

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 2682307 (N.D.N.Y.)
(Cite as: 2010 WL 2682307 (N.D.N.Y.))

mind or perception. The fact that LaBonte *perceived* that such a relationship may have existed between plaintiff and Brooks demonstrates only the *reasonableness* of LaBonte's actions and his concern that the security of the facility could be implicated by such a perceived relationship.[FN11]

> FN10. Defendant Garbera, a Corrections Counselor at Clinton, has stated that during the time relevant to plaintiff's allegations, he "recall[ed] noting that [plaintiff's] attentive behavior toward **inmate** Brooks-who was making overt efforts to present himself as female-suggested [plaintiff's] interest in a homosexual relationship. Not only would this violate DOCS regulations, it carried a potential for physical danger. We were aware of the facts of the plaintiff's Broome County conviction, an extremely violent rape and homicide. We had to be concerned about the possibility of similar behavior." (Garbera Decl. ¶ 19).

> FN11. A fact is "material" only if it has some effect on the outcome of the suit. *Anderson,* 477 U.S. at 248. *See also Catanzaro v. Weiden,* 140 F.3d 91, 93 (2d Cir.1998). A dispute regarding a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248

*12 Defendant LaBonte has thus provided permissible reasons for keeping plaintiff from his job assignment-namely staffing and security concerns.[FN12] *See, e.g., Hudson v. McMillan,* 503 U.S. 1, 6 (1992) (noting that "[p]rison administrators ... should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security ." (internal quotation marks and citation omitted). Plaintiff has not submitted sufficient evidence to raise a question of fact as to the reasonableness of defendant LaBonte's actions, but relies only upon his own conclusory statement that "[b]ecause of the positive Work Performance Evaluations that plaintiff received during his period assigned to the Cleaning Crew, there is no other plausible excuse for LaBonte to hold

back" plaintiff from the church cleaning crew except in retaliation for plaintiff's grievance against LaBonte. (Dkt. No. 68 at 5). Plaintiff's statement that there is no "other plausible excuse" for defendant LaBonte's actions is contradicted by the actual facts in this case, and plaintiff's retaliation claim fails because LaBonte has produced sufficient evidence that he would have taken the same action for valid reasons. *See Graham v. Henderson,* 89 F.3d 75, 81 (2d Cir.1996) (finding that even assuming that a retaliatory motive existed, defendant would still be entitled to **summary judgment** because there are "proper, non-retaliatory reasons" for the actions taken). *See also Lowrance v. Achtyl,* 20 F.3d 529, 535 (2d Cir.1994) (A finding of sufficient permissible reasons to justify state action is "readily drawn in the context of prison administration where we have been cautioned to recognize that prison officials have broad administrative and discretionary authority.") (quotation marks omitted).

> FN12. Defendant LaBonte's decision to have only enough **inmates** present at the church on a given day to complete the required jobs is reasonable. It is also reasonable to assume that idle **inmates** would present more of a security concern than **inmates** who are kept busy performing required tasks.

Accordingly, I find that no reasonable factfinder could conclude in plaintiff's favor with respect to the retaliation claim against defendant LaBonte. Thus, plaintiff's claim that defendant LaBonte retaliated against plaintiff for filing a grievance or complaint should be dismissed.

## IV. *Equal Protection*

Plaintiff claims that defendant LaBonte denied him equal protection by not allowing plaintiff to attend his prison job because the defendant LaBonte believed plaintiff to be a homosexual.

The Equal Protection Clause requires that the government treat all similarly situated people alike. *City of Cleburne, Tex. v. Cleburne Living Ctr.* 473 U.S. 432, 439 (1985). Specifically, the Equal Protection Clause "bars the government from selective adverse treatment of

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 2682307 (N.D.N.Y.)
(Cite as: 2010 WL 2682307 (N.D.N.Y.))

individuals compared with other similarly situated individuals if 'such selective treatment was based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, *or malicious or bad faith intent to injure a person.*' " *Bizzarro v. Miranda,* 394 F.3d 82, 86 (2d Cir.2005) (emphasis in original) (quoting *LeClair v. Saunders,* 627 F.2d 606, 609-10 (2d Cir.1980)).

**\*13** "Sexual orientation has been held to be a basis for an equal protection claim under Section 1983." *Emblen v. Port Authority of New York/New Jersey,* No. 00 Civ. 8877, 2002 WL 498634, at \*7 (S .D.N.Y. Mar. 29, 2002) (citing *Quinn v. Nassau County Police Dep't,* 53 F.Supp.2d 347, 356-57 (E.D.N.Y.1999) (noting that the Supreme Court has found that government discrimination against homosexuals, in and of itself, violates the Equal Protection Clause) (citing *Romer v. Evans,* 517 U.S. 620 (1996)). *See also Holmes v. Artuz,* 95 CIV. 2309, 1995 WL 634995, at \*1 (S.D.N.Y. Oct. 27, 1995) (removal from a prison job because of declared sexual orientation may state a claim under Section 1983) (citing *Kelley v.. Vaughn,* 760 F.Supp. 161, 163 (W.D.Mo.1991) (denying motion to dismiss on ground that **inmate** who claims his bakery prison job was terminated solely because of sexual orientation may have a valid equal protection claim)); *Howard v. Cherish,* 575 F.Supp. 34, 36 (S.D.N.Y.1983) (recognizing in dicta that complaint might state claim under § 1983 if it alleged that individual was discriminated against solely because of sexual orientation).

Defendant LaBonte correctly contends that plaintiff has no right to his prison job. *See Gill v. Mooney,* 824 F.2d at 194. However, that is not the question presented on this equal protection claim. Instead, the question is whether plaintiff was protected from discrimination based upon his perceived sexual orientation. In this respect, District Judge Suddaby has already concluded that plaintiff stated an equal protection claim sufficient to survive a motion to dismiss or for judgment on the pleadings.[FN13] (Dkt. No. 65 at 24-25). *See also Bussey v. Phillips,* 419 F.Supp.2d 569, 588 (S.D.N.Y.2006) ("A '[p]laintiff has no right to any particular prison job, but prison officials cannot discriminate against him on the basis of [an impermissible consideration] in work assignments.' ")[FN14] (quoting *LaBounty v. Adler,* No. 89 Civ. 4242, 1999 WL 961776, at \*2 (S.D.N.Y. Oct. 21, 1999) (other citation omitted).

FN13. Despite the fact that plaintiff's equal protection allegations survived the pleading stage, the standard of proof at **summary judgment** is more demanding; plaintiff's allegations "must be supported by specific facts raising a genuine issue for trial." *Bussey,* 419 F.Supp.2d at 582.

FN14. In *Bussey,* the impermissible consideration was race. *Id* .

Plaintiff has alleged that defendant LaBonte did not allow plaintiff to attend his church job on multiple occasions, even though other **inmates** were taken to their church job on those days, because LaBonte perceived plaintiff to be homosexual. (AC ¶¶ 36, 52, 53, 63, 64, 83, 85). The fact that plaintiff asserts that he is not homosexual is irrelevant to his equal protection claim. *See Emblen,* 2002 WL 498634 at \*7 (when plaintiff alleges denial of equal protection on the basis of homosexuality, the fact that plaintiff is not a homosexual is "irrelevant").

In *Romer v. Evans,* the Supreme Court, without specifically examining whether homosexuals are a suspect class, used the rational basis test to invalidate an amendment to the Colorado constitution prohibiting all governmental action designed to protect homosexuals from discrimination. *Romer,* 517 U.S. at 631-35. *See also Anderson v. Branen,* 799 F.Supp. 1490, 1492 (S.D.N.Y.1992) ("An equal protection analysis of discriminatory acts against homosexuals must be conducted pursuant to a rational basis test."). Thus, in order to establish an equal protection violation, plaintiff must show that "the disparity in treatment cannot survive the appropriate level of scrutiny which, in the prison setting, means that he must demonstrate that his treatment was not reasonably related to [any] legitimate penological interests." *Phillips v. Girdich,* 408 F.3d 124, 129 (2d Cir.2005) (citation and internal quotations omitted)

**\*14** As stated above, defendant LaBonte has set forth numerous legitimate penological reasons supporting his decision to exclude plaintiff from the church work crew on multiple occasions, the most important being the need to

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 2682307 (N.D.N.Y.)
(Cite as: 2010 WL 2682307 (N.D.N.Y.))

maintain prison security and order. *See* Hudson, 503 U.S. at 6 (noting that "[p]rison administrators ... should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." (internal quotation marks and citation omitted)).

[M]aintaining institutional security and preserving internal order and discipline are essential goals that may require limitation or retraction of the retained constitutional rights of ... convicted **prisoners** .... '[C]entral to all other corrections goals is the institutional consideration of internal security within the corrections facilities themselves.'

...

Prison officials must be free to take appropriate action to ensure the safety of **inmates** and corrections personnel .... Accordingly, we have held that even when an institutional restriction infringes a specific constitutional guarantee ... the practice must be evaluated in the light of the central objective of prison administration, safeguarding institutional security.

Bell v. Wolfish, 441 U.S. 520, 546-47 (1979) (internal citations and footnote omitted). *See also* Griffin v. Donelli, No. 05-CV-1072, Report-Recommendation and Order, 2010 WL 681394, at *11 (N.D.N.Y. November 24, 2009) (Homer, M.J.), *adopted* on *de novo* review, 2010 WL 681394, at * 1 (N.D.N.Y. Feb. 24, 2010) (McAvoy, S.J.) (finding that "[o]rder [and] security ... are valid and substantial penological interests that staff in a prison environment are entitled to, and are in fact required to act upon.").

Based upon his observations of interactions between plaintiff and **inmate** Brooks as well as reports from security staff and other **inmates**, defendant LaBonte was concerned that conflicts might arise between plaintiff and other members of the church crew. (LaBonte Decl. ¶ 12-13). Defendant LaBonte's concerns were validated by LaBonte's receipt of a letter from **inmate** Brooks indicating that a member of the church work crew (not

plaintiff) had made sexual advances to Brooks which were refused. (*Id.* Ex. A). A reasonable factfinder could conclude that this letter, coupled with LaBonte's suspicion that plaintiff and **inmate** Brooks might be involved in a relationship, provided a reasonable basis for LaBonte to believe that plaintiff's presence in the church work crew could present safety concerns.

Apart from defendant LaBonte's reasons for excluding plaintiff from his assigned job, plaintiff's own statements are fatal to his claim that defendant LaBonte discriminated against him on the basis of plaintiff's perceived sexual preference. In his January 29, 2004 grievance, plaintiff stated that "I was soon to learn that it *WAS NOT* Officer LaBonte who was DISCRIMINATING against me and **Inmate** Brooks, but a Superior Officer, who gives the orders. (Dkt. No. 66-10 at 13) (emphasis in original).

**\*15** Based upon the evidence, a reasonable factfinder could conclude that defendant LaBonte's concern for institutional safety, his attempt to maintain staffing on the church work crew at reasonable levels, and his policy of cutting the hours of more junior members of the work crew first, all suffice to satisfy the rational basis test and constitute legitimate reasons to exclude plaintiff from the church work crew on various days. Moreover, no reasonable factfinder could conclude that defendant LaBonte had the authority to remove plaintiff from his church job. Accordingly, I find that no reasonable factfinder could conclude in plaintiff's favor with respect to the equal protection claim against LaBonte. Thus, plaintiff's claim that defendant LaBonte violated plaintiff's right to equal protection should be dismissed.

**V. *Qualified Immunity***

In the alternative, defendants argue that they are entitled to qualified immunity with respect to plaintiff's claims that he was retaliated against for engaging in a protected activity in violation of the First Amendment and denied equal protection in violation of the Fourteenth Amendment. In determining whether qualified immunity applies, the court may first consider whether "the facts alleged show the [defendant's] conduct violated a constitutional right." Saucier v. Katz, 533 U.S. 194, 201(2001), *modified by* Pearson v. Callahan, --- U.S. ----,

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 2682307 (N.D.N.Y.)
(Cite as: 2010 WL 2682307 (N.D.N.Y.))

129 S.Ct. 808, 811 (2009) (holding that, "while the sequence set forth [in *Saucier* ] is often appropriate, it should no longer be regarded as mandatory in all cases"). The Court may also examine "whether the right was clearly established ... in light of the specific context of the case, not as a broad general proposition." *Saucier,* 533 U.S. at 201. However, "[i]f no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity." *Saucier,* 533 U.S. at 201. Since the Court has concluded in this case that no First or Fourteenth Amendment violations occurred, the Court need not address qualified immunity.

**WHEREFORE,** based on the findings above, it is

**RECOMMENDED,** that the motion for **summary judgment** filed on behalf of defendants Lareau, LaBonte, and Garbera (Dkt. No. 66) be **GRANTED** and the amended complaint be **DISMISSED WITH PREJUDICE AS TO ALL REMAINING DEFENDANTS AND CLAIMS.**

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have fourteen days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir.1989)); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(d), 72.

N.D.N.Y.,2010.
Vega v. Lareau
Slip Copy, 2010 WL 2682307 (N.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



Slip Copy, 2010 WL 1286800 (D.Conn.)
(Cite as: 2010 WL 1286800 (D.Conn.))

**C**

Only the Westlaw citation is currently available.

United States District Court,
D. Connecticut.
Thomas MAY, Plaintiff,
v.
Miguel DeJESUS, Correctional Officer, Defendant.
**No. 3:06CV1888 (AWT).**

March 30, 2010.

Thomas J. May, Machiasport, ME, pro se.

Matthew B. Beizer, Attorney General's Office, Hartford, CT, for Defendant.

*RULING ON MOTION FOR SUMMARY JUDGEMENT*

ALVIN W. THOMPSON, District Judge.

**\*1** The plaintiff, Thomas May, who is currently incarcerated at Maine State Prison in Warren, Maine, commenced this civil rights action *pro se* and *in forma pauperis* against the defendant, Correctional Officer Miguel DeJesus. The plaintiff claims that the defendant deprived him of basic human needs in violation of the Eighth and Fourteenth Amendment, which resulted in physical injury and emotional distress. The defendant has moved for summary judgment on all claims. For the reasons set forth below, the motion for summary judgment is being granted.

**I. Facts**

In December 2004, the plaintiff underwent hemorrhoid surgery. Following the surgery, Dr. Ruiz, a prison physician, prescribed Ducosate Sodium, a laxative, to be taken by the plaintiff twice a day from December 9, 2004 until March 29, 2005.

In March 2005, the defendant was employed as a Correctional Officer at Osborn Correctional Institution ("Osborn") in Somers, Connecticut where the plaintiff, a sentenced inmate, was incarcerated. On March 14, 2005, the plaintiff was scheduled to participate in a trial in a case filed in the United States Bankruptcy Court in New Haven, Connecticut. Department of Correction officials assigned the defendant to transport the plaintiff in a prison van from Osborn to the Bankruptcy Court in New Haven, a distance of approximately 65 miles. The plaintiff had taken his prescribed laxative medication prior to the trip to New Haven. The plaintiff and the defendant were the only occupants in the prison van. The plaintiff wore handcuffs and leg shackles during the trip to and from New Haven.

The plaintiff avers that, at the beginning of the trip to New Haven, the defendant did not ask him whether he had to use the bathroom and did not instruct him to use the bathroom. The plaintiff avers that "[i]f [the defendant] had asked or instructed me, I would have told [the defendant] that I did not need to use a bathroom, because at that time I had no urge to defecate or urinate." (Thomas J. May Affidavit (Doc. No. 27 Ex. 2) ("May Aff.") ¶ 9) Approximately 45 to 60 minutes into the trip to New Haven, the plaintiff informed the defendant that he needed to defecate and asked the defendant to stop the van at the Cheshire Correctional Institution so that he could use the bathroom. The defendant did not stop the van and the plaintiff defecated in his pants. The plaintiff was forced to sit in his soiled pants for 15 to 30 minutes until the van arrived at the courthouse in New Haven.

Upon his arrival at the courthouse, Deputy United States Marshals permitted the plaintiff to throw out his soiled pants, underwear and socks, take a shower and change into a new pair of pants. The United States Marshals' Service did not provide the plaintiff with a new pair of socks. The bankruptcy proceeding lasted approximately two hours. Thereafter, the plaintiff was placed in leg shackles and

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 1286800 (D.Conn.)
(Cite as: 2010 WL 1286800 (D.Conn.))

handcuffs for the return trip to Osborn.

The plaintiff avers that, at the beginning of the return trip to Osborn, the defendant did not ask him whether he had to use the bathroom and did not instruct him to use the bathroom. The plaintiff avers that "[i]f [the defendant] had instructed or asked me, I would have told [the defendant] that I did not need to use a bathroom, because at that time I had no urge to urinate or defecate." (May Aff.¶ 29) Approximately 60 minutes into the return trip, the plaintiff informed the defendant that he had to urinate and asked the defendant to stop the van at the Hartford Correctional Center or MacDougall-Walker Correctional Institution in Suffield so that he could use a bathroom. The defendant did not stop the van and the plaintiff urinated in his pants. The plaintiff sat in his urine-soaked pants for 15 to 30 minutes, before the van arrived at Osborn. Upon his arrival at Osborn, the plaintiff was escorted back to his cell.

**\*2** The plaintiff suffered a small abrasion, approximately 1/4 inch by 1/8 inch in size on his left ankle where the leg shackle rubbed against his skin during the return trip to Osborn. On March 24, 2005, a nurse examined the plaintiff's ankle and noted a small, well-healed scab on the front of the ankle, no sign of infection, redness or swelling and excellent range of motion. The nurse recommended follow-up as needed.

## II. Legal Standard

A motion for summary judgment may not be granted unless the court determines that there is no genuine issue of material fact to be tried and that the facts as to which there is no such issue warrant judgment for the moving party as a matter of law. Fed.R.Civ.P. 56(c). *See Celotex Corp. v. Catrett,* 477 U.S. 317, 322-23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Gallo v. Prudential Residential Servs.,* 22 F.3d 1219, 1223 (2d Cir.1994). When ruling on a motion for summary judgment, the court may not try issues of fact, but must leave those issues to the jury. *See, e.g., Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Donahue v. Windsor Locks Bd. of Fire Comm'rs,* 834 F.2d 54, 58 (2d Cir.1987). Thus, the trial court's task is "carefully limited to discerning whether there are any genuine issues of

material fact to be tried, not to deciding them. Its duty, in short, is confined ... to issue-finding; it does not extend to issue-resolution." *Gallo,* 22 F.3d at 1224.

Summary judgment is inappropriate only if the issue to be resolved is *both* genuine and related to a material fact. Therefore, the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment. An issue is "genuine ... if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248 (internal quotation marks omitted). A material fact is one that would "affect the outcome of the suit under the governing law." *Anderson,* 477 U.S. at 248. Only those facts that *must* be decided in order to resolve a claim or defense will prevent summary judgment from being granted. Immaterial or minor facts will not prevent summary judgment. *See Howard v. Gleason Corp.,* 901 F.2d 1154, 1159 (2d Cir.1990).

When reviewing the evidence on a motion for summary judgment, the court must "assess the record in the light most favorable to the non-movant and ... draw all reasonable inferences in its favor." *Weinstock v. Columbia Univ.,* 224 F.3d 33, 41 (2d Cir.2000)(quoting *Delaware & Hudson Ry. Co. v. Consolidated Rail Corp.,* 902 F.2d 174, 177 (2d Cir.1990)). However, the inferences drawn in favor of the nonmovant must be supported by the evidence. "[M]ere speculation and conjecture" is insufficient to defeat a motion for summary judgment. *Stern v. Trustees of Columbia University,* 131 F.3d 305, 315 (2d Cir.1997) (quoting *Western World Ins. Co. v. Stack Oil, Inc.,* 922 F.2d 118, 121 (2d. Cir.1990)). Moreover, the "mere existence of a scintilla of evidence in support of the [nonmovant's] position" will be insufficient; there must be evidence on which a jury could "reasonably find" for the nonmovant. *Anderson,* 477 U.S. at 252.

**\*3** Where one party is proceeding *pro se,* the court reads the *pro se* party's papers liberally and interprets them to raise the strongest arguments suggested therein. *See Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994). Despite this liberal interpretation, however, an unsupported assertion cannot overcome a properly supported motion for summary judgment. *Carey v. Crescenzi,* 923 F.2d 18, 21 (2d Cir.1991).

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 1286800 (D.Conn.)
(Cite as: 2010 WL 1286800 (D.Conn.))

### III. Discussion

The plaintiff contends that the defendant's failure to stop the van on the way to and from the courthouse to permit him to use the bathroom, which also resulted in injury from the application of leg shackles to his bare ankles, constituted a violation of his right to be free from unconstitutional conditions of confinement. The plaintiff also contends that he suffered humiliation and emotional distress as a result of the violation.[FN1]

> **FN1.** Deliberate indifference by prison officials to a prisoner's serious medical need constitutes cruel and unusual punishment in violation of the Eighth Amendment. _Estelle v. Gamble,_ 429 U.S. 97, 104, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). Although the plaintiff had undergone hemorrhoid surgery and was taking medication because of the surgery, he did not include a claim of deliberate indifference to medical needs in his complaint. The court does not construe the complaint as raising such a claim because even if the plaintiff could prove his medical condition was serious, he does not contend that the defendant was aware of this medical condition or of the fact that the plaintiff was taking medication. Thus, the plaintiff could not show that the defendant was deliberately indifferent to that condition.

The defendant moves for summary judgment on the ground that the plaintiff has failed to produce evidence that could show he was subjected to unconstitutional conditions of confinement during the trip to and from the courthouse.

### A. Constitutional Violation: Conditions of Confinement

"It is undisputed that the treatment a prisoner receives in prison and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment." _Helling v. McKinney,_ 509 U.S. 25, 31, 113 S.Ct. 2475, 125 L.Ed.2d 22 (1993). "A claim of cruel and unusual punishment in violation of the Eighth Amendment has two components-one subjective, focusing on the defendant's motive for his conduct, and the other objective, focusing on the conduct's effect." _Wright v. Goord,_ 554 F.3d 255, 268 (2d Cir.2009).

In _Gill v. Riddick,_ No. Civ. 9:03-CV-1456, 2005 WL 755745 (March 31, 2005), the court stated:

> A prisoner alleging that a certain prison condition constitutes cruel and unusual punishment must prove both an objective and subjective element, specifically, the inmate must show that the deprivation at issue is objectively sufficiently serious such that the plaintiff was denied the minimal civilized measure of life's necessities, and that the defendant possessed a sufficiently culpable state of mind associated with the unnecessary and wanton infliction of pain.... The objective component of an Eighth Amendment violation must be evaluated based on the severity of the deprivation imposed.... When considering whether a particular condition is so serious as to invoke the Eighth Amendment, a court should assess the duration of the condition and the potential for serious physical harm.... To prove the second, subjective component, a prisoner must establish that the person who inflicted the unconstitutional condition was deliberately indifferent to the severe deprivation.

_Id.,_ at *16 (internal quotation marks and citations omitted). "Because society does not expect or intend prison conditions to be comfortable, only extreme deprivations are sufficient" to state a claim of unconstitutional conditions of confinement. _Blyden v. Mancusi,_ 186 F.3d 252, 263 (2d Cir.1999).

**\*4** The defendant contends that the plaintiff has not met either the objective or the subjective component of the Eighth Amendment test because, as to the objective component, he has not produced evidence that he suffered an unconstitutional deprivation during his trip to or from the courthouse in New Haven, and, as to the subjective component, he has not produced evidence that the defendant acted with the requisite state of mind. The court concludes that the plaintiff has failed to create a genuine

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 1286800 (D.Conn.)
(Cite as: 2010 WL 1286800 (D.Conn.))

issue of fact as to the objective component and, for that reason, the defendant is entitled to summary judgment.

"To satisfy the objective component of an Eighth Amendment conditions of confinement claim, Plaintiff must show that the conditions alleged, either alone or in combination, deprive him of 'the minimal civilized measure of life's necessities,' such as adequate food, clothing, shelter, sanitation, medical care, and personal safety." *Alvarez v. County of Cumberland,* Civil No. 07-346(RBK), 2009 WL 750200, *4 (D.N.J. March 18, 2009)* (citation omitted). "To the extent that certain conditions are only 'restrictive' or 'harsh,' they are merely part of the penalty that criminal offenders pay for their offenses against society." *Id.*

In addition, an important consideration in determining whether a particular condition deprived an inmate of a basic human need or life necessity is the duration of the condition. *See e.g., Smith v. Copeland,* 87 F.3d 265, 268 (8th Cir.1996)* (holding that inmate's confinement in cell for four days with overflowed toilet, during which time he endured stench of his own feces and urine, did not rise to level of Eighth Amendment violation); *Davis v. Scott,* 157 F.3d 1003, 1006 (5th Cir.1998)*(holding that inmate being placed in cell with blood on walls and excretion on floors for three days did not meet objective component of Eighth Amendment, especially in view of fact that cleaning supplies were made available to him); *Hutto v. Finney,* 437 U.S. 678, 687-88, 98 S.Ct. 2565, 57 L.Ed.2d 522 (1978)*("A filthy overcrowded cell and a diet of 'grue' might be tolerable for a few days and intolerably cruel for weeks or months."); *Wright v. McMann,* 387 F.2d 519, 526 (2d Cir.1967)* ( "civilized standards of humane decency ... do not permit" an inmate to be placed in a filthy, unheated strip cell and deprived of clothes and basic hygiene items such as soap and toilet paper for a substantial period of time, i.e., 33 days).

The defendant concedes that unsanitary conditions, including lack of access to toilet paper or a properly functioning toilet, may constitute a severe deprivation of a basic human need. *See e.g., LaReau v. MacDougall,* 473 F.2d 974, 978 (2d Cir.1972)* (confinement for five days in strip cell with only a pit toilet and without light, a sink or other source of water violated minimum standards of human decency required by Eighth Amendment); *Wright,*

387 F.2d at 522, 526 (conditions of confinement in strip cell including denial of toilet paper for 33 days violated Eighth Amendment). The defendant contends, however, that depriving the plaintiff of the use of a bathroom for two short periods of time did not constitute an extreme deprivation of a basic human need.

**\*5** Courts in this and other circuits have consistently held that an occasional or temporary deprivation of toilet use, does not constitute an extreme deprivation of a basic human need or necessity of life. *See Jones v. Marshall,* No. 08 Civ. 0562, 2010 WL 234990, at *3 (S.D.N.Y. Jan.19, 2010)* (denial of right to use bathroom for 90 minutes did not "establish the existence of an objective injury for purposes of Eighth Amendment claim"); *Rogers v. Laird,* Civ. No. 9:07-CV-668 (LEK/RFT), 2008 WL 619167, at *3 (N.D.N.Y. Feb.8, 2008)* (denial of use of restroom during three hour trip to and from court causing inmate to urinate on himself did not "constitute an extreme deprivation of life's necessities"); *Simpson v. Wall,* 2004 WL 720276, at *3 (W.D.Wis. Mar.29, 2004)* ("Sitting in one's feces for sixty to eighty miles cannot be said to present a risk of serious harm."); *Bourdon v. Roney,* 2003 WL 21058177, at *10-11 (N.D.N.Y. Mar.6, 2003)* (three hours without bathroom privileges is not deprivation of minimal necessities of life); *Whitted v. Lazerson,* No. 96 Civ. 2746(AGS), 1998 WL 259929, at * 2 (S.D.N.Y. May 21, 1998)* (temporary deprivation of use of toilet for 90 minutes at most, in the absence of serious physical injury, did not constitute denial of necessities of life).

In reaching this conclusion, courts have considered whether the deprivation of toilet use resulted in unsanitary conditions that posed a significant risk to the inmate's health. *See Gill,* 2005 WL 755745, at *16 (inmate who urinated on himself as result of denial of use of bathroom during trip to prison failed to satisfy objective element of Eighth Amendment because denial was temporary-70 minutes-and he suffered no injury to his health); *Qawi v. Howard,* No. Civ. A. 98-220-GMS, 2000 WL 1010281, at *3-4 (D.Del. Jul.7, 2000)* (denial of use of bathroom for six hours during which inmate forced to urinate in drinking cup and bowl and defecate into a paper bag did not constitute sufficiently serious deprivation because duration of condition was brief and inmate suffered no significant health risk); *Odom v. Keane,* No. 95 Civ. 9941, 1997 WL 576088, at *4-5 (S.D.N.Y. Sept.17, 1997)* (lack of a working toilet in prison cell for approximately 10

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 1286800 (D.Conn.)
(Cite as: 2010 WL 1286800 (D.Conn.))

hours, absent an allegation that the prisoner risked contamination by contact with human waste, "does not rise to the level of cruel and unusual punishment").

Although the plaintiff was forced to sit in pants that were soiled with feces for up to 30 minutes on the way to court, he was permitted to clean himself and change his clothes when he arrived at the courthouse and before he was required to appear in court. Despite the fact that the plaintiff had to sit in urine-soaked pants for up to 30 minutes on the trip back to Osborn, there is no evidence to suggest that he was not able to wash himself and change his clothes after officers escorted him to his cell. Furthermore, other than a minor abrasion on his ankle, there is no evidence to suggest that the plaintiff suffered any contamination or risk to his health as a result of having to sit in pants soiled with feces and soaked with urine. There is no aspect of the conditions described by the plaintiff that could satisfy the objective element of the Eighth Amendment standard. The conditions were temporary and did not constitute an extreme deprivation of basic human need or the minimal civilized measure of life's necessities.

**\*6** The plaintiff fails to create a genuine issue of fact as to whether he can satisfy the objective component of the Eighth Amendment test, so it is not necessary to reach subjective component. Accordingly, the defendant's motion for summary judgment is being granted on this ground.

**B. Emotional Distress**

The plaintiff asserts that the defendant subjected him to emotional distress and humiliation because he was forced to walk into the courthouse in front of the Deputy United States Marshals in soiled pants and was escorted through a crowded prison gymnasium and housing unit on the way back to his cell at Osborn in urine-soaked pants. Having granted summary judgment on the plaintiff's sole federal claim, the court declines to exercise supplemental jurisdiction pursuant to 28 U.S.C. § 1367(c) over the plaintiff's state law claims for negligent or intentional infliction of emotional distress. *See Valencia ex rel. Franco v. Lee,* 316 F.3d 299, 305 (2d Cir.2003)("[I]n the usual case in which all federal-law claims are eliminated

before trial, the balance of factors to be considered under the pendent jurisdiction doctrine-judicial economy, convenience, fairness, and comity-will point toward declining to exercise jurisdiction over the remaining state-law claims.")(quoting *Carnegie-Mellon Univ. v. Cohill,* 484 U.S. 343, 350 n. 7, 108 S.Ct. 614, 98 L.Ed.2d 720 (1988)).

**IV. Conclusion**

For the reasons set forth above, the defendants' Motion for Summary Judgment **(Doc. No. 24)** is hereby **GRANTED.** The Clerk is directed to enter judgment in favor of the defendant and close this case.

It is so ordered.

D.Conn.,2010.
May v. DeJesus
Slip Copy, 2010 WL 1286800 (D.Conn.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



Slip Copy, 2009 WL 750200 (D.N.J.)
(Cite as: 2009 WL 750200 (D.N.J.))

Only the Westlaw citation is currently available.NOT FOR PUBLICATION

United States District Court, D. New Jersey.
Julio ALVAREZ, Jr., Plaintiff,
v.
COUNTY OF CUMBERLAND, et al, Defendants.
**Civil No. 07-346 (RBK).**

March 18, 2009.

West KeySummary
**Federal Civil Procedure 170A**  🗝  **2491.5**

170A Federal Civil Procedure
    170AXVII Judgment
        170AXVII(C) Summary Judgment
            170AXVII(C)2 Particular Cases
                170Ak2491.5 k. Civil Rights Cases in General. Most Cited Cases
Genuine issues of material fact existed as to the conditions of an inmate's confinement in an isolation unit at a county jail. Therefore, summary judgment was precluded in an action for an Eighth Amendment conditions of confinement claim. The inmate spent three days in his isolation cell without working plumbing and with a toilet overflowing with feces, urine, and other materials. The inmate also pointed to evidence that he contracted methicillin-resistant staphylococcus aureus (MRSA) while in isolation to show that he lived and slept exposed to feces in his cell. U.S.C.A. Const.Amend. 8; 42 U.S.C.A. § 1983.

Richard A. Stoloff, Law Offices of Richard A. Stoloff, Linwood, NJ, for Plaintiff.

Steven L. Rothman, Lipman, Antonelli, Batt, Dunlap, Wodlinger & Gilson, Vineland, NJ, Nancy L. Siegel, White & Williams, LLP, Cherry Hill, NJ, for Defendants.

**OPINION**

ROBERT B. KUGLER, District Judge.

**\*1** This matter comes before the Court on a motion by Defendants County of Cumberland, Cumberland County Board of Chosen Freeholders, Cumberland County Department of Corrections, Cumberland County Sheriff's Department, Kenneth Lamcken, Michael Palau, Glenn Saunders, and Lewis Walker (collectively, "the County Defendants") for partial summary judgment on the Complaint of Plaintiff Julio Alvarez, Jr. ("Plaintiff") and on a motion by Defendant Prison Health Services, Inc. ("PHS") for summary judgment on Plaintiff's Complaint. Plaintiff's Complaint includes allegations that the County Defendants and PHS acted negligently and violated Plaintiff's civil rights pursuant to 42 U.S.C. §§ 1983, 1985(3). The County Defendants only move for summary judgment on Plaintiff's civil rights claims against them. For the reasons expressed below, the Court will grant in part and deny in part the County Defendants' motion and grant Prison Health Services' motion.

**I. BACKGROUND**

The allegations in Plaintiff's Complaint arise from events that occurred while he was an inmate at the Cumberland County Correctional Facility ("Cumberland County Jail"). Plaintiff was placed in an isolation unit at the Cumberland County Jail on or about January 28, 2005, and released from isolation on or about February 2, 2005. Plaintiff's isolation cell measured six feet by eight feet and was the middle cell in a group of three adjacent isolation cells in the unit. The cells on either side of Plaintiff's had working toilets and sinks. However, the parties agree that the toilet and sink in Plaintiff's original cell was in a state of disrepair at the time of his placement in isolation. Other inmates occupied the adjacent isolations cells, which contained working toilets and sinks. For the purposes of summary judgment, the parties agree that Plaintiff's toilet in isolation was not only non-functional, but also filled to the point of overflowing with urine, feces, and trash.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 750200 (D.N.J.)
(Cite as: 2009 WL 750200 (D.N.J.))

While in his original isolation cell, Plaintiff urinated in a Styrofoam cup which he then emptied into the broken sink so as not to cause the toilet to overflow onto the floor. Plaintiff defecated in the toilet, only after removing from it pieces of plastic and cardboard, which he placed on the floor of the cell. Plaintiff used the toilet by squatting over it, attempting to avoid touching the toilet seat.

Plaintiff was not provided with cleaning products with which to clean the isolation cell himself, nor was it cleaned by someone else while Plaintiff occupied it. Plaintiff was not provided equipment to use to empty the toilet or sink. At one time during his stay, a corrections officer did attempt to fix the toilet but was unsuccessful. Plaintiff did not ask to use a toilet outside his cell. Plaintiff alleges, and the County Defendants refute, that he did not ask because there was not a guard available to whom Plaintiff could have made such a request. Plaintiff was allowed to shower twice during his time in the original cell. The County Defendants argue that Plaintiff had frequent access to corrections officer, including at the time of his showers.

*2 Plaintiff contends that on February 1, 2005, one day before he was released from isolation, he transferred himself, with the permission of the guards, to an adjacent isolation cell with working plumbing. Plaintiff further contends that he could not have moved to an adjacent cell until February 1 because both adjacent cells were occupied from the time of Plaintiff's arrival in the isolation unit until that date. The County Defendants do not agree to the date of Plaintiff's self-transfer, but agree that he did so at some point during the time he was in isolation.

Plaintiff was released from isolation on February 2, 2005, at which time he was seen by a nurse to be treated for boils. He was seen by a doctor on February 4, 2005, at which time he had developed 10 lesions over his buttocks, legs, and penis. Plaintiff was placed in a medical isolation cell with other prisoners until February 9, 2005 when he was sent to the hospital to be treated for his lesions. Plaintiff stayed at the hospital eight days and underwent surgery. Plaintiff's medical expert reports that Plaintiff was infected with methicillin-resistant staphylococcus aureus ("MRSA") at least in part due to his exposure to waste

matter in his isolation cell and his inability to wash after touching contaminated surfaces. (Pl.Opp.Ex. B.)

Plaintiff and the County Defendants agree that in 2005, the Cumberland County Jail was overcrowded. Further, Plaintiff presents the deposition testimony of Defendant Kenneth Lamcken, who was responsible for maintenance at the Cumberland County Jail in 2005. Lamcken testified that there were times in 2005 when toilets in isolation units were broken, but that inmates were placed in cells with broken toilets. He further testified that those inmates often defecated on the floor of the cell. (Pl.Opp.Ex. C.) The County Defendants do not contest Lamcken's testimony in their reply brief.

## II. LEGAL STANDARD

Summary judgment is appropriate where the Court is satisfied that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 330, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). A genuine issue of material fact exists only if "the evidence is such that a reasonable jury could find for the non-moving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). When the Court weighs the evidence presented by the parties, "[t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in [her] favor." Id. at 255.

The burden of establishing the nonexistence of a "genuine issue" is on the party moving for summary judgment. Celotex, 477 U .S. at 330. The moving party may satisfy this burden by either (1) submitting affirmative evidence that negates an essential element of the nonmoving party's claim; or (2) demonstrating to the Court that the nonmoving party's evidence is insufficient to establish an essential element of the nonmoving party's case. Id. at 331.

*3 Once the moving party satisfies this initial burden, the nonmoving party "must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). To do so, the nonmoving party must "do more than simply show that there is some metaphysical doubt as to material

Slip Copy, 2009 WL 750200 (D.N.J.)
(Cite as: 2009 WL 750200 (D.N.J.))

facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Rather, to survive summary judgment, the nonmoving party must "make a showing sufficient to establish the existence of [every] element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex,* 477 U.S. at 322.

## III. ANALYSIS

### A. The County Defendants' Motion

The County Defendants move for partial summary judgment on Plaintiff's constitutional claims against the County Defendants in Count IV of the Complaint.

### 1. Plaintiff's Fifth Amendment Claim

Plaintiff's Fifth Amendment claim does not present a genuine issue for trial and will be dismissed. The County Defendants move for summary judgment on Plaintiff's claim that they violated his constitutional rights guaranteed under the Fifth Amendment, contending that there is no genuine issue of material fact regarding a Fifth Amendment violation because Plaintiff has no evidence to support such a claim. Plaintiff has provided no argument to refute the motion on this point and thus presents no evidence to satisfy his burden. *See* Fed.R.Civ.P. 56(e). Finding no genuine issue of material fact, the Court will grant summary judgment for the County Defendants on Plaintiff's Fifth Amendment claim.

### 2. Plaintiff's Eighth Amendment Claim

The County Defendants move for summary judgment on Plaintiff's claim that they violated his Eighth Amendment rights. There are genuine issues of fact regarding the conditions of Plaintiff's confinement at the Cumberland County Jail, so Plaintiff's Eighth Amendment claims will survive summary judgment.

"To state a claim under [42 U.S.C.] § 1983, a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law." *West v. Atkins,* 487 U.S. 42, 48, 108 S.Ct. 2250, 101 L.Ed.2d 40 (1988). Prisoners have a protected right in being incarcerated at a place of confinement conforming to the standards set forth by the Eighth Amendment. The Constitution "does not mandate comfortable prisons," *Rhodes v. Chapman,* 452 U.S. 337, 349, 101 S.Ct. 2392, 69 L.Ed.2d 59 (1981), but neither does it permit inhumane ones, and it is now settled that "the treatment a prisoner receives in prison and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment." *Helling v. McKinney,* 509 U.S. 25, 31, 113 S.Ct. 2475, 125 L.Ed.2d 22 (1993). In its prohibition of "cruel and unusual punishments, the Eighth Amendment ... imposes duties on [prison] officials, who must provide humane reasonable measures to guarantee the safety of the inmates." *Hudson v. Palmer,* 468 U.S. 517, 526-27, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984); see *Helling,* 509 U.S. at 31-32; *Washington v. Harper,* 494 U.S. 210, 225, 110 S.Ct. 1028, 108 L.Ed.2d 178 (1990); *Estelle v. Gamble,* 429 U.S. 97, 103, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). The Eighth Amendment prohibits conditions which involve the unnecessary and wanton infliction of pain or are grossly disproportionate to the severity of the crime warranting imprisonment. *Rhodes,* 452 U.S. at 346, 347. The cruel and unusual punishment standard is not static, but is measured by "the evolving standards of decency that mark the progress of a maturing society." *Rhodes,* 452 U.S. at 346 (quoting *Trop v. Dulles,* 356 U.S. 86, 101, 78 S.Ct. 590, 2 L.Ed.2d 630 (1958)).

**\*4** To state a claim under the Eighth Amendment, an inmate's allegation must include both an objective and a subjective component. *See Wilson v. Seiter,* 501 U.S. 294, 298, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991). The objective component mandates that "only those deprivations denying 'the minimal civilized measure of life's necessities' ... are sufficiently grave to form the basis of an Eighth Amendment violation." *Helling,* 509 U.S. at 32 (quoting *Rhodes,* 452 U .S. at 346). This component requires that the deprivation sustained by a prisoner be sufficiently serious, for only "extreme deprivations" are sufficient to make out an Eighth Amendment claim. *Hudson v. McMillian,* 503 U.S. 1, 9, 112 S.Ct. 995, 117 L.Ed.2d 156 (1992). The subjective component requires that the state actor have acted with "deliberate

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 750200 (D.N.J.)
(Cite as: 2009 WL 750200 (D.N.J.))

indifference," a state of mind equivalent to a reckless disregard of a known risk of harm. *Farmer v. Brennan, 511 U.S. 825, 835, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994); Wilson, 501 U.S. at 303.*

To satisfy the objective component of an Eighth Amendment conditions of confinement claim, Plaintiff must show that the conditions alleged, either alone or in combination, deprive him of "the minimal civilized measure of life's necessities," such as adequate food, clothing, shelter, sanitation, medical care, and personal safety. *See Rhodes, 452 U.S. at 347-48; Young v. Quinlan, 960 F.2d 351, 364 (3d Cir.1992).* To the extent that certain conditions are only "restrictive" or "harsh," they are merely part of the penalty that criminal offenders pay for their offenses against society. *See Rhodes,* 452 at 347. An inmate may fulfill the subjective element of such a claim by demonstrating that prison officials knew of such substandard conditions and "acted or failed to act with deliberate indifference to a substantial risk of harm to inmate health or safety." *Ingalls v. Florio, 968 F.Supp. 193, 198 (D.N.J.1997).* An official "must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer, 511 U.S. at 837.*

In *Young,* the Third Circuit reversed the district court, which granted summary judgment for the defendant on plaintiff's claims regarding the conditions of his confinement. *See Young, 960 F.2d at 353.* In that case, Young was a federal prisoner who allegedly suffered continuous physical and psychological abuse by his cellmates. *Id. at 353-54.* In response to threats from one cellmate, Young stopped up his cell toilet, consequently flooding the cell. *Id. at 355.* As punishment, Young was placed in a dry cell, one without a toilet or running water, for ninety-six hours. *Id.* In addition, Young was not provided with toilet paper. *Id.* During the first twenty-nine hours of his confinement in the dry cell, Young asked repeatedly for a urinal and for permission to leave his cell to defecate. *Id.* Not receiving same, Young relieved himself in his cell. *Id.* Young was finally provided with a urinal and allowed to leave his cell to defecate, only after having been confined in the dry cell for twenty-nine hours. *Id.* The following day, Young again requested permission to leave his cell to defecate, but his requests were ignored or rejected. *Id.*

*5 When the Third Circuit considered whether Young had raised a genuine question of fact regarding the constitutionality of his confinement, it applied the standard described *supra. Id.* at 360. Specifically, the court noted that "inhumane prison conditions, including prolonged isolation in dehumanizing conditions ... and unsanitary conditions have ... been found to be cruel and unusual under contemporary standards of decency." *Id.* at 363. Further, the court explained that "segregated detention is not cruel and unusual punishment per se, as long as the conditions of confinement are not foul, inhuman or totally without penological justification." *Id.* at 364 (citing *Smith v. Coughlin, 748 F.2d 783, 787 (2d Cir.1984); Ford v. Board of Managers of New Jersey State Prison, 407 F.2d 937, 940 (3d Cir.1969); Mims v. Shapp, 399 F.Supp. 818, 822 (W.D.Pa.1975)).* Noting that "the touchstone [of the constitutional analysis] is the health of the inmate," the court determined that the conditions of Young's confinement worked a deprivation of the basic necessities of human existence and thus were sufficient to satisfy the objective prong of the analysis. *Young, 960 F.2d at 364.* Indeed, the court opined that "it would be an abomination of the Constitution to force a prisoner to live in his own excrement for four days." *Id. at 365.* Turning to the subjective prong of the Eighth Amendment analysis, the court found that among other questions, it was a genuine issue whether or not "prison officials were deliberately indifferent to Young's requests for a minimal amount of relief," and so summary judgment by the district court had been inappropriately granted. *Id.*

The facts of the instant case appear similar to Young's allegations regarding the toilet facilities in his dry cell.[FN1] As to the objective component of the analysis in Alvarez's case, the conditions of his confinement in isolation were similar to Young's. Plaintiff spent three days in his isolation cell without working plumbing and with a toilet overflowing with feces, urine, and other materials. Although the Plaintiff in this case does not claim, as Young did, that he explicitly was denied access to alternate toilet facilities, he does contend that the guards generally were unavailable to respond to his request for alternate facilities. In support of his contention, Plaintiff points to his own deposition testimony in response to the question, "Did you ever ask the guard to go someplace to use the bathroom?" Plaintiff's answer was, "They wouldn't come back there. What they are saying is all a lie." (Pl.Opp.Ex. A.) Plaintiff further points to evidence that he contracted MRSA, specifically boils in his groin area,

Slip Copy, 2009 WL 750200 (D.N.J.)
(Cite as: 2009 WL 750200 (D.N.J.))

while in isolation to show that he lived and slept exposed
to feces in his cell.

> FN1. To be sure, Young made numerous other
> allegations regarding his treatment in isolation,
> although for the purposes of this Court's analysis,
> we will consider the parallels to Young's and
> Alvarez's claims regarding toilet facilities.

The County Defendants contest Plaintiff's version of
events, alleging that Plaintiff never asked to use alternate
toilet facilities and was allowed to shower at least twice
(which Plaintiff admits, but the County Defendants
contend provided Plaintiff an opportunity to ask for
alternate toilet facilities). The Court finds the facts of this
case sufficiently similar to those in *Young* to find that the
objective prong of the Eighth Amendment analysis is
satisfied. So too, are there genuine issues of material fact
as to the knowledge and response of prison officials.
Summary judgment would thus be inappropriate on the
Eighth Amendment claims.

**3. Plaintiff's Fourteenth Amendment Claim**

**\*6** Plaintiff's Fourteenth Amendment claim, insofar as it
supports Plaintiff's Eighth Amendment claim, will remain
before the Court, although summary judgment is
appropriate as to any other Fourteenth Amendment claim.
The County Defendants move for summary judgment on
Plaintiff's Fourteenth Amendment claim on two grounds:
(1) that the County Defendants did not violate Plaintiff's
due process rights and (2) that Plaintiff's Fourteenth
Amendment claim cannot stand on its own without
Plaintiff's Fifth and Eighth Amendment claims. In
response, Plaintiff contends that because there are genuine
issues of material fact regarding the alleged violation of
his Eighth Amendment rights, his Fourteenth Amendment
claim must remain.

The County Defendants motion must fail in part because
Plaintiff has pointed out that there is a genuine issue as to
whether or not his Fourteenth Amendment rights were
violated so long as Plaintiff's claim rests on the Eighth
Amendment's prohibition against cruel and unusual
punishment. The Court will deny summary judgment as to

Plaintiff's Eighth Amendment claim made pursuant to the
Fourteenth Amendment, because Plaintiff's Eighth
Amendment claim remains, *see supra,* and the Eighth
Amendment is applicable to the states via the Due Process
Clause of the Fourteenth Amendment. *Robinson v.
California,* 370 U.S. 660, 666, 82 S.Ct. 1417, 8 L.Ed.2d
758 (1962).

Plaintiff, having failed to provide any argument to refute
the County Defendants' motion with respect to a
Fourteenth Amendment due process claim in and of itself,
does not meet his burden on that possible claim. *See*
Fed.R.Civ.P. 56(e). Accordingly, the Court will grant
summary judgment for the County Defendants on
Plaintiff's Fourteenth Amendment claim as it stands alone.

**4. Plaintiff's § 1983 Claim**

The County Defendants move for summary judgment on
all of Plaintiff's claims made pursuant to 42 U.S.C. §
1983. They contend that Plaintiff's constitutional rights
have not been violated, nor is there evidence of a policy or
custom of such violation.

"To state a claim under [42 U.S.C.] § 1983, a plaintiff
must allege the violation of a right secured by the
Constitution and laws of the United States, and must show
that the alleged deprivation was committed by a person
acting under color of state law." *West v. Atkins,* 487 U.S.
42, 48, 108 S.Ct. 2250, 101 L.Ed.2d 40 (1988). As
discussed *supra,* there is a genuine issue of fact as to the
possible Eighth Amendment rights violations which may
form the basis of a § 1983 claim against the County
Defendants. The Court finds that prison officials employed
by Cumberland County qualify as state actors, so
Plaintiff's § 1983 claims against the individual County
Defendants remain.

To hold the entity County Defendants liable under § 1983,
Plaintiff must first demonstrate the underlying
constitutional violation, about which there is a genuine
issue of material fact, as discussed. Under § 1983,
however, a local government entity such as a county
"cannot be held liable solely because it employs a
tortfeasor." *Monell v. New York City Dept. of Social*

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Case 9:08-cv-00975-TJM-DEP   Document 67   Filed 08/27/10   Page 129 of 192

Slip Copy, 2009 WL 750200 (D.N.J.)
(Cite as: 2009 WL 750200 (D.N.J.))

*Services,* 436 U.S. 658, 691, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). "[I]t is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts and acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983." *Id.,* at 694. To the extent that Plaintiff also makes allegations against those of the County Defendants which are entities, the Court undertakes a *Monell* analysis.

**\*7** The County Defendants contend that Plaintiff has no evidence of a policy of refusing working clean toilets to inmates in Cumberland County. So too, they contend that Plaintif has presented no evidence of similar incidents involving other inmates. Further, the County Defendants point to the undisputed material fact that the two isolation units next to Plaintiff's had working toilets to support its contention that no policy exists to satisfy the *Monell* standard. Plaintiff's responsive submission to the Court points to the deposition testimony of Kenneth Lamcken, who was responsible for maintenance at the Cumberland County Jail in 2005. Lamcken testified that there were times in 2005 when toilets in isolation units were broken and inmates were nonetheless placed in a cell with a broken toilet, where those inmates often defecated on the floor of the cell. (Pl.Opp.Ex. C.) The County Defendants do not contest Lamcken's testimony in their reply brief. Accordingly, the Court finds that there is a genuine issue of material fact with respect to whether there is a policy or custom in the Cumberland County Jail which deprives inmates' constitutional right to be free from cruel and unusual punishment. As Plaintiff's Eighth Amendment claims against the individual County Defendants remain, and there appears to be a genuine issue regarding a policy or custom of Eighth Amendment rights deprivations, the Court finds no reason to grant summary judgment for the County Defendants on Plaintiff's claims made pursuant to § 1983.

**5. Plaintiff's § 1985 Claim**

The County Defendants move for summary judgment on Plaintiff's claim made pursuant to 42 U.S.C. § 1985(3). They argue that Plaintiff has not shown evidence sufficient to make out such a claim, in particular providing no evidence of a conspiracy whatsoever, particularly not a conspiracy intended to inhibit Plaintiff's equal protection

rights.[FN2] Plaintiff contends that there is a genuine issue as to whether or not a conspiracy existed that prevented him from enjoying his civil rights, as evidenced by his placement in the isolation cell without a functioning toilet. Plaintiff avers that the conspiratorial aspect of his treatment arises out of a policy of placing other inmates in the same or similar conditions.

> FN2. Although the County Defendants also point out that there is no evidence of a conspiracy to deprive Plaintiff of his voting rights, Plaintiff makes clear in his opposition brief that his right to vote is not the basis of this claim.

To state a claim under 42 U.S.C. § 1985(3), Plaintiff must allege, among other things, a conspiracy motivated by a racial or class based discriminatory animus designed to deprive him of equal protection of the laws. *Lake v. Arnold,* 112 F.3d 682, 685 (3d Cir.1997) (citing *Griffin v. Breckenridge,* 403 U.S. 88, 102, 91 S.Ct. 1790, 29 L.Ed.2d 338 (1971)). Plaintiff has provided no specific allegations of such discrimination, nor any evidence to support such a claim. He has simply not alleged any class or race-based motive which would support a § 1985(3) claim. Accordingly, the Court will grant summary judgment for the County Defendants on Plaintiff's claims made pursuant § 1985(3).

*B. Prison Health Services' Motion*[FN3]

> FN3. Plaintiff previously agreed to dismiss Defendant Betty Gambrell from this matter; Gambrell was a health services administrator at Cumberland County Jail.

**\*8** PHS was contracted to provide health care management and staffing for the Cumberland County Jail at the time of the events alleged in Plaintiff's Complaint. PHS contends that it did not employ nurses to provide direct care to inmates, but rather that any nurses who did so were employed by Cumberland County. (PHS Br. at 1.) The Agreement between Cumberland County and the regional office of PHS reflects that PHS provided "physician and administrative personnel" at the Cumberland County Jail; there is no mention of PHS

Slip Copy, 2009 WL 750200 (D.N.J.)
(Cite as: 2009 WL 750200 (D.N.J.))

providing nurses. (PHS Exs. B, C.)

**1. Plaintiff's § 1983 Claim**

PHS moves for summary judgment on Plaintiff's Eighth Amendment claims against it filed pursuant to 42 U.S.C. § 1983.[FN4] PHS grounds its motion on Plaintiff's lack of evidence that PHS violated his constitutional rights and upon the legal argument that 42 U.S.C. § 1983 does not permit a claim based solely upon vicarious liability. Plaintiff did not oppose the instant motion.

> FN4. The Court notes that PHS does not specify that its motion only seeks summary judgment on Plaintiff's Eighth Amendment claims. It appears to the Court, however, that PHS has not addressed Plaintiff's Fifth and Fourteenth Amendment claims, nor for that matter Plaintiff's § 1985 claims, in the instant motion. Accordingly, the Court only considers PHS's motion with respect to Plaintiff's Eighth Amendment claims made pursuant to § 1983.

"To state a claim under [42 U.S.C.] § 1983, a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law." West, 487 U.S. at 48. Because a physician under contract with a state prison acts under the color of state law when he treats an inmate, the Court finds that PHS was also acting under the color of state law when it provided medical personnel to treat inmates at the Cumberland County Jail Id. Plaintiff may establish liability by showing that PHS had a policy or custom that caused the civil rights violations he alleges. Monell, 436 U.S. at 694. Thus, there can be no entity liability unless there is an underlying constitutional violation.

Where § 1983 claims are grounded on claims that medical treatment fell below constitutional standards, an inmate must show that the defendant was deliberately indifferent to his serious medical needs. See Estelle v. Gamble, 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251; Rouse, 182 F.3d at 197. "Deliberate indifference" exists "where [a] prison

official: (1) knows of a prisoner's need for medical treatment but intentionally refuses to provide it; (2) delays necessary medical treatment based on a non-medical reason; or (3) prevents a prisoner from receiving needed or recommended medical treatment." Rouse, 182 F.3d at 197. Further, claims of negligence or malpractice are not sufficient to establish "deliberate indifference." Id.

PHS contends that Plaintiff's only evidence regarding its treatment of Plaintiff comes in the form of an expert report by Dr. John Kirby. PHS notes that Dr. Kirby, Plaintiff's own expert, mentions PHS employees when it says that, "Once detected, Mr. Alvarez's wounds were treated appropriately by his physicians," although "wound care was neglected by the prison nurses." (PHS Ex. E at 7.)[FN5] The report further states that when Plaintiff discovered the boils on his abdomen and upper legs, "the prison physician lanced [the] boils." (PHS Ex. E at 3; PHS Ex. F at 3.) PHS also argues that there is no evidence that PHS was responsible for the cleaning and sanitation of the inmates' housing, a focus of both of Dr. Kirby's reports.

> FN5. The Court has taken into consideration both versions of the Kirby report submitted by PHS in support of its motion.

**\*9** The Court finds that PHS has met its burden, that Plaintiff's own expert report shows that PHS' physicians did not act with deliberate indifference to Plaintiff's serious medical need and that there is no evidence that PHS is responsible for Cumberland County Jail's failure to adequately prevent infection. PHS' contract with Cumberland County reinforces the notion that cell cleaning and sanitation were not its responsibility. There is thus no evidence before the Court which shows a genuine issue of material fact as to PHS' alleged Eighth Amendment violations. Plaintiff, having not opposed the instant motion, has not met his burden to show that there is a genuine issue for trial. Accordingly, the Court will grant summary judgment for PHS on Plaintiff's Eighth Amendment claims made pursuant to § 1983.

**2. Plaintiff's Negligence Claim**

PHS also moves for summary judgment on Plaintiff's

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 750200 (D.N.J.)
(Cite as: 2009 WL 750200 (D.N.J.))

negligence claims [FN6], arguing that Dr. Kirby's report concludes that the medical care provided to Plaintiff was appropriate. Plaintiff's medical malpractice claim fails and must be dismissed.

> FN6. The Court notes that PHS does not specify that its motion only seeks summary judgment on Plaintiff's medical malpractice claims of negligence. It appears to the Court, however, that PHS has not addressed in the instant motion Plaintiff's claims that PHS was negligent in other respects. Accordingly, the Court only considers PHS's motion as to Plaintiff's medical malpractice claims.

Plaintiff's negligence claim against PHS is, in part, a medical malpractice claim requiring expert testimony establishing (1) the applicable standard of care; (2) a deviation from that standard of care; and (3) that the deviation caused the injury. *See Teilhaber v. Greene*, 320 N.J.Super. 453, 727 A.2d 518 (N.J.Super.Ct.App.Div.1999). The facts of this case, as presented to the Court, do not show that there is a genuine issue as to Plaintiff's treatment by PHS. The physicians who treated him at the Cumberland County Jail provided medical care that, according to Plaintiff's own expert, was appropriate. Because Plaintiff has not responded, and there are no facts currently before the Court to support the bare allegations of medical malpractice in the Complaint, PHS is entitled to summary judgment Plaintiff's medical malpractice claims against it.

## IV. CONCLUSION

Based upon the foregoing, the Court will GRANT summary judgment for the County Defendants on Plaintiff's Fifth Amendment claims, Plaintiff's claims made pursuant § 1985(3), and Plaintiff's Fourteenth Amendment claim to the extent that it alleges a violation of Plaintiff's Fourteenth Amendment right to due process. Further, the Court will DENY summary judgment for the County Defendants on Plaintiff's Eighth Amendment claims made pursuant to the Fourteenth Amendment and 42 U.S.C. § 1983. The Court will GRANT summary judgment for PHS on Plaintiff's Eighth Amendment claims made pursuant to § 1983 and on Plaintiff's medical malpractice claims

against PHS. The accompanying Order shall issue today.

D.N.J.,2009.
Alvarez v. County of Cumberland
Slip Copy, 2009 WL 750200 (D.N.J.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 2003 WL 22211500 (S.D.N.Y.)
(Cite as: 2003 WL 22211500 (S.D.N.Y.))

**C**

Only the Westlaw citation is currently available.

United States District Court,
S.D. New York.
Robert ARROYO, Plaintiff,
v.
THE CITY OF NEW YORK, N.Y.C. Department of
Correction, Hospital Administrator, C-73, St. Barnabas
Hospital Administrator, Dr. "John" Mohammad, First
name being fictitious, real name being unknown, Dr.
Harjinger Bhatti, Dr. Jude Aririguzo, Dr. "John"
August, First name being fictitious, real name being
unknown, Dr. Jean Valcourt, Dr. "John Doe", Full name
being fictitious, real name being unknown, Dr. Sung
Kim, Dr. Ye Hum Kim, the New York City Health and
Hospitals Corporation, St. Barnabus Hospital, St.
Barnabus Correctional Health Systems, Inc., the New
York City Correctional Health Services, the New York
City Department of Health, Defendants.
**No. 99 Civ.1458(JSM).**

Sept. 25, 2003.

Inmate brought a § 1983 suit, alleging that violation of his
Eighth Amendment right to be free from cruel and unusual
punishment in connection with an eight-month delay of
allegedly necessary surgery for an inguinal hernia. On a
defense motion for summary judgment, the District Court,
Martin, J., held that: (1) inmate failed to exhaust his
administrative remedies, and (2) in any event, the alleged
delay did not amount to cruel and unusual punishment.

Motion granted.

West Headnotes

**[1] Civil Rights 78 🔑 1311**

**78** Civil Rights
    **78III** Federal Remedies in General
        **78k1306** Availability, Adequacy, Exclusivity, and
Exhaustion of Other Remedies
            **78k1311** k. Criminal Law Enforcement; Prisons.
Most Cited Cases
Inmate, in failing to renew his grievance or otherwise seek
to use an extensive inmate grievance resolution program
in place at correctional facility, did not exhaust his
administrative remedies, as required by the Prison
Litigation Reform Act (PLRA), thus barring his § 1983
suit alleging cruel and unusual punishment in connection
with an eight-month delay of allegedly necessary surgery
for an inguinal hernia; even if he initially thought that he
had been promised prompt surgery after his informal
grievance review, shortly thereafter he obviously knew
that surgery had not been performed, or even scheduled,
and he presented no explanation as to why he did not at
least inquire as to why surgery that he allegedly thought he
had been promised had not been forthcoming. 42 U.S.C.A.
§ 1983; Civil Rights of Institutionalized Persons Act, §
7(a), as amended, 42 U.S.C.A. § 1997e(a).

**[2] Prisons 310 🔑 192**

**310** Prisons
    **310II** Prisoners and Inmates
        **310II(D)** Health and Medical Care
            **310k191** Particular Conditions and Treatments
                **310k192** k. In General. Most Cited Cases
    (Formerly 310k17(2))

**Sentencing and Punishment 350H 🔑 1546**

**350H** Sentencing and Punishment
    **350HVII** Cruel and Unusual Punishment in General
        **350HVII(H)** Conditions of Confinement
            **350Hk1546** k. Medical Care and Treatment.
Most Cited Cases
Alleged eight-month delay of allegedly necessary surgery
for an inmate's inguinal hernia did not amount to cruel and
unusual punishment under the Eighth Amendment; the
hernia was not a serious enough condition to satisfy the
objective prong of the test, and as to the subjective prong,

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2003 WL 22211500 (S.D.N.Y.)
(Cite as: 2003 WL 22211500 (S.D.N.Y.))

all that the inmate alleged was negligence. U.S.C.A.
Const. Amend. 8.

OPINION & ORDER

MARTIN, J.

*1 Plaintiff Robert Arroyo brings this action pursuant to
42 U.S.C. § 1983, alleging that Defendants violated his
Eighth Amendment right to be free from cruel and unusual
punishments by delaying for eight months allegedly
necessary surgery for an inguinal hernia. Defendants have
moved for summary judgment on various grounds,
including Plaintiff's failure to exhaust administrative
remedies, the failure to proffer evidence of deliberate
indifference to Plaintiff's serious medical needs, the lack
of personal involvement by the individual Defendants,
qualified immunity, the failure to plead an unconstitutional
pattern or practice by the municipal Defendants, the fact
that the Department of Corrections and Correctional
Health Services are agencies that may not be sued, and, to
the extent that Plaintiff implies that he may have claims
under state law, the failure to file a notice of claim.

*Failure to Exhaust Administrative Remedies*

[1] The Prison Litigation Reform Act, 42 U.S.C. §
1997e(a) provides that a prisoner may not bring an action
pursuant to 42 U.S.C. § 1983 or any other Federal law
until he has exhausted any available administrative
remedies. In this case, Plaintiff failed to pursue his
administrative remedies, and for that reason alone, this
action must be dismissed.

In October 1998, Plaintiff filed a grievance stating that he
had been denied surgery for a hernia that caused him great
pain and suffering. His complaint was heard in a first level
informal proceeding, in which it was proposed that it be
resolved as follows:

   "On 10/26/98 the IGRC contacted the Clinic Manger.
   Grievant will be called down to have an examination.
   Action requested is accepted."

Plaintiff accepted this resolution, and was further
examined in the clinic at Riker's Island. When that
examination resulted only in further non-surgical
interventions, and he was not scheduled promptly for
surgery, he did not renew his grievance or otherwise seek
to use the extensive five step inmate grievance resolution
program that is in place at Riker's Island. His failure to do
so precludes this action, despite his claim that it would
have been irrational for him to appeal what he perceived
to be a favorable result. Even if Plaintiff though that he
had been promised prompt surgery after his informal
grievance review, shortly thereafter he obviously knew
that surgery had not been performed, or even scheduled.
He presents no explanation as to why he did not at least
inquire as to why surgery that he allegedly thought he had
been promised had not been forthcoming.

*Denial of Medical Care*

[2] Even if Plaintiff had exhausted his administrative
remedies, he has not sufficiently stated a claim for
violation of the Eighth Amendment. In order to state a
claim for an unconstitutional denial of medical care, a
plaintiff must prove "deliberate indifference" to his
serious medical needs. *Estelle v. Gamble,* 429 U.S. 97,
104, 97 S.Ct. 285, 291, 50 L.Ed.2d 251 (1976). The
deliberate indifference standard has both an objective and
a subjective component. First, the alleged condition must
be objectively "sufficiently serious." Such seriousness has
been defined as "a condition of urgency, one that may
produce death, degeneration, or extreme pain." *Hathaway
v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994), *cert. denied,*
513 U.S. 1154, 115 S.Ct. 1108, 130 L.Ed.2d 1074 (1995).
Subjective complaints of pain are not sufficient to satisfy
this standard. *Espinal v. Coughlin,* 98 Civ. 2579 (RPP),
2002 U.S. Dist. LEXIS 20, *9 (S.D.N.Y. Jan. 2, 2002);
*Chatin v. Artuz,* No. 95 Civ. 7994(KTD), 1999 U.S. Dist.
LEXIS 11918, *11 (S .D.N.Y. Aug. 4, 1999), *aff'd,* 2002
U.S.App. LEXIS 86 (2002) ("[Plaintiff's] alleged
problems in his right foot may indeed be very real. His
pain is not, however, of the type contemplated for
satisfaction of the objective standard." (citing *Liscio v.
Warren,* 901 F.2d 274, 277 (2d Cir.1990)). Second, the
Defendant must:

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

> ***2** know of and disregard an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.

*Hathaway v. Coughlin,* 37 F.3d at 66 (2d Cir.1994) (quoting *Farmer v. Brennan,* 511 U.S. 825, 837, 114 S.Ct. 1970, 1979, 128 L.Ed.2d 811 (1994)).

Charges that amount only to allegations of malpractice, and mere disagreements with respect to the quality of medical care do not state an Eighth Amendment claim. *Estelle v. Gamble,* 429 U.S. at 105-06, 97 S. Ct at 292 ("Thus, a complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment. Medical malpractice does not become a constitutional violation merely because the victim is a prisoner."). *See also* *Chance v. Armstrong,* 143 F.3d 698, 703 (2d Cir.1998); *Espinal v. Coughlin,* 2002 U.S. Dist. LEXIS 20, *10; *Brown v. McElroy,* 160 F.Supp.2d 699, 705-06 (S.D.N.Y.2001); *Culp v. Koenigsmann,* 99 Civ. 9557(AJP), 2000 U.S. Dist. LEXIS 10168, *32 (S.D.N.Y. July 19, 2000). Accordingly, a delay in treatment does not violate the Eighth Amendment unless it involves an act or a failure to act that evinces "a conscious disregard of a substantial risk of serious harm." *Chance v. Armstrong,* 143 F.3d 698, 703 (2d Cir.1998)); *Espinal v. Coughlin,* 2002 U.S. Dist. LEXIS 20, *9 ("The Second Circuit has 'reserved such a classification for cases in which, for example, officials deliberately delayed care as a form of punishment, ignored a 'life-threatening and fast-degenerating' condition for three days, or delayed major surgery for over two years.").

Application of the deliberate indifference standard to the facts of this case makes clear that summary judgment must be granted in favor of the Defendants. First, Plaintiff's inguinal hernia was not objectively a "serious" enough condition to satisfy the objective prong of the test. In *Gonzalez v. Greifinger,* No. 95 Civ. 7932(RWS), 1997 U.S. Dist LEXIS 18677, *7 (S.D.N.Y. Nov. 22, 1997), the Court found that an 11 month delay in surgically repairing the plaintiff's umbilical hernia, followed by surgery that resulted in complications, failed to satisfy the constitutional serious medical need standard.

Other courts have found objectively insufficient claims relating to a toothache, *Tyler v. Rapone,* 603 F.Supp. 268, 271-72 (E.D.Pa.1985), a broken finger, *Rodriguez v. Joyce,* 693 F.Supp. 1250, 1252-53 (D.Me.1988), and pain in the knee, *Espinal v. Coughlin,* 2002 U.S. LEXIS 20, *9. *See also* *Abdul-Akbar v. Dept. of Corrections,* 910 F.Supp. 986, 1006 (D.Del.1995), *aff'd,* 111 F.3d 125 (3rd Cir.), *cert. denied,* 522 U.S. 852, 118 S.Ct. 144, 139 L.Ed.2d 91 (1997) ("It is questionable whether a hernia is a 'serious medical need." ').

In this case, Plaintiff's condition was not "one of urgency that may produce death, degeneration, or extreme pain," and was far less serious than the types of conditions that have been found to constitute "serious medical needs." Plaintiff has not alleged, let alone presented evidence to show, that his condition was, at any point, "fast degenerating" or "life threatening," or that Defendants delayed necessary medical treatment in order to punish him.

***3** Secondly, with respect to the subjective prong, all that Plaintiff has alleged is negligence. There is no evidence that Plaintiff ever was denied medical treatment. To the contrary, he testified that he was promptly taken to the clinic whenever he asked to be, and it is clear that he was seen in the clinic at Riker's Island more than 30 times during the eight month period at issue here.[FN1] Also, there is ample evidence in the record of attempts to ameliorate Plaintiff's condition without surgery. The hernia, which Plaintiff first noticed 1993, and which was repeatedly diagnosed as a reducible hernia, was reduced at least twice. He was prescribed pain medication, a scrotal support, various trusses, ice packs, elevation, and a surgical consultation was requested. Ultimately, in January 1999, the hernia was surgically repaired at Kings County Medical Center. These interventions were consistent with the diagnosis made and treatment prescribed at Beth Israel Hospital one month before Plaintiff was incarcerated. There too he was diagnosed with an "easily reducible RIH [right inguinal hernia]," and told to purchase a scrotal support, or truss, for comfort. At that time, he also was given an appointment for a surgical consultation, which he did not attend. [FN2]

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2003 WL 22211500 (S.D.N.Y.)
(Cite as: 2003 WL 22211500 (S.D.N.Y.))

FN1. In addition to treatment for the hernia, Plaintiff was treated for a number of other conditions while incarcerated at Riker's Island. He received medical attention for drug dependency, mental health issues, dyspepsia, heartburn, and ingrown toe nails, and was prescribed eyeglasses at the Riker's Island clinic. Thus, there is absolutely no evidence his medical needs were ignored by Defendants.

FN2. Plaintiff's alleged urgent need and desire for surgery is further undercut by his refusal to undergo prescribed surgery for a left inguinal hernia, which was diagnosed and scheduled at the time of the surgical repair of the right inguinal hernia.

Moreover, Plaintiff has not alleged that the hernia became worse,FN3 or that his general condition deteriorated as a result of the alleged delay in surgery. The evidence also is that, unlike in *Gonzalez v. Greifinger,* 1997 U.S. Dist. LEXIS 18677, the surgery ultimately was performed successfully and without complications.

FN3. His allegation is that the hernia was, at all times, the size of a softball.

Finally, Defendants have presented evidence that attempting to treat a hernia conservatively prior to performing surgery constitutes reasonable medical practice. Plaintiff, on the other hand, did not present any medical opinion testimony to support his argument that it was unreasonable to first attempt to treat his hernia non-surgically, and to resort to surgery only after such methods had failed. *See Culp v. Koenigsmann,* 2000 U.S. Dist. LEXIS 10168, *11. Accordingly, Plaintiff has failed to meet his burden of proof in opposition to Defendants' motion for summary judgment. *Celotex v. Catrett,* 477 U.S. 317, 323-24, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986); *Cifarelli v. Village of Babylon,* 25 C.C.P.A. 785, 93 F.2d 47, 51 (2d Cir.1996) ("[M]ere conclusory allegations, speculation or conjecture will not avail a party resisting summary judgment."); *Goenaga v. March of Dimes Birth Defects Foundation,* 51 F.3d 14, 18 (2d Cir.1995).

It also appears that Plaintiff has not alleged that the municipal Defendants engaged in a pattern or practice of indifference to prisoners' medical needs, as required by *Monell v. Department of Social Services of the City of New York,* 436 U.S. 658, 694, 98 S.Ct. 2018, 2037-38, 56 L.Ed.2d 611 (1978); *Batista v. Rodriguez,* 702 F.2d 393, 397 (2d Cir.1983). Nor has Plaintiff alleged any personal participation by Dr. Ye Hum Kim. However, in light of the foregoing, there is no need to address either these issues or the Defendants' claims of qualified immunity. Furthermore, having dismissed all of Plaintiff's federal claims, the Court also will dismiss whatever state law claims he intended to state pursuant to this Court's supplemental jurisdiction. *See United Mine Workers v. Gibbs,* 383 U.S. 715, 726, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966).

*Conclusion*

**4** For the foregoing reasons, Defendants' motion for summary judgment is granted and the Second Amended Complaint is dismissed.

SO ORDERED.

S.D.N.Y.,2003.
Arroyo v. City of New York
Not Reported in F.Supp.2d, 2003 WL 22211500 (S.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



Slip Copy, 2009 WL 1322357 (S.D.N.Y.)
(Cite as: 2009 WL 1322357 (S.D.N.Y.))

**C**

Only the Westlaw citation is currently available.

United States District Court,
S.D. New York.
Jeffery HAMM, Plaintiff,
v.
Richard HATCHER, Prison Health Services, and New
York City Department of Correction, Defendants.
**No. 05-CV-503 (KMK).**

May 5, 2009.

West KeySummary
Civil Rights 78 ⚷ 1091

78 Civil Rights
    78I Rights Protected and Discrimination Prohibited in
General
        78k1089 Prisons
            78k1091 k. Medical Care and Treatment. Most
Cited Cases
An inmate stated a sufficient claim under § 1983 for
deliberate indifference to a serious medical need against
a prison doctor. The inmate was told that he would have
to wait for ten days for his "regular medication" when he first
entered the prison. The doctor knew that the inmate had
previously been taking the medication and the inmate
further alleged that the doctor knew he was "in recovery"
and wanted him make him suicidal. Further, the inmate
alleged that he suffered from withdrawal and his medical
record demonstrated that even after he returned to his
medication was nervous, anxious, and angry. 42 U.S.C.A.
§ 1983.

Jeffery Hamm, New York, NY, pro se.

Kimberly D. Conway, Esq., New York City Law
Department, Office of the Corporation Counsel, Bronx,
NY, for Defendants.

*OPINION AND ORDER*

KENNETH M. KARAS, District Judge.

**\*1** Plaintiff Jeffery Hamm, pro se, brings this action
pursuant to 42 U.S.C. § 1983 ("Section 1983"), alleging
that the New York City Department of Correction
("DOC"), Prison Health Services ("PHS"), and DOC
psychiatrist Richard Hatcher ("Hatcher") (collectively,
"Defendants") violated Plaintiff's rights under the Eighth
and Fourteenth Amendments in connection with their
suspension and alteration of his antidepressant
medications. Defendants move to dismiss Plaintiff's
Second Amended Complaint for failure to state a claim,
pursuant to Fed.R.Civ.P. 12(b)(6). For the reasons stated
herein, Defendants' motion is granted in part and denied in
part.

*I. Background*

*A. Facts*

For purposes of this Motion, the Court accepts as true all
facts alleged by Plaintiff in his Second Amended
Complaint, filed July 31, 2006.

Upon entering the custody of DOC in March 2002,
Plaintiff received antidepressant medications, including
"forty milligrams of Paxil and fifty milligrams of
T[ra]zodone." (Second Am. Compl. ("SAC") ¶ 6; Third
Unnumbered Exhibit to SAC ("Medical Records"), at first
unnumbered page ("Consent for Medication" form
indicating that on March 15, 2002, Plaintiff consented to
receive "Paxil 40mg PO QAM [orally, every morning]"
and "Trazodone 50mg PO QAM").) Plaintiff continued
taking these medications while detained at the Otis
Bantum Correctional Center ("OBCC") for one hundred
days. (SAC ¶ 6; Medical Records, at second unnumbered
page ("Progress Note" dated August 14, 2002, and signed
by "Roberto Caga-Anan, MD," indicating the location as

Slip Copy, 2009 WL 1322357 (S.D.N.Y.)
(Cite as: 2009 WL 1322357 (S.D.N.Y.))

"OBCC" and renewing Plaintiff's Paxil prescription at a dosage of "40mg").)

Plaintiff was subsequently transferred to the George Motchan Detention Center ("GMDC"), located at 15-15 Hazen Street, East Elmhurst, New York. (SAC ¶ 6.) At his "initial interview" upon arriving at GMDC, Plaintiff "was told by Doctor Richard Hatcher" that he "would have to wait ten days for [his] regular medication." <sup>FN1</sup> (Id.) Plaintiff "protested but was told that was the facility policy." (Id.) After ten days elapsed, Plaintiff was "prescribed only half [of his] regular dosage of Paxil" and was "suffering from the side effects of withdrawal symptoms of Paxil [sic]." (Id.) Plaintiff "continually complained and requested [his] regular dosage," but did not receive it prior to being "transferred upstate." (Id.)

> FN1. Plaintiff's Second Amended Complaint identifies Hatcher as a "[p]sychiatrist" at GMDC. (SAC ¶ 3(a).) Defendants, in their motion papers, assert that "defendant 'Richard Hatcher' is not and has never been an employee of the Prison Health Services or [DOC]" (Defs.' Mem. in Supp. of Mot. to Dismiss ("Defs.' Mem.") 1 n. 1); Plaintiff responds that Hatcher's signature appears "on copies from my medical record[s] ... three times" (Pl.'s Mem. in Opp'n to Defs.' Mot. to Dismiss ("Pl.'s Mem."), at first unnumbered page). It appears to the Court, however, that the signature to which Plaintiff refers is that of "Richard Fletcher, NP." (Medical Records, at third-fourth unnumbered pages). Regardless, the Court will assume for purposes of this motion that the individual at issue is named Richard Hatcher, and that he was a psychiatrist, as Plaintiff alleges, rather than a nurse practitioner. However, Defendants' counsel is requested to provide documents and other information to Plaintiff that identify the person who signed the relevant medical documents. These materials are to be provided to Plaintiff within thirty days of the date of this Opinion and Order.

A September 19, 2002 "Progress Note" signed by "Sandra Hernandez, C.S.W." indicates that Plaintiff had arrived at GMDC by that date.<sup>FN2</sup> The note stated: "Social Work. Pt. assigned & seen this P.M. Psychosocial & C.T.P. done."

(Medical Records, at third unnnumbered page.) According to an October 25, 2002 Progress Note, allegedly signed by Hatcher, Plaintiff stated: " 'I'm getting nervous. I don't want to snap and get into more trouble. I get angry easily. Could you raise my Paxil?' " (Id.) The Progress Note indicated that Plaintiff "express[ed] concern about experiencing anxiety[,] anger[, and] possible loss of temper [and] control," and concluded that Plaintiff "will continue ... current regiment [sic] and add Risperidone 1mg PO BID [twice a day] for impulse control [and] depression." (Id.) According to a November 11, 2002 Progress Note, also allegedly signed by Hatcher, Plaintiff stated: " 'I need the Paxil raise[d] to 40mg in the morning. And I'm doing OK [with] the rest of the medicine.' ... 'I need to raise the Paxil because that's my regular dose. I need to stay more calm during the day.' " (Id. at fourth unnumbered page.) The Progress Note ended by listing Plaintiff's medications, stating that a physician "will give [Plaintiff] ... Paxil 40mg PO QAM for depression and anxiety." (Id.) In this notation, the words "Paxil 40mg PO QAM" were preceded by an arrow pointing upward. (Id.)

> FN2. Accompanying the Progress Note is the date and the notation "C-73," which indicates GMDC. (Defs.' Mem. 2.)

**2 A form dated December 31, 2002 stated that Plaintiff had complained to the mental health clinic that his "psych medication expir[ed] 2 w[ee]ks ago without renewal," saying that "[he] ha[d] been taking these medication [sic] [for] 2 y[ea]rs[;] now everything is messed up." (Id. at sixth unnumbered page.) According to the form, Plaintiff was "previously on Risper[idone] 3 mg QHS[, and] bedtime] [,] Trazodone 50 mg QHS[, and] Paxil 20 mg QAM." (Id.) The form stated: "Please evaluate for continuation of meds." (Id.) A Progress Note dated January 3, 2003, and initialed "L.G." for "Lyubov Gorellk, MD," indicated that Plaintiff's Paxil dosage would be set to "20mg bid." (Id. at fifth unnumbered page.)

According to the Second Amended Complaint, Plaintiff's inability to receive his regular dosage of Paxil "further [ex]acerbated [his] condition while on trial[,] causing [him] to take a plea instead of going to trial." (SAC ¶ 6.) Pursuant to Plaintiff's guilty plea, he was convicted on February 6, 2003 of attempted criminal sale of a controlled substance in the third degree, and was

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 1322357 (S.D.N.Y.)
(Cite as: 2009 WL 1322357 (S.D.N.Y.))

sentenced to three to six years' imprisonment. (First Unnumbered Exhibit to SAC (*People v. Hamm,* No. 7840/01 (N.Y.App.Div. Apr.5, 2005) ("App.Div.Order"), at 12.) Plaintiff later "attempted to withdraw [his] plea on ... grounds" that he was impaired by his withdrawal from medication, "but was denied." (SAC ¶ 6.)

The Appellate Division affirmed the denial of Plaintiff's motion to withdraw his guilty plea, stating: "The record establishes that [Plaintiff's] plea was knowing, intelligent and voluntary, and it fails to support his claim that he was incompetent to plead guilty because he had not received his antidepressant medication." (App. Div. Order 12 (internal citations omitted).) The Appellate Division added that at his plea allocution Plaintiff "freely admitted his guilt, demonstrated his understanding of the terms and consequences of his plea, and specifically denied using any drugs or medication," and the court stated that the lower court "relied on its own recollection of [Plaintiff's] lucidity at the time of the plea" in denying Plaintiff's motion to withdraw his plea. (*Id.* 12-13.) Plaintiff's application for leave to appeal to the New York Court of Appeals was denied. (Second Unnumbered Exhibit to SAC (Cert. Denying Leave, dated June 18, 2005).)

Plaintiff alleges that Hatcher, knowing that Plaintiff was "in recovery," "endangered [Plaintiff's] safety as well as the safety of other inmates in an attempt to make [Plaintiff] suicidal." (SAC ¶ 6.) Plaintiff contends that Defendants "disregard[ed]" his "obvious medical condition" and "serious medical need," in violation of the Eighth Amendment, and "knew of and disregarded the risk of side effects of medication," with "[d]eliberate indifference," in violation of the Fourteenth Amendment. (*Id.*)

*B. Procedural History*

**\*3** Plaintiff filed suit on May 17, 2004, in the Northern District of New York. The action was transferred to the Southern District of New York on January 14, 2005. Then-Chief Judge Michael B. Mukasey determined that the Complaint was facially insufficient and ordered Plaintiff to amend. Plaintiff filed an Amended Complaint on March 28, 2005. The case was subsequently reassigned to Judge Colleen McMahon. Plaintiff filed his Second

Amended Complaint on July 31, 2006. The case was reassigned to this Court on August 6, 2007. Plaintiff, who by this time had completed his prison term, moved for a default judgment on December 6, 2007.[FN3] The Court denied Plaintiff's motion, and this motion to dismiss by Defendants followed.

> **FN3.** According to Plaintiff's submission to the Clerk of Court, dated August 8, 2007, as of that date he was "under arrest on a parole violation" and being held at a DOC facility in Manhattan. (Dkt. No. 19.) The New York State Department of Correctional Services website indicates that Plaintiff was paroled on March 20, 2007.

*II. Discussion*

*A. Standard of Review*

"On a Rule 12(b)(6) motion to dismiss a complaint, the court must accept a plaintiff's factual allegations as true and draw all reasonable inferences in [the plaintiff's] favor." *Gonzalez v. Caballero,* 572 F.Supp.2d 463, 466 (S.D.N.Y.2008); *see also Ruotolo v. City of New York,* 514 F.3d 184, 188 (2d Cir.2008) ("We review *de novo* a district court's dismissal of a complaint pursuant to Rule 12(b)(6), accepting all factual allegations in the complaint and drawing all reasonable inferences in the plaintiff's favor." (internal quotation marks omitted)). "When considering motions to dismiss the claims of plaintiffs proceeding pro se, courts in [the Second] Circuit ... construe the pleadings liberally[,] ... especially ... when dealing with civil rights complaints ...." *Weinstein v. Albright,* 261 F.3d 127, 132 (2d Cir.2001). "In adjudicating a Rule 12(b)(6) motion, a district court must confine its consideration to facts stated on the face of the complaint, in documents appended to the complaint or incorporated in the complaint by reference, and to matters of which judicial notice may be taken." *Leonard F. v. Isr. Disc. Bank of N.Y.,* 199 F.3d 99, 107 (2d Cir.1999) (internal quotation marks omitted).

The Supreme Court has held that "[w]hile a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to

Slip Copy, 2009 WL 1322357 (S.D.N.Y.)
(Cite as: 2009 WL 1322357 (S.D.N.Y.))

provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007) (internal citations omitted) (second alteration in Twombly). In *Bell Atlantic Corp. v. Twombly, see id.* at 554-63, the Supreme Court abandoned reliance on the oft-cited line from *Conley v. Gibson,* 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957), that "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." As the Court explained in *Twombly,* a literal application of *Conley's* "no set of facts" rationale is improper because "a wholly conclusory statement of claim would survive a motion to dismiss whenever the pleadings left open the possibility that a plaintiff might later establish some 'set of [undisclosed] facts' to support recovery." *Twombly,* 550 U.S. at 561 (alteration in *Twombly* ). Instead, the Court emphasized that "[f]actual allegations must be enough to raise a right to relief above the speculative level," *id.* at 555, and that "once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint," *id.* at 563. Plaintiff must allege "enough facts to state a claim to relief that is plausible on its face." *Id.* at 570. If Plaintiff "ha[s] not nudged [his] claims across the line from conceivable to plausible, [his] complaint must be dismissed." *Id.; see also Iqbal v. Hasty,* 490 F.3d 143, 157-58 (2d Cir.2007) ("After careful consideration of the Court's [*Twombly* ] opinion ..., we believe the Court is not requiring a universal standard of heightened fact pleading, but is instead requiring a flexible 'plausibility standard,' which obliges a pleader to amplify a claim with some factual allegations in those contexts where such amplification is needed to render the claim *plausible.*" (emphasis in original)).

*B. Plaintiff's Eighth Amendment Claim*

**\*4** "The Cruel and Unusual Punishments Clause of the Eighth Amendment imposes a duty upon prison officials to ensure that inmates receive adequate medical care." *Salahuddin v. Goord,* 467 F.3d 263, 279 (2d Cir.2006). "Yet not every lapse in medical care is a constitutional wrong." *Id.* "Rather, a prison official violates the Eighth Amendment only when two requirements are met." *Id.* (internal quotation marks omitted).

"The first requirement is objective: the alleged deprivation of adequate medical care must be sufficiently serious. Only deprivations denying the minimal civilized measure of life's necessities are sufficiently grave to form the basis of an Eighth Amendment violation. Determining whether a deprivation is an objectively serious deprivation entails two inquiries. The first inquiry is whether the prisoner was actually deprived of adequate medical care. As the Supreme Court has noted, the prison official's duty is only to provide reasonable care." *Id.* (internal citations and quotation marks omitted); *see also Farmer v. Brennan,* 511 U.S. 825, 844-47, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994). "Second, the objective test asks whether the inadequacy in medical care is sufficiently serious. This inquiry requires the court to examine how the offending conduct is inadequate and what harm, if any, the inadequacy has caused or will likely cause the prisoner." *Salahuddin,* 467 F.3d at 280; *see also Helling v. McKinney,* 509 U.S. 25, 32-33, 113 S.Ct. 2475, 125 L.Ed.2d 22 (1993). "[I]f the prisoner is receiving on-going treatment and the offending conduct is an unreasonable delay or interruption in that treatment, the seriousness inquiry 'focus[es] on the challenged delay or interruption in treatment rather than the prisoner's underlying medical condition alone.' " *Salahuddin,* 467 F.3d at 280 (quoting *Smith v. Carpenter,* 316 F.3d 178, 185 (2d Cir.2003)) (second alteration in *Salahuddin* ).

"The second requirement for an Eighth Amendment violation is subjective: the charged official must act with a sufficiently culpable state of mind. In medical-treatment cases not arising from emergency situations, the official's state of mind need not reach the level of knowing and purposeful infliction of harm; it suffices if the plaintiff proves that the official acted with deliberate indifference to inmate health. Deliberate indifference is a mental state equivalent to subjective recklessness, as the term is used in criminal law. This mental state requires that the charged official act or fail to act while actually aware of a substantial risk that serious inmate harm will result. Although less blameworthy than harmful action taken intentionally and knowingly, action taken with reckless indifference is no less actionable. The reckless official need not desire to cause such harm or be aware that such harm will surely or almost certainly result. Rather, proof of awareness of a substantial risk of the harm suffices. But recklessness entails more than mere negligence; the risk of

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 1322357 (S.D.N.Y.)
(Cite as: 2009 WL 1322357 (S.D.N.Y.))

harm must be substantial and the official's actions more than merely negligent." *Id.* (internal citations omitted); *see also Harrison v. Barkley,* 219 F.3d 132, 139 (2d Cir.2000) ("[T]he mere malpractice of medicine in prison does not amount to an Eighth Amendment violation.").

**\*5** However, the Eighth Amendment does not apply to individuals who are in pre-trial detention at the time of the incidents of which they complain. *See Cuoco v. Moritsugu,* 222 F.3d 99, 106 (2d Cir.2000) ("Because as a pre-trial detainee [plaintiff] was not being 'punished,' the 'cruel and unusual punishment' proscription of the Eighth Amendment to the Constitution does not apply."); *United States v. Walsh,* 194 F.3d 37, 47 (2d Cir.1999) ("[T]he Eighth Amendment's protection does not apply 'until after conviction and sentence' ...." (quoting *Graham v. Connor,* 490 U.S. 386, 392 n. 6, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989))).

The Second Amended Complaint, construed liberally, does not allege any violation of Plaintiff's rights occurring after his conviction. Instead, it focuses exclusively on alleged deprivation of appropriate medication during Plaintiff's pretrial detention at GMDC, specifically alleging that Plaintiff "never received [his regular dosage of Paxil] before [being] transferred upstate" (SAC ¶ 6), i.e., before being convicted and sentenced. Thus, "[b]ecause ... Plaintiff was a pretrial detainee during his detention in [DOC custody], his challenge to the conditions of his confinement arises from the substantive component of the Due Process Clause of the [Fourteenth] Amendment and not from the cruel and unusual punishment standards of the Eighth Amendment," *Iqbal,* 490 F.3d at 168, and Plaintiff's Eighth Amendment claim is dismissed. *See Bennett v. Falcone,* No. 05-CV-1358, 2009 WL 816830, at \*6 n. 9 (S.D.N.Y. Mar. 25, 2009) ("While a convicted prisoner's right to medical assistance stems from the Eighth Amendment's ban on cruel and unusual punishment, the right of a pretrial detainee to medical care arises under the Due Process Clause of the Fourteenth Amendment .").

*C. Plaintiff's Fourteenth Amendment Claim Against Hatcher*

"The rights of one who has not been convicted are

protected by the Due Process Clause; and while the Supreme Court has not precisely limned the duties of a custodial official under the Due Process Clause to provide needed medical treatment to a pretrial detainee, it is plain that an unconvicted detainee's rights are at least as great as those of a convicted prisoner." *Weyant v. Okst,* 101 F.3d 845, 856 (2d Cir.1996). "Thus, the official custodian of a pretrial detainee may be found liable for violating the detainee's due process rights if the official denied treatment needed to remedy a serious medical condition and did so because of his deliberate indifference to that need." *Id.; see also Cuoco,* 222 F.3d at 106 (noting that the Second Circuit has "often applied the Eighth Amendment deliberate indifference test to pre-trial detainees bringing actions under the Due Process Clause of the Fourteenth Amendment").

The Second Circuit has noted that while "the Eighth Amendment ... standard for assessing deliberate indifference is a subjective one, requiring a determination as to whether the official knew of the risk to an inmate's health or safety[,] ... the Supreme Court has not stated whether the same standard should be applied in the due process context." *Weyant,* 101 F.3d at 856. In *Liscio v. Warren,* 901 F.2d 274 (2d Cir.1990), the Second Circuit "used an objective standard, requiring determination of what the official knew or should have known," *Weyant,* 101 F.3d at 856, holding that "a jury could find that [a doctor's] failure to diagnose [a pretrial detainee's] alcohol withdrawal constituted deliberate indifference," *Liscio,* 901 F.2d at 277. Notwithstanding this potential discrepancy, several district courts within the Circuit have stated that the analysis of a deliberate indifference claim is the same under the Due Process Clause as under the Eighth Amendment. *See Mitchell v. Prison Health Servs., Inc.,* No. 07-CV-8268, 2008 WL 5069075, at \*3 (S.D.N.Y. Nov.20, 2008); *Jones v. Artuz,* No. 01-CV-4652, 2006 WL 2390267, at \*3 (S.D.N.Y. Aug.17, 2006); *Fuentes v. Parks,* No. 03-CV-2660, 2005 WL 911442, at \*4 n. 7 (S.D.N.Y. Apr.18, 2005).[FN4]

FN4. The Second Circuit has noted that "[u]nder either standard, the state of the defendant's knowledge is normally a question of fact to be determined after trial." *Weyant,* 101 F.3d at 856.

*1. Seriousness of Alleged Deprivation of Medical Care*

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 1322357 (S.D.N.Y.)
(Cite as: 2009 WL 1322357 (S.D.N.Y.))

**\*6** Defendants contend that "Plaintiff cannot show that the alleged temporary delay in defendant's provision of medication to plaintiff or the reduction in dose of plaintiff's Paxil prescription was objectively sufficiently serious" to state a Fourteenth Amendment due process claim. (Defs.' Mem. 4.) According to Defendants, Plaintiff must show that the alleged delay or reduction "caused a condition of urgency that could result in degeneration or extreme pain," but fails to "allege that he suffered any pain or physical harm" at all. (Id. 5.) The Court concludes that at least the alleged ten-day deprivation of all medication cannot, as a matter of law, be dismissed at this stage as insufficiently serious to invoke due process protection.

"[M]edical conditions[ ] may be of varying severity. The standard for Eighth Amendment violations contemplates 'a condition of urgency' that may result in 'degeneration' or 'extreme pain.' " Chance v. Armstrong, 143 F.3d 698, 702 (2d Cir.1998). "A prisoner who nicks himself shaving obviously does not have a constitutional right to cosmetic surgery. But if prison officials deliberately ignore the fact that a prisoner has a five-inch gash on his cheek that is becoming infected, the failure to provide appropriate treatment might well violate the Eighth Amendment." Id.; see also Harrison, 219 F.3d at 136-37. The Second Circuit has observed that other circuits have considered "[f]actors ... includ[ing] '[t]he existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain,' " Chance, 143 F.3d at 702 (third alteration in original), and has stated that such factors, "while not the only ones that might be considered, are without a doubt highly relevant to the inquiry into whether a given medical condition is a serious one," id. at 703. "[I]t is a far easier task to identify a few exemplars of conditions so plainly trivial and insignificant as to be outside the domain of Eighth Amendment concern than it is to articulate a workable standard for determining seriousness at the pleading stage." Id. at 702-03 (internal quotation marks omitted).

In his Second Amended Complaint, Plaintiff claims that when he arrived at GMDC, Hatcher allegedly told him that he "would have to wait ten days for [his] regular medication," despite Plaintiff's protests and despite the fact that Plaintiff, as Hatcher knew, was "in recovery." (SAC ¶ 6.) By the time that Plaintiff was given his medications (including a lower dose of Paxil), he was "suffering from the side effects of withdrawal symptoms of Paxil [sic]." (Id.) It is true that Plaintiff does not explain what the "side effects" or "withdrawal symptoms" were, and though he claims that Hatcher "attempt[ed] to make [him] suicidal," he does not allege that he actually had any suicidal thoughts. (Id.) However, reading the exhibits attached to the Second Amended Complaint in the light most favorable to Plaintiff, the Court deems Plaintiff to have alleged that as of October 25, 2002, he was " 'nervous,' " " 'g[o]t angry easily,' " and was "concern[ed] about experiencing anxiety." (Medical Records, at third unnumbered page.) By this time, Plaintiff had been at GMDC for over one month, and-assuming that he began receiving medication ten days after his arrival-had been taking antidepressants, including a reduced dosage of Paxil, for most of that time. Taking as true Plaintiff's contention that his reduced dosage of Paxil caused his nervousness, anger, and anxiety as of October 25, 2002, it is reasonable to read his pleadings as alleging that he suffered similar (and ostensibly more severe) psychological and emotional effects arising from his complete "withdrawal" from all medication during the ten-day period following his transfer from OBCC to GMDC. See Cuoco, 222 F.3d at 106 (noting that "[c]ourts have repeatedly held that treatment of a psychiatric or psychological condition may present a 'serious medical need' "); Young v. Coughlin, No. 93-CV-262, 1998 WL 32518, at \*4 (S.D.N.Y. Jan. 29, 1998) ("Even pain that is psychological in origin can constitute a serious medical need. The guarantee of the minimal standards of medical care to prisoners extends to treatment of psychological or psychiatric disorders.").

**\*7** The Court cannot say that Plaintiff's allegations of psychological suffering are "so plainly trivial and insignificant as to be outside the domain of Eighth Amendment concern," Chance, 143 F.3d at 702, and therefore cannot conclude at the pleading stage that Plaintiff's alleged subjection to ten days of withdrawal from antidepressants was consistent with adequate medical treatment. See id. at 703 ("The plaintiff ... has alleged that, as the result of the defendants' actions, he suffered extreme pain, his teeth deteriorated, and he has been unable to eat properly. It may become clear, at summary judgment or at some later stage in the litigation, that these claims are not

Slip Copy, 2009 WL 1322357 (S.D.N.Y.)
(Cite as: 2009 WL 1322357 (S.D.N.Y.))

adequately supported. But at the 12(b)(6) stage, we must accept the plaintiff's allegations as true and may not dismiss the case unless it is clear that it would be impossible for the plaintiff to make out a legally cognizable claim. Under this standard, the case before us should not have been dismissed."); *Tiggs v. City of New York,* No. 07-CV-7254, 2009 WL 602991, at *2 (S.D.N.Y. Feb.24, 2009) ("Although failure to treat an insect bite unto itself likely does not rise to the level of a constitutional violation, failure to timely treat a bite that appears seriously infected-as Plaintiff's bite may have been when he requested and was denied medical attention-could conceivably constitute such a violation.... [D]epending on the appearance of Plaintiff's alleged injury when he requested and was denied medical assistance, Plaintiff may be able to establish that his medical need was 'sufficiently serious' to satisfy the objective prong of the deliberate indifferen[ce] test." (footnote omitted)); *Laktas v. Health Prof'l Ltd.,* No. 03-CV-1374, 2007 WL 4379417, at *4, 12 (C.D.Ill.Dec. 12, 2007) (denying motion to dismiss claim that defendant doctors were "deliberately indifferent to ... serious medical conditions [including] ... bi-polar disorder," where plaintiff alleged that the doctors refused to renew his prescription for drugs to treat his bi-polar condition); *Hann v. Michigan,* No. 05-CV-71347, 2007 WL 894827, at *6 (E.D.Mich. Mar. 2, 2007) (R & R) (denying motion to dismiss where plaintiff alleged that "he had been prescribed ... an antidepressant, and that the medical care defendants knew this" but that they "nonetheless failed to provide him with [the antidepressant], despite his repeated protestations of his need for the medication," stating that "[t]here is no question that depression constitutes a serious medical condition," and noting that though "it may be the case that ... [plaintiff] was no longer depressed at the time the medication was discontinued, [that] matter[ ] ... may not be considered in analyzing defendants' motion to dismiss"), *adopted by* 2007 WL 895056 (E.D.Mich. Mar.21, 2007) *and* 2007 WL 1565465 (E.D.Mich. May 29, 2007); *cf. Barnard v. Beckstrom,* No.07-CV-19, 2008 WL 4280007, at *16 (E.D.Ky. Sept. 17, 2008) (awarding summary judgment on deliberate indifference claim, citing doctor's affidavit "find[ing] no merit in the claim that the ten-day delay ... in getting [plaintiff's] change in dosage and time of administration of [a psychiatric medication] ... caused [plaintiff] to suffer any adverse ... consequences"); *Caldwell v. McEwing,* No. 00-CV-1319, 2006 WL 2796637, at *11 (C.D.Ill. Sept.28, 2006) (awarding summary judgment on deliberate indifference claim where plaintiff had not established that her psychiatric

medication was a serious medical need).

*2. Deliberate Indifference*

**\*8** Defendants further argue that Plaintiff "makes no factual allegations to show that defendants were aware of facts from which one could infer that a substantial risk of serious harm existed because of the ten-day delay in plaintiff's receipt of medication, and the reduction in his Paxil prescription." (Defs.' Mem. 7.) In other words, Defendants argue, Plaintiff fails to properly allege that he was subjected to deliberate indifference.

The Court agrees that Plaintiff has failed to state a claim that Defendants were deliberately indifferent to Plaintiff's medical needs in connection with Defendants' alleged failure to provide Plaintiff with his full dosage of Paxil. This conclusion is the same regardless of whether the relevant issue is what Defendants subjectively knew about Plaintiff's medical needs or what they objectively should have known. The medical records annexed to the Second Amended Complaint indicate that on October 25, 2002, when Plaintiff asked to have his dosage of Paxil increased, Hatcher decided instead to continue with his existing dosage of Paxil and to add an additional medication, Risperidone, "for impulse control [and] depression." (Medical Records, at third unnumbered page.) The same records further indicate that on November 11, 2002, Hatcher *did* accede to Plaintiff's request to increase his dosage of Paxil to 40 milligrams each morning.[FN8] (*Id.* at fourth unnumbered page.) Later, on January 3, 2003, Plaintiff was prescribed 20 milligrams of Paxil twice daily, for a total of 40 milligrams per day. (*Id.* at fifth unnumbered page.) Even assuming-in light of Plaintiff's allegation that he "never received" his "regular" 40-milligram dosage of Paxil while in DOC custody-that this purported increase of Plaintiff's Paxil prescription after November 11 was never actually carried out, Plaintiff's unfulfilled demand for a larger dosage of Paxil represents a mere disagreement over the course of Plaintiff's treatment and is inconsistent with deliberate indifference, particularly in light of the medical treatment (and prescriptions) he received at the time. *See Adams v. Perez,* No. 08-CV-4834, 2009 WL 513036, at *3 (S.D.N.Y. Feb.27, 2009) ("Plaintiff's Complaint indicates that she has received significant medical attention since her fall. After Plaintiff fell she was transported to the

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 1322357 (S.D.N.Y.)
(Cite as: 2009 WL 1322357 (S.D.N.Y.))

prison's medical unit for care. She was admitted to the infirmary overnight and x-rays were taken of her injuries. Since being discharged from the infirmary, Plaintiff has received at least four prescriptions for her pain and seen [defendant doctor] on at least three occasions. Thus, it is clearly not the case that Defendants[ ] are ignoring Plaintiff's medical needs. Additionally, the two specific treatments Plaintiff requests ... constitute a disagreement regarding course of treatment, a situation that is not actionable under the Eighth Amendment. Thus, the Court finds that Plaintiff has not stated a claim against Defendants for deliberate indifference toward her medical needs." (internal citations omitted)); *Mitchell,* 2008 WL 5069075, at *5 ("[Plaintiff's] allegations [that a Mediport placed in his chest] ... should have been flushed more frequently and should have been removed[ ] amount to, at most, a claim for medical malpractice.... Generously construed, plaintiff's allegations might state a claim for negligence. But the complaint and affirmation do not allege sufficient facts to nudge plaintiff's claim that defendants acted with deliberate indifference to his serious medical needs across the line from conceivable to plausible."); *Hughes v. Pillai,* No. 07-CV-55, 2008 WL 723510, at *1 (W.D.Pa. Mar. 17, 2008) (granting motion to dismiss deliberate indifference claim where plaintiff "does not assert in his complaint that [defendant doctor] discontinued his psychiatric medication altogether, but merely that she substituted his benzo-class medication with another psychot [ro]pic medication"). Construing Plaintiff's pleadings in the light most favorable to Plaintiff, and drawing all inferences in his favor, the Court concludes that Plaintiff's allegations confirm that Hatcher was responsive to requests for increased medication and that any disagreement they may have had over the precise drugs to be administered (or the quantity of those drugs) is grounds at most for a claim of medical malpractice.[FN6]

FN5. As noted earlier, the Court is allowed to consider materials appended to, or incorporated into, the Amended Complaint. *See Leonard F., 199 F.3d at 107.*

FN6. The Court briefly notes that its conclusion on this issue-that Plaintiff fails to state a claim as to the reduction of Plaintiff's Paxil dosage from 40 to 20 milligrams-renders moot Defendants' argument that Plaintiff's Section 1983 claim on these grounds is barred by *Heck v. Humphrey,* 512 U.S. 477, 114 S.Ct. 2364, 129 L.Ed.2d 383 (1994). (Defs.' Mem. 8-9.) In *Heck,* the Supreme Court held that in order to recover damages for harm caused by actions whose unlawfulness would render his conviction or sentence invalid, a Section 1983 plaintiff must show that that conviction or sentence had been called into question by issuance of a writ of habeas corpus or otherwise invalidated. This favorable-termination requirement applies to plaintiffs who are incarcerated at the time that they file their Section 1983 actions, regardless of whether they are later released. *See Gastelu v. Breslin,* No. 03-CV-1339, 2005 WL 2271933, at *4 (E.D.N.Y. Sept. 12, 2005) ("[Plaintiff] ... was still in prison when he initiated this § 1983 action. Because his challenge would necessarily imply the invalidity of his confinement, he is precluded from bringing an action under § 1983. The fact that he was released while his § 1983 action was pending does not alter the result."); *accord Rolle v. Connell,* No. 05-CV-991, 2005 WL 3077474, at *3 (N.D.N.Y. Nov. 16, 2005) (following *Gastelu*). Defendants argue that because "the purported 'consequence' alleged in the Second Amended Complaint of the modification in plaintiff's medication regime is that the reduction in his medication caused him to take a plea agreement," Plaintiff's claim therefore "represents nothing more than a collateral attack by plaintiff on his criminal conviction" and therefore is "prohibited" by *Heck.* (Defs.' Mem. 8-9.) Defendants are correct that Plaintiff, who was still serving his sentence when he filed this action, is barred from making any claim relying on alleged harm he suffered from entering a guilty plea. The Court's analysis of Plaintiff's claims therefore relies only on Plaintiff's allegation that Defendants' deliberate indifference caused him to suffer medical harm during his pretrial detention in DOC custody; this allegation alone, if proven, would not call into question the validity of Plaintiff's conviction and sentence.

**\*9** However, the Court cannot dismiss Plaintiff's claim that Defendants were deliberately indifferent to Plaintiff's need for medication during his first ten days at GMDC. Plaintiff alleges that Hatcher supposedly told him he would have to

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 1322357 (S.D.N.Y.)
(Cite as: 2009 WL 1322357 (S.D.N.Y.))

wait ten days for his "regular medication," indicating Hatcher's understanding that Plaintiff was previously taking certain drugs; Plaintiff further claims that Hatcher was aware that he was "in recovery," that Hatcher "attempt[ed] to make [him] suicidal," and that the reason given for the delay was not an assessment that Plaintiff would be better off without medication but rather that it was a GMDC "policy ." Together with Plaintiff's claims that he suffered from withdrawal and the evidence in Plaintiff's medical records that, even after returning to his medication, Plaintiff was nervous, anxious, and angry, these allegations suffice to state a claim that Hatcher was deliberately indifferent to Plaintiff's medical needs when he first arrived at GMDC. *See Chance,* 143 F.3d at 704 ("Crucially, [plaintiff] has ... alleged that [defendant dentists] recommended extraction not on the basis of their medical views .... This allegation of ulterior motives, if proven true, would show that the defendants had a culpable state of mind and that their choice of treatment was intentionally wrong and did not derive from sound medical judgment."); *Hemmings v. Gorczyk,* 134 F.3d 104, 109 (2d Cir.1998) ("It is ... possible that [plaintiff] could prove that [defendant nurse] acted with a sufficiently culpable state of mind when she aggravated his condition by allegedly taking away one of his crutches."); *Koehl v. Dalsheim,* 85 F.3d 86, 88 (2d Cir.1996) (holding that "[f]rom the allegations of this *pro se* complaint, it is not beyond dispute that [plaintiff] will be unable to develop evidence to show that [defendant] officers were aware of his serious medical need for ... eye-glasses," where plaintiff alleged that one officer " 'checked with' [a] nurse [ ] who had seen [plaintiff's] medical documentation" regarding the glasses, and therefore "the complaint suffices to warrant discovery to ascertain whether ... the [defendant] officers were aware of [plaintiff's] serious medical needs").

*D. Plaintiff's Fourteenth Amendment Claims Against Other Defendants*

Defendants contend that Plaintiff's claim against DOC must be dismissed because DOC is not a proper defendant. Defendants are correct. "As an agency of the City of New York, the Department of Corrections ... is not a suable entity." *Green v. City of N.Y. Dep't of Corr.,* No. 06-CV-4978, 2008 WL 2485402, at *4 (S.D.N .Y. June 19, 2008). Plaintiff's claim against DOC is therefore dismissed.

In addition, although Defendants do not address Plaintiff's claim against PHS, other than to deny that Hatcher is or has ever been a PHS employee (Defs.' Mem. 1 n. 1), the Court concludes that Plaintiff's claim against PHS must also fail for lack of any allegation that PHS was involved in the violation of Plaintiff's rights. The Second Amended Complaint does not mention PHS at all other than to name it as a defendant, and it does not appear to the Court that any exhibits annexed to the pleading mention PHS. Thus, Plaintiff's claim against PHS is also dismissed. *See Farrell v. Burke,* 449 F.3d 470, 484 (2d Cir.2006) ("It is well settled in this Circuit that personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." (internal quotation marks omitted)).

*10 The Court finds it appropriate, however, to permit Plaintiff to amend his pleading one more time, so that he may allege, if warranted, claims against PHS and the City of New York ("City"). *See Myrie v. Calvo/Calvoba,* 591 F.Supp.2d 620, 629 (S.D.N.Y.2008) ("Given plaintiff's *pro se* status, it seems prudent to give him an opportunity to supplement his allegations, if he can, with specific facts tending to show ... deliberate indifference."); Fed.R.Civ.P. 15(a)(2) ("The court should freely give leave [to amend] when justice so requires."). The Court notes that the Second Amended Complaint alleges that Hatcher denied Plaintiff medication pursuant to a facility "policy," which could conceivably be grounds for a claim against PHS and/or the City pursuant to *Monell v. Department of Social Services,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). Plaintiff is therefore "granted leave to reassert his Fourteenth Amendment claim as against New York City itself, since his complaint clearly reflects an effort to assert a claim against the governmental entity in addition to [Hatcher]," but is also "cautioned that he must make clear the factual basis of any federal claim he is asserting against the City of New York, because the municipality can only be held liable if the violation complained of is the product of a municipal policy, custom or practice." *Green,* 2008 WL 2485402, at *4. Plaintiff may also choose, if appropriate, to renew his claim against PHS, provided that he can explain in his amended pleading how PHS was involved in the alleged deprivation of his rights. However, Plaintiff is strongly encouraged to review the materials Defendants' counsel will be sending Plaintiff, as such records might help Plaintiff accurately identify the medical

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 1322357 (S.D.N.Y.)
(Cite as: 2009 WL 1322357 (S.D.N.Y.))

officials who signed the relevant documents and otherwise were responsible for the plausibly actionable medical decisions in this case.

*III. Conclusion*

For the reasons stated herein, Defendants' Motion to Dismiss is granted in part and denied in part. Plaintiff's Eighth Amendment claims are dismissed. Plaintiff's Fourteenth Amendment claim against PHS is dismissed without prejudice. Plaintiff's Fourteenth Amendment claim against DOC is dismissed with prejudice, and DOC is dismissed from this action. Plaintiff's Fourteenth Amendment claim against Hatcher is dismissed to the extent that it is based on allegations that Plaintiff received a lower dose of Paxil than he requested. Plaintiff's remaining claim, therefore, is that Hatcher violated Plaintiff's Fourteenth Amendment rights to adequate medical care by denying prescription medication to Plaintiff for a ten-day period after Plaintiff arrived at GMDC.

Plaintiff is also granted leave to amend his pleading, in order to substitute the correct party for Hatcher if warranted and to add claims against Prison Health Services and/or the City of New York, as described above; should Plaintiff choose to amend, he must file and serve his Third Amended Complaint by no later than sixty days from the date of this opinion. Plaintiff is directed to the pro se office (212-805-0175) for assistance in filing such a pleading.

**\*11** The Clerk of Court is respectfully directed to terminate the pending Motion (Dkt. No. 22), and to dismiss Defendants Prison Health Services and New York City Department of Correction from the case.

SO ORDERED.

S.D.N.Y.,2009.
Hamm v. Hatcher
Slip Copy, 2009 WL 1322357 (S.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



Slip Copy, 2008 WL 974409 (N.D.N.Y.)
(Cite as: 2008 WL 974409 (N.D.N.Y.))

C

Only the Westlaw citation is currently available.

United States District Court,
N.D. New York.
Faris ABDUL-MATIYN, Plaintiff,
v.
Governor George PATAKI, Governor; Allen,
Correction Officer; Rowe, Correction Officer;
Valezquez, Correction Officer; Benbow, Correction
Officer; Johnson, Sullivan Correctional Facility Senior
Parole Officer; John Doe, 1, Sullivan Correctional
Facility Audiologist; John Doe 2, Sullivan Correctional
Facility Counselor; Walsh, Sullivan Correctional
Facility Superintendent; John Doe 3, Sullivan
Correctional Facility Psychiatrist; John Doe # 4, Cnypc
Psychiatrist; Elizabeth Farnum, Doctor; Debroize,
Doctor; Forshee, Doctor; Pete Hanmer, Cnypc Primary
Therapist; Tom Murphy; Jeff Nowicki; Sharon Barboza,
Director Cnypc Sotp Program; Sawyer, Director, Cnypc;
Cnypc Medical Staff; Michelle Payne, Former Cnypc
Program Rehabilitation Counselor; Steve Capolo; and
Linda Becker, Defendants.
No. 9:06-CV-1503 (DNH)(DRH).

April 8, 2008.

Faris Abdul-Matiyn, Brooklyn, NY, pro se.

Hon. Andrew M. Cuomo, Office of the Attorney General
State of New York, Gerald J. Rock, Esq., Assistant
Attorney General, of Counsel, Albany, NY, for
Defendants Johnson, Walsh, Farnum, Debroize, Forshee,
Hanmer, Murphy, Nowicki, Barboza, Sawyer, CNYPC
Medical Staff, Capolo, and Becker.

Kloss, Stenger, Kroll & Lotempio, David W. Kloss, Esq.,
of Counsel, Buffalo, NY, for Defendants Allen, Rowe,
Valezquez, and Benbrow.

*DECISION and ORDER*

DAVID N. HURD, District Judge.

**\*1** Plaintiff, Faris Abdul-Matiyn, brought this civil rights
action pursuant to 42 U.S.C. § 1983. By a voluminous
Report-Recommendation dated February 19, 2008, the
Honorable David R. Homer, United States Magistrate
Judge, addressed the numerous issues in this matter with
the recommendations that:

1. The motion of Walsh and Johnson to sever be denied;

2. The motion of Walsh and Johnson to dismiss be granted
as to plaintiff's conspiracy claim against defendant
Johnson for failure to intervene, and denied in all other
respect;

3. The state defendants' motion to dismiss be granted in all
respects as to defendant Sawyer; granted in all respects as
to plaintiff's claim for denial of access to the courts, and
denied in all other respects;

4. The City defendants' motion to dismiss be denied in all
respects;

5. The motion of defendant CNYPC Medical Staff to
dismiss be granted; and

6. The complaint be dismissed without prejudice as to
defendants George Pataki, Michelle Payne, and John Does
I-IV.

No objections to the Report-Recommendation have been
filed.

Based upon a careful review of the entire file and the
recommendations of Magistrate Judge Homer, the

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2008 WL 974409 (N.D.N.Y.)
(Cite as: 2008 WL 974409 (N.D.N.Y.))

Report-Recommendation is accepted and adopted in its entirety. *See* 28 U.S.C. 636(b) (1).

Accordingly, it is

ORDERED that:

1. Defendant Walsh and Johnson's motion to sever is DENIED;

2. Defendant Walsh and Johnson's motion to dismiss is GRANTED with regard to plaintiff's conspiracy claim against defendant Johnson for failure to intervene, and DENIED in all other respects;

3. The state defendants' motion to dismiss is GRANTED in all respects with regard to defendant Sawyer, GRANTED in all respects with regard to plaintiff's claim for denial of access to the courts, and DENIED in all other respects;

4. The City defendants' motion to dismiss is DENIED in all respects;

5. The motion of defendant CNYPC Medical Staff to dismiss is GRANTED; and

6. The complaint is DISMISSED without prejudice with regard to defendants George Pataki, Michelle Payne, and John Does I-IV.

7. The Clerk is directed to enter judgment accordingly, and the remaining defendants are instructed to file and serve answers with regard to the remaining claims on or before April 29, 2008.

IT IS SO ORDERED.

## REPORT-RECOMMENDATION AND ORDER[FN1]

FN1. This matter was referred to the undersigned for report and recommendation pursuant to 28 U.S.C. § 636(b) and N.D.N.Y.L.R. 72.3(c).

DAVID R. HOMER, United States Magistrate Judge.

Plaintiff pro se Faris Abdul-Matiyn ("Abdul-Matiyn"), formerly an inmate in the custody of the New York State Department of Correctional Services ("DOCS"), brings this action pursuant to 42 U.S.C. § 1983 alleging that defendants,[FN2] twelve DOCS employees[FN3] ("State defendants"), four New York City Corrections Officers ("City defendants"), and defendant Central New York Psychiatric Center ("CNYPC") Medical Staff ("CNYPC defendants"), violated his constitutional rights under the First, Fourth, Eighth, and Fourteenth Amendments. Compl. (Docket No. 1). Presently pending are a motion to sever defendants Walsh and Johnson pursuant to Fed.R.Civ.P. 21 or, in the alternative, to dismiss pursuant to Fed.R.Civ.P. 12(b)(6) (Docket No. 17) and motions to dismiss from the State defendants (Docket Nos. 44, 47),[FN4] the City defendants (Docket No. 46), and defendant CNYPC Medical Staff defendants (Docket No. 55) pursuant to Fed.R.Civ.P. 12(b)(6). Abdul-Matiyn opposes all motions. Docket Nos. 45, 48, 62. For the following reasons, it is recommended that (1) the motion of Walsh and Johnson to sever be denied and their motion to dismiss be granted in part and denied in part, (2) the State defendants' motion be granted in part and denied in part, (3) the City defendants' motion be denied, and (4) the motion of the CNYPC Medical Staff be granted.

FN2. Abdul-Matiyn initially named twenty-six defendants. Compl. By an order entered January 26, 2007, the Court *sua sponte* dismissed three of the defendants. Docket No. 8. Defendants Pataki and Payne have not been served or otherwise appeared in this action. Likewise, defendants John Does I-IV have neither been served nor further identified. More than 120 days have elapsed since the complaint was filed. Accordingly, it is recommended that the complaint be dismissed without prejudice as to these six defendants pursuant to Fed.R.Civ.P. 4(m) and N.D.N.Y.L.R. 4.1(b).

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2008 WL 974409 (N.D.N.Y.)
(Cite as: 2008 WL 974409 (N.D.N.Y.))

FN3. Two of the State defendants, Walsh and Johnson, are employed by Sullivan Correctional Facility and, while represented by the same attorney as the other State defendants, have filed separate motions.

FN4. The State defendants initially moved to dismiss which was later discovered to contain an error in the electronic scanning of the documents. Docket No. 47. By an order dated May 29, 2007 (Docket No. 44, Pt. 1), that motion was stricken from the record and replaced by Docket No. 47. Docket No. 49.

### I. Background

*2 The facts are presented in the light most favorable to Abdul-Matiyn as the non-moving party. See *Ertman v. United States,* 165 F.3d 204, 206 (2d Cir.1999).

Abdul-Matiyn "was released from Woodburn [Correctional Facility], after ... serv[ing] sixteen years and eight months ...." Compl. at 13. Abdul-Matiyn thereafter "attended [and completed] sex therapy, alternative[s] to violence, [and] psychological programs ...." *Id.* However, on May 5, 2005, Abdul-Matiyn was arrested and detained at Rikers Island due to a parole violation. *Id.*

Upon his arrival at Rikers Island, Abdul-Matiyn complained of "arthritis, back problems (pains), a history of heart problems, a history of blackouts ...," and kidney and bladder stones. *Id .* On July 6, 2005, Abdul-Matiyn requested a sick call because he was "having severe back pains, that were making it almost impossible for him to walk ... [and] a tightness in his chest and strong chest pains." *Id.* at 7. Abdul-Matiyn alleges that he was sent back to his cell, and despite his continued complaints, crippling pain, and pleas to go to the hospital, defendants Allen and Benbow ignored his requests. *Id.* at 7-8. Defendant Valezquez replaced Allen and "[Abdul-Matiyn] and the inmates informed [her] that [AbdulMatiyn] was having chest and back pains ... [so she] called the hospital and she was told to send [him] right down." *Id.* at 8. Benbow approached Valezquez to inquire where AbdulMatiyn was going and when Valezquez informed

her that he was going to the hospital, Benbow allegedly referred to Abdul-Matiyn by a racial epithet and called the hospital, instructing them to put Abdul-Matiyn "on the burn". *Id.*

Defendant Rowe met Abdul-Matiyn upon his arrival at the hospital. *Id.* She informed him that he was "on the burn" and "[d]espite [Abdul-Matiyn's] persistent complaints of chest and back pains ..," Rowe did not let him see a doctor until over three and one-half hours later. *Id.* at 9. Abdul-Matiyn's chest pains had subsided, but he was still suffering from back pain and was prescribed methocarbamol. *Id.* Abdul-Matiyn contends that the physician informed him that due to the hospital's faulty equipment, the methocarbarnol was the only treatment available and that any persisting pain would have to be managed with Abdul-Matiyn's ability to use his mind to control the discomfort. *Id.*

Additionally, Abdul-Matiyn alleges that on another occasion where he was rushed to the clinic "due to severe pains [in his] chest, back and belly ..," he encountered Rowe, who stated that "they had something special in store for [Abdul-Matiyn]" and refused to provide Abdul-Matiyn with immediate medical treatment. *Id.* at 12. Abdul-Matiyn also contends that some of Rowe's saliva landed on his face and in his mouth while Rowe was speaking to him and attributed this exchange of bodily fluids to his contraction of Hepatitis B. *Id.* at 15.

*3 Abdul-Matiyn was supposed to be released from Rikers Island on May 5, 2006. *Id.* at 14. However, at the beginning of April, Abdul-Matiyn was summoned to meetings with the Sullivan Correctional Facility's mental health department. *Id.* at 16.FN5 The mental health workers "stated that Albany told them to interview [Abdul-Matiyn] and to send Albany an evaluation;" however, despite Abdul-Matiyn's repeated requests, they would not tell him why Albany required an evaluation. *Id.* During the interview, Abdul-Matiyn was asked questions concerning his religion and alleged involvement with terrorists and terrorist organizations. *Id.* Additionally, Abdul-Matiyn contends that the mental health department was misconstruing prior conversations he had with them FN6 about his religious beliefs, "distort[ing] and misinterpret[ing his statements] to have it appear that [he] was seeing and hearing things that were not there." *Id.*

Slip Copy, 2008 WL 974409 (N.D.N.Y.)
(Cite as: 2008 WL 974409 (N.D.N.Y.))

FN5. At some point Abdul-Matiyn was transferred to Sullivan Correctional Facility for housing, but the exact date is not reflected in the record.

FN6. Abdul-Matiyn states that he sporadically suffered from depression which caused trouble sleeping. Compl. at 16. When this occurred, he would "go to mental health and speak with someone and [ ] get something to help him sleep." *Id.*

After the evaluation interview, Abdul-Matiyn was seen by defendant Johnson. *Id.* at 17. Johnson asked Abdul-Matiyn to complete additional paperwork, allegedly because AbdulMatiyn's initial paperwork had been "messed up." *Id.* Abdul-Matiyn "asked if anything came up that would interfere with his release ...." and Johnson responded "no unless something else comes up unexpectedly ...." *Id.* Abdul-Matiyn continually asked correctional facility staff if there were new developments occurring in his case that would preclude his release; however, "[e]ach defendant expressed ... that they had no knowledge of anything that would prevent [him] from going home." *Id.*

On May 5, 2005, Abdul-Matiyn was met by Johnson and informed that he was "suppose[d] to have been examined by mental health the last two weeks before he was to be released [and] ... he had to be transferred to Marcy Psychiatric [Correctional Facility] to be evaluated." *Id.* at 18. Abdul-Matiyn alleges that he was told that his evaluation would be "three days to a week and no more than two weeks ...." *Id.* Abdul-Matiyn was then strip-searched, shackled, and transported to CNYPC. *Id.* Abdul-Matiyn later alleged that Walsh authored and signed an application for involuntary commitment and that this information was readily known by other defendants. Docket No. 45 at ¶¶ 6-7; Docket No. 48 at ¶¶ 11, 13-14.

Upon arrival at CNYPC, defendant Murphy allegedly told Abdul-Matiyn that he would "be [t]here a lot longer than [two weeks because he was] one of the filthy animals [defendants] have to clean off our streets." Compl. at 19. "All of [Abdul-Matiyn's] property was taken from him,"

including religious texts and other items. *Id.* Additionally, Murphy informed Abdul-Matiyn that he would "be [t]here for the rest of [his] life." *Id.* Abdul-Matiyn continually asked what authority granted defendants the ability to keep him confined against his will, but defendants did not give him an answer. *Id.*

*4 Additionally, Abdul-Matiyn underwent a psychological evaluation upon arrival. *Id.* According to the psychologist, "she didn't see anything mentally wrong with [Abdul-Matiyn] ... and that she could not give [him] any answers to his legal questions except that Governor Pataki instructed them to lock up everyone convicted of a sexual offense by any means possible, and keep them locked up forever." *Id.*

While Abdul-Matiyn resided at CNYPC, the CNYPC defendants, "especially ... Hanmer, .. Murphy, .. Nowicki and ... Payne told [him] he had no constitutional rights ... to be allowed to practice his religion, have access to the courts or be told why he was [t]here at CNYPC." *Id.* at 20. Additionally, defendant Capolo allegedly refused Abdul-Matiyn's requests to pray, "tell[ing Abdul-Matiyn] that he was too busy to allow [Abdul-Matiyn] the opportunity to pray and [that he] would have to find another time after Capolo got off work to pray." *Id.* at 27. Abdul-Matiyn also contends that Payne "would taunt [him] everyday by making sarcastic statements about [Abdul-Matiyn] and his religion to groups of people whenever he was present." *Id.* Furthermore, although CNYPC provided kosher meals to Jewish residents and defendant Becker "told [Abdul-Matiyn] that they would consider obtaining a contract for halal meals FN7 ...," none were purchased and Abdul-Matiyn was denied his special religious diet. *Id.* at 20.

FN7. "Halal" foods are those prepared in accordance with Islamic religious law. *See, e.g.,* Cyril Glasse, *The Concise Encyclopedia of Islam* 133, 144, 148 (1989).

Abdul-Matiyn also contends that while he was at CNYPC, he was "forcefully strip searched, on a few occasions and threatened with the threat of being injected with drugs if he refused to be striped [sic] searched or ... participate in the programs [t]here at CNYPC, even if his refusal [wa]s

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2008 WL 974409 (N.D.N.Y.)
(Cite as: 2008 WL 974409 (N.D.N.Y.))

due to his religion or if he w[as] physically ill." *Id.* at 23. Abdul-Matiyn also alleges that Payne threatened him with the punishment of the "side room", where patients were allegedly "unmercifully beat, kick[ed] and stomp[ed] ...." *Id.* at 28. Moreover, Abdul-Matiyn contends that his "room ha[d] not been clean in over six months and the times [he] ha[d] tried to clean his room with a wet towel; he was threatened with punishment ...." *Id.* at 23. Abdul-Matiyn also complains that his confinement was discriminatory because "defendants ... came to the determination that they would imprison males convicted of sexual offenses ... [since] defendants are targeting only males convicted of sexual offenses and not females who commit the same or similar offenses." *Id.* at 25. This action followed.

## II. Discussion

In his complaint, Abdul-Matiyn alleges that his First Amendment rights were violated because the CNYPC defendants failed to provide him with halal meals, did not allow him to pray, and impeded his access to the courts. Abdul-Matiyn also claims that he was unlawfully strip-searched and shackled on multiple occasions. Additionally, Abdul-Matiyn asserts Eighth Amendment violations for deliberate indifference to a serious medical need [FN8] and, liberally construing Abdul-Matiyn's complaint, failure to protect. Moreover, AbdulMatiyn contends that his due process rights were violated by his civil confinement and the conspiracy between Walsh and Johnson to have him civilly confined, as well as claiming that his equal protection rights were violated by CNYPC's discriminatory procedures confining only male sex offenders. Walsh and Johnson move to sever and, in the alternative, dismiss based upon the failure to (1) abide by the pleading requirements, (2) allege the personal involvement of Walsh, and (3) state a claim with respect to Johnson. The State defendants move to dismiss based upon (1) Abdul-Matiyn's failure to comply with pleading requirements, (2) failure to allege the personal involvement of Sawyer, (3) the submission of a conclusory complaint with respect to the First and Fourteenth Amendment claims, and (4) the fact that verbal harassment alleged on the part of Capolo is not actionable under § 1983. The City defendants move to dismiss based upon the failure to (1) comply with pleading requirements, (2) allege personal involvement, (3) exhaust administrative remedies,[FN9] and (4) allege a serious medical need. The

CNYPC defendants move to dismiss based upon Eleventh Amendment immunity.

> FN8. Abdul-Matiyn asserts multiple claims of serious medical conditions including *inter alia* back and chest pain, hearing loss, bladder and kidney stones, Hepatitis B, and arthritis. Compl. at 5,11, 12-13, 14. Because only the City defendants asserted an argument controverting Abdul-Matiyn's serious medical need, only the ailments directly pertaining to their involvement with his treatment will be discussed. Docket No. 46. These claims primarily concern the complaints of Abdul-Matiyn's chest and back pain. Compl. at 7-9.

> FN9. "[F]ailure to exhaust is an affirmative defense ...." *Jones v. Block,* 127 S.Ct. 910, 921 (2007); *see also Paese v. Hartford Life Accident Ins. Co.,* 449 F.3d 435, 445 (2d Cir.2006). Thus, the City defendants' assertion of this affirmative defense in a motion to dismiss is premature but may be revisited at the summary judgment stage. *See Jones,* 127 S.Ct. at 921-22 (holding that an inmate is not required to plead exhaustion in the complaint). Accordingly, the City defendants' motion on this ground should be denied.

### A. Legal Standard

*5 Fed.R.Civ.P. 12(b)(6) authorizes dismissal of a complaint that states no actionable claim. When considering a motion to dismiss, "a court must accept the allegations contained in the complaint as true, and draw all reasonable inferences in favor of the nonmovant." *Sheppard v. Beerman,* 18 F.3d 147, 150 (2d Cir.1994). However, "a 'complaint which consists of conclusory allegations unsupported by factual assertions fails even the liberal standard of Rule 12(b)(6)." *Gilfus v. Adessa,* No. 5:04-CV-1368 (HGM/DEP), 2006 WL 2827132, at *3 (N.D.N.Y.2006) (citing *De Jesus v. Sears, Roebuck & Co.* 87 F.3d 65, 70 (2d Cir.1996) (internal quotations omitted)). Thus, dismissal is only warranted if it appears, beyond a reasonable doubt, that the non-moving party cannot prove a set of facts which would support his or her claim or entitle him or her to relief. *See Hishon v. King &*

Slip Copy, 2008 WL 974409 (N.D.N.Y.)
(Cite as: 2008 WL 974409 (N.D.N.Y.))

*Spalding,* 467 U.S. 69, 73 (1984); *Harris v. City of New York,* 186 F.3d 243, 247 (2d Cir.1999).

When, as here, a party seeks dismissal against a pro se litigant, a court must afford the non-movant special solicitude. *See Triestman v. Fed. Bureau of Prisons,* 470 F.3d 471, 477 (2d Cir.2006). As the Second Circuit has stated,

> [t]here are many cases in which we have said that a *pro se* litigant is entitled to "special solicitude," ... that a *pro se* litigant's submissions must be construed "liberally,"... and that such submissions must be read to raise the strongest arguments that they 'suggest..... At the same time, our cases have also indicated that we cannot read into *pro se* submissions claims that are not "consistent" with the *pro se* litigant's allegations,.. or arguments that the submissions themselves do not "suggest, ..." that we should not "excuse frivolous or vexatious filings by *pro se* litigants" ... and that *pro se* status "does not exempt a party from compliance with relevant rules of procedural and substantive law ...."

*Id.* (citations and footnote omitted).

### B. Failure to Comply with Pleading Requirements

"Under the Federal Rules, a 'short and plain' complaint is sufficient as long as it puts the defendant on notice of the claims against it." *Phillips v. Girdich,* 408 F.3d 124, 127 (2d Cir.2005) (*quoting* Fed.R.Civ.P. 8(a)). Additionally, the Federal Rules state that "[a]ll averments of claim ... shall be made in numbered paragraphs, the contents of each of which shall be limited as far as practicable to a statement of a single set of circumstances...." Fed.R.Civ.P. 10(b). However, "[a]t base, the Rules command us never to exalt form over substance." *Phillips,* 408 F.3d at 128 (*citing* Fed.R.Civ.P. 8(f)).

The majority of defendants cite Abdul-Matiyn's failure to number his complaint in paragraphs as a basis for dismissal. However, the Court has been "willing to overlook harmless violations of Rule 10(b) ..." where the spirit of the rule, "to facilitate [ ] the clear presentations of

the matters set forth, so that allegations might easily be referenced in subsequent pleadings," is not offended. *Id.* (citations and internal quotations omitted). Thus, "where the absence of numbering or succinct paragraphs does not interfere with one's ability to understand the claims or otherwise prejudice the adverse party, the pleading should be accepted." *Id.* (citations omitted).

**\*6** In this case, it is clear that all defendants were able to reference easily the allegations in the complaint as each set forth multiple reasons to dismiss the complaint other than the failure to comply with Rule 10(b). Moreover, defendants were not clearly prejudiced as each motion and memorandum of law is extensively researched, cogently written, and, when viewed together, refute most of the bases upon which Abdul-Matiyn asserts constitutional violations.

Therefore, the motions of Walsh and Johnson, the State defendants, and the City defendants on this ground should be denied.

### C. Personal Involvement

Certain defendants contend that Abdul-Matiyn has failed to establish their personal involvement. " '[P]ersonal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.' " *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (quoting *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 (2d Cir.1991)). Thus, supervisory officials may not be held liable merely because they held a position of authority. *Id.; Black v. Coughlin,* 76 F.3d 72, 74 (2d Cir.1996). However, supervisory personnel may be considered "personally involved" if:

> (1)[T]he defendant participated directly in the alleged constitutional violation, the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2008 WL 974409 (N.D.N.Y.)
(Cite as: 2008 WL 974409 (N.D.N.Y.))

exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

*Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995) (citing *Williams v. Smith,* 781 F.2d 319, 323-24 (2d Cir.1986)).

### 1. Walsh

Walsh contends that "[o]ther than being named in the caption and identified as a party, [he] is never referred to in the complaint." Docket No. 17, Pt. 2 at 4. However, construing all of Abdul-Matiyn's submissions liberally, he alleges that "Walsh ... without any medical support, wrote out an application, stating that [Abdul-Matiyn] was in need of involuntary commitment .... " Docket No. 48 at ¶ 11. As discussed *infra* in subsection II(E)(2)(I), Abdul-Matiyn's involuntary civil confinement may constitute a due process violation. Thus, Walsh's alleged actions of authoring and signing the allegedly false report which served as the basis of Abdul-Matiyn's confinement may constitute direct participation in an alleged constitutional violation.

Accordingly, Walsh's motion to dismiss on this ground should be denied.

### 2. Benbow, Allen, Rowe, and Valezquez

The City defendants contend that there are no allegations that they were personally involved in the alleged deliberate indifference to Abdul-Matiyn's medical treatment because they were not personally involved with providing his medical care. However, defendants need not physically administer the care to be subject to Eighth Amendment liability.

*7 As discussed *infra* in subsection II(E)(1), construing all facts in the light most favorable to Abdul-Matiyn, the City defendants exhibited deliberate indifference to his medical treatment. Although the City defendants were not responsible for the actual medical care, they were

responsible for seeing that Abdul-Matiyn received adequate treatment once they were aware of his serious medical need. Crediting Abdul-Matiyn's allegations, each City defendant ignored this responsibility by denying Abdul-Matiyn with medical treatment or severely delaying it. Therefore, the complaint suffices to allege that each was directly involved in the alleged deliberate indifference.

Thus, City the City defendants' motion on this ground should be denied.

### 3. Sawyer

The State defendants argue that "[o]ther than being named in the caption and identified as a party, Sawyer is never referred to in the complaint." Docket No. 47, Pt. 2 at 4. Reading all of Abdul-Matiyn's submissions together, he alleges that "superiors [are] liable for their [employees'] actions ... and Sawyer is responsible for the training for those employed at CNYPC and liable for their actions and inactions." Docket No. 48 at ¶ 22. Abdul-Matiyn continues by alleging negligent hiring and retention and vicarious liability. *Id.* at ¶¶ 23-26.

Sawyer cannot be held liable solely because he held a supervisory position over other defendants. Abdul-Matiyn does not specifically contend that Sawyer was directly involved or had knowledge of the alleged constitutional violations; however, even when reading the complaint in the light most favorable to Abdul-Matiyn, any liberally construed allegations of direct involvement and knowledge would still lack any factual basis. Additionally, although Abdul-Matiyn contends that there was negligent supervision, there is no fact asserted beyond his conclusory allegations that Sawyer created a hiring or retention policy which allowed constitutional violations to continue or was grossly negligent in managing the other named defendants.

Therefore, the State defendants' motion to dismiss on this ground should be granted.

### D. Severance

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2008 WL 974409 (N.D.N.Y.)
(Cite as: 2008 WL 974409 (N.D.N.Y.))

In the event of misjoinder of parties, "[a]ny claim against a party may be severed and proceed separately." Fed.R.Civ.P. 21. "While the decision whether to grant a severance motion is committed to the sound discretion of the trial court, the federal courts view severance as a procedural device to be employed only in exceptional circumstances." *Baergas v. City of New York,* No. 04-CV-2944 (BSJ/HBP), 2005 WL 2105550 at *3 (S.D.N.Y. Sept. 01, 2005) (citations and internal quotations omitted). The factors considered "when determining whether severance is appropriate [are]:

> (1) whether the claims arise out of the same transaction or occurrence, whether the claims present common questions of fact or law, (3) whether severance would serve judicial economy, (4) prejudice to the parties caused by severance, and (5) whether the claims involve different witnesses and evidence."

**8** *Id.* at *3-4 (citations omitted).

In this case, it is clear that severance is not warranted. The actions of Walsh and Johnson are the basis of Abdul-Matiyn's due process claim. Liberally reading all submissions, Abdul-Matiyn alleges that Walsh, "without any medical support, wrote out an application, stating that [Abdul-Matiyn] was in need of involuntary commitment" and signed it, leading to Abdul-Matiyn's involuntary civil confinement, potentially in violation of the Fourteenth Amendment. Docket No. 45 at ¶¶ 6-7; Docket No. 48 at ¶ 11. Additionally, Abdul-Matiyn contends that Johnson participated in the conspiracy to involuntarily confine him "by concealing what was taking place, and giving [him] misleading information concerning the situation." *Id.* at ¶ 13. Thus, the subsequent claims of involuntary confinement asserted against the CNYPC defendants directly relate to, and intertwine with, the allegations against Walsh and Johnson. Additionally, the same set of facts relating to who signed the papers and ordered that he be confined would be determined in both cases. Among other things, this would result in defendants calling duplicate witnesses. Thus, severing the litigation would not serve the interests of judicial economy and may lead to inconsistent findings in liability and damages which

would prejudice all defendants.

Therefore, Walsh and Johnson's motion to sever should be denied.

**E. Failure to State a Claim**

An action commenced pursuant to 42 U.S.C. § 1983 requires proof of the "deprivation of any right[ ], privilege[ ], or immunit[y] secured by the Constitution" or laws of the federal government. 42 U.S.C. § 1983. Thus, no action lies under § 1983 unless a plaintiff has asserted the violation of a federal right. *See Middlesex County Sewerage Auth. v. Nat'l Sea Clammers Ass'n,* 453 U.S. 1, 19 (1981).

**1. Eighth Amendment**

The Eighth Amendment explicitly prohibits the infliction of "cruel and unusual punishment." U.S. CONST. amend. VIII. This includes the provision of medical care and punishments involving "the unnecessary and wanton infliction of pain." *Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994) (citations omitted). A prisoner advancing an Eighth Amendment claim for denial of medical care must allege and prove deliberate indifference to a serious medical need. *Wilson v. Seiter,* 501 U.S. 294, 297 (1991); *Hathaway,* 37 F.3d at 66. More than negligence is required "but less than conduct undertaken for the very purpose of causing harm." *Hathaway,* 37 F.3d at 66. The test for a § 1983 claim is twofold. First, the prisoner must show that there was a sufficiently serious medical need. *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998). Second, the prisoner must show that the prison official demonstrated deliberate indifference by having knowledge of the risk and failing to take measures to avoid the harm. *Id.* "[P]rison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted." *Farmer v. Brennan,* 511 U.S. 825, 844 (1994).

**9** " 'Because society does not expect that prisoners will have unqualified access to healthcare,' a prisoner must

Slip Copy, 2008 WL 974409 (N.D.N.Y.)
(Cite as: 2008 WL 974409 (N.D.N.Y.))

first make [a] threshold showing of serious illness or injury" to state a cognizable claim. *Smith v. Carpenter,* 316 F.3d 178, 184 (2d Cir.2003) (quoting *Hudson v. McMillian,* 503 U.S. 1,9 (1992)). Because there is no distinct litmus test, a serious medical condition is determined by factors such as "(1) whether a reasonable doctor or patient would perceive the medical need in question as 'important and worthy of comment or treatment,' (2) whether the medical condition significantly affects daily activities, 16 and (3) the existence of chronic and substantial pain ." *Brock v. Wright,* 315 F.3d 158, 162-63 (2d Cir.2003) (citing *Chance,* 143 F.3d at 702). The severity of the denial of care should also be judged within the context of the surrounding facts and circumstances of the case. *Smith,* 316 F.3d at 185.

Deliberate indifference requires the prisoner "to prove that the prison official knew of and disregarded the prisoner's serious medical needs." *Chance,* 143 F.3d at 702. Thus, prison officials must be "intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed." *Estelle v. Gamble,* 429 U.S. 97, 104, (1976). "Mere disagreement over proper treatment does not create a constitutional claim," as long as the treatment was adequate. *Id* . at 703. Thus, "disagreements over medications, diagnostic techniques (e.g., the need for X-rays), forms of treatment, or the need for specialists ... are not adequate grounds for a § 1983 claim." *Magee v. Childs,* No. 04-CV1089 (GLS/RFT), 2006 WL 681223, at *4 (N.D.N.Y. Feb. 27, 2006). Furthermore, allegations of negligence or malpractice do not constitute deliberate indifference unless the malpractice involved culpable recklessness. *Hathaway v. Coughlin,* 99 F.3d 550, 553 (2d Cir.1996).

Courts have held that "[s]evere back pain, especially if lasting an extended period of time, can amount to a 'serious medical need' under the Eighth Amendment." *Nelson v. Rodas,* No. 01-CV-7887 (RCC/AJP), 2002 WL 31075804, at *14 (S.D.N.Y. Sept. 17, 2002). Courts have also failed to recognize chest pains as a serious medical condition. *See McCoy v. Goord,* 255 F.Supp.2d 233, 260 (S.D.N.Y.2003) (holding that keeping plaintiff "waiting for twenty-five minutes and then sen[ding] him back to his cell without treating his chest pains does not amount to a constitutional deprivation.").

However, considering Abdul-Matiyn's claims together and reading all allegations in a light most favorable to him, it appears that he has alleged a serious medical condition. Abdul-Matiyn contends he had a history of back pain and that the back pain he was experiencing on July 6, 2005 was so severe that it was "making it almost impossible to walk ...." Compl. at 7. This pain began at 11:30 a.m. and was not addressed until after 3 p.m. *Id.* at 7-9. Additionally, the back pain was accompanied by severe chest pain. *Id.* at 7. This pain lasted far longer than that addressed in *McCoy.* Additionally, the combination "had [Abdul-Matiyn] twisted over in a bending position ... [causing him to] cry[ ]." *Id.* Crediting Abdul-Matiun's allegations, this combination of factors present a condition which a reasonable person or physician would deem worthy of treatment. Additionally, the pain appears to have been of sufficient severity. Thus, Abdul-Matiyn's chest and back pain constituted a serious medical condition.

**\*10** Construing the allegations in the light most favorable to Abdul-Matiyn also leads to the conclusion that the City defendants were deliberately indifferent to his need for medical treatment. Abdul-Matiyn alleges that Allen and Benbow refused to respond to his repeated requests to go to the clinic for his severe and crippling chest pains. Compl. at 7. Additionally, even though Valezquez called the clinic on Abdul-Matiyn's behalf, it is alleged that Valezquez stood idly by while Benbow told the clinic that Abdul-Matiyn was to be placed "on the burn." *Id.* at 8. Additionally, upon arrival at the clinic, Rowe refused to let Abdul-Matiyn see a physician for an extended period of time. Compl. at 9. If proven, these actions could constituted intentional delay and denial of medical services during a serious medical need.

Therefore, the City defendants' motion to dismiss on this ground should be denied.

### 2. Fourteenth Amendment

### I. Due Process

Abdul-Matiyn contends that the State defendants violated his due process rights when he was involuntarily, civilly

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2008 WL 974409 (N.D.N.Y.)
(Cite as: 2008 WL 974409 (N.D.N.Y.))

confined at CNYPC without being given any justification from the State defendants. The State defendants contend that Abdul-Matiyn's claims are conclusory.

As a threshold matter, an inmate asserting a violation of his or her right to due process must establish the existence of a protected interest in life, liberty, or property. *See Perry v. McDonald,* 280 F.3d 159, 173 (2d Cir.2001). "Prisoners enjoy the right not to be deprived of life, liberty or property without due process of law, but their rights are to be balanced with, and often tempered by, the needs of their special institutional setting." *Malik v. Tanner,* 697 F. Supp 1294, 1301 (S.D.N.Y.1988) (citing *Wolff v. McDonnell,* 418 U.S. 539, 556 (1974)). "Involuntary confinement, including civil commitment, constitutes a significant deprivation of liberty requiring due process." *Fisk v. Letterman,* 401 F.Supp.2d 362, 374 (S.D.N.Y.2005) (citing *Addington v. Texas,* 441 U.S. 418, 425 (1979)). However, the Supreme Court has "permit[ed] involuntary confinement based upon a determination that the person currently both suffers from a 'mental abnormality' or 'personality disorder' and is likely to pose a future danger to the public." *Kansas v. Hendricks,* 521 U.S. 346, 371 (1997). "In the case of civil confinement, due process requires that the nature and duration of commitment bear some reasonable relation to the purpose for ... commit[ment] ... [and is in]tolera [nt of] the involuntary confinement of a nondangerous individual." *Mental Hygiene Legal Serv. v. Spitzer,* No. 07-CV-2935 (GEL), 2007 WL 4115936, at *6 (S.D.N.Y. Nov. 16, 2007) (citations and internal quotations omitted).

In this case, viewing all facts in the light most favorable to Abdul-Matiyn, it appears that his due process rights were violated. Abdul-Matiyn continually inquired why he was being interviewed, if the results of those discussions would interfere with his release date, and, upon his arrival at CNYPC, under what authority and with what proof he was being detained. All of these unanswered inquiries directly reflect upon the due process, or lack thereof, afforded to Abdul-Matiyn.

**\*11** Additionally, construing the allegations in the light most favorable to Abdul-Matiyn, he was not a danger to the community as he had undergone multiple courses during his release and devoted his time and energy to his religion and assisting those less fortunate in the

community. Compl. at 13-14. Moreover, Abdul-Matiyn had no suicidal ideations or mental illness but was merely a devout and spiritual Muslim. *Id.* at 16. Therefore, AbdulMatiyn has alleged adequate facts to present a basis for recovery.

Thus, the State defendants' motion to dismiss on this ground should be denied.

**ii. Equal Protection**[FN10]

> **FN10.** Liberally construing Abdul-Matiyn's complaint, there is a second allegation of discrimination. Abdul-Matiyn claims that defendants did not target those convicted of homicide, a crime specifically mentioned in the Mental Hygiene laws, for confinement while they did target sex offenders, a crime allegedly "never considered by the framers ... as a mental illness ...." Compl. at 25. However, Abdul-Matiyn's conclusory allegations do not compare similarly situated individuals; thus, any such contention does not implicate Fourteenth Amendment protection.

The Fourteenth Amendment's Equal Protection Clause mandates equal treatment under the law. Essential to that protection is the guarantee that similarly situated persons be treated equally. *City of Cleburne, Tex. v. Cleburne Living Ctr.,* 473 U.S. 432, 439 (1985). "In order to establish an equal protection violation, the plaintiffs must show that they were treated differently than other people in similar circumstances and must establish that such unequal treatment was the result of intentional and purposeful discrimination." *Myers v. Barrett,* No. 95-CV-1534, 1997 WL 151770, at *3 (N.D.N.Y. Mar. 28, 1997) (Pooler, J.). "To withstand constitutional challenge, previous cases establish that classifications by gender must serve important governmental objectives and must be substantially related to achievement of those objectives." *Craig v. Boren,* 429 U.S. 190, 197 (1976).

In this case, Abdul-Matiyn alleges that male sex offenders were civilly confined in CNYPC while similarly situated female sex offenders were not. Compl. at 25. Construing

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2008 WL 974409 (N.D.N.Y.)
(Cite as: 2008 WL 974409 (N.D.N.Y.))

all allegations in the light most favorable to Abdul-Matiyn, it appears that he has asserted a sex-based, discriminatory policy. The State defendants merely claim that Abdul-Matiyn has stated a conclusory allegation; however, at this stage these facts, without any proffer of substantial relation to an important government objective, are suffice to allege a potential basis for relief.

Therefore, the State defendants' motion to dismiss on this ground should be denied.

### 3. First Amendment

### I. Free Exercise of Religion

Abdul-Matiyn alleges that his First Amendment rights were violated when the State defendants failed to provide him with his religious meals and refused to let him pray. The State defendants contend that Abdul-Matiyn's claims are conclusory.

"The First Amendment ... guarantees the right to the free exercise of religion." *Johnson v. Guiffere,* No. 04-CV-57 (DNH), 2007 WL 3046703, at *4 (N.D.N.Y. Oct. 17, 2007) (citing *Cutter v. Wilkinson,* 544 U.S. 709, 719 (2005). "Prisoners have long been understood to retain some measure of the constitutional protection afforded by the First Amendment's Free Exercise Clause." *Ford v. McGinnis,* 352 F.3d 582, 588 (2d Cir.2003) (citing *Pell v. Procunier,* 417 U.S. 817, 822 (1974)). This right "is not absolute or unbridled, and is subject to valid penological concerns ...." *Johnson,* 2007 WL 3046703, at * 4.

### a. Failure to Provide Halal Meals

**\*12** The Free Exercise Clause extends "into other aspects of prison life including, pertinently, that of an inmate's diet ...." *Id.* The Second Circuit has held that it is "clearly established that a prisoner has a right to a diet consistent with his or her religious scruples ...." *Ford,* 352 F.3d at 597 (citations omitted). Therefore, to "deny prison inmates the provision of food that satisfies the dictates of their faith ... unconstitutionally burden [s] their free exercise

rights." *McEachin v. McGuinnis,* 357 F.3d 197, 203 (2d Cir.2004).

> A party asserting a free exercise claim bears the initial burden of establishing that the disputed conduct infringes on his or her sincerely held religious beliefs.... [T]he burden then shifts to the defendant to identify a legitimate penological purpose justifying the decision ... [and i]n the event such a[n] interest is articulated, its reasonableness is then subject to analysis under ... *Turner ....*

*Johnson,* 2007 WL 3046703 at * 4-5 (citations omitted).

In this case, Abdul-Matiyn has articulated a First Amendment violation as the State defendants did not provide him with his halal meals during his confinement in CNYPC. There is no dispute at this stage that Abdul-Matiyn held genuine religious beliefs. The State defendants at this stage assert only that Abdul-Matiyn's claim was conclusory. Therefore, the State defendants' motion must be denied because the allegations of the complaint suffice to state a claim.

Therefore, the State defendants' motion on this ground should be denied.

### b. Refusal to Allow Prayer

"A determination of whether the refusal to permit attendance at a religious service [vioolates the First Amendment] hinges upon the balancing of an inmate's First Amendment free exercise right[ ] against institutional needs of ... operating prison facilities ...." *Johnson,* 2007 WL 3046703, at *4. "The governing standard is one of reasonableness, taking into account whether the particular regulation affecting some constitutional right asserted by a prisoner is reasonably related to legitimate penological interests." *Benjamin v. Coughlin,* 905 F.2d 571, 574 (2d Cir.1990) (citations omitted).

In this case, Abdul-Matiyn appears to have asserted a First Amendment violation when the State defendants removed

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2008 WL 974409 (N.D.N.Y.)
(Cite as: 2008 WL 974409 (N.D.N.Y.))

his religious texts and refused to permit him to pray. Compl. at 19. Abdul-Matiyn specifically references defendant Capolo, alleging that "he refuse[d] to allow [Abdul-Matiyn] to go and perform his prayers ...." *Id.* at 27. The State defendants contend that Capolo's oral refusals constituted nothing more than verbal harassment, which "alone, unaccompanied by an injury no matter how inappropriate, unprofessional, or reprehensible .., does not constitute the violation of any federally protected right and therefore is not actionable under 42 U. S.C. § 1983." *Murray,* 2007 WL 956941, at *8.

However, the State defendants are incorrect in asserting that Capolo's alleged oral denials amounted only to verbal harassment and were insufficient to state a First Amendment violation. Capolo's alleged continuous refusals to provide Abdul-Matiyn with his religious texts or permit him time and space to pray were at least arguably unreasonable in light of the fact that at this stage, the State defendants have not proffered a legitimate penological interest which justified denial of the provision of a book and time for prayer. Thus, Abdul-Matiyn has alleged here a violation with a potential basis for relief.

**\*13** Therefore, the State defendants motion on this ground should be denied.

### ii. Access to Courts

Abdul-Matiyn contends that while confined, he was denied access to a law library and was thus denied his First Amendment right of access to the courts. The State defendants assert that Abdul-Matiyn alleges only a conclusory claim here.

The Supreme Court has held "that the fundamental constitutional right of access to the courts requires prison authorities to assist inmates in the preparation and filing of meaningful legal papers by providing prisoners with adequate law libraries ...." *Bounds v. Smith,* 430 U.S. 817, 828 (1977); *see also Lewis v. Casey,* 518 U.S. 343, 351 (1996). This right is not unlimited and "an inmate cannot establish relevant actual injury simply by establishing that his prison's law library or legal assistance program is subpar in some theoretical sense." *Lewis,* 518 U.S. at 531.

"[I]n order to fulfill the actual injury requirement ... on a law library claim where there is a lack of access to the courts, the inmate must be pursuing [*inter alia* ] ... a civil rights claim pursuant to § 1983 to vindicate basic constitutional rights." *Linares v. Mahunik,* No. 05-CV-625 (GLS/RFT), 2006 WL 2595200, at *7 (N.D.N.Y. Sept. 11, 2006) (citations and internal quotations omitted). Thus, "to prove an actual injury, a plaintiff must show that a non-frivolous legal claim was frustrated or impeded due to the actions of prison officials." *Id.* (citations omitted).

In this case, Abdul-Matiyn enjoyed the right to a law library. Construing his allegations in the light most favorable to Abdul-Matiyn, this right was violated when the State defendants denied him access to one. Compl. at 20. However, Abdul-Matiyn does not allege that he suffered any injury due to this alleged deprivation. even when viewing all of Abdul-Matiyn's submissions together, he makes only that his lack of access to a law library precluded him from "drafting papers for court." Docket No. 48 at § 47. Additionally, Abdul-Matiyn claims that this preclusion from drafting papers provided defendants with their grounds for dismissal based on non-compliance with pleading requirements. *Id.*

However, this conclusory allegation is insufficient to provide a basis for relief. AbdulMatiyn alleges no case then pending which was adversely affected in any way. In this case, defendants' motions to dismiss based on the failure to comply with the pleading requirements were rejected. Moreover, Abdul-Matiyn gives no other indication of what drafts he intended to submit to the Court.

Therefore, the State defendants' motion to dismiss on this ground should be granted.

### 4. Conspiracy

Johnson assert that Abdul-Matiyn has failed to state a cause of action against him. Abdul-Matiyn contends that Johnson participated in the conspiracy to have him civilly detained and that he has a right "to be free from conspiracies to deprive him of his constitutional rights."

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2008 WL 974409 (N.D.N.Y.)
(Cite as: 2008 WL 974409 (N.D.N.Y.))

Docket No. 48 at ¶¶ 13-14.

**\*14** "Section 1985 prohibits conspiracies to interfere with civil rights." *Davila v. Secure Pharmacy Plus,* 329 F.Supp.2d 311, 316 (D.Conn.2004). To state a claim for relief under § 1985(3), a plaintiff must show:

(1) a conspiracy; (2) for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; and (3) an act in furtherance of the conspiracy; (4) whereby a person is either injured in his person or property or deprived of any right of a citizen of the United States.

*United Bhd. of Carpenters & Joiners of Am., Local 610 v. Scott,* 463 U.S. 825, 828-29 (1983); *see also Iqbal v. Hasty,* 490 F.3d 143, 176 (2d Cir.2007). "In addition, the conspiracy must be motivated by some class-based animus." *Iqbal,* 490 F.3d at 176 (citations omitted).

Here, Abdul-Matiyn alleges that Johnson joined with others to deprive Abdul-Matiyn of his rights. Liberally construing those allegations, the concert of actions by Johnson and others could support a claim of agreement among Johnson and other defendants and acts in furtherance of the conspiracy. This suffices to support a claim for conspiracy against Johnson and Johnson's motion on this ground should be denied.

However, liberally construing Abdul-Matiyn's claims, he has asserted an action for negligent failure to prevent the deprivation of his rights. If Johnson "ha [d] knowledge that any of the wrongs ... mentioned in section 1985 ... [we]re about to be committed, and ha[d] power to prevent or aid in preventing the commission of the same, [and] neglect[ed] or refuse[d] so to do ... [he] shall be liable to the party injured." 42 U.S.C. § 1986. However, "[a] claim under section 1986 ... lies only if there is a viable conspiracy claim under section 1985." *Gagliardi v. Vill. of Pawling,* 18 F.3d 188, 194 (2d Cir.1994).

Therefore, Johnson's motion to dismiss on this ground

should be granted in part and denied in part.

**F. Eleventh Amendment**

The Eleventh Amendment provides that "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. Const. amend. XI. "[D]espite the limited terms of the Eleventh Amendment, a federal court [cannot] entertain a suit brought by a citizen against his [or her] own State ." *Pennhurst State Sch. & Hosp. v. Halderman,* 465 U.S. 89, 98 (1984) (citing *Hans v. Louisiana,* 134 U.S. 1, 21 (1890)). Regardless of the nature of the relief sought, in the absence of the State's consent, a suit against the State or one of its agencies or departments is proscribed by the Eleventh Amendment. *Halderman,* 465 U.S. at 100.

"[T]he Central New York Psychiatric Center[,] ... [as an institution, is an] arm[ ] of the state for Eleventh Amendment purposes and ... therefore, [is] absolutely immune from [P]laintiff's claims for monetary damages in this lawsuit." *Murray v. Pataki,* No. 03-CV-1263 (LEK/RFT), 2007 WL 956941, at *12 (N.D.N.Y. Mar. 29, 2007) (citations omitted). Therefore, the motion of defendant CNYPC Medical Staff on this ground should be granted.

**III. Conclusion**

**\*15** For the reasons stated above, it is hereby **RECOMMENDED** that:

A. The motion of Walsh and Johnson to sever (Docket No. 17) be **DENIED;**

B. The motion of Walsh and Johnson to dismiss (Docket No. 17) be:

1. **GRANTED** as to Abdul-Matiyan's conspiracy claim

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2008 WL 974409 (N.D.N.Y.)
(Cite as: 2008 WL 974409 (N.D.N.Y.))

against defendant Johnson for failure to intervene; and

2. **DENIED** in all other respects;

C. The State defendants' motion to dismiss (Docket Nos. 44, 47) be:

1. **GRANTED** in all respects as to defendant Sawyer;

2. **GRANTED** in all respects as to Abdul-Matiyan's claim for denial of access to the courts; and

3. **DENIED** in all other respects;

D. The City defendants motion to dismiss (Docket No. 46) be **DENIED** in all respects;

E. The motion of defendant CNYPC Medical Staff to dismiss (Docket No. 55) be **GRANTED;** and

F. The complaint be **DISMISSED** without prejudice as to defendants George Pataki, Michelle Payne, and John Does I-IV.

Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993); *Small v. Sec'y of HHS,* 892 F.2d 15 (2d Cir.1989); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a), 6(e).

N.D.N.Y.,2008.
Abdul-Matiyn v. Pataki
Slip Copy, 2008 WL 974409 (N.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 2007 WL 4115936 (S.D.N.Y.)
(Cite as: 2007 WL 4115936 (S.D.N.Y.))

H

Only the Westlaw citation is currently available.

United States District Court,
S.D. New York.
MENTAL HYGIENE LEGAL SERVICE and Shawn
Short, Plaintiffs,
v.
Elliot SPITZER, Andrew Cuomo, Michael Hogan,
Diana Jones Ritter, and Brian Fischer, Defendants.
**No. 07 Civ. 2935(GEL).**

Nov. 16, 2007.

Sadie Zea Ishee, New York, NY, and Dennis Bruce Feld,
Mineola, NY, for plaintiff Mental Hygiene Legal Service.

Hollie S. Levine, Binghamton, NY, for plaintiff Shawn
Short.

Edward J. Curtis, Jr., and Bruce B. McHale, Assistant
Attorneys General, New York, NY, for defendants.

**OPINION AND ORDER**

GERARD E. LYNCH, District Judge.

**\*1** On March 14, 2007, Governor Spitzer signed the Sex
Offender Management and Treatment Act, which became
effective on April 13, 2007, in part as Article 10 of the
New York Mental Hygiene Law ("MHL"), creating a new
legal regime for "Sex Offenders Requiring Civil
Commitment or Supervision." As part of the Act, the New
York Legislature found that "recidivistic sex offenders
pose a danger to society that should be addressed through
comprehensive programs of treatment and management,"
MHL § 10.01(a), and that some "sex offenders have
mental abnormalities that predispose them to engage in

repeated sex offenses," MHL § 10.01(b). The Legislature
concluded that such offenders

> should receive ... treatment while they are incarcerated
> as a result of the criminal process, and should continue
> to receive treatment when that incarceration comes to an
> end. In extreme cases, confinement of the most
> dangerous offenders will need to be extended by civil
> process in order to provide them such treatment and to
> protect the public from their recidivist conduct.

*Id.*

On April 12, 2007, Plaintiff Mental Hygiene Legal
Service ("MHLS") filed a declaratory judgment action
attacking the constitutionality of certain provisions of the
Act, and subsequently moved for preliminary injunctive
relief and a temporary restraining order. Subsequently,
Shawn Short, an individual subject to various provisions
of the law, intervened in the matter and joined MHLS's
motions. Plaintiffs do not attack the substantive
constitutionality of the statutory provision for civil
commitment. Rather, their motion focuses narrowly on
particular procedural provisions of the Act, contending
that specific aspects of the regime it creates fail to provide
the requisite procedural safeguards necessary to comport
with the constitutional command that persons may not be
deprived of liberty without due process of law. Plaintiffs
also contend that certain aspects of the statutory regime
deny the individuals subject to those provisions the equal
protection of laws guaranteed by the Constitution.
Together, the plaintiffs challenge:

(A) MHL § 10.06(f), which authorizes the New York
Attorney General to issue a "securing petition" to detain
certain individuals beyond the completion of their term
of imprisonment, in advance of the probable cause
hearing, without notice or opportunity for review;

(B) MHL § 10.06(k), which mandates involuntary civil
detention pending the commitment trial, based on a
finding at the probable cause hearing that the individual
may have a mental abnormality, without a finding of

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 4115936 (S.D.N.Y.)
(Cite as: 2007 WL 4115936 (S.D.N.Y.))

current dangerousness;

(C) MHL § 10.06(j)(iii), which forbids an individual indicted for a crime but found incompetent to stand trial to contest the commission of the acts that constituted the crime at the probable cause hearing;

(D) MHL § 10.07(d), which authorizes civil commitment for persons found incompetent to stand trial and never convicted of any offense based on a showing by clear and convincing evidence that they committed the sexual offense with which they were charged;

**\*2** (E) MHL § 10.07(c), which authorizes the factfinder at the commitment trial to make a retroactive determination by clear and convincing evidence that certain non-sex crimes were committed with a "sexual[ ] motivat [ion];"

(F) MHL § 10.05(e), which authorizes certain pre-hearing psychiatric examinations, in the absence of counsel, of individuals subject to the Act. [FN1]

> **FN1.** At oral argument, plaintiffs withdrew their application for preliminary injunctive relief with respect to a seventh provision, MHL § 33.13(c)(9)(vii), which permits the release of confidential clinical and medical records of certain individuals subject to the act under certain specified circumstances. (Tr. 5).

Oral argument was heard on September 14, 2007.

For the reasons discussed below, plaintiffs have demonstrated irreparable injury as well as a likelihood of success in demonstrating that § 10.06(k) is unconstitutional insofar as it permits civil detention pending trial without an individualized finding of current dangerousness and that § 10.07(d) is unconstitutional insofar as it allows detention of individuals after the commitment trial absent a finding beyond a reasonable doubt that such individuals committed the acts which

constituted the crime for which they had been charged. Defendants' motion to dismiss these portions of plaintiffs' complaint will therefore be denied. Plaintiffs have failed to make a showing sufficient for a preliminary injunction against the restrictions on contesting certain past events at the probable cause hearing as provided for in § 10.06(j)(iii). Defendants' motion to dismiss that portion of plaintiffs' facial attack against this provision will be granted. Both plaintiffs' motion for a preliminary injunction and defendants' motion to dismiss regarding challenges to the securing petition procedures, as provided for in § 10.06(f), the retroactive determination of the "sexual motivation" of a past crime, as provided for in § 10.07(c), and the failure to appoint counsel in advance of certain pre-hearing psychiatric exams, as provided for in § 10.05(e), will be denied.

## DISCUSSION

I. Article Ten of the MHL

Provisions of the Act are triggered when a "person who may be a detained sex offender" is nearing an anticipated release" from confinement or parole. MHL § 10.05(b). [FN2] A "[d]etained sex offender" is (for the most part) a person "in the care, custody, control, or supervision of an agency with jurisdiction," as a result of having been adjudicated to have committed certain sex offenses or certain designated felonies meeting a "sexual[ ] motivat[ion]." MHL § 10.03(g). [FN3] As such a person nears release, a case review team ("CRT") of three individuals, at least two of whom must be mental health professionals meeting certain statutory requirements, MHL § 10.05(a), are to determine whether the person is a "sex offender requiring civil management." MHL § 10.06(a).

> **FN2.** "Release" is defined to include "release, conditional release or discharge from confinement, from supervision by the division of parole, or from an order of observation, commitment, recommitment or retention." MHL § 10.03(m).

> **FN3.** The complete definition of "detained sex offender" is:

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 4115936 (S.D.N.Y.)
(Cite as: 2007 WL 4115936 (S.D.N.Y.))

a person who is in the care, custody, control, or supervision of an agency with jurisdiction, with respect to a sex offense or designated felony, in that the person is either: (1) A person who stands convicted of a sex offense as defined in subdivision (p) of this section, and is currently serving a sentence for, or subject to supervision by the division of parole, whether on parole or on post-release supervision, for such offense or for a related offense; (2) A person charged with a sex offense who has been determined to be an incapacitated person with respect to that offense and has been committed pursuant to article seven hundred thirty of the criminal procedure law, but did engage in the conduct constituting such offense; (3) A person charged with a sex offense who has been found not responsible by reason of mental disease or defect for the commission of that offense; (4) A person who stands convicted of a designated felony that was sexually motivated and committed prior to the effective date of this article; (5) A person convicted of a sex offense who is, or was at any time after September first, two thousand five, a patient in a hospital operated by the office of mental health, and who was admitted directly to such facility pursuant to article nine of this title or section four hundred two of the correction law upon release or conditional release from a correctional facility, provided that the provisions of this article shall not be deemed to shorten or lengthen the time for which such person may be held pursuant to such article or section respectively; or (6) A person who has been determined to be a sex offender requiring civil management pursuant to this article.

MHL § 10.03(g).

As defined by the Act, a "[s]ex offender requiring civil management" is a "detained sex offender who suffers from a mental abnormality," who is either "a dangerous sex offender requiring confinement" or "a sex offender requiring strict and intensive supervision." MHL §

10.03(q). A "[d]angerous sex offender requiring confinement" is a "detained sex offender suffering from a mental abnormality involving such a strong predisposition to commit sex offenses, and such an inability to control behavior, that the person is likely to be a danger to others and to commit sex offenses if not confined to a secure treatment facility." MHL § 10 .03(e). A "[s]ex offender[ ] requiring strict and intensive supervision" is a "detained sex offender who suffers from a mental abnormality but is not a dangerous sex offender requiring confinement." MHL § 10.03(r). A mental abnormality is defined to be a "congenital or acquired condition, disease or disorder that affects the emotional, cognitive, or volitional capacity of a person in a manner that predisposes him or her to the commission of conduct constituting a sex offense and that results in that person having serious difficulty in controlling such conduct." MHL § 10.03(i).

**\*3** If the CRT finds the offender to require civil management, then the Attorney General may file a "sex offender civil management petition" in New York State court. MHL § 10.06(a). Within 30 days after the petition is filed, the court "shall conduct a hearing to determine whether there is probable cause to believe that the respondent is a sex offender requiring civil management." MHL § 10 .06(g). At the conclusion of the probable cause hearing as described in § 10.06(g), the court "shall determine whether there is probable cause to believe that the respondent is a sex offender requiring civil management." MHL § 10.06(k). If the court so determines, it "shall order the respondent ... committed to a secure treatment facility ... [and] the respondent shall not be released pending the completion of [the] trial [contemplated in MHL § 10.07]." MHL § 10.06(k).

Under § 10.07, at the commitment trial, which is supposed to begin within 60 days of the probable cause determination, the jury (or judge if the right to a jury trial is waived) determines by clear and convincing evidence "whether the respondent is a detained sex offender who suffers from a mental abnormality." MHL §§ 10.07(a), (d). If such a determination is made, then the judge "shall consider whether the respondent is a dangerous sex offender requiring confinement or a sex offender requiring strict and intensive supervision." MHL § 10.07(f). If at the commitment hearing the court finds:

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 4115936 (S.D.N.Y.)
(Cite as: 2007 WL 4115936 (S.D.N.Y.))

by clear and convincing evidence that the respondent has a mental abnormality involving such a strong predisposition to commit sex offenses, and such an inability to control behavior, that the respondent is likely to be a danger to others and to commit sex offenses if not confined to a secure treatment facility, then the court shall find the respondent to be a dangerous sex offender requiring confinement.

MHL § 10.07(f). Upon such a finding, the respondent "shall be committed to a secure treatment facility ... until such time as he or she no longer requires confinement." *Id.* Once committed, the individual shall have a yearly psychiatric exam, and a right to be examined by an independent examiner. MHL § 10.09(b). In certain circumstances, the detained individual has a right to petition the court for an evidentiary hearing, and detention will continue only if the Attorney General can demonstrate by clear and convincing evidence that the respondent is still a dangerous sex offender requiring confinement. MHL § 10.09(h). While committed, sex offenders shall be kept in "secure treatment facilit[ies]," MHL § 10.06(k)(i), segregated from those who are not "sex offenders." MHL § 10.10(e). If the court grants a subsequent hearing based on the detainee's petition and finds that the detained individual suffers from a mental abnormality, but is no longer a dangerous sex offender, then the court will discharge the individual from custody but order a regimen of strict and intensive supervision and treatment. MHL § 10.09(h).

**\*4** If the judge does not find that the respondent is a dangerous sex offender requiring confinement, "then the court shall make a finding of disposition that the respondent is a sex offender requiring strict and intensive supervision, and the respondent shall be subject to a regimen of strict and intensive supervision and treatment." MHL § 10.07(f).[FN4] In making such a finding, the court shall consider "the conditions that would be imposed upon the respondent if subject to a regimen of strict and intensive supervision, and all available information about the prospects for the respondent's possible reentry into the community." *Id.* An individual may petition every two years for modification or termination of the strict and intensive supervision. MHL § 10.11(f). Upon receipt of a petition for termination, the court may, in its discretion, hold a hearing where the Attorney General must show by clear and convincing evidence that the individual is still a

sex offender in need of civil management. MHL § 10.11(h).

FN4. The statute allows the mental abnormality issue to be relitigated after two years of strict and intensive supervision, MHL § 10.11(f), and if a court agrees to hear a petition for discharge by an individual adjudicated to be a dangerous sex offender requiring civil confinement. MHL § 10.09(h).

II. Legal Standards

A. Preliminary Injunction

To obtain a preliminary injunction the moving party must show irreparable injury and either (i) likelihood of success on the merits or (ii) sufficiently serious questions going to the merits and a balance of hardships decidedly tipped in the movant's favor. *Green Party of New York State v. New York State Bd. of Elections,* 389 F.3d 411, 418 (2d Cir.2004); *Tom Doherty Associates, Inc. v. Saban Entertainment, Inc.,* 60 F.3d 27, 33 (2d Cir.1995); *Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc.,* 596 F .2d 70, 72 (2d Cir.1979) (per curiam).

B. Procedural Due Process

Procedural due process claims are to be examined in "two steps: the first asks whether there exists a liberty or property interest which has been interfered with by the State ... [and] the second examines whether the procedures attendant upon that deprivation were constitutionally sufficient." *Kentucky Dep't of Corrections v. Thompson,* 490 U.S. 454, 460 (1989) (citations omitted). Whether a deprivation affects a liberty or property interest can be a difficult question. In this case, however, there is no question. Persons affected by Article 10 are threatened with deprivation not merely of *a* liberty interest, but of liberty *tout court,* as the Act contemplates that those found within its scope may be confined against their will.

If a protected liberty interest is implicated by state action,

Not Reported in F.Supp.2d, 2007 WL 4115936 (S.D.N.Y.)
(Cite as: 2007 WL 4115936 (S.D.N.Y.))

then the Court must determine what process is due. Due process is not a fixed concept, but flexible, and depends on the particular circumstances. *Zinermon v. Burch,* 494 U.S. 113, 127 (1990). The extent of process due is analyzed under the framework established by *Mathews v. Eldridge:*

[I]dentification of the specific dictates of due process generally requires consideration of three distinct factors: First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

*5 424 U.S. 319, 335 (1976). When a person's liberty interests are implicated, due process requires at a minimum notice and an opportunity to be heard. *Hamdi v. Rumsfeld,* 542 U.S. 507, 533 (2004) (plurality opinion) (The "central meaning of procedural due process" is that parties "whose rights are to be affected are entitled to be heard; and in order that they may enjoy that right they must first be notified. It is equally fundamental that the right to notice and an opportunity to be heard must be granted at a meaningful time and in a meaningful manner.") (citations and internal quotation marks omitted); *Armstrong v. Manzo,* 380 U.S. 545, 552 (1965); see also *United States v. James Daniel Good Real Property,* 510 U.S. 43, 53 (1993); *Wisconsin v. Constantineau,* 400 U.S. 433, 437 (1971).

Though the *Mathews v. Eldridge* analysis requires an evaluation of each challenged statutory provision or instance of government deprivation, certain general comments are appropriate. The personal interests implicated by Article 10 are fundamental human interests, including (i) liberty per se, which may be lost to involuntary commitment or strict probation-like conditions which must be complied with on pain of involuntary commitment; [FN5] (ii) involuntary psychiatric or behavior modification medication or other treatment; [FN6] and (iii) the lifelong stigma attached to the label of sex offender that may adversely affect an individual's ability to live and

work. [FN7] An erroneous deprivation due to inadequate procedures in this context will likely lead to, at a minimum, substantial stigma and mandated strict supervision. The governmental interests involved are also serious. Individuals who are mentally ill and dangerous, and prone to the commission of sexual offenses, pose serious risks to our communities. New York thus has a strong interest in ensuring the safety of potential victims of such offenses.

FN5. "In our society liberty is the norm, and detention prior to trial or without trial is the carefully limited exception." *United States v. Salerno,* 481 U.S. 739, 755 (1987). "[A]n unchecked system of detention carries the potential to become a means for oppression and abuse." *Hamdi v. Rumsfeld,* 542 U.S. 507, 530 (2004) (plurality opinion). *See also Vitek v. Jones,* 445 U.S. 480, 492 (1980) (" '[A]mong the historic liberties' protected by the Due Process Clause is the 'right to be free from, and to obtain judicial relief for, unjustified intrusions on personal security.' "), quoting *Ingraham v. Wright,* 430 U.S. 651, 673 (1977). "[I]nvoluntary commitment to a mental hospital, like involuntary commitment of an individual for any reason, is a deprivation of liberty which the State cannot accomplish without due process of law." *O'Connor v. Donaldson,* 422 U.S. 563, 580 (1975) (Burger, C.J., concurring), citing *Specht v. Patterson,* 386 U.S. 605, 608 (1967), and *In re Gault,* 387 U.S. 1, 12-13 (1967). *See also Vitek,* 445 U.S. at 491 ("[F]or the ordinary citizen, commitment to a mental hospital produces a massive curtailment of liberty ... [and] in consequence requires due process protection.") (citations and internal quotation marks omitted); *see also Project Release v. Prevost,* 722 F.2d 960, 971 (2d Cir.1983).

FN6. One has a liberty interest against "[c]ompelled treatment in the form of mandatory behavior modification programs" absent adequate justification. *Vitek,* 445 U.S. at 492. *See also Mills v. Rogers,* 457 U.S. 291, 299 n. 16 (1975) (assuming without deciding "that involuntarily committed mental patients do retain liberty interests protected directly by the

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 4115936 (S.D.N.Y.)
(Cite as: 2007 WL 4115936 (S.D.N.Y.))

Constitution ... and that these interests are implicated by the involuntary administration of antipsychotic drugs") (citations omitted); *Project Release v. Prevost,* 722 F.2d 960, 979 (2d Cir.1983) ("Although *Mills* did not definitively resolve the question of whether a liberty interest in refusing antipsychotic medication exists as a federal constitutional matter, the case appears to indicate that there is such an interest."); *id.* ("[I]t appears that New York State recognizes the right" to refuse antipsychotic medication).

FN7. Due process is implicated not only when an individual's physical liberty is impaired, but also "[w]here a persons's good name, reputation, honor, or integrity is at stake because of what the government is doing to him." *Wisconsin v. Constantineau,* 400 U.S. 433, 437 (1971). Harm to "reputation alone ... is [not] 'liberty' ... by itself sufficient to invoke the procedural protection of the Due Process Clause." *Paul v. Davis,* 424 U.S. 693, 701 (1976). The Second Circuit has required some additional impediment beyond harm to reputation alone to establish a constitutional deprivation. *See, e.g., Valmonte v. Bane,* 18 F.3d 992, 999 (2d Cir.1994); *Neu v. Corcoran,* 869 F.2d 662, 667 (2d Cir.1989). The liberty interests implicated by involuntary civil commitment based on mental illness include "adverse social consequences to the individual ... [and] [w]hether we label this phenomena 'stigma' or choose to call it something else ... we recognize that it can occur and that it can have a very significant impact on the individual." *Vitek,* 445 U.S. at 492, citing *Addington v. Texas,* 441 U.S. 418, 425-26 (1979); *Neal v. Shimoda,* 131 F.3d 818, 829 (9th Cir.1997) ("We can hardly conceive of a state's action bearing more 'stigmatizing consequences' than the labeling of a prison inmate as a sex offender ."). *See also Doe v. Pataki,* 3 F.Supp.2d 456, 469 (S.D.N.Y.1998).

C. Involuntary Detention of Persons With Mental Illness

The Constitution does not guarantee an "absolute right in each person to be, at all times and in all circumstances,

wholly free from restraint. There are manifold restraints to which every person is necessarily subject for the common good. On any other basis organized society could not exist with safety to its members." *Kansas v. Hendricks,* 521 U.S. 346, 356-57 (1997) (citations and internal quotation marks omitted). Civil commitment is appropriate in certain circumstances, but it "must be justified on the basis of a legitimate state interest, and the reasons for committing a particular individual must be established in an appropriate proceeding. Equally important, confinement must cease when those reasons no longer exist." *O'Connor,* 422 U.S. at 580 (Burger, C .J., concurring), citing *McNeil v. Director, Patuxent Inst.,* 407 U.S. 245, 249-50 (1972) and *Jackson v. Indiana,* 406 U.S. 715, 738 (1972). States have, in "certain narrow circumstances," provided for "forcible civil detainment of people who ... pose a danger to the public," and the Supreme Court has

**\*6** consistently upheld ... involuntary commitment statutes when (1) the confinement takes place pursuant to proper procedures and evidentiary standards, (2) there is a finding of dangerousness either to one's self or others, and (3) proof of dangerousness is coupled ... with the proof of some additional factor, such as a 'mental illness' or 'mental abnormality.'

*Kansas v. Crane,* 534 U.S. 407, 409-10 (2002), citing *Hendricks,* 521 U.S. at 357-58 (internal quotation marks omitted). "[E]ven if ... involuntary confinement [is] initially permissible [and founded upon a constitutionally adequate basis], it [can] not constitutionally continue after that basis no longer exist[s]." *O'Connor,* 422 U.S. at 575 (citation omitted); see also *Foucha v. Louisiana,* 504 U.S. 71, 78 (1992) ("[K]eeping [someone] against his will in a mental institution is improper absent a determination in civil commitment proceedings of current mental illness and dangerousness.").

FN8. These constitutional concerns were reflected in the Kansas civil commitment statute at issue in *Hendricks* and *Crane,* where "[i]f, at any time, the confined person is adjudged 'safe at large,' he is statutorily entitled to immediate release." *Hendricks,* 521 U.S. at 364. The Kansas statute "permit[s] immediate release upon a showing that the individual is no longer dangerous or mentally impaired." *Id.* at 368-69.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 4115936 (S.D.N.Y.)
(Cite as: 2007 WL 4115936 (S.D.N.Y.))

The substantive standards governing involuntary civil detention are well established: "A finding of 'mental illness' alone cannot justify a State's locking up a person against his will and keeping him indefinitely in simple custodial confinement." *O'Connor,* 422 U.S. at 575. "Mere public intolerance or animosity cannot constitutionally justify the deprivation of a person's physical liberty." *Id.* (citations omitted). Involuntary civil confinement "may entail indefinite confinement, [which] could be a more intrusive exercise of state power than incarceration following a criminal conviction." *Project Release v. Prevost,* 722 F.2d 960, 971 (2d Cir.1983). Though "involuntary civil commitment constitutes a significant deprivation that requires due process protection, ... the difference between civil and criminal confinement may nonetheless be reflected in different standards and procedures applicable in the context of each of the two systems-so long as due process is satisfied." *Id.* (citations and internal quotation marks omitted). In the case of civil confinement, "due process requires that the nature and duration of commitment bear some reasonable relation to the purpose for which the individual is committed." *Jackson,* 406 U.S. at 738. However, "due process does not tolerate the involuntary confinement of a nondangerous individual." *Project Release,* 722 F.2d at 972 (citations and internal quotation marks omitted).

III. The Challenged Provisions

Plaintiffs do not challenge New York's authority to involuntarily commit individuals who have in the past committed sexual crimes and are at present mentally ill and dangerous. Nor can they, because the Supreme Court has held that such detention is constitutionally authorized. See *Hendricks,* 521 U.S. at 356, 369-71 (holding that confinement of sex offenders based on proof of mental abnormality and a finding of dangerousness does not violate substantive due process, and rejecting claims that sexual offender detention provisions violate the Double Jeopardy Clause or constitute impermissible ex post facto lawmaking). Plaintiffs' challenges therefore leave untouched the central provisions of the new statutory scheme, which authorize detention based on a finding that an individual who (i) has committed a sex crime (or the acts which constitute the crime) and (ii) is mentally ill and dangerous may be involuntarily committed. Plaintiffs

object, however, to some provisions of the statute that they claim permit an offender to be detained on an inadequate showing of these factors. Five of their six challenges to the statute relate to this basic concern. Their sixth challenge relates to the timing of the appointment of counsel.

A. MHL § 10.06(f)

**\*7** Article 10 authorizes detention both after the probable cause hearing and after the commitment hearing. However, Article 10 also authorizes detention of a potential sexual offender even *before* the probable cause hearing, and in advance of any judicial hearing, solely on the basis of an executive order of detention, and plaintiffs challenge the constitutionality of these pre-hearing detention provisions.

When an individual subject to the Act may be released from incarceration or parole before the CRT is able to make a determination as to whether the individual may be a sex offender in need of civil management, the Attorney General, if she "determines that the protection of public safety so requires," may file a "securing petition." MHL § 10.06(f).[FN9] The filing of such a "securing petition" in and of itself requires that the individual shall be (or remain) detained and "there shall be no probable cause hearing until such time as the case review team may find that the respondent is a sex offender requiring civil management." *Id.*[FN10]

FN9. The statute incorporates certain time-lines anticipating that the evaluation of the individual will be completed before an individual is scheduled for release. *See, e.g.,* MHL § 10.05(b) (agencies shall give notice to the Attorney General and Commissioner of Mental Health 120 days prior to an individual's release); MHL § 10.05(g) (if the CRT determines that the individual is a sex offender requiring civil management, it shall give notice of this fact to the Attorney General and the respondent within 45 days of the Commissioner of Mental Health's receipt of the notice of the individual's release); MHL § 10.06(a) (Attorney General shall seek to file the sex offender civil management petition with the court within 30 days after receiving the

Not Reported in F.Supp.2d, 2007 WL 4115936 (S.D.N.Y.)
(Cite as: 2007 WL 4115936 (S.D.N.Y.))

case review team's finding). However, as certain of the provisions explicitly note, *see, e.g.,* MHL §§ 10.05(g), 10.06(a), and the statute more generally provides, these deadlines are almost always aspirational, and the failure to meet these deadlines "shall not invalidate later agency action except as explicitly provided by the provision in question." MHL § 10.08(f). Thus, Article 10 anticipates that some individuals may be scheduled for release before the CRT can complete its work and the normal judicial process is instituted.

FN10. The full text of the provision states:

Notwithstanding any other provision of this article, if it appears that the respondent may be released prior to the time the case review team makes a determination, and the attorney general determines that the protection of public safety so requires, the attorney general may file a securing petition at any time after receipt of written notice pursuant to subdivision (b) of section 10.05 of this article. In such circumstance, there shall be no probable cause hearing until such time as the case review team may find that the respondent is a sex offender requiring civil management. If the case review team determines that the respondent is not a sex offender requiring civil management, the attorney general shall so advise the court and the securing petition shall be dismissed.

MHL § 10.06(f).

Plaintiffs contend that these provisions violate the most basic tenets of due process: notice to the individual and an opportunity to challenge the continued detention. (MHLS Mot. 5-7.) Defendants contend that plaintiffs' concerns are overblown, and that their criticisms take the statute out of context. (D.Opp.8-10.) They insist that the securing petition provision actually "protects rather than injures the respondent" because it ensures that a judge can only determine whether an individual has a "mental abnormality" with the benefit of technical clinical evidence provided by the CRT evaluation. (*Id.* at 8.) Defendants also suggest that "the securing provisions come into play only after notice" and only in situations where "the protection of public safety so requires." (*Id.* at 10.)

On these points, defendants' arguments are unpersuasive. It is true that some form of "notice" must be given in advance of a securing petition; however, it is not notice given *to* the individual subject to the petition, and it is not notice *regarding* the potential detention by securing petition. The statute anticipates that the agency that has jurisdiction over a person who may be a detained sex offender nearing release will give notice to the Attorney General and the Commissioner of Mental Health within 120 days before such a person's release. MHL § 10.05(b). The Attorney General is authorized to issue a securing petition "at any time after receipt of written notice" pursuant to § 10.05(b), regardless of whether the Commissioner of Mental Health has received such notice. MHL § 10.06(f). Whatever notice might in due course be given to a respondent about Article 10's potential applicability to him in advance of the filing of a securing petition,[FN11] the statute unquestionably does not require that anyone give notice to the respondent, in advance of the detention, that he will be detained by a securing petition. Moreover, the statute gives an individual no opportunity to contest the petition, and thus his detention, in advance of its issuance. In addition, individuals subject to securing petitions would not necessarily have state-appointed counsel to assist them in determining how to respond to a securing petition. MHL § 10.06(c) (appointment of counsel is triggered by the filing of a sex offender civil management petition or the request by the attorney general for a court-ordered psychiatric examination, not the filing of a securing petition).

FN11. *See, e.g.,* MHL § 10.05(e) ("If the person is referred to a case review team for evaluation, notice of referral shall be provided to the respondent.").

**\*8** Defendants also contend that any deprivation of liberty will be modest, because the statute requires a probable cause hearing to be held within 72 hours of the filing of the securing petition. (D. Opp. at 8). However, this is not strictly accurate. Though the probable cause hearing is

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 4115936 (S.D.N.Y.)
(Cite as: 2007 WL 4115936 (S.D.N.Y.))

initially scheduled to be held within 72 hours of the filing of a securing petition, the probable cause hearing may be delayed due to (i) delay caused or consented to by the individual, or (ii) a showing by the Attorney General, to the satisfaction of the court, of "good cause why the hearing could not ... commence." MHL § 10.06(h). Moreover, the statute provides that in the event of the filing of a securing petition, "there shall be no probable cause hearing until such time as the case review team may find that the respondent is a sex offender requiring civil management." MHL § 10.06(f). Thus, the confinement occasioned by the securing petition could extend well beyond 72 hours.

The Second Circuit has upheld against constitutional challenge brief detentions of less than 72 hours in certain situations involving persons who may be mentally ill and dangerous to themselves or others. Project Release, 722 F.2d at 966, upheld a statutory provision authorizing involuntary detention for 72 hours of a previously voluntary admittee to a mental hospital who gave notice of his desire to leave, so as to give the hospital administrator sufficient time to determine whether the individual should be converted from voluntary to involuntary commitment. Charles W. v. Maul authorized detention for less than 72 hours in a New York State psychiatric center of an individual adjudicated incompetent to stand trial on a misdemeanor charge, in order to "evaluate whether he presented a danger to himself or others warranting invocation of New York's civil commitment law." 214 F.3d 350, 353 (2d Cir.2000).

The situation surrounding the detentions authorized here appears different from those involved in Project Release or Maul. First, the nature of the dilemma faced by New York is different. Both Project Release and Maul involved situations where the release of the potentially dangerous or ill person was necessarily unpredictable. A hospital director does not know that a voluntary admittee who wishes to leave until the admittee gives the director notice of those wishes. Similarly, when, or whether, a criminal defendant will be adjudicated incompetent to stand trial is also unpredictable, and the "state will not necessarily be prepared to undertake civil commitment proceedings immediately after criminal charges are dismissed." Maul, 214 F.3d at 359. In those situations, therefore, brief emergency detention periods are in some sense functionally necessary. Here, in contrast, the conclusion of

a term of parole or imprisonment is generally a predictable event, and one for which, at least in the normal course of events, the CRT has at least 120 days in advance of the offender's release to prepare by conducting its investigation.

*9 Second, the procedures and deadlines involved in the 72-hour period of review here appear to be less rigorous than those at issue in Project Release and Maul. Under the regulatory scheme challenged in Project Release, upon written notice of the patient's desire to leave, the hospital director could continue that person's detention based on "reasonable grounds for belief that the patient may be in need of involuntary care and treatment." 722 F.2d at 966, citing MHL § 9.13(b). During that period, the director "must have two physicians examine the patient and report their findings and conclusions separately to the director, who must then either release the patient or apply for a court order authorizing involuntary retention." Id., citing N.Y. Comp.Codes R. & Regs. tit. 14, § 15.7 (1980). Upon application to a court, written notice is given to the patient and the patient's nearest known relative, and to a number of other parties (including Mental Health Information Service, an organization that provides information and assistance to patients and others interested in their welfare), any of whom can demand a judicial hearing to be held within three days of the court's receipt of such a demand. Id. The normal procedures for court authorization of detention of an involuntary patient then apply. Id., citing MHL §§ 9.13(b), 9.33. In Maul, the government policy authorizing detention required evaluation within 72 hours of a finding of incompetency to stand trial before initiating civil confinement proceedings. 214 F.3d at 356.

Here, in contrast, the judicial review at the 72-hour stage may be no more than a determination that the Attorney General has shown "good cause" for delaying the CRT evaluation. The statute does not provide any absolute outer limit to the time that a CRT may spend in making its determination in the wake of a filed securing petition. There are no standards in the statute for what may constitute "good cause," no requirement that this "good cause" showing be established by any sort of hearing, and no requirement that petitioner participate in such a process. Furthermore, the "good cause" finding appears to relate to the existence of an excusable failure to complete the CRT evaluations, and is not necessarily a mechanism by which the judge may review the Attorney General's

Not Reported in F.Supp.2d, 2007 WL 4115936 (S.D.N.Y.)
(Cite as: 2007 WL 4115936 (S.D.N.Y.))

determination that the individual is sufficiently dangerous so as to require a securing petition. Though the detention may be based on an executive branch determination that an individual is dangerous, that determination may be unreviewable by a court for a potentially indefinite period of time.

The securing petition thus may operate as a mechanism by which an executive branch official is empowered to order that an individual be held in custody beyond his sentence or judicial order of confinement on the mere say-so of the Attorney General. It may operate to authorize executive detention without notice to the individual being detained, without an opportunity to be heard, without advance judicial approval of the detention. There is no provision for immediate review by any court that the emergency action was justified and that the individual is in fact dangerous or may be dangerous, and no requirement that the court make an immediate decision as to whether an offender merits detention. Moreover, the detention could potentially last indefinitely, where "good cause" is shown why the CRT is unable to render a decision as to whether the individual may suffer a "mental abnormality" as defined by the statute.

**\*10** However, this is not a case in which any plaintiff is challenging his or her confinement pursuant to a securing petition. Rather, the plaintiffs here are challenging the provisions of § 10.06(f) as facially unconstitutional. Such plaintiffs bear a heavy burden. Facial invalidation of a statute is an extraordinary remedy and generally disfavored. *National Endowment for the Arts v. Finley,* 524 U.S. 569, 580 (1998) (Facial challenges to statutes are "generally disfavored," as facial invalidation is "strong medicine" that "has been employed by the Court sparingly and only as a last resort."), citing *FW/PBS, Inc. v. Dallas,* 493 U.S. 215, 223 (1990), and *Broadrick v. Oklahoma,* 413 U.S. 601, 613 (1973). "A facial challenge will only succeed if there is no set of circumstances under which the challenged practices would be constitutional." *Deshawn E. by Charlotte E. v. Safir,* 156 F.3d 340, 347 (2d Cir.1998). Therefore, a court need only determine "whether there are 'any circumstances under which the [provisions] of the Act are permissible in order to uphold the Act.' " *Velazquez v. Legal Services Corp.,* 164 F.3d 757, 763 (2d Cir.1999), quoting *Able v. United States,* 88 F.3d 1280, 1290 (2d Cir.1996). At least outside the special context of the First Amendment, plaintiffs challenging the facial

constitutionality of a statute must demonstrate that the statute is invalid "in all applications." *Brooklyn Legal Servs. Corp. v. Legal Servs. Corp.,* 462 F.3d 219, 228 (2d Cir.2006).

Although the analysis above suggests that under certain circumstances the broad authorization of confinement by direction of the Attorney General may operate unconstitutionally, whether by extending detention for too long a period or by permitting detention without a genuine emergency, the present record does not demonstrate that the statute cannot be administered or interpreted in a way to avoid these problems. To obtain a preliminary injunction, plaintiffs have the burden of demonstrating a likelihood of success in proving that "each time that [the] statute is enforced, it will necessarily yield an unconstitutional result." *Nat'l Abortion Fed'n v. Gonzales,* 437 F.3d 278, 293-94 (2d Cir.2006) (Walker, C.J., concurring).

There are situations, however, in which an executive official, with cause to believe that an individual is dangerous, can constitutionally detain such an individual in advance of a court hearing. See, e.g., *County of Riverside v. McLaughlin,* 500 U.S. 44, 56 (1991) (noting that probable cause hearing must follow within 48 hours of warrantless arrest); see also *Project Release,* 722 F .2d at 966; *Maul,* 214 F.3d at 353. The constitutionality of the detention depends, among other things, on (i) the reason for the detention, including existence of good or probable cause to detain the individual in the first place, and the nature of the exigency requiring action without prior notice and hearing, (ii) the nature of the detention, including the length of the detention pending the judicial hearing, and (iii) the nature and meaningfulness of the judicial review, when it actually comes. Thus, there exist situations in which an individual who may be a sexual offender may constitutionally be detained in advance of a decision by an impartial decision maker that the individual is in fact dangerous. However, detention in advance of meaningful review by a judicial officer or other impartial factfinder is usually only appropriate for a matter of days. See, e.g., *County of Riverside,* 500 U.S. at 56; *Project Release,* 722 F.2d at 966; *Maul,* 214 F.3d at 353.

**\*11** Thus, while plaintiffs have raised serious and legitimate concerns about the potential operation of §

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 4115936 (S.D.N.Y.)
(Cite as: 2007 WL 4115936 (S.D.N.Y.))

10.06(f), they have not established that they are likely to succeed in establishing the facial invalidity of this provision. It is not possible to conclude on the basis of the present record that the statute will necessarily function in an unconstitutional manner. In the first six months of the statute's operation, the parties agree, securing petitions have been used only twice.[FN12]

> FN12. The first securing petition was filed on the date the Act became effective. (Letter of Edward J. Curtis, Esq., to the Court, dated September 21, 2007, at 2.) The second securing petition was filed on July 11, 2007, and withdrawn in two days. (Letter of Edward J. Curtis, Esq., to the Court, dated September 26, 2007, at 1 .)

In these cases, it appears that the periods of detention without judicial review were brief, and the record is unclear as to the reasons, if any, why the CRT was unable to complete its review before the offender's scheduled release.

It is conceivable that the statute may be susceptible to constitutional application. If there are situations in which a potentially dangerous offender who may qualify as a mentally abnormal sex offender requiring confinement is unexpectedly scheduled for imminent release, and the detention is limited to a brief period before a judicial hearing, the resulting emergency may justify a short period of detention pending such a hearing. At this early stage of the proceedings, it is unclear whether such situations exist. A factual record detailing the circumstances under which the relevant authorities become aware of the scheduled release of offenders, and how the CRTs operate, may reveal whether genuine emergency conditions warranting executive detention actually exist.

But plaintiffs have not established that it is likely that such conditions do not exist. And in any event, as a matter of equitable discretion, an injunction on these facts would be inappropriate. Since the statute was recently enacted, New York State courts have not yet had an opportunity to interpret these provisions. As a matter of equitable discretion, it is preferable to give the New York State courts the opportunity to determine the proper scope of a New York law before a federal court declares whether it

offends the federal Constitution. New York courts may well interpret the securing petition as a mere emergency device, only to be utilized in compelling circumstances, and may narrowly interpret the exceptions to the provision of judicial review within 72 hours. Depending upon how New York courts interpret their own statute, there may be no need to reach any federal constitutional issue.

In short, this Court declines to issue a preliminary injunction against a provision that may rarely if ever be used, or if used, may be capable of being interpreted or applied in a manner that does not offend the due process clause. Because a fuller factual record is necessary for the Court to determine whether the statute may be capable of constitutional application, both plaintiffs' motion for a preliminary injunction and defendants' motion to dismiss will be denied as they pertain to MHL § 10.06(f).

B. MHL § 10.06(k)

Once the Attorney General, based on the report of the CRT, determines that an individual may be a sex offender in need of civil management, he may file a "sex offender civil management petition" with a New York court. MHS § 10.06(a). Within 30 days of the filing of the sex offender management petition, the court must conduct a hearing without a jury to determine if there exists "probable cause to believe that the respondent is a sex offender requiring civil management." MHL § 10.06(g). If, at the conclusion of the hearing, the court finds such probable cause, the judge is required to commit the individual to a secure treatment facility, where the individual shall be detained pending the civil commitment trial. MHL § 10.06(k). Detention may last more than 60 days.[FN13]

> FN13. The statute requires a trial to begin within 60 days of the probable cause hearing. MHL § 10.07(a). However, since the statute mandates detention through the completion of the trial, MHL § 10.06(k)(iii), the statute authorizes detention beyond 60 days. In the first case that went to trial, the time of detention extended to 80 days. (Tr. 53.) In complicated trials, detention may even be longer. Both the significant period of detention authorized, as well as the purpose of the detention itself, separate this case from other

Not Reported in F.Supp.2d, 2007 WL 4115936 (S.D.N.Y.)
(Cite as: 2007 WL 4115936 (S.D.N.Y.))

statutes which authorize very short periods of detention for the purpose of determining whether or not an individual is dangerous or is in need of confinement. See *Project Release,* 722 F.2d at 966 (72 hours); *Charles W. v. Maul,* 214 F.3d at 358-59 (2d Cir.2000) (less than 72 hours).

**\*12** Plaintiffs contend that these provisions are unconstitutional because they mandate the confinement of an individual pending the commitment trial without a finding that the individual detained is in fact dangerous, or even without probable cause to believe that the individual *might* be dangerous. An evaluation of this contention requires careful attention to the details of the regulatory scheme.

It is undisputed that when a proceeding may result in an adjudication of detention, a court may detain the defendant pending adjudication of the matter based on a finding of probable cause to believe the facts justifying ultimate detention exist, plus a finding that lesser conditions of supervision during pendency of the action will not be sufficient to guarantee the safety of the community. That is the teaching of *United States v. Salerno,* 481 U.S. 739 (1987), which upholds a statute permitting pre-trial detention of defendants in criminal cases on just such a showing. There is no reason why a similar standard should not apply in civil commitment proceedings: if there is probable cause to believe the respondent is likely to be adjudicated a dangerously mentally ill person or a sex offender requiring confinement as defined in the Act, the same need to guarantee the safety of the community that warrants detention of a criminal defendant while he is still presumed innocent warrants a similar detention pending trial of potentially dangerous persons who have not yet been found to require civil commitment.

Plaintiffs do not dispute this general principle. They argue, however, that unlike the pre-trial detention regime upheld in Salerno, the statute at issue here requires the detention pending trial of *all* respondents as to whom there is probable cause that they qualify as sex offenders requiring civil management, without an individualized judicial determination that they cannot safely be at liberty pending adjudication. They contend, in effect, that this is analogous to a statute that denied bail to *all* criminal defendants pending trial, based only on a finding of

probable cause to believe they committed an offense that *might* lead to a prison sentence.

Defendants respond that the analogy fails, because a finding of dangerousness is implicit in the probable cause determination required by MHL § 10.06(k). They note that the required finding, is among other things, a finding of probable cause to believe that the respondent suffers from a mental abnormality which is defined to include only those mental abnormalities which "predispose [ ] [an individual] to the commission of conduct constituting a sex offense and that results in that person having serious difficulty in controlling such conduct." MHL § 10.03(i). Therefore, defendants contend, a degree of dangerousness sufficient to justify 60 days of detention pending a trial is embedded into the definition of mental abnormality itself.

But that is not quite so. What is relevant to the pre-trial release decision is not merely a generalized notion that a person presents some degree of potential danger-if that were so, any person that there is probable cause to believe committed a crime of violence could be detained without more-but also a finding that the person is sufficiently dangerous that less intrusive conditions than detention cannot guarantee the safety of the community pending trial.

**\*13** Article 10 itself makes clear, however, that not all persons who have a mental abnormality sufficient to meet the definition of a "sex offender requiring civil management" require actual confinement. Under the statute, "sex offender requiring civil management" is a catch-all category that includes individuals subject to the act who are *not* individuals "likely to be a danger to others and to commit sex offenses if not confined to a secure treatment facility." MHL §§ 10.03(e), (q), (r). At least some individuals who fit this broader category will *not* be subject to detention, but only to parole-or probation-like conditions of supervision while at liberty in the community, even *after* a jury finding that they have been *proven,* by clear and convincing evidence, to be sex offenders in need of civil management.

The Act is not simply a mechanism to extend the confinement of individuals currently incarcerated; it can also operate to extend parole-like conditions to persons

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 4115936 (S.D.N.Y.)
(Cite as: 2007 WL 4115936 (S.D.N.Y.))

who are currently on parole. In certain situations, New York apparently believes that strict and intensive supervision of (and medication and therapy for) a respondent, under conditions resembling parole supervision, is adequate to protect the community. Defendants do not contest that persons across a broad spectrum of treatment needs and threat levels may be classified as "sex offenders requiring civil management." That there is probable cause to believe that an individual requires some kind of civil management, and may be dangerous *if not treated,* does not necessarily mean that such a person will be dangerous *if released,* and would therefore require detention.[FN14]

> **FN14.** The presence of a mental abnormality combined with the commission of a past crime may be sufficient to institute proceedings against an individual, and surely the commission of past sexually violent crimes is relevant to a psychiatrist's or judge's determination of whether an individual is at present violent. *Hendricks,* 521 U.S. at 357 ("[P]revious instances of violent behavior are an important indicator of future violent tendencies.") (citations and internal quotation marks omitted). However, it is current dangerousness, not past crimes, which ultimately justifies civil detention in these situations. *See, e.g., id.* (the act held constitutional in *Hendricks* "unambiguously requires a finding of dangerousness either to one's self or to others as a prerequisite to involuntary confinement").

Nevertheless, the Act requires the detention, pending trial, on a mere finding of probable cause to believe that the respondent suffers from a "mental abnormality," of those for whom detention is not a necessary or intended remedy, even if such abnormality is proven at trial. Mandatory detention pending trial is triggered by a court finding of probable cause to believe that a person is a "sex offender requiring civil management," not by a finding of probable cause to believe that such a person is dangerous or requires secure confinement. Under the Act, then, a person may be detained for 60 days or more based on a determination that there is probable cause to believe that he may have committed a sexual felony and may have a mental abnormality.[FN15] Comparing a federal sex offender statute's definition of "sexually dangerous" demonstrates how Article 10's definition of "mentally abnormal" does

not incorporate a finding of dangerousness. The comparable federal sex offender statute defines a "sexually dangerous" individual to be one who "suffers from a serious mental illness, abnormality, or disorder as a result of which he would have serious difficulty in refraining from sexually violent conduct or child molestation *if released.*" 18 U.S.C. § 4247(a)(6) (italics added). Likewise, by provision of Article 10, a "dangerous sex offender requiring confinement" is a person who suffers from a mental abnormality such that "the person is likely to be a danger to others and to commit sex offenses *if not confined to a secure treatment facility."* MHL § 10.03(e) (italics added). Both incorporate a finding that the individual would likely be sexually violent *if released.* In critical contrast, Article 10's definition of mental abnormality includes those individuals whose tendencies may be controlled by remedies that fall short of confinement, such as medicine, treatment, or some other form of supervision.

> **FN15.** Article 730 defendants, a subset of the larger category of "detained sex offender," MHL § 10.03(g)(2), may have only been indicted for a crime before a court found them incompetent to stand trial. N.Y.Crim. Proc. Law ("CPL") § 730.50(1). Article 10 requires that only those 730 defendants that "did engage in the conduct constituting" the offense be subject to Article 10. However, such a determination is presumed at the probable cause stage, MHL § 10.06(j)(iii), and only needs to be proved by clear and convincing evidence at the trial stage, MHL § 10.07(d).

**\*14** The intervenor's situation illustrates the point.[FN16] He alleges that in the Article 10 proceeding against him, New York seeks only an order, in effect, of continued parole. (Intervenor Complaint ¶¶ 4, 21, 26.) Such parole-like community treatment is apparently all New York contends is required, and all the State asks the Court to impose if a jury finds that he indeed requires any treatment at all. Such treatment without detention, indeed, is all that was imposed on the intervenor before institution of proceedings under the Act.

> **FN16.** At this stage of the proceedings, the Court makes, and can make, no findings on the facts of

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 4115936 (S.D.N.Y.)
(Cite as: 2007 WL 4115936 (S.D.N.Y.))

the intervenor's case. Rather, the Court assumes the truth of the intervenor's allegations for the purposes of this discussion. The point is not whether these facts are indeed true as to the intervenor, but simply that what he contends are the facts of his case illustrate the conceded structure of the statute. Indeed, the Court has been advised that since the briefing in this case, the intervenor has been detained on a charge of parole violation.

Nevertheless, under § 10.06(k), upon a finding of probable cause to believe that the intervenor may have a mental abnormality as defined by the statute, a person in the intervenor's situation must be automatically detained pending trial. Such detention is potentially catastrophic. Not only will the intervenor lose his liberty, but he will likely lose his job and his house, and default on loans. (*Id.* ¶ 33.) He will thus, by mandatory operation of the statute, be deprived of more liberty *before* he is adjudicated in need of treatment, based on a mere showing of probable cause to believe treatment is required, than New York seeks to impose *after* he is shown by clear and convincing evidence to need treatment. This is perverse, and at oral argument the State was unable to give any rational explanation of how this furthers any legitimate government interest.[FN17] Nor can it-there is no convincing reason that an individual should be detained for a substantial period of time pending a trial to determine whether a person does or does not need outpatient treatment.

   FN17. *See* (Tr. at 54-59); (*id.* at 59, "It is a difficult thing to justify. I have explained why I believe it's there, and that's about all I can offer.").

The Supreme Court has never held that an individual can be detained for a substantial period of time based on mental incapacity alone. See, e.g., *O'Connor,* 422 U.S. at 575 ("A finding of 'mental illness' alone cannot justify a State's locking up a person against his will and keeping him indefinitely in simple custodial confinement."). Those civil commitment statutes that the Supreme Court has upheld require a specific "finding of dangerousness either to one's self or to others" that "links that finding to the existence of a 'mental abnormality' or 'personality

disorder' that makes it difficult, if not impossible, for the person to control his dangerous behavior." *Crane,* 534 U.S. at 410, citing *Hendricks,* 521 U.S. at 357-58. Due process "does not tolerate the involuntary confinement of the nondangerous individual." Project Release, 722 F.2d at 972 (citations and internal quotation marks omitted).

In practice, the automatic detention provisions operate less as a precise tool to determine who is dangerous enough to be committed pending trial, and more as a hammer to coerce individuals to enter into plea arrangements with the State, and thereby accept both designation as a sex offender and intensive ongoing treatment in order to avoid spending what may be more than 60 days in involuntary confinement. A respondent as to whom post-trial detention is not sought will have an overwhelming incentive to agree to an adjudication that he is a sex offender in need of treatment, and to accept continuation of community supervision, rather than contest the State's case, in order to avoid a potentially lengthy period of detention pending trial, even if he believes he may avoid any adverse consequence by going to trial.

**15** Detention will of course be warranted in some cases; however, it should be triggered, as the Legislature notes, "[i]n extreme cases" and only for "the most dangerous offenders." MHL § 10.01(b).[FN18] In contrast, § 10.06(k) extends automatic detention to all individuals who may receive treatment subject to Article 10, without a judicial proceeding to determine dangerousness, and with no rational basis for determining whether the particular individual would pose a danger to the community if released. New York may not automatically detain any individual who may be subject to the statute for a significant period of time without proving that there is at least probable cause to believe that he is dangerous.[FN19]

   FN18. In other portions of the brief, defendants note that the "array of protections, evaluations, judicial determinations and necessary findings which are built into the legislative scheme provide ample constitutional protections, at both the probable cause and trial stages." (D.Mot.12-13.) However, at no point previous to the mandatory detention does any person at any level make any determination that an individual is so dangerous as to necessitate detention.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 4115936 (S.D.N.Y.)
(Cite as: 2007 WL 4115936 (S.D.N.Y.))

FN19. Defendants argue that in order to mount a successful facial challenge to a statute, plaintiffs must establish that there is no set of circumstances under which the statute would be valid. (D. Opp. 29, quoting *Salerno*, 481 U.S. at 745.) However, MHL § 10.06(k) can never be constitutional, because individuals subject to these provisions, and faced with a substantial period of detention, are entitled to an individualized determination that they are in fact dangerous. The question is not whether *detention pending trial* will ever be valid-plaintiffs concede it sometimes will be-but whether *mandatory* detention pending trial, without the showing of dangerousness necessary to justify such detention, is on its face invalid.

Plaintiffs have thus demonstrated a likelihood of success on the merits with respect to the unconstitutionality of MHL § 10.06(k). Plaintiffs have also demonstrated irreparable injury. When a complaint alleges denial of a constitutional right, irreparable harm is presumed. *Mitchell v. Cuomo*, 748 F.2d 804, 806 (2d Cir.1984). Unjustified confinement to a mental institution is a "massive curtailment of liberty." *Vitek*, 445 U.S. at 491. Being coerced into accepting a designation of "mentally abnormal sex offender" is also highly stigmatic. See *Vitek*, 445 U.S. at 492; *Neal v. Shimoda*, 131 F.3d 818, 829 (9th Cir.1997) ("We can hardly conceive of a state's action bearing more 'stigmatizing consequences' than the labeling of a prison inmate as a sex offender ."). The harm to respondent either in being involuntarily committed without a finding of dangerousness or in being coerced to accept a designation of sex offender without an opportunity to contest the Attorney General's petition is both grave and irreparable.

This dispute must be resolved with urgency because respondents in the civil commitment proceedings are entitled to contest the State's case against them. However, if they know that they will be detained pending trial, where the pre-trial consequences are more severe than the post-trial consequences even were they to be adjudicated at the commitment trial to be a sex offender in need of civil management, then there is overwhelming and enormous pressure for an individual to accept the designation of sex offender and related treatment rather than face the 60 days of involuntary confinement. This statutory provision raises serious due process concerns with respect to all individuals who may be subject to its terms, not only because it does not require a finding of dangerousness before a period of substantial involuntary commitment, but also because it functions as a club to coerce waivers of very serious and important rights.

Plaintiffs have demonstrated a likelihood of proceeding on the merits as well as irreparable injury. Section 10.06(k) is inherently coercive, and plaintiffs' motion for a preliminary injunction will be granted insofar as the section requires detention pending trial absent a specific, individualized finding of probable cause to believe that a person is sufficiently dangerous to require confinement, and that lesser conditions of supervision will not suffice to protect the public during pendency of the proceedings.

C. MHL § 10.06(j)(iii)

**\*16** Plaintiffs also challenge a provision of the Act that forbids a class of individuals known as Article 730 defendants from contesting at the probable cause hearing the facts that form the basis of the criminal charges against them. Article 730 defendants are individuals who have been charged with a crime and found incompetent to stand trial pursuant to Article 730 of the New York Criminal Procedure Law, N.Y.Crim. Proc. Law ("CPL") §§ 730.10-.70. FN20 MHL § 10.03(g)(2). Although these individuals have never been found guilty of a crime, nevertheless a respondent's commission of a sex offense shall be "deemed established" and shall not be re-litigated at the probable cause hearing where it "appears that ... the respondent was indicted for such offense by a grand jury but found to be incompetent to stand trial for such offense." MHL § 10.06(j)(iii).

FN20. Article 730 authorizes criminal courts to order psychiatric investigations of criminal defendants under certain circumstances and when the court "is of the opinion that the defendant may be an incapacitated person." CPL § 730.30(1). Upon the receipt of an examination order, two qualified psychiatric examiners must examine the defendant to determine his capacity.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 4115936 (S.D.N.Y.)
(Cite as: 2007 WL 4115936 (S.D.N.Y.))

CPL § 730.20(1). If the examiners are not of the same opinion regarding the capacity of the defendant, a third psychiatric examiner must examine the defendant. CPL § 730.20(5). When the examiners are not unanimous in their opinion that the defendant is a dangerous incapacitated person, the court must conduct a hearing to make that determination. CPL § 730.30(4). Where the examiners are unanimous, the court may *sua sponte* conduct a capacity hearing, and must do so on motion by the defendant or the district attorney. CPL § 730.30(3). If the court concludes that the defendant is not incapacitated, the criminal action against him will proceed. CPL § 730.50(1). If the court is satisfied that the defendant lacks the capacity to assist in his defense, or if no party objects to the unanimous conclusion of the psychiatrists that the defendant is incapacitated, the court must issue either an order of observation or an order of commitment. CPL § 730.50(1). In the case of those charged with non-felony offenses, upon the order of observation or commitment the court must dismiss the criminal indictment with prejudice. CPL § 730.50(1). In the case of those charged with felony offenses, the criminal action may proceed against the defendant if the defendant regains capacity. CPL §§ 730.50(2)-(3). A defendant charged with a felony but found unable to stand trial cannot be detained in the aggregate for longer than two-thirds of the authorized maximum term of imprisonment for the highest class felony charged in the indictment. CPL § 730.50(3).

Plaintiffs attack these procedures, pointing out that Article 730 defendants may be detained pending an Article 10 trial without any finding that they committed the underlying offense charged, while all other persons to whom the Act applies have been found to have committed all of the elements of the offense charged. (MHLS Mot. 16 .) Plaintiffs claim that this provision violates both due process and equal protection.

Plaintiffs' due process argument is founded on the concern that an individual may be detained following the probable cause hearing pending the commitment trial based on insufficient evidence that he in fact committed a crime and

is in fact dangerous. Defendants argue that indictment by a grand jury demonstrates the existence of "legally sufficient evidence" to establish that a person committed such an offense. (D. Mot. 20, citing CPL §§ 190.65(1)(a)-(b) & 70.10(l)-(2)). Plaintiffs rightly point out that neither an indictment nor a finding of incompetence establishes guilt. However, detention pending criminal trial does not require a finding that the defendant in fact committed the crime charged, but only probable cause to believe that the individual committed an offense (and is dangerous or a flight risk). See, e.g., *Salerno,* 481 U.S. at 749, 755; *Bell v. Wolfish,* 441 U.S. 520, 534 (1979). In criminal cases, moreover, an indictment by a grand jury is sufficient to establish probable cause. CPL § 190.65(1); *U.S. v. Beyer,* 426 F.2d 773, 774 (2d Cir.1970). If an indictment is sufficient to conclusively establish probable cause that the person committed the offense at issue in the criminal proceeding, then surely it is sufficient to perform the same function in a civil commitment proceeding. Article 730 defendants, like other persons subject to the Act, will have the opportunity to contest the State's case against them at the commitment trial. So long as they are detained pending trial based on an individualized finding of dangerousness and mental abnormality (see discussion above regarding MHL § 10.06(k)), due process requires no more than a probable cause finding with respect to the underlying alleged offense.

**\*17** Plaintiffs' contention that this provision violates equal protection is also unpersuasive. Unlike others subject to the Act who have been convicted of crimes, individuals who lack capacity to assist in their own defense may not constitutionally be tried; and definitive findings about whether such a defendant in fact committed the charged crime are thus precluded. See, e.g., *Cooper v. Oklahoma,* 517 U.S. 348, 354 (1996) ("A defendant may not be put on trial unless he has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding ... [and] a rational as well as factual understanding of the proceedings against him.") (citations and internal quotation marks omitted). New York has not had the opportunity to try Article 730 defendants in advance of the Article 10 proceedings. Their inability to stand trial, however, should not prevent Article 730 defendants from being committed pursuant to an otherwise constitutional sexual offender commitment scheme. Persons who are unable to stand trial may still have committed violent sexual crimes, be mentally ill, and pose

Page 17

Not Reported in F.Supp.2d, 2007 WL 4115936 (S.D.N.Y.)
(Cite as: 2007 WL 4115936 (S.D.N.Y.))

a serious danger to the community. New York has a strong interest in detaining and treating such individuals. New York also has a strong interest in preventing the probable cause hearing, intended as an efficient screening mechanism, from turning into the first of two trials. That some persons subject to the Article 10 proceedings have been found guilty of crimes while others have not does not deny equal protection to either group.

Plaintiffs have not demonstrated a likelihood of success on the merits in their claims that MHL § 10.06(j)(iii) is facially unconstitutional, and subject to the other provisions of this opinion, plaintiffs' motion for preliminary injunction with respect to this provision is denied. Moreover, defendants' motion to dismiss the complaint will be granted as it pertains to plaintiffs' attack of MHL § 10.06(j)(iii), because as a matter of law, the probable cause established by an indictment is a sufficient showing of potential guilt to warrant pretrial detention where an individualized showing of mental abnormality and dangerousness have been made.

D. MHL § 10.07(d)

The statute predicates detention after the commitment trial on findings that an individual is (i) a sex offender who is (ii) mentally ill and (iii) dangerous. The vast majority of persons subject to the Act have been found by a jury beyond a reasonable doubt to have committed at least one crime.[FN21] For two groups, however, the Act authorizes detention following the commitment trial of individuals who have not been convicted of any crime. The first group consists of those persons who, at a criminal trial, had been found by a jury beyond a reasonable doubt to have committed the conduct constituting the offense charged, but were also found to be not guilty by virtue of some mental disease or defect. MHL § 10.03(g)(3); see also NYPL § 40.15. The second group consists of Article 730 defendants, those persons charged with sex offenses but determined by a court to have been so incapacitated as to have been unable to help prepare their own defense, and therefore unable to stand trial. MHL § 10.03(g)(2). For such defendants, the statute permits post-trial detention where the Attorney General can "prov[e] by clear and convincing evidence [at the commitment trial] that respondent did engage in the conduct constituting [the sex] offense" for which the Article 730 defendant was indicted.

MHL § 10.07(d). Therefore, of all individuals subject to the Act, only the Article 730 defendants face a designation of "sex offender," and potentially involuntary detention, without having been found beyond a reasonable doubt to have committed the acts which constitute *any* crime, sexual or otherwise.

FN21. In most cases, that crime will have been determined by a jury, beyond a reasonable doubt, to have been sexual in nature. There are certain circumstances in which that is not the case, as discussed in Part III E of this Opinion, below.

*18 Plaintiffs attack the provisions relating to the post-trial detention of these Article 730 defendants, claiming that the procedures violate due process. Defendants, relying on Addington v. Texas, 441 U.S. 418 (1979), insist that the procedures set forth in the statute are adequate, because facts necessary to support involuntary civil commitment need only be found by clear and convincing evidence. (D.Opp.21-22.)

Defendants' argument is not without force. As a general matter, plaintiffs concede that an individual may be civilly committed based on a finding, by clear and convincing evidence, that an individual is mentally ill and dangerous. (See Tr. at 35, 36-38.) Plaintiffs concede this, as they must, because the Supreme Court's opinion in Addington supports exactly that proposition, holding that an individual can be indefinitely civilly committed upon a showing by clear and convincing evidence that an individual is mentally ill and would be a danger if released. 441 U.S. at 420, 433. See also Hollis v. Smith, 571 F.2d 685, 692, 695 (2d Cir.1978). Indeed, Article 730 defendants who may be detained under Article 10 may have been committed pursuant to just such a civil commitment scheme,[FN22] and presumably the legislature could, if it chose, permit lengthier commitment for such individuals than is currently permitted by Article 730.[FN23]

FN22. See MHL § 10.03(g)(2) (Article 730 defendants must have been charged for committing a sex offense.); MHL § 10.03(p) (All sex offenses are felonies.); CPL § 730.50(1) (If the court determines that defendant is an incapacitated person it must adjudicate defendant

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 4115936 (S.D.N.Y.)
(Cite as: 2007 WL 4115936 (S.D.N.Y.))

an incapacitated person, and "[w]hen the indictment charges a felony ... it must issue an order of commitment ... for care and treatment in an appropriate institution for a period not to exceed one year from the date of such order."); CPL § 730.50(2) (upon the conclusion of a period of confinement pursuant to Article 730, when the State believes that the defendant continues to be incapacitated, it can apply for an order of retention, and if the court adjudicates the defendant an incapacitated person, it must issue an order of retention for a period not to exceed one year); CPL § 730.60(6) (If an Article 730 defendant is about to be released and the court determines that the defendant is a danger to himself or others, then "the court shall issue an order to the commissioner authorizing retention of the committed person in the status existing at the time notice was given hereunder, for a specified period, not to exceed six months.").

FN23. See CPL § 730.50(3) (The civil detention for a defendant charged with a felony but found unable to stand trial "must not exceed two-thirds of the authorized maximum term of imprisonment for the highest class felony charged in the indictment.").

But Article 10 is not a mere civil commitment statute that may apply to any citizen. Rather, it applies only to those who have committed a sexual offense (or at least, the conduct constituting such an offense). The Article 10 respondent is labeled not merely a person in need of treatment, but a "sex offender," a label premised on the conclusion that the accused committed a crime (or at least, the conduct constituting a crime). Application of the stigma associated with a finding of criminality elevates the statute beyond the ordinary civil standards of proof, and requires proof beyond a reasonable doubt, regardless of the "civil" label attached to the statute.

In re Winship, 397 U.S. 358 (1970), is instructive. In Winship, the Supreme Court held that when a juvenile is "charged with an act which would constitute a crime if committed by an adult," that act must be proved beyond a reasonable doubt. Id. at 359. New York defined juvenile delinquents as persons older than seven but younger than

16 who "do[ ] any act which, if done by an adult, would constitute a crime." Id. at 359, citing N.Y. Fam. Ct. Act § 712. The Court rejected the argument that a lesser standard of proof was required because "delinquency status is not made a crime [and therefore] the proceedings are not criminal," id. at 365, concluding that "civil labels and good intentions do not themselves obviate the need for criminal due process safeguards" and that a "proceeding where the issue is whether the child will be found to be 'delinquent' and subject to the loss of his liberty for years is comparable in seriousness to a felony prosecution." Id. at 365-66, citing In re Gault, 387 U.S. 1, 36 (1967) (internal quotation marks omitted). The Court noted that though a different label was used, the individual was still subject to the "stigma of a finding that he violated a criminal law" and the "possibility of institutional confinement on proof insufficient to convict him were he an adult." Id. at 367.

*19 Although Winship establishes that a civil label is not always dispositive of the requisite standard of proof, the Supreme Court has made clear that a legislature's declaration of the civil nature of confinement may be overcome only where there is "the clearest proof" that "the statutory scheme [is] so punitive either in purpose or effect as to negate [the State's] intention" to deem it civil. Hendricks, 521 U.S. at 361, citing United States v. Ward, 448 U.S. 242, 248-49 (1980). Here, plaintiffs have met that high burden. The situation presented here is indistinguishable from that addressed in Winship. In neither case can the State use a particular label to obviate the need for appropriate procedural protections in determining whether an individual in fact committed acts that constitute a crime, where such a determination not only triggers the possibility of long-term detention, but also labels the person an "offender." Just as with a juvenile adjudication, the statute combines the severe deprivation of liberty attendant on detention and rehabilitative treatment with a stigmatic label. The statute subjects an Article 730 defendant found to have committed a sex offense both to the "stigma of a finding that he violated a criminal law" and to the "possibility of institutional confinement on proof insufficient to convict him were he an adult" competent to stand trial. Winship, 397 U.S. at 367. The consequences of the adjudication are significant. Article 730 defendants who are confined pursuant to the Act will be confined in secure treatment facilities, segregated alongside dangerous sexual criminals found to suffer from mental abnormalities. MHL §§

10.06(k), 10.07(c). And the prerequisite for that confinement is a conclusion that they too have committed sexual offenses.

Article 10 is a civil statute, and provides civil, not criminal, remedies for individuals who are mentally ill and dangerous. Those remedies, however, are predicated on criminal conduct. The statute applies only to *criminals* or to individuals who would be criminals if they had been sane when they committed the acts which constituted the crime and had been competent to stand trial. The title of Article 10 is *"Sex Offenders* Requiring Civil Commitment or Supervision." (Emphasis added.) The statute refers to those subject to its provisions as "sex offenders" and "recidivist sex offenders." See, e.g., MHL §§ 10.01(a), (g). Individuals subject to the Act are termed "sex offender[s] requiring civil management." MHL § 10.03(q). The instrument that the Attorney General must file to instigate commitment proceedings is a "sex offender civil management petition." MHL § 10.06(a). Both the terms "offender" and "recidivist" have clear criminal implications. Black's defines an "offender" as "[a] person who has committed a crime," and a "recidivist" as "one who has been convicted of multiple criminal offenses, usually similar in nature." Black's Law Dictionary (8th ed.2004). The procedures involved as well as the terminology used impart an aspect of moral condemnation, normally reserved for criminal judgments, upon those found guilty at the Article 10 trial.[FN24]

FN24. On these matters, the current statute stands in contrast to Kansas's sexual offender civil commitment statute upheld in *Hendricks*, 521 U.S. at 352. The Kansas statute applied to "sexually violent predator [s]," defined as those persons who "ha[ve] been convicted of or charged with a sexually violent offense and who suffer[ ] from a mental abnormality or personality disorder which makes [them] likely to engage in the predatory acts of sexual violance." *Id.* citing Kan. Stat. Ann. § 59-29a02(a) (1994). Though "predator" is not a gentle term, neither is it necessarily a criminal term. Furthermore, the Kansas statute applied not only to those who had been convicted of crimes, but also to those charged with committing crimes, and therefore did not purport to restrict itself to individuals who have committed criminal offenses. In any event, the Kansas statute only authorizes detention based on proof beyond a reasonable doubt that the individual was in fact a sexually violent predator. *Hendricks*, 521 U.S. at 352-53.

***20** Under the *Mathews v. Eldridge* standard, the severity of these consequences, normally resulting only from criminal conviction, argues for the imposition of the highest burden of proof. The second Eldridge factor, the risk of erroneous adjudication, points in the same direction, as the risk is particularly high in the case of Article 730 defendants. The reason these defendants have not been put on trial for the acts that form the basis of the criminal charges against them is that they were found by a court to have been incompetent to participate in their own defense. To have put them on trial on the criminal charge would have violated due process. *Cooper*, 517 U.S. at 354 ("A defendant may not be put on trial unless he 'has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding ... [and] a rational as well as factual understanding of the proceedings against him.' "), quoting *Dusky v. United States*, 362 U.S. 402, 402 (1960). Even at a criminal trial, with a standard of proof beyond a reasonable doubt and all the other attendant protections of the criminal process, the risk of an erroneous conviction is too great when the defendant lacks the ability to assist his attorney in defending the case.

Every other category of "offender" to whom the law applies has been found guilty of conduct constituting a crime beyond a reasonable doubt, at a criminal trial at which the defendant was fully able to participate in his defense. To *reduce* the burden of proving guilt for Article 730 defendants perversely heightens the risk of erroneous conviction. The unique circumstances of these defendants, who were adjudicated to have been unable to participate in their own defense, suggest a need for stronger, not reduced, procedural protections against erroneous conviction.

The standard of proof "represents an attempt to instruct the fact-finder concerning the degree of confidence our society thinks he should have in the correctness of factual conclusions for a particular type of adjudication." *Winship*, 397 U.S. at 370. A weakened standard of proof

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

represents, by definition, the tolerance of a greater likelihood of error. When combined with the inherently greater risk of error implicated in trying a defendant who is unable to defend himself due to incompetence, the risk of erroneous adjudication of guilt becomes too great to permit the imposition of the stigma of the "sex offender" label and the attendant long-term deprivation of liberty.

The third Eldridge factor, the importance of the governmental interest at stake, does not suggest a more lenient standard of proof. Without question, the government interest involved here is of the highest order, involving the protection of the public safety against serious imposition. It is precisely that interest that permits the State, in effect, to put the incompetent on trial at all: given the importance of protecting potential victims against repeat sexual offenders, the difficulties that prevent a criminal trial of the incompetent cannot preclude the State from taking preventive steps to provide necessary treatment.[FN25] But the requirement of proof beyond a reasonable doubt that the respondent *is* an offender is not an obstacle to the statutory scheme. Indeed, a finding of criminal conduct beyond a reasonable doubt is prerequisite to "civil management" proceedings for every category of person subject to the scheme *other than* Article 730 defendants. There is no plausible reason to suggest that the governmental interest supporting Article 10 commitments would be undermined if the same requirement is imposed with respect to the category of defendants least able to defend themselves.

FN25. Plaintiffs do not argue, and the Court does not hold, that individuals who were found either incompetent to stand trial or not guilty by virtue of insanity may not be detained pursuant to the Act because they have not been convicted of a crime. The statute is drafted to deal with individuals who are mentally ill, and it would be strange to prevent a state from dealing with mentally ill and dangerous individuals who have been adjudicated to have committed violent sexual acts via the civil remedies that this Act imposes. Even though *Winship* required certain procedural protections in the context of juvenile adjudications, it did not completely transform all aspects of the juvenile delinquency system into a criminal system. *See, e.g.,* *Winship,* 397 U.S. at 359 n. 1 (The opinion does not "rest[ ] ... on the assumption that all juvenile proceedings are criminal prosecutions, hence subject to constitutional limitations ... [W]e are not here concerned with ... the pre-judicial stages of the juvenile process, nor do we direct our attention to post-adjudicative or dispositional process.") (citations and internal quotation marks omitted). So too here, requiring that New York must prove beyond a reasonable doubt that the Article 730 defendant committed the acts that constitute a crime that may have been sexual does not transform all aspects of Article 10, at least with respect to Article 730 defendants, into criminal proceedings.

***21** Due process therefore requires that when an individual is subject to the stigma of being labeled a "sexual offender" and of a finding that he violated a criminal law triggering the possibility of institutional confinement, proof that he in fact committed the acts that form the basis for being labeled an "offender" must be made beyond a reasonable doubt.[FN26] Plaintiffs have demonstrated a likelihood of success in prevailing on their claim that the "clear and convincing" burden of proof does not afford the protections that due process requires in determining that Article 730 defendants are in fact "offenders" subject to the Act. Therefore, plaintiff's motion for a preliminary injunction will be granted with respect to this portion of the statute.

FN26. Plaintiffs do not argue that due process requires any other procedures to ensure that Article 730 defendants are dealt with fairly, and the Court expresses no view on any such issue.

E. MHL § 10.07(c)

The same constitutional difficulty that undermines § 10.07(d) affects § 10.07(c), albeit in a different way that presents a closer issue.

Eligibility for extended supervision under Article 10 is premised on the fact that an individual is not only an offender, but specifically a *sexual* offender. A sexual offender may be one who has committed either a crime

Not Reported in F.Supp.2d, 2007 WL 4115936 (S.D.N.Y.)
(Cite as: 2007 WL 4115936 (S.D.N.Y.))

that by definition includes a sexual element (for example, rape or sexual abuse) or a crime not necessarily sexual by definition (for example, kidnapping) in a sexual manner or with a sexual motive.[FN27] The Act thus recognizes that crimes that are not sexual in their essential nature may still constitute sexual offenses. New York's criminal code did not previously recognize such a category of "as-applied" sexual crimes, and the Act amends the code to create a new crime: the commission of any one of a set of serious felonies "for the purpose, in whole or substantial part, of his or her own direct sexual gratification." NYPL § 130.91. That crime will be, by definition, a sexual offense. For those individuals subject to Article 10 by reason of a crime committed after the enactment of Article 10, that crime must be one of a defined set of sexual crimes, including a "sexually motivated felony" as defined by NYPL § 130.91. MHL § 10.03(p); NYPL §§ 130.00-130.91. In such cases, the "sexual motivation" will be an element of a crime that will have been charged, submitted to the jury, and proved beyond a reasonable doubt in the underlying criminal case, before an offender will be subject to the extended supervision provisions of the Act.

FN27. The provisions of Article 10 apply to individuals who have committed certain specialized crimes that are inherently sex-based offenses, such as rape and sexual abuse. MHL § 10.03(p); NYPL §§ 130.00-130.90. The provisions also apply to individuals who have committed certain "designated felon[ies]," MHL § 10.03(f), crimes not necessarily sexual in nature, in a way that demonstrates a "sexual [ ] motivat[ion]." MHL § 10.03(g)(4); NYPL § 130.91.

However, for those individuals sought to be detained based on a crime committed before the enactment of Article 10, that crime need not have been proven before a criminal jury to have been inherently sexual or committed with a sexual motivation. The Act authorizes the detention of such individuals if they have committed any one of a set of serious "designated felonies" with a "sexual motivation." For most of these individuals, it would have been impossible for the sexual motivation determination to have been made at the underlying trial.[FN28] Therefore, for those who have committed the crime that forms the basis of their potential detention before the enactment of

Article 10, the statute allows the "sexual motivation" determination to be made not at an underlying criminal trial, but at the civil commitment trial, at which the determination is to be made on the basis of clear and convincing evidence. MHL §§ 10.03(g)(4), 10.03(p)(4), 10.07(d).

FN28. Some persons subject to Article 10 have been charged with, and convicted of, a designated felony before Article 10 was enacted or proposed. For such offenders, it would obviously have been impossible to have put the "sexual motivation" issue to the jury at the underlying criminal trial. For an offender who committed his allegedly sexual crime before the enactment of the Act, but who has been or will be charged with (and convicted of) his crime after the enactment of the Act, New York could perhaps put the issue of "sexual motivation" before the jury in the underlying criminal trial, so as to determine his eligibility for the detention provisions of Article 10. However, unlike those who committed their crimes after the Act's enactment, those who committed their crimes before its enactment cannot be found guilty of, and punished for, a crime that did not exist at the time that they committed the allegedly criminal acts. U.S. Const. art. 1, § 9. cl. 3. Moreover, such a procedure could be at best unwieldy and at worst prejudicial to defendants. In any event, New York apparently has not attempted to provide a procedure for putting the issue before the underlying criminal jury in such cases.

**\*22** Plaintiffs contend the "sexual motivation" determination is in fact an element of a crime, and that due process therefore requires that it be proved beyond a reasonable doubt. Defendants insist that due process requires only a "clear and convincing" standard of proof for civil commitment proceedings, relying on Addington for support. 441 U.S. at 432 (concluding that "the reasonable-doubt standard is inappropriate in civil commitment proceedings because, given the uncertainties of psychiatric diagnosis, it may impose a burden the state cannot meet and thereby erect an unreasonable barrier to needed medical treatment").

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 4115936 (S.D.N.Y.)
(Cite as: 2007 WL 4115936 (S.D.N.Y.))

Plaintiffs argue, however, that a retroactive determination that a pre-existing crime was committed with a sexual motive is essentially a criminal finding that necessitates a heightened standard of proof. They point out that in Addington, the Supreme Court rested its acceptance of the lesser standard of proof on the inherent uncertainties in the diagnostic and predictive findings of "mental illness" and "future dangerousness," which are not the sort of historical facts for which the standard of proof beyond a reasonable doubt was designed. The nature of a psychiatric diagnosis at issue in Addington raised a "serious question as to whether a state could ever prove beyond a reasonable doubt that an individual is both mentally ill and likely to be dangerous" because the "subtleties and nuances of psychiatric diagnosis render certainties virtually beyond reach in most situations." 441 U.S. at 429-30 (citations omitted). See also, Hollis v. Smith 571 F.2d 685, 692, 695 (2d Cir.1978) (making determinations about a person's character and prospects for future conduct "beyond a reasonable doubt would either prevent the application of [commitment statutes predicated on such findings] except in the most extreme cases or invite hypocrisy on the part of judges or juries"); Id. (The "ultimate issue" is "not as in a criminal case whether an alleged act was committed or event occurred, but the much more subjective issue of the individual's mental and emotional character. Such a subjective judgment cannot ordinarily attain the same 'state of certitude' demanded in criminal cases."); United States v. Comstock, No. 5:06-HC-2195BR, --- F.Supp.2d ----, ----, 2007 WL 2588815 at *26 (E.D.N.C. Sep. 7, 2007).

In contrast, a determination of "sexual motivation," as Article 10 itself makes clear, is capable of being made by a jury beyond a reasonable doubt. "The state of a man's mind," as Lord Justice Bowen famously remarked, "is as much a fact as the state of his digestion." United States Postal Serv. Bd. of Governors v. Aikens, 460 U.S. 711, 716-17 (1983), quoting Edgington v. Fitzmaurice, 29 Ch. Div. 459, 483 (1885). See also Arave v. Creech, 507 U.S. 463, 473 (1993) ("The law has long recognized that a defendant's state of mind is not a 'subjective' matter, but a fact to be inferred from the surrounding circumstances.") (citations omitted). Unlike the findings at issue in Addington that an individual is both mentally ill and dangerous, a determination that an individual committed a crime with a sexual motivation is a factual determination, normally based on inferences from the facts and circumstances, that can be made beyond a reasonable

doubt, as similar findings of purpose and intent are made every day in criminal trials.

*23 Of course, the Supreme Court in Addington articulated other reasons besides the difficulty of making findings regarding mental illness and dangerousness beyond a reasonable doubt for holding the clear and convincing burden of proof standard acceptable for civil commitment proceedings. The most fundamental reason for the clear and convincing standard is that, unlike criminal commitment, "[i]n a civil commitment state power is not exercised in a punitive sense." Addington 441 U.S. at 428. Furthermore, the standard of proof beyond a reasonable doubt "historically has been reserved for criminal cases," and the calculation of interests relevant to civil commitment is different such that it "cannot be said ... that it is much better for a mentally ill person to 'go free' than for a mentally normal person to be committed." Id. at 428-29. Although Article 10, like the traditional civil commitment regime discussed in Addington, is intended to be therapeutic, protective, and regulatory rather than punitive, the sexual offender provisions of the Act differ crucially from other civil commitment regimes, in that they are reserved for persons who have already been brought into the criminal justice system, and either found guilty of sexual crimes, or determined in the commitment trial to have engaged in conduct constituting such crimes. A determination that one may need treatment is fundamentally different from a determination that one committed a crime, or that one is a sexual offender.

Applying the Mathews v. Eldridge standard to these offenders presents issues broadly similar to those discussed above in relation to Article 730 defendants, but with significant differences. First, with respect to the importance of the individual interests involved, the ultimate stakes remain of the highest level, since the respondent's personal liberty is at risk in these proceedings. As noted above, however, in the discussion regarding MHL § 10.07(d), the Constitution permits deprivation of liberty in the form of civil commitment on a showing of mental illness and dangerousness by clear and convincing evidence, without any finding of criminality at all. Such findings are to be made in the course of the detention hearing contemplated by Article 10 in any event. What is at stake in the determination of whether a respondent committed a crime with a sexual motivation is not whether such an offender can be

Not Reported in F.Supp.2d, 2007 WL 4115936 (S.D.N.Y.)
(Cite as: 2007 WL 4115936 (S.D.N.Y.))

detained, but whether the respondent can be detained pursuant to this sexual offender regime.

This, of course, is no small matter, not only because it is intertwined with the ultimate detention decision, but also because there is, as noted above, a significant stigma associated with the declaration that a person is a "sex offender." In this regard, however, individuals covered by MHL § 10.07(c) differ importantly from the Article 730 defendants covered by MHL § 10.07(d). The persons covered by § 10.07(c) have already been found, beyond a reasonable doubt, to have committed a serious felony, while the incompetent defendants covered by § 10.07(d), although accused of crimes, have never been tried or found guilty, and continue to be presumed innocent of any crime. To designate the latter "sex offenders" requires that persons who have never been convicted of a crime nevertheless be declared functionally guilty of serious felonies-which in turn will subject them to a scheme of extended detention or other supervision not imposed on any other person who has not been found beyond a reasonable doubt to have committed the conduct constituting such a felony. The defendants covered by MHL § 10.07(c), in contrast, have already been formally condemned as felons based on proof beyond a reasonable doubt. The further determination that their crimes had a sexual motivation is surely a serious matter that must be weighed carefully in the Eldridge balance. But the interest in question is not quite as strong as the interest of Article 730 defendants in avoiding a declaration of criminal guilt.

*24 The risk that an offender will erroneously be found a sexual offender if the clear and convincing standard is applied is also less great for this group of respondents. Unquestionably, the lessening of the burden of proof from "beyond a reasonable doubt" to "clear and convincing evidence" makes it easier for the finding to be made, and thus increases the chance of an erroneous finding of guilt (while, of course, reducing the risk that a respondent will erroneously be found *not* to have acted from a sexual motive). But because defendants covered by MHL § 10.07(c) are competent to assist in their defense, they are far better able to make use of the assistance of counsel and the other procedural rights accruing to respondents at trial, to defend against erroneous accusations, and to raise doubts in the mind of jurors about the accuracy of the State's charges.

Moreover, the narrowness of the issue presented reduces the chance of erroneous condemnation. Since the Article 730 defendants have never been found guilty of any crime, all of the elements of the underlying offense would be in play at an Article 10 trial. The respondent would thus have the full panoply of criminal defenses, including mistaken identity, alibi, and challenges to the witnesses' or victim's version of events available. Because of the respondent's incompetence, a lawyer representing the respondent would have little or no understanding of her client's version of the events, and thus would be enormously hampered in investigating the facts, selecting a defense, and challenging what may be a fundamentally mistaken understanding of the case. In the case of a defendant who has been found guilty of a non-sexual serious felony, however, there is no chance of error about the perpetrator's identity, or about whether the basic underlying crime was in fact committed: those facts have already been found by a jury beyond a reasonable doubt. In many cases, the sexual aspect of the case may be apparent, or, conversely, clearly absent. As compared with the cases covered by § 10.07(d), there will thus be fewer § 10.07(c) cases in which the burden of proof will likely make a difference, and in those, the respondent will be able to mount a defense. The extent to which the reduction of the burden of proof increases the risk of error is thus less in the case of § 10.07(c) than in the case of § 10.07(d).[FN29]

FN29. Plaintiffs argue that evidence that an individual has, at the present time, a sexual abnormality, another element at issue in the Article 10 trial, is "all but guaranteed" to taint the determination as to whether that individual has, in the past, committed crimes with a sexual motivation. (MHLS Mot. 9-10.) The argument has a certain air of unreality about it: it is far more likely that the evidence that the crime of conviction had a sexual aspect is what triggered the inquiry into the defendant's mental abnormality in the first place. In any event, as in all trials, the jurors will be properly instructed about the different issues they will be required to decide, the relevance or irrelevance of different pieces of evidence to each of those issues, and the need to follow any necessary limiting instructions, and it will be presumed that the jurors will follow those instructions.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 4115936 (S.D.N.Y.)
(Cite as: 2007 WL 4115936 (S.D.N.Y.))

Finally, as is the case with the Article 730 defendants, while the interest of the State in the Article 10 scheme as a whole is extremely strong, the State's interest in the reduced burden of proof is more attenuated. For all sexual offenders who engage in criminal activity after the effective date of the Act, the sexual nature of their offense will have to be proven beyond a reasonable doubt, because such offenders will not be eligible for extended detention or treatment under Article 10 unless they are convicted beyond a reasonable doubt either of an offense that is sexual in its nature, or of the new crime created by the Act and codified at NYPL § 130.91. This makes it difficult for defendants to argue either that the retroactive finding of sexual motivation is not a finding of the element of a criminal offense, or that requiring such a finding to be make beyond a reasonable doubt will cripple, or even hamper, accomplishment of the State's salutary purposes in enacting Article 10.

**\*25** Defendants argue that the State could constitutionally justify civil detention based on a finding by clear and convincing evidence, at the underlying criminal trial, that the individual committed the crime with a sexual motivation, and that the Legislature did not provide for such a lesser standard at the underlying criminal trial simply in order to avoid confusing the jury with multiple standards of proof.[FN30] That argument is unpersuasive.

> **FN30.** Counsel for defendants contended at oral argument that the State required a heightened standard of proof for the "sexual motivation element" at the underlying criminal trial not as a constitutional necessity, but as a matter of legislative "genero[sity]." (*See* Tr. 40 ("I think what the legislature wanted to do was avoid confusing the juries or other triers of fact about what standard of proof they are supposed to employ. I mean, it was generous to those individuals who were charged after, but it makes sense in light of that.").)

First, the commission of the new crime-"sexually motivated felony"-also triggers a sentencing scheme, NYPL § 70.80, requiring certain mandatory minimum sentences that differ from the mandatory minimum sentences applicable to the commission of the underlying felonies without a sexual motivation. [FN31] It is thus not clear that New York could constitutionally reduce the burden of proving this element at the underlying criminal trial.[FN32]

> **FN31.** Pursuant to NYPL § 70.80(4)(a), a person who has committed a felony sex offence as criminalized by NYPL § 130.91 is subject to certain mandatory minimums to which they would not otherwise be subject. *See* NYPL §§ 70.80, 130.92(3). Whereas the standard mandatory minimum for those who have committed a class B through class E felony is one year, NYPL §§ 70.00(2), 70.00(3), for those who committed a class B felony with a sexual motivation, the minimum term of imprisonment is five years, NYPL § 70.80(4)(a)(i), for those who committed a class C felony with a sexual motivation, the minimum term of imprisonment is three and a half years and the maximum term of imprisonment is 15 years, NYPL § 70.80(4)(a)(ii), for those who committed a class D felony with a sexual motivation, the minimum term of imprisonment is two years, NYPL § 70.80(4)(a) (iii), and for those who committed a class E felony with a sexual motivation, the minimum term of imprisonment is one and a half years, NYPL § 70.80(4)(a)(iv). Even higher mandatory minimums apply if the individual who committed the sexually motivated felony is a "predicate felony sex offender" as defined by NYPL § 70.80(c). *See* NYPL §§ 70.80(4), (5).

> **FN32.** A heightened mandatory minimum sentence with no corresponding increase in the maximum sentence may not offend the Supreme Court's recent jurisprudence holding that subjecting a defendant to enhanced sentencing based on an additional offense element requires a jury finding of that element beyond a reasonable doubt. *See Harris v. United States,* 536 U.S. 545, 557 (2002) (finding that facts affecting mandatory minimums need not be proved beyond a reasonable doubt); *McMillan v. Pennsylvania,* 477 U.S. 79, 91 (1986) (same); *cf. Apprendi v. New Jersey,* 530 U.S. 466 (2000); *Blakely v. Washington,* 542 U.S. 296 (2004); *United States v. Booker,* 543 U.S. 220 (2005). It is not clear, however, that a majority of the

Not Reported in F.Supp.2d, 2007 WL 4115936 (S.D.N.Y.)
(Cite as: 2007 WL 4115936 (S.D.N.Y.))

Supreme Court continues to accept the validity of *Harris* and *McMillan. See, e.g., Harris,* 536 U.S. at 569 (Breyer, J., concurring in part and concurring in the judgment) ("I cannot easily distinguish *Apprendi* ... from this case in terms of logic."); *id.* at 572 (Thomas, J., joined by Stevens, Souter, and Ginsburg, JJ., dissenting) (*"McMillan* ... conflicts with the Court's later decision in *Apprendi."* ). However, NYPL § 130.91 is nonetheless a different crime from the commission of the underlying felony without a sexual motivation, and a crime for which the consequences are potentially more severe for a portion of those convicted.

Second, the prospective statutory scheme makes even clearer that the function of the "sexual motivation" element is not to decide who is in need of extended treatment, but to define a category of *convicted criminals* who are then eligible for *assessment* for such treatment. The function of the finding of sexual motivation is to define the kind of crime that the offender committed, not to determine whether he requires treatment. The clear and convincing standard of proof applies under Addington to factual assessments relating to the latter question, not the former. Thus, contrary to the State's argument, when the criminal jury under Article 10's prospective scheme is assessing the offender's motivation, it is not making an assessment of his need for extended treatment beyond expiration of his criminal sentence. That is a decision that will be made at a later date and by another jury-possibly many years later-based on a finding of mental abnormality and dangerousness as of that time. The Article 10 jury's finding about the nature of the offense is a retrospective, historical finding about the nature of the offender's conduct that triggers such an assessment, not an aspect of the assessment itself.

Finally, even accepting arguendo defendants' premise that the State could have provided prospectively for a trial finding of sexual motivation by clear and convincing evidence (for example, by foregoing any sentencing consequences other than eligibility for civil commitment under Article 10), the fact is that it did not. The issue in this case is not the constitutionality of hypothetical statutes that the Legislature might have passed affecting future sexual offenders. Rather, the inquiry under *Mathews v. Eldridge* is whether the procedural protections provided

by the actual legislation with respect to past offenders are adequate, given a balancing of factors including the strength of the governmental interest in the existing scheme. Thus, regardless of the reasons why New York elected to require proof beyond a reasonable doubt of sexual motivation on a prospective basis, the fact that it did-and that it says it did so in order to simplify trial procedure by avoiding multiple standards of proof-undermines any claim that requiring proof beyond a reasonable doubt will interfere with the accomplishment of the statute's purposes.[FN33]

> FN33. Alternatively, counsel argues that the reduced standard of proof was necessary because the gap in time between the crime committed with the alleged sexual motivation and the commitment hearing makes proving the "sexual motivation" element "quite a burden," and thus provides adequate justification for easing the State's burden of proof. (Tr. 40.) But the burden of defending oneself against such a charge also becomes more difficult with time. Thus, to the extent that the difficulty of accurately determining the offender's motivation retrospectively is a factor in the decision, that suggests an increased risk of error (a factor arguing for stronger procedural protections) as much as it suggests greater difficulty in accomplishing the State's purposes.

*26 The balancing standard of *Mathews v. Eldridge* necessarily involves the Court in weighing factors that the Legislature presumably considered in enacting the statute. Caution is therefore appropriate in evaluating the statutory scheme, and deference to the Legislature's conclusions is appropriate to the judicial role. Moreover, precedent is sparse and conflicting. The case of juvenile delinquency adjudications addressed in Winship appears to be the only case in which the Supreme Court has mandated proof beyond a reasonable doubt in proceedings denominated civil, and Addington's holding that those found to be dangerous and mentally ill by clear and convincing evidence may be civilly committed stands as a counter-example supporting the State's conclusion. The case of persons already found guilty beyond a reasonable doubt of a serious felony is less clearly analogous to Winship, moreover, than that of the mentally incompetent Article 730 defendants, who have never been found guilty

Not Reported in F.Supp.2d, 2007 WL 4115936 (S.D.N.Y.)
(Cite as: 2007 WL 4115936 (S.D.N.Y.))

of any crime and whose ability to defend themselves is by definition seriously impaired. Thus, while the prospective statutory scheme appears to demonstrate that the State could accomplish its goals with respect to past offenders even if a higher burden of proof were imposed, the other factors in the Eldridge balance do not point as strongly in favor of enhanced procedural protection.

Arguably, the case of offenders convicted of serious but non-sexual felonies gravitates closer to Addington. A state may civilly commit an individual based on clear and convincing evidence that he or she is mentally ill and dangerous. It therefore appears somewhat anomalous to hold that a state may not civilly commit or subject to an extended treatment regime an individual who has already been convicted of a serious crime based on clear and convincing evidence that he is mentally abnormal and dangerous, along with the additional finding that his previous crime was committed with a sexual motivation. Unquestionably, in the civil proceeding contemplated by Article 10, evidence that the respondent's past criminal acts were committed with a sexual motivation would be admissible in any event to prove the existence of a mental abnormality or a present danger to others such that an individual merits detention. Rather than subject all criminal defendants to screening for possible proceedings under Article 10, New York has chosen to limit eligibility for extended detention to those whose crimes involved a sexual motivation. It is hardly clear that, in the absence of explicit guidance to the contrary, this Court should prevent a state from focusing on those types of individuals who, in the State's judgment, most likely require commitment.

With respect to these defendants, therefore, the question of constitutionality is more closely balanced than with respect to the Article 730 defendants discussed above. On the current record, plaintiffs have not demonstrated a likelihood of success on the merits, and therefore their motion for a preliminary injunction will be denied. It is also not clear, however, on the face of the complaint, that Winship or Addington forecloses relief. A fuller record with respect to the types of cases that are subject to MHL § 10.07(c) may well affect the proper understanding of the Eldridge factors. At this stage of the case, the parties are unable to address how many offenders are subject to § 10.07(c), the length of time typically separating a criminal conviction from proceedings under Article 10, or the nature of the evidence that may be available to

retrospectively assess the motivations of offenders, among other factors that may bear on the balancing of the Eldridge factors. Whether retrospective re-characterization of a crime in a civil proceeding requires the same procedural protections as are required for classifying an incompetent defendant as a criminal is an issue sufficiently complicated, with sufficiently broad ramifications, that the Court cannot simply find the statute constitutional on a motion to dismiss based solely on the pleadings. Accordingly, defendants' motion to dismiss that portion of the complaint that refers to MHL § 10.07(c) will also be denied.FN34

FN34. Plaintiffs' equal protection argument adds nothing to the analysis. Essentially, plaintiffs argue that it is irrational to distinguish the standard of proof applicable to prospective offenders from that applicable to past offenders. However, the two categories of offenders are distinct, and present distinct problems. Going forward, New York has decided that the proper way to address the problem of sexually-motivated felons is to create a new category of crime, something that the State plainly is constitutionally forbidden from doing retrospectively by the Ex Post Facto Clause of the Constitution. U.S. Const. art. 1, § 9. cl. 3. But New York does have an interest in addressing the potential present and future need for extended treatment or detention of individuals whose crimes were committed in the past. The choice to deal with future offenders primarily through the creation of a new criminal prohibition does not foreclose New York from dealing otherwise with past offenders who are presently mentally abnormal and dangerous. The question is whether the procedures adopted to deal with such past offenders are consistent with due process in their own right. Any difference between those procedures and the procedures put in place with respect to future offenders is thus a rational product of the different situations of past and future offenders, and not of any irrational bias against or greater hostility toward past as opposed to future sex offenders.

F. MHL § 10.05(e)

Not Reported in F.Supp.2d, 2007 WL 4115936 (S.D.N.Y.)
(Cite as: 2007 WL 4115936 (S.D.N.Y.))

**\*27** Article 10 provides for a right to legal counsel, with the appointment of counsel at state expense for those who cannot afford it, upon the Attorney General's initiation of a formal action against a respondent. MHL § 10.06(c). Therefore, a respondent is guaranteed state-funded counsel for all judicial hearings pursuant to the Act. Plaintiffs contend, however, that counsel is also required before the Attorney General files any formal action before a court, when an individual who is being investigated by a CRT is asked to submit to a psychiatric exam. This psychiatric exam may affect both the CRT's recommendation to the Attorney General and the Attorney General's case for confinement at the probable cause hearing and commitment trial.

Article 10 provides for three potential psychiatric examinations before the commitment trial. First, during the investigational stage, before institution of any judicial proceeding, the CRT may request that an offender submit to a psychiatric examination in connection with the CRT's investigation to determine "whether the respondent is a sex offender in need of civil management." MHL § 10.05(e). While the offender apparently may decline to participate in the interview, such a declination may be used against him. At the commitment trial, the jury "may hear evidence of the degree to which the respondent cooperated with the psychiatric examination" and, upon request and if it so finds, the court can "instruct the jury" that "respondent refused to submit to a psychiatric examination." MHL § 10.07(c). If the CRT finds that the respondent is such a sex offender, it must notify both the respondent and the Attorney General in writing. MHL § 10.05(g). This notification must include a written report from a psychiatric examiner that includes a finding as to whether the individual has a mental abnormality. Id. This determination necessarily occurs in advance of the filing of a civil management petition, and triggers the formal court process, including the probable cause hearing and the commitment hearing. MHL §§ 10.06(a); 10.06(g); 10.07(a). An individual is not entitled to counsel when asked by the CRT to submit to a psychiatric evaluation, MHL § 10.08(g), and the statute provides no notice to the respondent of the potential consequences of the examination.[FN35]

FN35. As was clarified at oral argument:

The Court: "Now, what kind of advice of rights, if any, does [a respondent asked to participate in a CRT-requested psychiatric examination] get ... When an individual gets told, we would like you to see Dr. So-and-so in connection with this process ... Then the doctor shows up. What is this person supposed to do? How is he supposed to make a decision as to do I go through [with] this, what does this mean, what are my rights? He is basically on his own to make that call?"

Counsel for Defendants: "I think he is pretty much on his own to make that call."

(Tr. 76-77.)

Second, upon receipt of the CRT report (but still before the filing of a sex offender civil management petition), the Attorney General may petition the court to order the respondent to submit to an evaluation by a psychiatric examiner. MHL § 10.06(d). If the court grants relief, the interview will be conducted by a psychiatric examiner of the Attorney General's choosing. Id. An individual is entitled to counsel upon the Attorney General's filing of such a petition. MHL § 10.06(c).

Third, after the filing of a sex offender civil management petition but prior to the commitment trial, the individual against whom the petition was filed may ask the court to order that he be evaluated by a psychiatric examiner of his own choosing. MHL § 10.06(e). If so ordered, and if the respondent cannot afford to pay a psychiatric examiner, the court "shall appoint an examiner of the respondent's choice to be paid within the limits prescribed by law." Id. Following the examination, the examiner shall report his findings in writing to the respondent or his counsel, the Attorney General, and the court. Id. If unable to afford one, a respondent is entitled to counsel upon the filing of a civil management petition, MHL § 10.06(c), and therefore will have the assistance of counsel in petitioning the court for a respondent-requested psychiatric exam.

**\*28** The Second Circuit has suggested that involuntary commitment proceedings trigger a right to counsel.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 4115936 (S.D.N.Y.)
(Cite as: 2007 WL 4115936 (S.D.N.Y.))

*Project Release,* 722 F.2d at 976. However, it has also declined to extend that guarantee to pre-hearing psychiatric interviews held pursuant to the civil commitment provisions of Article 9 of New York's Mental Hygiene Law. *Id.* ("[W]e [are not] prepared to require that legal counsel be guaranteed at pre-hearing psychiatric interviews" under Article 9.); cf. *Ughetto v. Acrish,* 518 N.Y.S.2d 398, 405 (1987) (holding that the New York legislature intended that "in the absence of any showing that counsel's presence would interfere with the psychiatric examination, counsel should be permitted to observe either directly or indirectly these [Article 9] prehearing psychiatric examinations"). In evaluating Article 9 of the Mental Hygiene Law, the Second Circuit found it constitutionally sufficient that commitment procedures specifically provided a right to counsel, at state expense, in all judicial proceedings. *Project Release,* 722 F.2d at 976. Article 10, like Article 9, provides a right to counsel, at state expense, in all judicial proceedings.

Plaintiffs contend that the interests implicated here are different from those at issue in Project Release. They note that the civil commitment as a mentally abnormal sex offender under Article 10 engenders greater stigma than a psychiatric commitment under Article 9. Furthermore, individuals are presumptively committed to a "secure treatment facility" under Article 10 in contrast to a non-secure hospital under Article 9. Also, Article 10 requires a court order for release of a detained individual, and does not permit release based solely on the clinical judgment of his treating doctors. Article 9 allows release based on the clinical judgment of the treating physicians without a court order. Plaintiffs argue that these greater intrusions on the detainees' liberty warrant greater protections against the erroneous deprivation. Plaintiffs also argue that not only is the CRT-prompted psychiatric interview functionally mandatory, but operates as a critical stage of the commitment hearing,[FN36] which, especially in view of the diminished capacity of many individuals subject to the provisions, merits the appointment of counsel. Plaintiffs do not contend that counsel should be permitted to intervene in the examination. Rather, they argue only that due process requires a passive observational role for counsel in the CRT psychiatric hearing only so as to ensure that the psychiatric report and testimony based on the interview is accurate. (Letter of Sadie Zea Ishee, Esq., to the Court, dated September 21, 2007, at 4.)

[FN36.] *See, e.g.,* MHL § 10.08(g) (relevant written reports of psychiatric examiners are admissible in any hearing or trial pursuant to Article 10); MHL § 10.07(c) (jury may hear evidence of the "degree to which the respondent cooperated with the psychiatric examination" and if the respondent "refused to submit to a psychiatric examination").

Though there are differences between the two civil commitment provisions, it is unlikely that these differences are sufficiently significant to require a different constitutional mandate. First, and as a general proposition, the Second Circuit, like courts in other jurisdictions, has been reluctant to extend the right to counsel to psychiatric examinations. See, e.g., *Project Release,* 722 F.2d at 976; *Hollis v. Smith,* 571 F.2d 685, 692 (2d Cir.1978); *United States v. Baird,* 414 F.2d 700, 711 (2d Cir.1969); see also *Tippett v. Maryland,* 436 F.2d 1153, 1158 (4th Cir.1971); *United States ex rel. Wax v. Pate,* 409 F.2d 498 (7th Cir.1969); *United States v. Albright,* 388 F.2d 719, 726-27 (4th Cir.1968); *State v. Whitlow,* 45 N.J. 3, 210 A.2d 763 (1965). Second, the specific statute at issue here provides that any one against whom a civil management petition has been filed has the option, with the assistance of appointed counsel if he cannot afford his own, to petition the Court for his own examiner, also paid for by the State, to examine the individual and potentially rebut any distortions or inaccuracies in the report or testimony of the CRT-prompted or Attorney General-petitioned psychiatric examiner. MHL § 10.06(e). Practically speaking, the most effective counter to an improperly-conducted psychiatric examination is not the presence of counsel, but a more professional examination by another psychiatrist. Based on both the statutory structure as well as the presence of cases from this Circuit suggesting otherwise, plaintiffs are unable to demonstrate a likelihood of success on the merits with respect to this constitutional claim. The chances of succeeding on this point appear slim, and therefore their motion for a preliminary injunction will be denied.

***29** It does not follow, however, that defendants' motion to dismiss must be granted. First, because plaintiffs seek relief different from that sought in *Project Release*[FN37] and because of the differences between the consequences of Article 9 and Article 10 proceedings set forth above, it

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 4115936 (S.D.N.Y.)
(Cite as: 2007 WL 4115936 (S.D.N.Y.))

cannot be said that Project Release absolutely forecloses the position advanced by plaintiffs. Second, the evaluation of plaintiffs' arguments requires a more detailed understanding of how the psychiatric examination provisions of Article 9 and Article 10 operate. Plaintiffs argue, for example, that these proceedings function as a critical stage in the proceeding, and the strength of such an argument depends on factual allegations whose accuracy cannot be assessed on a motion to dismiss .FN38 Plaintiffs are entitled to develop their record, and it will be more appropriate to adjudicate the merits of this argument on summary judgment or at trial. Therefore, both plaintiffs' motion for preliminary injunctive relief and defendants' motion to dismiss the complaint will be denied.

FN37. Plaintiffs here seek only an observational role for counsel, and not a participatory role. (Letter of Sadie Zea Ishee, Esq., to the Court, dated September 21, 2007, at 3 n. 2.) In *Project Release,* the plaintiffs contended that individuals had a statutory "right to have [someone] present as counsel at discussions between [themselves] and hospital staff." 722 F.2d at 969, citing *Project Release v. Prevost,* 551 F.Supp. 1298, 1303 n. 2 (S.D.N.Y.1982). The Second Circuit "found no error in this determination." 722 F.2d at 969. It is not clear from either the opinion of the district court or the Second Circuit the exact role that plaintiffs sought for the counsel at such discussions, though being present "as counsel" normally implies an active role. It is precisely because an active counsel may interfere in the course of a hospital discussion or psychiatric examination that courts are often reluctant to grant such a right to counsel. *See, e.g., Hollis,* 571 F.2d at 692 (" 'It is difficult to imagine anything more stultifying to a psychiatrist, as dependent as he is upon the cooperation of his patient, than the presence of a lawyer objecting to the psychiatrist's questions and advising his client not to answer this question and that.' "), quoting *Tippett,* 436 F.2d at 1158.

FN38. Plaintiff MHLS filed suit before the effective date of the Act, and "did not fully appreciate, until seeing SOMTA in operation, how critical the psychiatric exams under MHL 10.05(e) would prove" to the position of

individuals subject to the Act. (Letter of Sadie Zea Ishee, Esq., to the Court, dated September 21, 2007, at 2.) Plaintiffs claim that "[i]n practice, nearly all psychiatric exams so far conducted under Article 10 have been arranged by the case review team, rather than the attorney general, and accordingly, counsel has not been involved." (*Id.*) Upon the filing of an Article 10 petition, the psychiatric examiner who conducted the CRT evaluation "is ordinarily called as the State's primary or sole witness at the probable cause hearing" and that the State "may even enter the examiner's report without calling the examiner to testify." (*Id.*) Plaintiffs also note that in addition to the fact that the individuals being interviewed may be of impaired capacity, there exists an "emotional tension" inherent in a psychiatric interview that may determine the interviewee's eligibility for post-sentence civil commitment. They liken this to the context of criminal line-ups. (*Id.* at 3 n. 2, citing *United States v. Wade,* 388 U.S. 218, 230-31 (1967) (discussing how "emotional tension" may interfere with a suspect's ability to accurately observe and report on line-up procedures).)

**CONCLUSION**

For the reasons set forth above, plaintiffs' motion for a preliminary injunction is granted with respect to the challenged portion of MHL §§ 10.06(k) and 10.07(d), and denied in all other respects, and defendants' motion to dismiss is granted with respect to plaintiffs' challenge to MHL § 10.0(j)(iii), and denied in all other respects.

Plaintiffs are directed to submit a proposed form of order consistent with this opinion after consultation with defendants.

SO ORDERED.

S.D.N.Y.,2007.
Mental Hygiene Legal Service v. Spitzer
Not Reported in F.Supp.2d, 2007 WL 4115936 (S.D.N.Y.)

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 30

Not Reported in F.Supp.2d, 2007 WL 4115936 (S.D.N.Y.)
(Cite as: 2007 WL 4115936 (S.D.N.Y.))

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



Slip Copy, 2010 WL 2025613 (C.A.2 (N.Y.))
(Not Selected for publication in the Federal Reporter)
(Cite as: 2010 WL 2025613 (C.A.2 (N.Y.)))

**H**
Only the Westlaw citation is currently available.This case was not selected for publication in the Federal Reporter.

United States Court of Appeals,
Second Circuit.
Joel MURRAY, Plaintiff-Appellant,
v.
George E. PATAKI, Governor of New York State, Kang Yeon Lee, M.D., Daniel Senkowski, Superintendent of Clinton Correctional Facility, Dr. Melendez, R. Leduc, Corrections Officer, N. Irwin, J. Travers, J. Forth, Corrections Officer, R. Girdich, Superintendent at Franklin Correctional Facility, Glenn S. Goord, Commissioner of N.Y.S. D.O.C.S., Richard Roy, Inspector General, T. Reif, Corrections Officer, CNY Psychiatric Center, S. Jones, Defendants-Appellees.[FN*]
**No. 09-1657-pr.**

May 24, 2010.

**Background:** Pro se prisoner brought civil rights action against various government defendants. The United States District Court for the Northern District of New York, dismissed certain § 1983 claims, Lawrence E. Kahn, J., 2007 WL 956941, and granted summary judgment in favor of defendants on his remaining § 1983 and § 1985 claims, and dismissed his claim against prison employee defendant, Suddaby, J., 2009 WL 981217. Prisoner appealed.

**Holding:** The Court of Appeals held that United States Marshals' failure to effect service automatically constituted "good cause" for extension of time in which to serve prison employee defendant.
Affirmed in part, and vacated and remanded in part.

West Headnotes

Federal Civil Procedure 170A 🔑 417

170A Federal Civil Procedure
    170AIII Process
        170AIII(B) Service
            170AIII(B)1 In General
                170Ak417 k. Time for Making. Most Cited Cases
Pro se prisoner provided information sufficient to identify prison employee defendant, and therefore United States Marshals' failure to effect service automatically constituted "good cause" for an extension of time in which to serve. Fed.Rules Civ.Proc.Rule 4(m), 28 U.S.C.A.

Appeal from a judgment of the United States District Court for the Northern District of New York (Suddaby, J., Treece, M.J.).Joel Murray, pro se, Romulus, NY.

Andrew M. Cuomo, Attorney General of the State of New York; Barbara D. Underwood, Solicitor General; Benjamin N. Gutman, Deputy Solicitor General (Sudarsana Srinivasan, Assistant Solicitor General; Kate H. Nepyeu, of Counsel), New York, NY, for Defendants-Appellees.

Present BARRINGTON D. PARKER, DEBRA ANN LIVINGSTON, and DENNY CHIN, Circuit Judges.

**SUMMARY ORDER**

**\*1 UPON DUE CONSIDERATION, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED** that the judgment of the district court is **AFFIRMED IN PART** and **VACATED AND REMANDED IN PART.**

Plaintiff-Appellant Joel Murray appeals *pro se* from an order of the United States District Court for the Northern District of New York (Suddaby, *J.*), entered March 29,

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 2025613 (C.A.2 (N.Y.))
(Not Selected for publication in the Federal Reporter)
(Cite as: 2010 WL 2025613 (C.A.2 (N.Y.)))

2007, dismissing certain of his 42 U.S.C. § 1983 claims against various of the Defendants-Appellees, and from a second order, entered on April 9, 2009, granting summary judgment in favor of Defendants-Appellees on Murray's remaining claims under 42 U.S.C. §§ 1983 and 1985, and dismissing his claim against Defendant-Appellee Dr. Melendez for failure to timely effect service of process upon her pursuant to Federal Rule of Civil Procedure 4(m). We assume the parties' familiarity with the underlying facts and procedural history of the case, and with the issues presented on appeal.

We review de novo a district court's dismissal of claims pursuant to Fed.R.Civ.P. 12(b)(6), "construing the complaint liberally, accepting all factual allegations in the complaint as true, and drawing all reasonable inferences in the plaintiff's favor ." Chambers v. Time Warner, Inc., 282 F.3d 147, 152 (2d Cir.2002). A complaint must plead "enough facts to state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). A claim will have facial plausibility "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, --- U.S. ----, ----, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009). We also review a district court's grant of summary judgment de novo, and determine whether there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. See Miller v. Wolpoff & Abramson, L.L.P., 321 F.3d 292, 300 (2d Cir.2003). While we construe the evidence in the light most favorable to the non-moving party, id., "conclusory statements or mere allegations [are] not sufficient to defeat a summary judgment motion," Davis v. New York, 316 F.3d 93, 100 (2d Cir.2002).

We have undertaken a de novo review of the record and relevant cases and, except as noted below, we affirm the dismissal of Murray's claims against all defendants for substantially the same reasons set forth in Magistrate Judge Treece's thorough reports and recommendations of March 5, 2007, and March 3, 2009; these reports were adopted by the district court in their entirety.

We vacate the district court's dismissal of Murray's claim against Dr. Melendez for failure to serve process. We

review a district court's dismissal pursuant to Federal Rule of Civil Procedure 4(m) for abuse of discretion. Zapata v. City of New York, 502 F.3d 192, 195 (2d Cir.2007). A district court abuses its discretion if it bases its ruling on an erroneous view of the law or clearly erroneous findings of fact, or its decision "cannot be located within the range of permissible decisions." Lynch v. City of New York, 589 F.3d 94, 99 (2d Cir.2009) (quoting Sims v. Blot, 534 F.3d 117, 132 (2d Cir.2008)).

*2 Rule 4(m) provides that "[i]f a defendant is not served within 120 days after the complaint is filed, the court-on motion or on its own notice to the plaintiff-must dismiss the action without prejudice against that defendant or order that service be made within a specified time." Fed.R.Civ.P. 4(m). If the plaintiff shows "good cause for the failure" to serve, the district court is required to grant an "appropriate" extension of time in which to serve. Id. District courts also have discretion to enlarge the 120-day period even in the absence of good cause. See Zapata, 502 F.3d at 196. A pro se prisoner proceeding in forma pauperis, such as Murray, is "entitled to rely on service by the U.S. Marshals." Romandette v. Weetabix Co. ., 807 F.2d 309, 311 (2d Cir.1986). As long as the pro se prisoner provides the information necessary to identify the defendant, the Marshals' failure to effect service automatically constitutes "good cause" for an extension of time within the meaning of Rule 4(m). See, e.g., id.; see also Moore v. Jackson, 123 F.3d 1082, 1085-86 (8th Cir.1997); Byrd v. Stone, 94 F.3d 217, 220 (6th Cir.1996); Dumaguin v. Sec'y of Health & Human Servs., 28 F.3d 1218, 1221 (D.C.Cir.1994); Sellers v. United States, 902 F.2d 598, 602 (7th Cir.1990); Puett v. Blandford, 912 F.2d 270, 275 (9th Cir.1990). A pro se prisoner proceeding in forma pauperis is only required to provide the information necessary to identify the defendant, see, e.g., Sellers, 902 F.2d at 602, and it is "unreasonable to expect incarcerated and unrepresented prisoner-litigants to provide the current addresses of prison-guard defendants who no longer work at the prison," Richardson v. Johnson, 598 F.3d 734, 739-40 (11th Cir.2010).

Here, albeit after receiving a number of extensions of time within which to serve Melendez, Murray provided information that was sufficient to identify Dr. Melendez by full name and as an employee formerly assigned to Clinton Correctional Facility. See Doc. 103, Murray v.

Slip Copy, 2010 WL 2025613 (C.A.2 (N.Y.))
(Not Selected for publication in the Federal Reporter)
(Cite as: 2010 WL 2025613 (C.A.2 (N.Y.)))


*Pataki,* 9:03-CV-1263 (N.D.N.Y. Apr. 13, 2007) (letter from Murray to the district court styled "Notification of Defendant"). This was sufficient to satisfy Murray's burden to provide sufficient information for the Marshals to identify the defendant. Although the Marshals subsequently failed to serve Dr. Melendez at the Clinton facility on March 11, 2008, *id.* Doc. 134, they were clearly able to identify her from the information proffered by Murray, and service was unsuccessful merely because Dr. Melendez apparently no longer worked at Clinton. *See id.* As Murray had satisfied his burden, it was an abuse of discretion for the district court to require him to provide additional information regarding Dr. Melendez, and to dismiss Murray's claims against her pursuant to Rule 4(m) for failure to serve process upon her. District courts have a responsibility to assist *pro se* plaintiffs in their efforts to serve process on defendants. *See Valentin v. Dinkins,* 121 F.3d 72, 75-76 (2d Cir.1997) (recognizing district court's obligation to allow *pro se* plaintiff limited discovery to identify defendant for service of process). With the information that Murray provided, the district court here could have ordered the other defendants to contact Dr. Melendez to see if she would accept service or to provide the Marshals with Dr. Melendez's last known address.


**\*3** For the foregoing reasons, the judgment of the district court dismissing the claims against Dr. Melendez for failure to serve process is **VACATED,** and we **REMAND** to the district court for further proceedings in accordance with this decision. The judgment is **AFFIRMED** in all other respects.


FN* The Clerk of the Court is respectfully directed to amend the official caption as it appears above.


C.A.2 (N.Y.),2010.
Murray v. Pataki
Slip Copy, 2010 WL 2025613 (C.A.2 (N.Y.))


END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.